# EXHIBIT A

# EFT in the United States
## Policy Recommendations and the Public Interest

DEPOSITORY

NOV ⅃ 5 1977

UNIV. OF ILL. LIBRARY
URBANA-CHAMPAIGN

The Final Report of the
National Commission on
Electronic Fund Transfers



Digitized by Google

The Final Report of the
National Commission on
Electronic Fund Transfers

# EFT in the United States
## Policy Recommendations and the Public Interest

October 28, 1977
Washington, D.C.



Digitized by 

Digitized by Google



**Letter of Transmittal**

To the President and to the
Congress of the United States:

It is my honor to transmit the final report of
the National Commission on Electronic Fund Transfers.

The Commission, which was established by Public
Law 93-495 (Oct. 28, 1974), was directed to conduct a
thorough study and investigation of the emerging pay-
ment system alternative known as electronic funds
transfer (EFT), and to recommend appropriate adminis-
trative action and legislation to permit the orderly
development of private and public EFT systems.

Since its first meeting on Feb. 6, 1976, the
full Commission and its committees have met more than
100 times to hear testimony, review research results,
elicit the views of the public, and debate and take
positions on the major issues pertinent to the evo-
lution of EFT.  Nearly all of these meetings have
been open to the public.  The Commission has testi-
fied before the Congress on four occasions.  It has
issued many research reports and background papers.
It has also presented to you two formal documents: a
progress report, Programs, Plans, and Accomplishments
of the National Commission on Electronic Fund Trans-
fers (Oct. 29, 1976), and an interim report contain-
ing the Commission's first substantial body of find-
ings and recommendations, EFT and the Public Interest
(Feb. 23, 1977).  Both documents have been widely dis-
tributed to provide the basis for a continuing dia-
logue on EFT.

This report presents all of the conclusions and
recommendations of the Commission.  It focuses par-
ticularly on the rights and responsibilities of con-
sumers in EFT.  But it also contains recommendations
on the availability of EFT services, on the deploy-
ment and sharing of EFT systems, on the competitive
implications of EFT, on technological considerations
in EFT development, on the role of the Government as
an operator of EFT systems, on the potential impact
of EFT on monetary policy, and on other significant
matters that appear to require governmental attention,
both Federal and State.

The Commission recognizes that because EFT is in
its infancy, new issues will undoubtedly arise.  The
Commission strongly believes, however, that it has
addressed the principal questions now before the
Nation on this subject, and that it has developed a
set of recommendations that you will find worthy of
adoption and support.

Respectfully submitted,

*William B. Widnall*

William B. Widnall
Chairman

Oct. 28, 1977
Washington, D.C.

iii

Digitized by Google



## Members of the Commission

William B. Widnall
Chairman
Saddle River, New Jersey
*Public Representative*

Herb Wegner
Vice Chairman, Steering Committee
President, Credit Union National
Association, Incorporated
*Representing Credit Unions*

Kenneth C. Anderson
Chief, Special Regulated Industries Section
*Department of Justice*

Verne S. Atwater
President, Central Savings Bank, New York
*Representing Mutual Savings Banks*

Lawrence Connell, Jr.
Administrator
*National Credit Union Administration*

Daniel V. De Simone
Acting Director
*Office of Technology Assessment*

James E. Faris
Director, Department of Financial Institutions
State of Indiana
*Representing State Regulators of Banks*

Albert A. Foer
Associate Director, Bureau of Competition
*Federal Trade Commission*

Roy G. Green
President, Fidelity Federal Savings and Loan, Florida
*Representing Savings and Loan Associations*

Richard D. Hill
Chairman of the Board
First National Bank of Boston
*Representing Commercial Banks*

Freyda P. Koplow
Former Commissioner of Banks
Commonwealth of Massachusetts
Wellesley, Massachusetts
*Public Representative*

Fairfax Leary, Jr.
Professor of Law
The Delaware Law School of Widener College
*Public Representative*

Robert E. Lee
Commissioner
*Federal Communications Commission*

Digitized by 

Ralph F. Lewis
Editor and Publisher
Harvard Business Review
*Public Representative*

William B. Lewis
Deputy Commissioner
Division of Savings and Loan Associations
State of New Jersey
*Representing State Regulators of Thrift Institutions*

George W. Mitchell
Former Vice Chairman, Federal Reserve Board
Consultant to the Board of Governors
*Federal Reserve System*

Russell D. Morris
General Manager, Financial Planning
*United States Postal Service*

George S. Oram, Jr.
Director
Office of Management Systems and Administration
*Federal Home Loan Bank Board*

Almarin Phillips
Professor of Economics, Law, and Public Policy
University of Pennsylvania
Philadelphia, Pennsylvania
*Public Representative*

Lester W. Plumly
Assistant Fiscal Assistant Secretary
*Department of the Treasury*

John J. Reynolds
President and Chief Executive Officer
Interbank Card Association
*Representing Organizations Providing Interchange Services for Credit Cards Issued by Banks*

Robert P. Rogers
Director of Management Systems and Economic Analysis
*Federal Deposit Insurance Corporation*

Donald L. Scantlebury
Director
Financial and General Management Studies Division
*General Accounting Office*

Thomas W. Taylor
Associate Deputy Comptroller for Consumer Affairs and EFTS
*Comptroller of the Currency*

George W. Waters
Executive Vice President
American Express Company
New York, New York
*Representing Non-Bank Institutions Offering Credit Card Services*

Gordon R. Worley
Executive Vice President
Montgomery Ward & Co., Incorporated
Chicago, Illinois
*Representing Retailers*

v





## Commission Staff

John B. Benton
*Executive Director*

Wayne I. Boucher
*Deputy Director and
Director of Research*

James O. Howard, Jr.
*General Counsel*

Rose Marie Allen
*Administrative Officer*

Daphine Arnold
*Typist*

Mark G. Bender
*Program Manager*

Kurt Brandes
*Office Assistant*

Suzanne Charlick
*Administrative Officer,
Budget and Finance*

Marjorie M. Clayman
*Secretary to the
Executive Director*

Lisa Goodson
*Secretary*

James S. Hatch
*Senior Staff*

Kathryn H. Humes
*Program Manager*

David Johnson
*Office Assistant*

Romena Johnson
*Secretary*

Diana L. Jones
*Assistant Program
Manager*

Janet M. Lawson
*Assistant Finance Officer*

Mary Lou Liggon
*Secretary to the
Deputy Director*

Gwen Matthews
*Secretary*

Bruce Maye
*Office Assistant*

John J. McDonnell, Jr.
*Program Manager*

Janet K. Miller
*Public Information Officer
and Congressional Liaison*

Judith D. Morton
*Administrative Officer*

William P. Neufeld
*Research Analyst*

Terri T. Ochal
*Administrative Assistant*

Cynthia W. Owens
*Secretary*

Henry M. Polmer
*Deputy General Counsel
and Program Manager*

Kathryn Racette
*Publications*

Gaynell E. Richardson
*Secretary*

N. Scott Sacks
*Counsel and
Program Manager*

Beverly J. Shay
*Secretary to the
Chairman*

Garry L. Singer
*Research Analyst*

Richard E. Sprague
*Program Manager*

Shelly Turcotte
*Senior Secretary*

May Weibel
*Secretary*

John R. Youngken
*Research Analyst*

vi

Digitized by 



# Contents

PART I.    THE COMMISSION AND ITS WORK. . . . . . 1

Major Issues . . . . . . . . . . . 2
The Commission's Assignment and
  Approach . . . . . . . . . . . 3
Major Recommendations. . . . . . . . 6
Consumer Interests . . . . . . . . 6
Developmental Issues in EFT. . . . . 10
Technology . . . . . . . . . . . 14
Roles of the Federal Government. . . 15
International Developments in EFT. . 16
Concluding Observations. . . . . . . 17

PART II.    THE CONSUMER AND EFT

Chapter 1.    Privacy. . . . . . . . . . . . . 19

EFT and Privacy Concerns . . . . . . 20
Existing Legal Protections . . . . . 23
Government Access to and Use of
  Information. . . . . . . . . . 24
Private Sector Access to and Use
  of EFT Information . . . . . . . 26
Comments on Recommendations of
  the Privacy Commission . . . . . 37

Chapter 2.    Establishing and Operating
  an EFT Account. . . . . . . . . 41

Establishing an EFT Account . . . . 41
Operating an EFT Account. . . . . . 46

Chapter 3.    EFT Theft, Error, and
  System Malfunctions . . . . . . 55

Theft . . . . . . . . . . . . . 56
Error Resolution. . . . . . . . . 59
System Malfunctions . . . . . . . . 63

Chapter 4.    Additional Consumer Needs . . . . 67

Consumer Redress. . . . . . . . . 67
Protection of Earnings from
  Attachment or Garnishment . . . . 68
EFT Education . . . . . . . . . . 71
EFT and the Low-Income Customer . . 71

vii

Digitized by Google

PART III.      DEVELOPMENTAL ISSUES IN EFT

Chapter 5.     The Branch/Terminal Issue. . . . . .   75

               Types of Regulation. . . . . . . . .   78
               Regulatory Factors Directly
                 Pertinent to Deployment. . . . . .   79
               Types of EFT Services. . . . . . . .   80
               Availability of the Information
                 Services . . . . . . . . . . . .    82
               Availability of the Funds
                 Transfer Services. . . . . . . . .   83
               Deployment of Terminals. . . . . . .   87
               Other Regulatory Factors . . . . . .   88

Chapter 6.     Sharing. . . . . . . . . . . . . . .   91

               Legal Environment. . . . . . . . . .   92
               Pro-Competitive Sharing. . . . . . .   94
               Implementation . . . . . . . . . . .   97

Chapter 7.     The Impact of EFT on the
                 Competition for Deposits . . . . .  103

               Competition Among Despository
                 Institutions . . . . . . . . . . .  103
               Empirical Evidence . . . . . . . . .  108
               Conclusions and Recommendations. . .  115

Chapter 8.     The Impact of EFT on Credit. . . . .  117

               Background:  Credit. . . . . . . . .  117
               EFT and Aggregate Credit
                 Availability . . . . . . . . . . .  125
               EFT and the Distribution of
                 Consumer Credit. . . . . . . . . .  130

               Further Considerations and
                 Recommendations . . . . . . . . .   133
               Housing Credit. . . . . . . . . . .   139
               Competition . . . . . . . . . . . .   139

Chapter 9.     Cost Analysis of EFT. . . . . . . .   141

               The Cost Analysis Program . . . . .   141
               Findings and Conclusions. . . . . .   143

PART IV.       TECHNOLOGY AND EFT

Chapter 10.    Competition Among Suppliers . . . .   153

               Market Structure. . . . . . . . . .   153
               Problem Areas . . . . . . . . . . .   159
               Policy Alternatives . . . . . . . .   161

Chapter 11.    Standards for EFT . . . . . . . . .   169

               Standards-Development Process . . .   170
               Adequacy of Existing Standards. . .   174
               The Need for a Test Facility. . . .   180

Chapter 12.    Security in EFT . . . . . . . . . .   183

               Background on the EFT
                 Security Issue. . . . . . . . . .   184
               Points of Vulnerability . . . . . .   186
               Present Countermeasures
                 and Safeguards. . . . . . . . . .   188
               Recommendations . . . . . . . . . .   192

Digitized by Google

PART V.      ROLES OF THE FEDERAL GOVERNMENT
             IN EFT

Chapter 13.  EFT and Monetary Policy. . . . . . . 197

             EFT and the Payments System. . . . . 197
             Monetary Management. . . . . . . . . 198
             EFT and Monetary Policy. . . . . . . 199
             Recommendations. . . . . . . . . . . 202

Chapter 14.  Government Operations of ACHs
             and POS Switches . . . . . . . . . . 205

             Automated Clearing Houses. . . . . . 205
             Switches for Point-of-Sale
                Payments . . . . . . . . . . . . . 210
             Recommendations Concerning
                Government Operation of ACHs . . . 213
             Recommendations Concerning
                Government Operation of
                POS Switches . . . . . . . . . . . 216

PART VI.     INTERNATIONAL DEVELOPMENTS IN EFT

Chapter 15.  EFT In Other Industrial Nations:
                Observations and Implications. . . 221

             International Symposium. . . . . . . 221
             Automated Clearing House
                Developments . . . . . . . . . . . 225
             Giro Payment Systems . . . . . . . . 229
             Cash Dispensers and Automated
                Teller Machines. . . . . . . . . . 234

PART VII.    SEPARATE STATEMENTS . . . . . . . . 237

             Commissioner V. S. Atwater. . . . . 238
             Commissioner J. E. Faris
                and Others. . . . . . . . . . . . . 242
             Commissioner A. A. Foer . . . . . . 256
             Commissioner F. Leary, Jr. . . . . 267
             Commissioner W. B. Lewis
                and Others. . . . . . . . . . . . . 278
             Commissioner G. W. Mitchell
                and Others. . . . . . . . . . . . . 280
             Commissioner D. L. Scantlebury. . . 287
             Commissioner G. R. Worley . . . . . 292
             Chairman W. B. Widnall and
                Vice Chairman H. Wegner . . . . . 305

PART VIII.   APPENDICES

Appendix A.  Act Establishing the NCEFT. . . . . 313
Appendix B.  Votes on Certain Issues . . . . . . 317
Appendix C.  The Payment System in the
                United States . . . . . . . . . . 333
Appendix D.  The Public Interchange Program. . . 347
Appendix E.  Meetings of the Commission
                and Its Committees. . . . . . . . 351
Appendix F.  Witnesses at NCEFT Hearings
                and Participants in NCEFT
                Workshops and Seminars. . . . . . 359
Appendix G.  Other Outside Support for
                the Commission. . . . . . . . . . 377
Appendix H.  Commission Expenditures by
                Programs and Functions. . . . . . 379
Appendix I.  NCEFT Publications. . . . . . . . . 383


Digitized by Google

# The Commission and Its Work



Digitized by 



The American public today is being given a significant new choice in the way it carries out its payment transactions and handles its financial affairs. This choice, one of many that mark the transition to the post-industrial society, involves a set of innovations in the delivery of financial services that is called electronic funds transfer (EFT). A product of the data processing and telecommunications age, EFT systems and services represent an alternative that will operate side-by-side with the traditional cash and check payment systems.

It is widely believed that EFT offers many opportunities to provide payment services more conveniently and efficiently. For example, using this new technology, the consumer can authorize his or her depository institution automatically to pay a recurring obligation, such as a utility bill, an insurance premium, or a mortgage payment. This relieves the consumer of the inconvenience and cost of paying bills by check, and it reduces the costs to the recipient company and the depository institution of processing the transaction.

The technology of EFT also allows the consumer to have his paycheck deposited by his employer directly into his account. This service, facilitated by a network of automated clearing houses, (ACHs), eliminates unnecessary delays, means fewer problems with lost or stolen checks, and ends worries about how the check will be deposited in the consumer's absence, if, for example, he is on vacation.

EFT systems also can serve the consumer in retail locations, such as department stores, supermarkets, or drug stores, wherever he may travel in the Nation. Through the use of terminals offering EFT information services, a check can be authorized or guaranteed more quickly and reliably, making this conventional form of payment more acceptable. Instantaneous transfers of funds between the consumer and the merchant may also be provided as a payment option in the future.

The emergence of EFT systems providing such capabilities is illustrated by the large number of EFT-related terminals, such as automated teller machines and cash dispensers, that are already in operation throughout the country in places such as airports and shopping centers. These systems pro-


Digitized by Google

vide a convenient way to obtain cash and perform other financial transactions--and are frequently available to the consumer 24 hours a day.

Credit services, too, may be enhanced through the use of EFT. By providing access to better information about the credit-worthiness of buyers, there may be a substantial improvement in the control and cost-effectiveness of consumer credit, particularly at the point of sale.

As these illustrations suggest, EFT combines computer technology and electronic communications systems to provide a variety of basic financial services. Some of these services involve the actual transfer of funds from account to account, while others are purely informational. All are well known and routine in today's paper-based payment system. In general, however, it appears that EFT can make these conventional consumer financial transactions simpler, more convenient, and potentially less costly. EFT could also increase the security of these transactions by reducing the risk of theft of currency or checks and the unauthorized use of checks. Moreover, EFT may be able to serve low-income households that today do not have an account relationship with a depository institution.

## MAJOR ISSUES

In these and other ways, EFT may eventually benefit all participants in the Nation's payment system. But, as with all new developments having such sweeping implications, EFT raises a wide range of questions of public policy.

Many of these center on the consumer. For example, how can the protection of personal privacy be guaranteed? What should be the rights and liabilities of consumers under this new system? How adequate are current safeguards in Federal and State statutes and regulations? How can the consumer be assured that he does not lose control of his financial transactions? What steps should be taken to ensure that the consumer will continue to be able to choose among methods of payment? Who should be responsible for helping the consumer to understand the possible advantages and disadvantages of EFT?

The business community, particularly the financial sector, is also challenged by EFT. To what extent, if any, can or should EFT be permitted to affect the Nation's dual chartering system for banking? Will EFT change the competitive relationships among different types of financial institutions? What are the consequences for small institutions? What rules should govern the availability of EFT services or the deployment of terminal devices for providing these services? Should all institutions have equal access to EFT systems? Should such access be mandated? What control should retailers have over the EFT services offered at the point of sale? How will EFT affect proprietary credit programs? Should the terminals deployed by retailers and other non-depository institutions be regulated?

EFT also raises technological issues. For example, will the entry of the dominant suppliers of communications services into the EFT services business reduce competition in this developing field? Will it be necessary for regulators to develop technical standards and procedures for EFT systems security?



EFT-related issues extend beyond the consumer and business sectors of society. For example, the Commission examined the roles that the Federal Government should play in the development of EFT. It considered Government not only as a user of EFT, but also as a provider of EFT services. Specifically, it evaluated appropriate Government involvement in the operation of two major subsystems of EFT--automated clearing houses (ACHs) and point-of-sale (POS) switching facilities. It also looked at ways in which EFT might affect the conduct of monetary policy. And the Commission explored the extent to which it might be possible to derive useful lessons and guidance from the experience of foreign nations with EFT.

## THE COMMISSION'S ASSIGNMENT AND APPROACH

To assess what consequences these issues might have for American society, Congress created the National Commission on Electronic Fund Transfers in 1974.[1] Specifically, establishment of the Commission grew out of a concern, expressed in the Senate Report on the legislation creating the Commission, that EFT poses a number of significant policy questions which will eventually have to be resolved by Congress, and that "without sufficient study . . . electronic funds transfers development could result in distortions to competition and the invasion of individual citizens' right to privacy and confidentiality."[2]

Congress instructed the Commission to complete a comprehensive review of this subject and to provide explicit recommendations, so that the

Government might develop a national policy for the orderly development of EFT systems in the United States.

In its charge, Congress directed the Commission to investigate, "among other things . . . :

1. The need to preserve competition among the financial institutions and other business enterprises using such a system.

2. The need to promote competition among financial institutions and to assure Government regulation and involvement or participation in a system competitive with the private sector be kept to a minimum.

3. The need to prevent unfair or discriminatory practices by any financial institution or business enterprise using or desiring to use such a system.

4. The need to afford maximum user and consumer convenience.

---

[1] The Commission was established on Oct. 28, 1974. Because of delays in forming the Commission and selecting its members, it did not begin work until Feb. 1, 1976.

[2] S. Report 93-902, 93d Congress, 2d Session, Report of the Committee on Banking, Housing, and Urban Affairs to Accompany H.R. 11221, Depository Institutions Amendments of 1974, p. 14.

3

Digitized by 

5. The need to afford maximum user and consumer rights to privacy and confidentiality.

6. The impact of such a system on economic and monetary policy.

7. The implications of such a system on the availability of credit.

8. The implications of such a system expanding internationally and into other forms of electronic communications.

9. The need to protect the legal rights of users and consumers."[3]

The Commission consisted of 26 members and was chaired by William B. Widnall, a former ranking minority member of the House Banking and Currency Committee.

The Commissioners, who are listed in the beginning of this report, represented many backgrounds and concerns. This helped to ensure that a multiplicity of interests would be considered, and that the Commission's recommendations would be built upon a broad base, rather than on the more limited concerns of particular individuals.

As the Commission's investigation proceeded, certain fundamental perspectives became central to its research and recommendations. First, the Commission recognized that EFT is an evolutionary development, not only in the United States, but in other industrialzed nations. Moreover, only the first steps along its potential evolutionary path have now been taken, and the pace has been slow.

This observation has many policy implications. For example, the Commission found that because EFT services and systems are being developed gradually, the Federal and State governments are in a position to monitor developments and act in time to protect the public interest if adverse effects appear.

Second, the Commission held to the principle that the growth of EFT should take place in a competitive environment. The Commission concluded that, in general, EFT should be allowed to develop free from unnecessary regulation and to remain as open as possible to marketplace pressures and consumer demands. In this way, innovation will be sparked, the largest possible array of alternative EFT services and systems will be placed before users and consumers, and the unfettered choice among these alternatives will produce an EFT environment that is most responsive to the public's needs and desires.

Third, the Commission found that EFT is properly viewed as an alternative means of providing payment services--not as a replacement for existing systems based on cash or checks.[4] Indeed, all evidence suggests that today's paper-based system will remain in operation indefinitely. The public will use cash and checks for many years to come.

---

[3] Pub. L. 93-495 (Oct. 28, 1974), Section 203(a); 12 U.S.C. 2403. (For the full text of the Act, see Appendix A.)

[4] See Appendix C, "The Payment System in the United States," for a description of these systems.



Finally, the Commission concluded early in its deliberations that the future of EFT is inextricably tied to consumer acceptance. The technology must fulfill consumer needs, and if it does not, EFT is unlikely to grow beyond its early stages. Evidence before the Commission was persuasive that, in most instances, if the consumer retains free choice and the marketplace remains competitive, the consumer's interest will be the primary force affecting new service developments. Thus, the Commission does not recommend that an elaborate new structure of regulation aimed directly at EFT is in order at this time, although certain specific legislative and regulatory actions are necessary to protect the public interest.

The Commission and its staff sought to obtain information about EFT from as many sources as possible. The research involved five sets of public hearings;[5] a number of formal solicitations for public comment; some 60 papers, including many external research reports written under contract by recognized experts;[6] a comprehensive interim report to the President and the Congress on the Commission's preliminary recommendations; and a series of three public interchange "town hall" meetings, which were used to review the Commission's preliminary findings with interested citizens in three communities-- Chicago, Denver, and Sacramento.[7]

The Commission used a committee structure for most of its work. Each of these committees was chaired by a Commissioner who guided the development of ideas from inception to the final report. Each committee addressed a specific area of EFT, such as consumer interests, regulatory concerns of EFT providers, technological interests of the suppliers of EFT systems, and similar areas of focus.[8] Commissioners typically took part in the work of several committees. Through this structure, individual Commissioners thus had the opportunity to participate directly and extensively in the investigation of questions of greatest personal interest to them. For 21 months, the Commissioners engaged in continuing and intensive public debate on issues, findings, and proposed recommendations.[9] Results on the committee level were reported to the Commission. All findings and recommendations in this report were examined and voted on by the entire Commission.

---

[5]For a list of Commission hearings and witnesses, see Appendix F.

[6]Appendix I lists these publications and provides information on how copies may be obtained.

[7]For details on the Public Interchange Program, see Appendix D.

[8]For a description of how the Commission developed a research plan appropriate to its needs, see National Commission on Electronic Fund Transfers, "Programs, Plans, and Accomplishments of the National Commission on Electronic Fund Transfers" (Oct. 29, 1976).

[9]For a list of Commission and committee meetings, see Appendix E.

5



## MAJOR RECOMMENDATIONS

Throughout its deliberations the Commission was aware that EFT in the United States is a new and dynamic development. Virtually every aspect of EFT is undergoing rapid change and, thus, projections about future events necessarily involve a degree of speculation. Further, the Commission found no evidence that EFT has yet caused harm to financial markets, financial institutions, or consumers.

Therefore, as indicated earlier, the Commission concluded that the appropriate approach to these new financial service concepts is, in general, to permit their further evolution in a relatively unconstrained way and, to the extent possible, in a manner consistent with the nature and purpose of existing law and regulation governing financial services.

The Commission found, however, that in some instances existing law and regulation are incomplete or are not applicable to new financial service concepts. EFT was not anticipated when most financial legislation was enacted. The Commission therefore recommends new legislation in these cases. Examples involve the law pertaining to the rights and responsibilities of issuers and holders of checks, and the law defining the relationship between branches of depository institutions and electronic terminals that provide EFT services.

The Commission also observed that some aspects of consumer concern are so fundamental that they should be addressed at this time in order to guarantee to consumers a number of basic rights in an EFT environment.

The Commission's findings and recommendations concern five general areas: consumer interests, developmental issues in EFT, technology, the role of the Federal Government, and international developments in EFT.

The detailed recommendations presented in this report reflect the majority view of the Commission on the issues it considered. Of course, the Commission was not always unanimous in the support of these positions. In many instances, individual Commissioners held views that differ from those of the majority. All views, whether of the majority or minority, reflect important perspectives.[10]

## CONSUMER INTERESTS

The Commission addresses in depth in Part II of this report the effect of EFT on consumers. To learn about this crucial area, the Commission conducted research, held hearings on consumer issues,

---

[10]For a list of recommendations on which Commissioners wished their vote recorded by name, see Appendix B. For separate statements filed by individual Commissioners, see Part VII. The overall vote on each recommendation is presented in the text, following the statement of the recommendation. Typically, these votes are shown as a sequence of three numbers. The first indicates the number of affirmative votes; the second, the number of negative votes; and the third, the number of abstentions. Not all Commissioners voted on every recommendation; thus, the total indicates only the number of Commissioners who were present and who voted.



reviewed correspondence from consumers, and listened to consumers' concerns at public interchange meetings.

The Commission learned that many consumers are reluctant to accept many EFT concepts. Some consumer concerns may result from a lack of experience with these new ideas, but others are well founded.

It is difficult to provide adequate consumer protection, yet not unduly interfere with the competitive marketplace, which the Commission recognized as the best means for protecting consumers by providing them with the greatest choice among payment alternatives at the lowest cost.

This report addresses many important consumer issues, including privacy, choice of payment methods, disclosure of terms and EFT information, distribution of debit cards, stop payment, unauthorized use of an EFT account, and error correction.

## Consumer Privacy

In general, the Commission concluded that present legal safeguards for the privacy of financial transaction information, irrespective of their sufficiency today, are not adequate to deal with threats to privacy that may arise with EFT. The Commission identified four areas in which the likelihood that an individual's privacy may be violated is increased with EFT:

- EFT will generate new kinds of financial transaction records.

- EFT may increase the amount of information currently included in transaction records.

- EFT records will be easier to retrieve.

- EFT may increase the number of institutions with access to an individual's financial records.

The Commission focused its attention on the access and use of EFT information by Government and by the private sector, and it considered ways to guarantee the consumer's right to control the accuracy of the information. The Commission's recommendations in these areas are contained in Chapter 1.

Regarding the Government's access to and use of EFT information, the Commission recommends that Government should minimize the extent to which, first, it requires an institution to maintain or report records generated by an EFT system and, second, it requires information to be collected by an EFT system that is not required as a matter of sound business practice.

It also recommends that EFT systems not be used by Government for surveillance, to learn either a consumer's physical location or his patterns of behavior.

The Commission recognized, however, that the legitimate needs of law enforcement must be balanced against the individual's right to privacy. Thus, it recommends procedures that allow Government to obtain EFT financial information. These procedures require notifying the consumer and giving him the



opportunity to contest the Government access, except in specific instances that would be contrary to the public interest.

The Commission's recommendations regarding private sector use of EFT information concentrate on the manner in which this information can be disclosed to third parties. The recommendations are intended to provide protection to individuals as to the confidentiality of EFT information, and they specify procedures for disclosure. For example, financial institutions should be required to have the specific consent of the consumer before releasing information to a third party, except in areas where disclosure is made as an accepted business practice. These situations are detailed in this report.

Another important area is the consumer's ability to control the accuracy of EFT records. The Commission concluded that the consumer should have access to records about him and should be able to challenge and correct inaccuracies in such records. The Commission recommends that the Fair Credit Reporting Act be amended to provide this protection.

Other Consumer Safeguards

In addition to privacy, the Commission recommends consumer protections on the establishment and operation of EFT accounts, which is discussed in Chapter 2, and on EFT theft, error, and system malfunction, all of which are discussed in Chapter 3.

Establishment of EFT Account Relationships. Generally, the Commission concluded that EFT can

benefit the consumer by enhancing his choice of payment methods. To ensure an increased choice, the Commission recommends that several laws be enacted. For example, requirements that employees do business with a particular depository institution as a condition of employment or receipt of Government benefit should be forbidden by law. It should also be unlawful to require, as a condition to a loan, preauthorized debiting as the method of repayment. Further, when direct deposit is offered as a method of payment, the consumer should be guaranteed the right to select the depository institution.

Another important consumer protection with respect to establishing an EFT account is to ensure that the consumer knows the terms and conditions of the service. The Commission recommends that a clear and meaningful written statement be provided to the consumer regarding the statutory and contractual terms and conditions of any EFT service for which he contracts, and that similar disclosure should occur whenever the terms of use change.

On another important issue the Commission was confronted with a dilemma concerning whether or not depository institutions should be permitted to distribute unsolicited debit cards. On the one hand, many consumers believe that unsolicited debit cards would be a nuisance and a threat to the security of their deposit account. On the other hand, many small depository institutions believe that a total restriction on the unsolicited distribution of debit cards would place them at a competitive disadvantage. The Commission's compromise recommendation is to permit unsolicited distribution of debit cards without credit features only to an institution's existing customers and only with full disclosure of the

8


Digitized by Google

terms of the service. Until the contract for the service is signed, the consumer would assume no liability for any use of the card.

The Commission does not recommend any change in the current law regarding the distribution of credit cards or debit cards with credit capabilities.

Operation of EFT Accounts. One of the more frequent consumer concerns involves the potential lack of information about EFT account activity. The Commission recommends that Federal legislation be enacted that requires institutions to mail or deliver statements to consumers for any month in which an EFT transaction takes place. Statements would not be required where pre-authorized credit transactions are the only electronic items on an EFT account, but even in this case a positive or negative notification that the deposit was received is recommended.

The Commission also recommends that Federal legislation be enacted to require that a receipt be provided in conjunction with any EFT transactions except a card withdrawal.

Another controversial issue for the Commission was that of stop payment and reversibility of EFT transactions. Consumers have legitimate concerns that EFT will not allow them to stop payment, as is possible with the check system. In part, this concern stems from some consumers' belief that eventually EFT will be the only payment system available. As indicated earlier, the Commission concluded that this will not be the case in the foreseeable future. EFT will expand the range of payment alternatives rather than limit them. The Commission also noted

that the stop-payment right with the check system is infrequently used, expensive, and generally available for only a short time after making payment. In addition, an EFT reversibility requirement would remove one EFT consumer advantage-- guaranteed acceptance of payment at the point of sale. Further, the market has shown in the case of its liberal reversal policies for pre-authorized debits through the ACH system that it can be responsive to consumer concerns about the need to reverse transactions. In short, the Commission found no evidence to suggest a need at this time to legislate a right to stop or reverse EFT payments.

Theft, Error, and Malfunction. Like the credit and check systems, EFT systems are subject to theft, error, and system malfunction. But unlike more traditional payment methods, EFT systems are not yet governed by laws that assign rights and responsibilities between depository institutions and their customers.

In examining the need for legislation on the unauthorized use of debit cards, the Commission did not follow the negligence standards of the check payment model or that of the credit card model, which provides for a $50 limit on a consumer's liability. Instead, the Commission recommends Federal legislation providing that an EFT account holder should have no liability unless the depository institution can prove that the account holder was negligent in at least one of three ways--writing his personal identification number (PIN) on the card; keeping the PIN with the card; or permitting the account accessing devices, such as the card and the PIN, to come into the possession of someone who makes an unauthorized use.

9

Digitized by 

The Commission also recommends that the consumer have the responsibility to review his descriptive statement promptly and to report unauthorized uses and that the consumer be relieved of liability once such use is reported.

Regarding errors resulting from EFT transactions, the Commission recommends the enactment of Federal legislation to provide consumers with a procedure for dealing with errors resulting from unauthorized uses, computation mistakes, incorrect debits or credits, or failure to enter legitimate debits or credits. If the error is reported by the account holder within 60 days of receiving his descriptive statement, the depository institution would then have 45 days to correct the error or to inform the account holder of the circumstances relating to the matter, including reporting the error to any third party who may be involved. Specific penalties are recommended for failure to correct an error promptly.

The Commission also considered problems associated with system malfunctions. Among other recommendations, it establishes conditions under which a debtor's obligation can be suspended as a result of a system malfunction and specifies when depository institutions should be liable for damages caused to its account holders as a result of a system malfunction.

## Other Important Consumer Issues

The Commission examined and recommends action on a number of other important consumer concerns. These recommendations are discussed in Chapter 4.

For example, the Commission recommends guidelines for Federal legislation to provide a means for consumer redress through civil litigation. The Commission also addresses the issue of attachment or garnishment and recommends steps to protect consumers receiving payments on a pre-authorized direct deposit basis.

The Commission believes that consumers need to be educated about EFT and specifically encourages EFT providers to accept a responsibility in this area.

Regarding low-income consumers, the Commission recommends that Congress direct an appropriate Government agency to examine the needs of this group in more depth and to recommend options for developing appropriate EFT systems such as a Giro, or credit-transfer, payment system.

## DEVELOPMENTAL ISSUES IN EFT

Part III of the report addresses EFT developmental issues pertinent to the relationships among the institutions involved in EFT. The Commission examines the need for separate legislation covering terminals offering EFT services, the rules for deploying and offering services through these terminals, the proper approach to sharing EFT systems, the potential competitive impact of EFT, possible changes in the availability of credit under EFT, and the costs of EFT systems.


Digitized by Google

## Branch/Terminal Issue

The branch/terminal issue, which is discussed in Chapter 5, centers on whether or not terminals deployed by depository institutions should be subject to the same rules and restrictions as those imposed on brick-and-mortar branches of those institutions. The Commission recommends that the off-premise deployment of terminals offering EFT services should not be regulated by the same set of rules that govern the establishment of branches, but by a distinct set of rules, which the Commission specifies.

The Commission considered the services now being offered through EFT systems and determined that the availability of these systems should be determined on the basis of the services provided, rather than the hardware used. The services considered were information services, such as check authorization, and the funds transfer services of deposit-taking, debit, and credit.

Information services are widely available in today's system. In the absence of evidence that present safeguards are inadequate, the Commission recommends that EFT-related information services should continue to be available to the same extent, and under the same rules, that they are today.

Funds transfer services were viewed differently. It was argued by some that an unregulated approach to the offering of these services would lead eventually to the domination of financial markets by a handful of giant depository institutions and to the collapse of the dual banking system. After thorough review of the arguments for and against this view, the Commission concluded that this danger is

not great and can be avoided in several ways. The Commission focused its attention on development of an evolutionary approach to the elimination of geographical restrictions on the availability of funds-transfer services.

With respect to the debit services, the Commission recommends that State and federally chartered depository institutions should have the power to offer these services anywhere in the country through terminal-based EFT systems.

More caution is warranted in the case of the deposit-taking service, because it is not clear whether a nationwide deposit-taking service would alter the Nation's banking structure. Therefore, the Commission recommends a gradual expansion of deposit-taking through terminals offering EFT services, beginning with two steps.

First, the Commission recommends that State and Federal legislation be enacted to permit any depository institution to offer the deposit-taking service statewide within the State in which that depository institution is chartered.

Second, the Commission recommends that State and Federal legislation be enacted to permit the EFT deposit-taking service to be offered through terminals across contiguous State lines to serve natural market areas, provided that the States involved permit such arrangements through reciprocal legislation. The Commission also recommends that Congress establish a date after which time federally chartered depository institutions would be permitted to cross contiguous State lines in natural market areas, regardless of whether or



not State-chartered institutions are permitted to do so.

This interstate restriction on deposits is intended to restrict only deposits to individuals' accounts taken through EFT terminals. Deposits to merchant accounts resulting from customer debits and deposits generated on a pre-authorized basis should continue to be possible without geographic restriction.

With respect to the services involving the use of credit--debit with overdraft, credit purchase, and cash advance--the Commission recommends that no geographic restrictions be placed on their availability.

The availability of services and the deployment of terminals by depository institutions to provide those services are distinct issues, and the Commission therefore considered them separately. In general, the Commission recommends that the rules on terminal deployment be no more restrictive than those governing service offerings.

Regarding all of its recommendations on terminal deployment and service availability, the Commission urges legislators and regulators to keep in mind the evolutionary nature of EFT. Inappropriate regulation can impede innovation, inhibit competition, and jeopardize potential consumer benefits.

## Sharing

In Chapter 6 the Commission addresses the issue of sharing. The Commission takes the view that competition in the marketplace is one of the principal ways in which EFT will develop in the public interest. The question of how to deal with sharing arrangements, which in some cases might limit competition among institutions offering EFT services, is therefore critical.

Competition would be lessened if more institutions share EFT facilities than is required by the economics of operation. On the other hand, there is concern that some institutions or classes of institutions without the resources to form their own competing EFT systems might not have access to EFT systems operated by competitors and that the ability of these institutions to compete would be unfairly restricted.

To deal with these problems, the Commission concludes that "pro-competitive" sharing will best serve both consumers and providers of EFT services. By "pro-competitive," the Commission means an arrangement under which the parties may agree to share but, if challenged, sharing would be permitted, required, or prohibited on a case-by-case basis, depending upon the effect such sharing would have on competition. The Commission recommends that Federal legislation be enacted to reaffirm the applicability of Federal antitrust laws to sharing arrangements and expressly nullify the effect of State mandatory sharing laws.

In addressing the problem of access to EFT systems the Commission recommends that the competitive and public interest policies embodied in the antitrust laws be the standards applied in judging access requests.



In its interim report the Commission indicated that it would look for ways to expedite resolution of access disputes through administrative and judicial means. A number of approaches to administrative relief were considered, but the Commission was unable to identify an acceptable solution. If an institution, with the assistance of its primary regulator, is unable to negotiate terms of access, then it or its primary regulator may exercise remedies under the antitrust law. The Commission recommends, however, that Congress provide a preferred position for such suits on the docket of the appropriate U.S. District Court.

## Competitive Impact of EFT

Much of the concern regarding EFT development centers on its competitive consequences. The central focus of this concern is whether EFT in and of itself could cause a particular type of depository institution to be at a disadvantage with respect to other institutions in the competition for deposits. In Chapter 7, the Commission presents its findings and recommendations on this matter.

The Commission examined how an institution's size might affect competition, the impact of economies of scale on smaller institutions, and the availability of EFT systems to various classes and sizes of depository institutions. In each case, the Commission found no evidence for immediate concern.

The Commission's recommendation, therefore, is that appropriate State and Federal regulatory agencies continue to monitor the proliferation of EFT

systems and take appropriate action consistent with the agencies' charter.

## Credit Availability Under EFT

As discussed in Chapter 8, the Commission found that EFT will have a minor effect on the total availability of housing and consumer credit, although it could have an effect on the share of market of some or all credit grantors. The magnitude and distribution of such market shifts are unclear, but it is possible that the shifts may adversely affect some consumers served by some credit grantors. The possibility exists, for example, that less affluent consumers could be forced to seek credit elsewhere, perhaps at higher interest rates or less advantageous terms, or could be left without a source for credit.

The Commission concluded that competition between credit grantors will best serve the needs of consumers and the public interest. The Commission recommends that finance companies and other credit grantors, which do not normally offer revolving credit cards, not be denied access to or sharing of point-of-sale EFT facilities. This need for access to EFT systems also underscores the importance of the Commission's sharing recommendations.

It is also the Commission's conclusion that legislation should not limit the right of merchants to select those transaction services that are honored on their premises and should prohibit EFT providers from engaging in tie-in arrangements for EFT services when such services are not available independently from another EFT provider.



## Cost Analysis

The Commission's cost analysis program is discussed in Chapter 9. From a review of the literature on this subject and from a Commission-sponsored empirical study, it appears that point-of-sale EFT systems realize scale economies as system size increases. If POS systems demonstrate continually decreasing costs as system size increases, EFT has the potential to have a significant effect on market shares and the structure of the retail financial service industry. At this time, however, there are no useful data for estimating the limits of scale economies in POS applications. Further, the decreasing cost of EFT system components and the possible nature of sharing arrangements add to the uncertainty of defining the cost implications of POS systems.

The Commission concluded, therefore, that it would be inappropriate at this time to impose rules or regulations restricting the nature of EFT development that are based solely or primarily on the cost of entry or the cost of operations of such systems. The Commission recommends, however, that regulators of financial institutions continue to monitor market share impacts of EFT.

## TECHNOLOGY

In Part IV, the Commission examines issues of technology in EFT. The three chapters in this part of the report focus on competition among suppliers of equipment and communications services (Chapter 10), standards (Chapter 11), and security (Chapter 12).

## Competition Among Suppliers

As discussed in Chapter 10, the Commission concluded that the public interest will be best served by the participation of all interested parties in the EFT system and related terminal equipment marketplace. The Commission concluded, however, that terminals offering EFT services should comply with Federal Communications Commission (FCC) registration requirements for terminal equipment used in conjunction with the public telephone network. The underlying communications transmission and distribution facilities used with EFT systems should continue to be regulated.

One issue addressed by the Commission is how to treat companies that provide regulated communications common carrier services and that wish to offer EFT system services and associated terminal equipment. The Commission recommends that, in order to promote competition, these companies should have the opportunity to offer these services and equipment, but not under tariff. (The Commission notes that the American Telephone & Telegraph Co. is forbidden by its consent decree of 1956 from offering untariffed communications services, and does not take a position on that matter.) Unreasonable and anti-competitive cross-subsidization of untariffed services from tariffed services should be prohibited. Enforcement should be handled by the FCC and the antitrust agencies.

Although the Commission concluded that it is premature to establish federally mandated standards for EFT systems and related terminals, it recommends that communications interface standards and protocols used by EFT equipment manufacturers and other

14



providers that are not in accordance with published American National Standards Institute (ANSI) standards must be published when adopted for use.

## Standards

Additional issues relating to standards are discussed in Chapter 11. The Commission recognized that the standards-development process is usually time-consuming and that standards can affect the competitive marketplace. Nevertheless, the Commission was not in a position to deal with the broad policy issues raised by the entire standards-making process. The Commission's recommendations therefore are intended to improve the voluntary standards process on EFT as it exists.

To this end, the Commission recommends that representatives of financial regulatory agencies--one State and one Federal--assume an active role in the voluntary EFT standards-development process and that, in particular, ANSI should expedite the development of standards for numbering systems, message formats, and standardized invoice and billing systems.

## Security

The development of EFT security techniques is discussed in Chapter 12. The Commission recognizes that there are significant security vulnerabilities in EFT systems, but also notes that a balance will have to be achieved between the cost of security measures and the value of the losses they are designed to protect against. The Commission finds that, while vulnerabilities exist, actual breaches of security are few.

The Commission recommends that State and Federal regulators and financial institutions develop uniform security regulation and examination requirements and that they develop joint solutions to common problems of security supervision. State and Federal criminal codes should also be strengthened regarding criminal misuse of computer systems.

## ROLES OF THE FEDERAL GOVERNMENT

In Part V, the Commission addresses the role of the Federal Government in EFT. Two basic areas are examined: the impact of EFT on monetary policy and the involvement of the Federal Government in the operation of ACHs and POS switches.

## Monetary Policy

Chapter 13 addresses the implications of EFT on monetary policy. Although the Commission found no evidence to suggest that EFT will impair the effectiveness of monetary policy, it concluded that the increased use of EFT systems may affect the rates of growth of monetary aggregates and also that EFT systems and service arrangements may contribute to the difficulties of developing workable definitions of monetary aggregates. As EFT systems evolve, they will have an effect on time, cost, and convenience, and in so doing, they may facilitate the conversion of additional types of assets into monetary assets. As money's efficiency is enhanced by EFT in this manner, the desire to hold demand deposits will

Digitized by 

depend increasingly on whether the legal prohibition of interest on demand deposits is retained and nationwide NOW accounts are permitted.

To ensure that anticipated institutional arrangements do not make the introduction of EFT any more destabilizing than it need be, the Commission recommends that an interest return should be permitted on liabilities held for transaction purposes at all depository institutions. The approval of NOW accounts for all depository institutions appears to be the best approach to achieving this result.

The Commission also concluded that the holding of reserves in the Federal Reserve System is an important factor in the stability of relationships between the money supply and target variables and that the holding of such reserves should be encouraged. To this end, the Commission recommends that the Federal Reserve be permitted to pay interest on reserve balances held by any member bank or by any other depository institution.

## Government Operation of ACHs and POS Switches

The Commission assesses in Chapter 14 the proper role of the Federal Government in the operation of ACHs and POS switches.

The Federal Reserve is already heavily involved in the operation of ACHs, and its withdrawal from this area might be detrimental to the public interest. The Commission therefore concluded that it is appropriate for the Federal Reserve to continue to provide the basic level of ACH-like services, but that it not discourage private sector development

in this field. The Commission recommends that the Federal Reserve assess charges on an equitable and fully allocated cost basis to depository institutions using Federal Reserve ACH facilities, giving due consideration to balances held at the Federal Reserve.

Regarding POS switches, the Commission recommends that the Federal Government should not be involved operationally, at present or in the foreseeable future. The Commission concluded that the private sector has shown a willingness to serve this market, and should be allowed to continue to do so.

## INTERNATIONAL DEVELOPMENTS IN EFT

The Commission observes in Chapter 15 that some types of EFT services have been extensively developed overseas. These services include ACH-like networks, with their related direct deposit and pre-authorized debit payment services, and the credit transfer, or Giro, payment system.

In many foreign nations direct deposit of payroll and other income payments is more common than in the United States, and, indeed, is sometimes mandatory. The Commission does not favor mandatory direct deposit in this country, but it recommends that this option be available for all recurring Federal Government payments. It also recommends that the U.S. Department of the Treasury encourage and assist State and local governments in developing direct-deposit programs and, further, that the U.S. Department of Labor take steps to involve labor unions, employers, and employees in understanding direct deposit of payroll.

16



With respect to Giro-like payment systems, the Commission concluded that this type of system offers consumers and businesses in Europe many features not provided in the U.S. payment system. To encourage the development of the Giro-like credit transfer concept, the Commission recommends that the Department of the Treasury sponsor an experiment to demonstrate the feasibility of the credit transfer payment approach for payments made to the Government. The Commission also recommends that standardized invoicing and billing procedures be expanded to incorporate and facilitate the Giro-like payment service.

## CONCLUDING OBSERVATIONS

The Commission started its work with a mandate to gain a better understanding of electronic funds transfer and to make recommendations that would permit the orderly development of this new payment system. It was not the intent of the Commission either to promote or impede this emerging system, but rather to evaluate its implications for the Nation and provide appropriate guidelines to those responsible for making public policy.

EFT can offer the public additional and more convenient financial services. The Commission concludes that the development of EFT within an orderly competitive marketplace would be in the best interest of consumers, providers, and suppliers of EFT systems. At the same time, the Commission believes that certain fundamental safeguards should be established for consumers and those who provide these new payment service capabilities.

The Commission's recommendations in the chapters that follow are intended to protect the public interest while encouraging the innovative spirit that characterizes this society.

17



# The Consumer and EFT







Chapter 1

# Privacy

Would the widespread implementation of EFT systems further erode the ability of individuals to keep their personal financial affairs private? Many consumers believe that it would and, indeed, the question of privacy has emerged as a major consumer concern about EFT.

The notion of privacy refers to the individual's expectation of control over what information about himself is communicated to or used by others.[1] The object of the consumer's concern regarding privacy under EFT is the potential use of his financial transaction information to develop a personal profile.[2]

As Justice Douglas said, in dissent in a case concerning Government access to bank records, "In a sense a person is defined by the checks he writes. By examining them, the agents get to know his doctors, lawyers, creditors, political allies, social connections, religious affiliation, educational interests, the papers and magazines he reads and so on ad infinitum."[3] Furthermore, one has little choice about the creation of these records:

For all practical purposes, the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to

---

[1] See Statement of Alan Westin, Professor of Law and Government, Columbia University, in National Commission on Electronic Fund Transfers, "Consumer Issues in EFT, Part I, Testimony Presented to the National Commission on Electronic Fund Transfers, October 26, 1976," Internal Working Document IWD-56 (Oct. 1977); see also Statement of Charles Marson, Legal Director, American Civil Liberties Union Foundation of Northern California, NCEFT, IWD-56.

[2] The phrase "financial transaction information" refers to information included in transaction records: the account holder's name, address, account number, account balance, debit and credit amounts, debit and credit payees or payors, and location, date, and time of transactions.

[3] California Bankers Association v. Schultz, 416 U.S. 21, 85 (1974).

19

Digitized by Google


participate in the economic life of contemporary society without maintaining a bank account. In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography.[4]

The Commission concluded that present legal safeguards for the privacy of financial transaction information, irrespective of their sufficiency today, are not adequate to deal with threats to privacy that may arise with EFT. Although both Government and the private sector pose a threat to privacy, the nature and extent of these threats and the appropriate safeguards required are different. Therefore, the Commission makes different recommendations regarding private sector access and Government access to financial information.

The Privacy Protection Study Commission, which recently completed its final report, developed three general objectives to guide its recommendations: (1) to minimize intrusiveness; (2) to maximize fairness; and (3) to create legitimate, enforceable expectations of confidentiality.[5] The National Commission on Electronic Fund Transfers focused its examination of privacy on those issues related to records generated by EFT transactions, and intends its recommendations to be consistent with the above objectives of the Privacy Protection Study Commission.[6]

This chapter discusses the ways in which EFT expands the threat to privacy of financial records and describes existing legal protections of individual privacy. The chapter also analyzes the sources of abuse of consumer privacy in an EFT environment and presents the Commission's recommendations in this area.

## EFT AND PRIVACY CONCERNS

Recent advances in computer science have sharpened consumer interest in the privacy issue because this technology permits more efficient data collection, storage, and dissemination. The threat perceived by consumers is not the technology itself, but the fact that it could make violations of privacy easier and less expensive to accomplish.[7] The prospect of privacy abuse has also grown because of the increase in the types and amount of information collected and stored by depository institutions pursuant to legislative requirements such as

---

[4] *Burrows* v. *Superior Court of San Bernardino County*, 13 Cal. 3d 238, 529 P. 2d 590, 596 (1975).

[5] Privacy Protection Study Commission, *Personal Privacy in an Information Society* (Washington, D.C.: U.S. Government Printing Office, July 1977), pp. 14-15.

[6] The three recommendations of the Privacy Protection Study Commission dealing specifically with EFT are discussed later in this chapter.

[7] See Hearings on S3914 and S3828, Subcommittee on Banking, Housing, and Urban Affairs, U.S. Senate, 92nd Congress, 2d Session (1972).


Digitized by Google

the Bank Secrecy Act[8] and because of the information requirements demanded by the diversity of financial services now offered. The Commission identified five specific ways in which EFT might pose threats to individual privacy.

First, EFT will generate financial transaction records where none existed before. If an EFT debit card is used instead of cash, a record is created linking a transaction to a particular individual, where there was previously no such record. This process is already occurring as credit cards replace cash, and the use of debit cards will further increase the amount of new financial information collected.

Second, EFT may increase the amount of information currently included in transaction records. A check records the payor, the payee, the amount, and the date of the transaction. In addition to this information, the EFT debit transaction at a point of sale could record the time and location of the transaction and a transaction identifier.[9] Because of the difficulty of providing adequate audit trail information to protect both consumers and depository institutions under EFT systems, more descriptive information about a transaction may be required.[10] Recordkeeping requirements of the Bank Secrecy Act may also apply to EFT transactions exceeding $100.

Third, in an EFT system financial records will be maintained in an electronically readable form, thus making them easy to retrieve. The present payments system includes both paper and electronic processing and storage of personal financial transaction information. This decentralization provides some degree of protection because of the difficulty

and cost of accessing such information. EFT promises to reduce the cost and facilitate the

[8] This chapter uses the popular name, "Bank Secrecy Act," to refer to Pub. L. 91-508, Title I, 84 Stat. 1114 et seq., 12 U.S.C. Sections 1829b, 1951-1959 and the Currency and Foreign Transactions Reporting Act, Pub. L. 91-508, Title II, 84 Stat. 118 et seq., 31 U.S.C. Sections 1051-1122. Discussed in some detail below, the Bank Secrecy Act requires storage by banks of financial transaction information for law enforcement purposes.

[9] The Commission recommends in Chapter 2, "Establishing and Operating an EFT Account," that, for any transaction for which the transaction record or a facsimile is not enclosed, the descriptive statement should reasonably identify each transaction in a manner that enables the account holder readily to ascertain the date of the transaction or date of charge, the amount, the location, the means of transfer--e.g., point of sale (POS), automated teller machine (ATM), direct deposit of payroll (DDP)--type of transaction--e.g., deposit, cash withdrawal, purchase, etc.--and, where applicable, other parties to the transaction.

[10] It is unclear whether EFT records will capture more information concerning the specifics of a financial transaction than a check does. If EFT records were to contain information on the product or type of service purchased, then EFT would provide more detailed information on an individual than do check records and thus pose greater potential threats to his privacy. But, as is often the case in dealing with privacy concerns,

21

Digitized by Google

retrieval of information stored in computers, par-
ticularly those computers that are accessible by
telecommunications.[11] Even if no more transaction
information than is contained on a check were re-
corded in the EFT mode, more of the information
would be readily accessible to those who gain access
to the system.

Fourth, EFT systems that operate on-line and in
real time could be used to locate individuals when-
ever they conduct a transaction. The present
credit authorization and check authorization and
guarantee systems and the on-line systems developed
through EFT will, as a by-product of processing an
individual transaction, simultaneously identify the
customer's location, which can become known to any-
one with access to the system.

Finally, EFT may increase the number of insti-
tutions with access to an individual's financial
records. Because of the high start-up costs for
EFT systems and the need to build large transaction
volumes to minimize the per-transaction costs, EFT
systems may involve a high level of cooperation
among a greater number of separate businesses than
is the case with the check system. In fact, many
States have passed laws requiring that EFT systems[12]
be shared among competing depository institutions.

In the check system only the customer's bank
maintains records on all his checks, but in a shared
EFT system many of the participating institutions
will maintain records of some sort on each transac-
tion handled. Shared systems also require a switch
to route messages among participating merchants and
depository institutions. The switch might maintain
temporary backup records called "memo files," for

---

[10]*Continued*

*a balance will have to be maintained between com-
peting values. A consumer concerned about the
generation of data files on his personal finances
may also wish to have a detailed descriptive state-
ment of transactions made available to him for
financial management purposes.*

[11]*A comparison between the check system and EFT
in this regard may be instructive. Banks are re-
quired by the Bank Secrecy Act to make copies of
all checks written for an amount greater than $100.
In fact, banks make copies of all checks. But a
Government agency wanting to use these records would
have to locate and examine the checks manually.
Additional kinds of information would have to be
MICR-encoded so that the checks could be sorted by
machine. This information would include, at least,
the date of the transaction and some indication of
the type of goods purchased. In addition to estab-
lishing formats and other standards for new MICR-
encoded descriptors, new software routines for sort-
ing these descriptors would have to be written. New
manual sorting procedures and training programs for
the personnel involved also would have to be estab-
lished. Only then would it be possible to retrieve
the kinds of information sought by investigators.*

*EFT systems, on the other hand, would auto-
matically encode and store information about trans-
actions in an easily retrievable form.*

[12]*The legal and economic considerations in-
volved in shared EFT systems are discussed in
Chapter 6, "Sharing."*

22


Digitized by Google

control and audit purposes,[13] which are updated for each transaction that flows through the system. In that case, the records kept at the switch would add another source of stored information, however temporarily, to that found in today's record systems.

These potential privacy problems arise from the collection and dissemination of information on individuals. This information flow is directly tied to a number of consumer benefits, such as the consumer's ability to have his checks and credit cards accepted away from home by merchants who rely on check and credit authorization and guarantee services, or to have his loan application approved, and approved speedily. Measures to protect privacy must be carefully designed so that the potential dangers are forestalled, while the benefits that the information flow makes possible are not curtailed.

## EXISTING LEGAL PROTECTIONS

Although the Supreme Court has long recognized that the individual's right to privacy is inherently protected by the Constitution,[14] the Court has specifically denied the individual a constitutionally protected interest in personal information contained in financial records maintained by depository institutions. Privacy rights established by the judicial and legislative process over the past hundred years have not been directly applied to access to or use of financial records stored by a depository institution. Common law privacy concepts are focused primarily on protecting the individual from damages resulting from undue publicity and emotional distress. Statutory law is aimed at maintaining the privacy of personal information contained in Federal

data banks and at preventing unwarranted eavesdropping and surveillance of individuals. Constitutional safeguards developed by the courts are directed toward protecting the individual from invasions of privacy by the Government in prosecution of criminal action.

The Bank Secrecy Act makes it difficult to safeguard the privacy of financial transaction information by requiring substantial collection, storage, and reporting of individual financial transaction information. The law was enacted to enable law enforcement agencies to summon an individual's financial transaction information without notifying the subject of the inquiry or obtaining his consent.

---

[13] The amount of information flowing through the switch will vary according to its technical configuration. This problem will always exist to one degree or another, regardless of the configuration. Transaction records should be maintained by the switch only for the period of time necessary to resolve disputes--perhaps a few months. After that time, there is no operational motive for the switch to store them, and such records should be destroyed.

[14] See Roe v. Wade, 410 U.S. 113, 152 (1973); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Terry v. Ohio, 392 U.S. 1, 8-9 (1968); Katz v. United States, 389 U.S. 347, 350 (1967); Griswold v. Connecticut, 381 U.S. 479, 484-85 (1965); Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis J., in dissent); Union Pacific R.R. v. Botsford, 141 U.S. 250, 251 (1891); and Boyd v. United States, 116 U.S. 616, 630 (1886).



In _California Bankers Association_ v. _Schultz_,[15] the Supreme Court upheld the constitutionality of the Bank Secrecy Act, ruling that it represented a proper exercise of Congressional power to deal with crime in interstate and foreign commerce and did not deprive bank customers of due process of law.  The Court found further that the Act's recordkeeping provisions did not violate an individual's Fourth or Fifth Amendment rights.

More recently, in _United States_ v. _Miller_,[16] the Supreme Court denied that an individual has a constitutionally protected interest in transaction information maintained by his depository institution, holding that such information was voluntarily given, that it was the property of the institution, and that the individual had no legal standing to challenge the use and dissemination of such information.

These decisions, and the Bank Secrecy Act itself, may have important implications for EFT because it is likely that EFT transactions will fall within their purview.

In contrast to deposit account information, the privacy of credit account information receives some statutory protection.  The Fair Credit Reporting Act, discussed later in this chapter, limits the collection and dissemination of information on consumers by credit bureaus, which are the central repositories of credit-related information.[17]

GOVERNMENT ACCESS TO AND USE OF INFORMATION

Consumers view the Federal Government as a primary threat to the privacy of individual

financial transaction information.  As one witness testified before the Commission:

> It is a fact that a large portion of the consumer information which banks are legally required to maintain is kept for one purpose only--access by the Federal Government.  The primary example of this is, of course, the Bank Secrecy Act. . . .[18]

If a Government agency seeks access to an individual's records from his bank, neither the Government nor the bank is under obligation to inform the

---

[15] _California Bankers Association_ v. _Schultz_, 416 U.S. 21 (1974).

[16] _United States_ v. _Miller_, 425 U.S. 435 (1976). A detailed discussion of this case and others bearing on Constitutional protections for bank records is contained in Statement of Charles Marson, NCEFT, IWD-56.

[17] The Fair Credit Reporting Act does not cover disclosure by a credit grantor of information about its own customers.  Pub. L. 90-321, Title VI, as added by Pub. L. 91-508, Title VI, Oct. 26, 1970, 15 U.S.C. Sections 1681-1681t.

[18] Statement of Kenneth V. Larkin, Senior Vice President, Bank of America, on behalf of the American Bankers Association, in NCEFT, "Consumer Issues in EFT, Part II, Testimony Presented to the National Commission on Electronic Fund Transfers, October 27, 1976," IWD-57 (October 1977).


Digitized by Google

individual of this action.  Even if a bank wishes to protect the privacy of its customers' records, it is not able to guarantee that those records will be protected from Government access.  The only protective actions a bank can take are to inform its customer that the Government is seeking access to his records and to require the Government to use formal process to obtain records that the bank is not already required, by law or regulation, to report.

The Commission concluded that EFT calls for much stricter controls than now apply to Government access to an individual's financial records.

*In particular, the Commission recommends that Government should minimize the extent to which it requires an institution to maintain or report records on an individual that are generated by his use of an EFT system, and should also minimize the extent to which it requires information to be collected by an EFT system that is not necessary, as a matter of sound business practice or customer needs, to the operation of the system.*  (Unanimous voice vote in favor, with one abstention.)

*Further, the Commission recommends that EFT systems should not be used for surveillance of individuals, either as to their physical location or patterns of behavior.*  (Unanimous voice vote in favor, with one abstention.)

The legitimate needs of law enforcement agencies should be balanced against the individual's right to privacy.  For example, law enforcement efforts should not be rendered ineffective against serious organized crime problems or serious threats to national security.[19]  There may be a limited

number of instances in which prior notification of Government access to financial transaction information would be contrary to the public interest.  The Commission concluded that there should not be a ban on Government access to individuals' financial records, but rather that the Government should notify an individual whose records are sought and that he be granted the right to contest.  The Commission concluded that access without prior notice should be allowed when a court determines that notice would have a reasonable possibility of compromising the effectiveness of law enforcement.

*Therefore, the Commission recommends* (unanimous voice vote in favor with one abstention) *that Federal legislation should be enacted to provide that an individual has a property interest sufficient to establish standing in the information maintained by a financial institution concerning the individual, and that Government authorities may obtain information concerning an individual's depository account from a depository institution or EFT system operator without the individual's consent, only through judicial subpoena or court order, or through administrative summons.  The administrative summons should issue only where:*

- *Explicit legislative authority for the issuance of the summons exists; and*

---

[19] *The usefulness of bank records in tracing the activities of organized crime has been stressed in Senate hearings on the Bank Secrecy Act.  See* Amend the Bank Secrecy Act, *Hearings, Subcommittee on Financial Institutions, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 92nd Congress, 2nd Session (1972).*



- *The information sought is relevant to and is sought in conjunction with a proper investigation or for carrying out a statutory responsibility, or is essential to the protection of the health or safety of the individual or others; and*

- *The information is not readily available from other sources.*

The Commission does not intend by this recommendation to affect the right of those Government agencies that regulate depository institutions to gain access to information necessary for carrying out their normal supervisory functions.

*The Commission also recommends (unanimous voice vote in favor with one abstention) that the individual whose account information is being sought through judicial subpoena, court order, or administrative summons should be served with the subpoena, court order, or summons before the institution must respond thereto unless a court finds and so specifies in its order that notice should not be given, in which case Government should, within a reasonable time after issuance of a summons, subpoena, or court order without notice, notify the individual whose account information has been obtained. The court should specify that notice not be given only if the court finds that such notification is reasonably likely to result in any of the following:*

- *The destruction of relevant evidence.*

- *Flight by the individual served to avoid prosecution.*

- *Physical harm to another individual.*

- *Other serious compromise of law enforcement effectiveness.*

*The Commission further recommends (unanimous voice vote in favor with one abstention) that when an individual is served with the subpoena, court order, or summons, he should have a reasonable period of time in which to respond, and have standing to contest the disclosure of the information by the institution holding it.*

## PRIVATE SECTOR ACCESS TO AND USE OF EFT INFORMATION

### Controlling the Use of Information

The information concerning an individual that is collected or generated by an EFT system has many potential private sector uses, some of which raise privacy concerns. The Commission concluded that this information[20] should be treated as confidential by the institution providing the EFT system, and should be disclosed to third parties only when necessary to the operation of the EFT account and the supporting financial system. Any

---

[20] *EFT information is of two basic types: (1) transaction information, which describes the particulars of a transaction, such as the payee, the amount, the time, the location, and the description of a purchase; and (2) account information, which is particularly useful for credit checks, including account balances, frequency of debits and credits, fraud, and account misuse.*

26

Digitized by Google


other disclosures should occur only with the specific consent of the customer.

*As a general principle, therefore, the Commission recommends that information collected on an individual as a precondition to or result of his participation in an EFT system, in general, should be disclosed to third parties only if necessary to the operation of the system (primary uses), or for purposes of which the consumer has been informed and to which he has consented (secondary uses).* (Unanimous voice vote in favor, except for one negative vote and one abstention.)

*More specifically, the Commission recommends that information concerning an individual that is collected or generated by an EFT system to establish or maintain an EFT relationship should be treated as confidential by the individual's depository institution or other EFT system provider (hereafter EFT institution), and should not be disclosed to third parties except with specific consent of the individual, or as otherwise provided in the exceptions noted below in this chapter. For these exceptions, the third party receiving the information should certify (and this certification should be implied in law) that it will use the information only for the purpose for which it is given.* (Unanimous voice vote in favor, except for one negative vote and one abstention.)

The disclosures that are necessary to the operation of the system and that, for the purpose of analysis, may be considered primary uses are of two sorts: those necessary to operate the account, and those required to operate the supporting financial system. All other uses are secondary.

The disclosures necessary to operate the account are those made by the EFT institution to its support organizations, such as data processing bureaus or plastic card manufacturers.

*The Commission recommends that information necessary to perform routine services of an EFT account, including information necessary to prevent or correct system malfunction likely to jeopardize the integrity of the EFT system, may be given to a support organization that certifies that it will maintain the confidentiality of the information.* (Unanimous voice vote in favor.)

The disclosures necessary to operate the supporting financial system encompass a much broader range of information and recipients. They include transfers of information about a transaction to other parties to the transaction and to any intermediaries (such as check and credit authorization or guarantee services) necessary to complete the transaction.

The flow of information necessary to complete a transaction depends, of course, on the kind of transaction taking place. For a debit transaction (one in which payment is being made with funds the customer has on deposit) the EFT system needs to ascertain only that the individual has sufficient funds in his EFT account. If the EFT transaction involves a draw against an open-ended line of credit, however, then completion of the transaction may require much the same type of updated financial information required to initiate a loan.

For this reason, the Commission concluded that, as has traditionally been the case, deposit

27

Digitized by Google

account information should be accorded higher confidentiality than credit account information.

EFT, however, will tend to blur the traditional distinctions between deposit and credit accounts. An EFT debit card may be programmed to act as a multipurpose card--to pay for purchases at the point of sale with funds on deposit or, if there are not sufficient funds in the account, to trigger an overdraft line of credit that places funds in the account to cover the amount necessary for the debit. This arrangement, which exists today with some checking accounts, promises to become more prevalent with EFT.

Therefore, the Commission's recommendations concerning disclosures of account information distinguish between the debit portion of an EFT account, and the credit portion of the account.

Debit Accounts. Some disclosures of information are necessary to allow the consumer to make widespread use of his EFT accounts. When a consumer attempts to make a purchase using a check, credit card, or EFT debit card, the merchant wants to be assured that he will eventually be paid. This problem has led to the development of check authorization and guarantee services. These benefit the consumer by increasing his ability to use checks at businesses where he is not known personally, and benefit the merchant by decreasing his risks. Similarly, many credit card companies have established credit authorization systems, which allow consumers to use credit cards more easily.[21]

An EFT debit card, if used in an on-line system that is programmed to transfer funds immediately from the individual's account to that of the merchant, will eliminate the merchant's risk of not being paid, and therefore will enhance the consumer's ease of making payments. But it will be many years, if ever, before every retail outlet and payor will be connected on-line in a nationwide EFT system. Check, debit, and credit authorization services will continue to be necessary to facilitate EFT services for consumers. In some cases these services are offered as part of an EFT system as an inducement to the consumer and merchant to use the system. In other cases, the services are offered by independent companies. In either case the Commission concluded that depository institutions providing EFT accounts should be allowed to provide the information required for these services. This will give the consumer flexibility in choosing a means of payment that will be widely accepted--whether EFT, check, or credit card.

Once the consumer and the merchant (or other payee) have decided to make payment through an EFT system, there needs to be an exchange of information among the parties to the transaction in order to consummate the transaction and to provide the proper audit trails.

*Therefore, the Commission recommends that information necessary to complete or verify a specific EFT transaction may be given to a participant or intermediary to the transaction.* (Unanimous voice

---

[21]*The Commission's recommendations concerning the availability of these services are contained in Chapter 5, "The Branch/Terminal Issue."*



vote in favor.)  Intermediaries include organiza-
tions that authorize or guarantee transactions.

*Further, the Commission recommends that in-
formation necessary to verify the existence or good
standing of an account may be disclosed to a third
party stating a legitimate business need, including
a credit bureau and services that authorize or
guarantee a transaction.  (21-0-4)*

Credit Accounts.  If an EFT account holder
desires credit features in connection with his EFT
account, the depository institution offering the EFT
account should be allowed to exchange information
with credit grantors,[22] either directly or with
credit bureaus.[23]  Without such information, credit
grantors are not able to assess an individual's
credit worthiness and would generally be unwilling
to extend credit except at high prices.  Credit
privileges entail a lessening of individual pri-
vacy, and EFT consumers who place a higher value
on privacy than on credit availability would pre-
sumably opt for pure debit accounts.

There are additional factors to consider in
determining what limitations to place on credit
uses of EFT information.  Curtailing the flow of
information from a consumer's EFT account would
probably affect his eligibility for credit from
many sources in addition to the depository institu-
tion providing his EFT service.  Retailers, oil and
gas companies, travel and entertainment card issuers,
and other credit grantors all rely on this informa-
tion flow to make credit decisions.

Moreover, there is a competitive consideration
related to credit uses of EFT information.  It

involves the increased concentration of financial
information in depository institution data banks
that could occur if EFT gains wide consumer accept-
ance.  Non-depository credit grantors are concerned
that depository institutions that provide EFT serv-
ices may replace credit bureaus as the chief reposi-
tories of credit information, and that the unwill-
ingness or inability of the depository institutions
to share this information with their credit-granting
competitors may diminish the role of non-depository
credit grantors.  The National Commission on Con-
sumer Finance warned of this possibility in a
discussion of the effect of EFT on credit
information:

---

*[22]Credit grantors, depository institutions, and
credit bureaus exchange a great deal of information
about the financial status of individuals.  This
includes information about an individual's income,
buying and payment habits, loan activity, indebted-
ness, general assets, flow of funds through accounts,
and so forth.  The information is constantly up-
dated, and is considered to be the backbone of the
consumer credit system.*

*[23]As one of their functions, credit bureaus
collect information on the credit histories of indi-
viduals, which they disseminate to credit grantors.
These information and collection practices are
governed by the Fair Credit Reporting Act, which
is discussed later in this chapter.  Information
regarding credit collected by credit bureaus in-
cludes the credit balance due, the "open-to-buy" or
unused portion of a line-of-credit, and repayment
performance.  Credit bureaus do not normally collect
information regarding a specific EFT transaction.*



Finally, the emergence of the electronic funds transfer system means that whoever controls and operates that system will also have a record of credit extensions and payments. Consequently, if commercial banks continue to enlarge their share of the consumer credit market and if the bank card-EFTS becomes a reality, commercial banks will not only control the funds transfer system but they will own the major portion of the available credit information. Moreover, banks will be under no obligation to share credit information with competing firms whose own credit information will become progressively less reliable as banks enlarge their share of the market. In short, if the banks' current dominant role in credit cards is coupled with control of the EFTS and, by extension, ownership of the credit information system, those banks dominating these systems will be in position to exercise significant control over the market for consumer credit. If only two credit card plans emerge as part of EFTS, a large and growing portion of consumer credit in the United States will be controlled by a two-system oligopoly with a potential for restraint of competition in the market for consumer credit.[24]

The flow of accurate credit information is essential to the system through which consumers receive credit; EFT does not alter the need for this information.[25]

*The Commission recommends that information regarding the credit portion of an EFT account (that is, the portion of the account involving an extension of credit by the EFT institution to the individual) including balance, unused portion of a line of credit, and repayment may be disclosed to a credit grantor, credit bureau, credit authorization service, check authorization service, check guarantee service, or EFT institution. (17-1-4)*

It should be noted, however, that the information concerning the credit portion of an EFT account does not include details of individual transactions or information on the volume of activity. That information, which if aggregated could present a detailed picture of an individual's life style, should not be disclosed by the EFT system except to other parties to the transaction.

<u>Disclosures to Protect the Financial System</u>. Certain other disclosures are appropriate for both debit and credit accounts to protect the integrity of the financial system. These disclosures would occur only with accounts that are delinquent or otherwise misused. Misuse includes improper check

---

[24] *National Commission on Consumer Finance, <u>Consumer Credit in the United States</u> (December 1972), p. 213. This concern was reiterated in the Statement of Maurice Gregg, Vice President, Gimbel Brothers, Inc., on behalf of the National Retail Merchants Association, in NCEFT, IWD-57, p. 5. Similar concerns have been voiced by the National Consumer Finance Association, "Electronic Funds Transfer Systems--A National Consumer Finance Association Position Paper" (Feb. 23, 1976).*

[25] *The Commission's recommendations for ensuring the accuracy of information in EFT systems are found later in this chapter.*



and debit transactions, such as bad checks, attempted fraud, and closure of an account for improper uses. Misuse of the debit portion of an EFT account may be disclosed to other EFT system operators, to credit grantors, or to credit bureaus.

The EFT institution also should have the freedom to give information on its own initiative to law enforcement officers concerning fraud, attempted fraud, or other crime involving an EFT transaction.[26]

In addition, when a delinquent customer changes his residential or business address, the Commission concluded that the EFT system should be allowed to divulge the new address in order to collect the debt. But this is the only information on an individual's location that a system should be allowed to divulge. The Commission concluded that EFT systems should not be used for surveillance, and that it is improper to use an EFT system to locate an individual when he is making a purchase, unless the individual is at that time attempting to use the EFT system to commit a fraud or other crime. In such a case, as discussed above, the EFT system should be allowed to inform appropriate law enforcement agencies of the location of the crime in progress.

*Therefore, the Commission recommends that:*

- *Information regarding fraud, attempted fraud, or other crime involving an EFT transaction may be disclosed to law enforcement officers by the victimized institution.* (Unanimous voice vote in favor.)

- *Information regarding the improper use of the account, including delinquency, default, fraud*

*or attempted fraud, and closure of an account for misuse may be disclosed to other participants in an EFT system, an institution to which an applicant has applied to open a new EFT account, a credit grantor, or credit bureau.* (19-1-1)

- *The residential or occupational address of the individual may be disclosed to a credit grantor for the purpose of collecting a debt.* (13-9-2)

Secondary Uses. All other disclosures to third parties of personal information about an individual should be prohibited unless the individual concerned specifically authorizes them. This includes disclosure of the name and address of an EFT account holder to third parties for commercial use in direct mail or personal solicitation. Because some individuals prefer not to receive such material, they should be allowed to object and prevent such disclosures.

---

[26]The Commission's recommendations earlier in this chapter concerning Government access to financial records are designed for situations where the Government is seeking access to financial records, and the financial institution is involved as the holder of those records. In contrast, this recommendation is designed for situations where the financial institution itself initiates the disclosure of information to the Government in order to protect itself against fraud, attempted fraud, or other crime involving an EFT transaction.



This also includes disclosure of data that could reveal details of an individual's everyday life, disclosure of information regarding the non-credit aspects of an EFT account (such as the balance on deposit, volume of activity, or details of a particular transaction), and disclosures about the credit aspects of an EFT account as to the volume of activity or a particular transaction. These data traditionally have been accorded confidential status: consumers have a reasonable expectation that this confidentiality will be preserved and that disclosures will be limited to those they specifically authorize.

_Notice and Consent_. The type of notice to the individual and the consent required by the individual to permit disclosure of data should vary by whether the data are disclosed for primary or secondary uses.

The individual should be informed about what primary uses will be made of the data as a result of his obtaining an EFT account. Because most primary uses involve routine disclosures, which are essential to maintaining the account, completing a transaction, or protecting the financial system, consent to those disclosures should be implied upon notification to the depositor of such intended use.

The Commission was aware that consumer concern regarding privacy and EFT may arise in part from unfamiliarity with EFT and a fear of the unknown. Consumer education can alleviate much of this concern. Experience with consumer protection statutes that require a full disclosure of information to the consumer suggests, however, that disclosures that are complex, lengthy, and expressed in technical or legalistic language may be largely unread by

consumers and therefore ineffective. A simple notice in a contract or application form that a detailed statement is available on request would serve to stimulate interested customers to ask for and receive a detailed explanation of the EFT institution's practices.

As to secondary disclosures, the Commission concluded that information should be given to third parties only with the specific consent of the individual involved.

A less-stringent requirement is appropriate, however, for direct mail promotions. It should be noted that depository institutions have a strong tradition of not transferring information regarding their depository customers to others for promotional purposes. But direct mail promotions serve the public interest in several ways: they reduce selling costs, making goods and services available at lower prices, and in nonurban areas. As an inexpensive means of selling, direct mail has traditionally been an avenue for opening new businesses. In addition, disclosure of a name and address is not a serious invasion of one's privacy. The Commission concluded, therefore, that an EFT institution that transfers its customers' names and addresses to a third party for direct mail promotion should notify its customers beforehand and allow them to decline to participate. Anyone who does not decline may be presumed to have consented to the disclosure.

_Therefore, the Commission recommends that the address or name and address of an EFT account holder may be disclosed to a third party for the purpose of direct mail marketing or soliciting, provided_

32



that the individual has been provided a written notice that states that such disclosures may occur unless the individual expressly disallows such disclosures and provides a simple mechanism by which the consumer can expressly disallow such disclosures; and the individual has not exercised the option provided above to disallow such disclosures. (16-8-2)

Upon receipt of express written consent from an individual EFT account holder, an EFT institution may disclose, to any third parties named or described by the individual, any information designated by the individual. No individual should be denied an EFT account as a result of a refusal to permit the release of information pursuant to this recommendation. (23-2-0)

Prior to establishing an EFT relationship with an individual, an EFT institution should give the individual in writing a notice that a detailed statement of the institution's information practices, including the types of information generally disclosed and the types of recipients, is available on request. (16-5-2)

## Controlling the Accuracy of the Information

Information collected by EFT systems will be used by financial institutions and other credit grantors to make decisions regarding a consumer's eligibility for credit or for account services. It is important to the consumer, therefore, that this information be accurate. The Commission concluded that the most effective means of protecting the

consumer in this regard is to allow him to review the accuracy of his own financial records.

Therefore, the Commission recommends that the subject of a record in an EFT system (including check authorization or verification systems) should have access to all recorded information concerning him that is used to make decisions about his participation in the EFT system, and should be able to challenge and correct inaccuracies in the record. (21-3-0)

This recommendation is similar to policies established for Federal agencies by the Privacy Act of 1974[27] and for credit bureau records by the Fair Credit Reporting Act.[28]

The Fair Credit Reporting Act was designed to protect a consumer from inaccurate information about himself that is contained in a consumer report used to determine his eligibility for credit, insurance, employment, Government benefit, or in connection with another business transaction involving the consumer.

The Act limits the purposes for which a consumer report may be procured (15 U.S.C. Section 1681d) or furnished (Section 1681b), prohibits the reporting of obsolete information (Section 1681c),

[27] Pub. L. 93-579, Dec. 31, 1974, 5 U.S.C. Section 552a.

[28] Pub. L. 90-321, Title VI, as added by Pub. L. 91-508, Title VI, Oct. 26, 1970, 15 U.S.C. Sections 1681-1681t.



requires the user of the report to notify the consumer of any adverse action based on the report (Section 1681m), and provides for reinvestigation and correction of disputed information (Section 1681i).

The Commission concluded that the Fair Credit Reporting Act provides an appropriate mechanism for giving effect to the Commission's recommendations regarding consumer protection against inaccurate information maintained by EFT systems. The Act is in place and familiar, and Federal agencies regulating depository institutions already have substantial experience with interpreting and enforcing its provisions.

The extent to which the Act now covers various kinds of EFT transactions is unclear.[29] The Commission concluded that this ambiguity should be resolved by broadening the Act. Coverage should be extended to include the data bases used for EFT transactions and for check and credit authorization services and guarantee services.[30] Subjecting these authorization and guarantee services to those provisions of the Fair Credit Reporting Act that apply to credit bureaus, will enable a consumer whose check, debit card, or credit card is not accepted because of these services to ascertain what information the service has about him and to correct the data where appropriate.

The Commission also concluded that the specificity of the information to which a consumer is entitled under the Act should be increased. The Act now provides that a consumer may receive "the nature and substance of all information (except medical information) in its files on the consumer

---

[29] The extent to which the Fair Credit Reporting Act now covers various kinds of EFT transactions is unclear in two respects.

First, it is unclear whether an institution that provides information on consumers as part of an EFT program--for example, through a check guarantee system--is a "consumer reporting agency" for purposes of the Act. The Statute defines the term in this way: "The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in . . . assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties. . . ." (Section 1681a(f)).

Second, it is uncertain whether the Act applies to systems in which each of the participating institutions reports on its own customers, through a switch, to the other participating institutions so that there is no independent body that furnishes reports to third parties. An institution's report of its dealings with its own customers is not a "consumer report," for purposes of the Act.

It is important here to consider the definitions of "consumer reporting agency" and "consumer report" together. A "consumer report" does not include "(A) any report containing information solely as to transactions or experiences between the consumer and the person making the report; (B) any authorization or approval of a specific extension of credit directly or indirectly by the



at the time of the request" (15 U.S.C. Section 1681g(a)(1). The consumer should, in addition, be entitled to inspect, copy, and have interpreted to him in a reasonable form, those records generated through his participation in an EFT system.

*Specifically, the Commission recommends that the Fair Credit Reporting Act should be amended to provide that:*

- *Organizations that provide check, debit, or credit authorization or guarantee services are subject to the provisions of the Act that apply to credit reporting agencies, except for the requirement that the organization notify prior recipients of information that is later disputed and found to be of questionable accuracy. (22-0-2)*

- *Institutions that decline to honor a check, debit, or credit presented by an individual in whole or in part because of a report by a check, debit, or credit authorization or guaranty service shall disclose to the individual the name and address or telephone number of such services and such disclosure may be made orally at the point of transaction or in writing at a location designated by the institution. (22-0-2)*

- *An individual has the right to inspect, copy, and have interpreted to him in a reasonable form, records on him generated through his participation in an EFT system, subject to payment of a reasonable fee (in the absence of an adverse decision) and to reasonable time for compliance. (20-2-0)*

[29] Continued

issuer of a credit card or similar device; . . . ." 15 U.S.C. Section 1681a(d).

*Thus, an EFT system may now be covered under the Act with respect to some of its operations but not others, depending on whether the system is operating in an on-line mode to participating banks, or is accessing a negative file maintained by the switch. If the switch maintains a negative file on the customers of participating institutions, for use when those institutions' computers are down, then the switch may be considered a consumer reporting agency (and its messages, consumer reports) for purposes of the Act, but only for the messages originating in the negative file.*

*This anomaly arises because of the definition of "consumer report," which specifically excludes "any report containing information solely as to transactions or experiences between the consumer and the person making the report. . . ." (15 U.S.C. Section 1681a(d)). Thus, arguably, when the message comes directly from the bank concerning its experiences with its own customer, there is no consumer report, whereas when the switch accesses a negative file using information supplied by the bank, there is a consumer report.*

*The Commission concluded that to require a system to comply with the Act in one mode of operation and not in another, when the consumer is unable to know which is being used, is burdensome to the institutions and unsound as a matter of public policy.*



None of the Commission's recommendations designed to protect individual privacy or the accuracy of reported information should be subject to variation or waiver by agreement.

The institution maintaining the records should have a reasonable time in which to comply with a request for inspection, copying, or interpretation, and should, as is now provided by the Act (15 U.S.C. Section 1681j), be able to charge a reasonable fee unless the records have been used to make an adverse determination with respect to the consumer.

The Commission's recommendation that an individual be allowed to see and copy records about himself that are generated or maintained by an EFT system, when coupled with the Commission's other privacy recommendations, including the extension of the Fair Credit Reporting Act to cover guarantee and authorization systems, will help discourage questionable practices regarding the collection and dissemination of information.

For the consumer who is interested in information practices, the Commission recommended earlier in this chapter that a disclosure statement, given to the consumer when he opens an EFT account, inform him that he may have on request a detailed statement of the institution's information practices, including the types of information generally disclosed and the types of recipients. The Commission concluded that providing this information on request is preferable to setting it out at length in the disclosure statement. The Commission recommends in Chapter 2 that the disclosure statement inform the consumer of his statutory and contractual rights and liabilities concerning costs, methods of

correcting errors, and liabilities for unauthorized use of his EFT account. This is a significant amount of information; adding to it a detailed listing of information practices might well result in a disclosure statement so long, complex, and technical that the consumer would be unlikely to read it or unable to understand its implications. [31]

---

[30] In addition to credit bureaus, the paper-based check and credit payment systems have developed new service organizations that serve as central repositories of information. These include credit and check guarantee services and credit and check authorization services. Guarantee services insure the retailer or other payee of a check or debit that the item will be paid. Authorization services inform the payee of a check or credit that there are sufficient funds in the account to cover the transaction or, alternatively, that the account is not on a list of accounts that are in difficulty. EFT will enhance the ability of these organizations to collect and disseminate data.

[31] During the past decade consumer psychologists, by focusing on the ways in which individuals use and process information in dealing with products, services, and ideas, have begun to provide policymakers with some empirical guidance in determining how that information should be provided.

An overview and discussion of a variety of studies in this area can be found in George S. Day, "Assessing the Effects of Information Disclosures Requirements," Journal of Marketing, Vol. 40 (April 1976), pp. 42-52. See also James R. Bettman, "Issues in Designing Consumer Information



The one circumstance in which the information practices of the EFT system are of great concern to the consumer is when the institution uses information in its possession to make an adverse decision about the consumer, such as refusing to allow an EFT transaction. In that case, the Commission's recommendations provide that the consumer be informed of the source of the information, and be allowed to challenge and correct inaccuracies in the records at issue. The Commission concluded that these recommendations will result in a disclosure statement that is informative and easy to read and understand. At the same time, the consumer is assured of receiving additional information when he needs it.

## COMMENTS ON RECOMMENDATIONS OF THE PRIVACY COMMISSION

As stated above, the National Commission on Electronic Fund Transfers support the general principles enunciated by the Privacy Protection Study Commission. However, the NCEFT finds it necessary and appropriate to comment on the three recommendations (numbered 9, 10, and 11) of the Privacy Commission that are directed specifically to EFT.[32]

The Commission believes (22-0-1) that Recommendation 9 and 10 are reasonable and appropriate. Recommendation 9 states:

That individually identifiable account information generated in the provision of EFT services be retained only in the account records of the financial institutions and other parties to a transaction, except that it may be retained by the EFT service provider to the extent,

and for the limited period of time, that such information is essential to fulfill the operational requirements of the service provider.[33]

And Recommendation 10 provides:

That procedures be established so that an individual can promptly correct inaccuracies in transactions or account records generated by an EFT service.

However, the Commission disagrees with Recommendation 11, which states:

That no governmental entity be allowed to own, operate, or otherwise manage any part of an electronic payments mechanism that involves transactions among private parties.

---

[31]Continued Environments," *Journal of Consumer Research*, Vol. 2 (December 1975), pp. 169-177.

[32]These recommendations are contained in Chapter 3, "The Depository Relationship," in *Privacy Protection Study Commission, op. cit.*

[33]In particular, these records should be maintained and shared by an EFT switch only for the period of time necessary to resolve disputes-- perhaps a few months. After that time, there are no operational needs for the switch to store them, and the records should be destroyed. This point is discussed earlier in this chapter.

37

Digitized by Google

This recommendation is written very broadly and could be read to cover both of the Federal Reserve's existing electronic payments-mechanism operations. Since enactment of the Federal Reserve Act in 1913, the Federal Reserve System has operated the Federal Reserve wire transfer network--the primary means by which this country's business transactions are settled through the transfer of reserve account balances and Government securities.[34] The Federal Reserve also operates automated clearing houses (ACHs). These facilities are used by the Department of the Treasury to transfer Government payments, such as Social Security benefits, and by commercial banks and thrift institutions to transfer recurring payments, such as wages and salaries.

Enactment of Recommendation 11 might bar the Federal Reserve from operating any electronic payments mechanisms, including the Federal Reserve wire transfer network. Such an action could have a serious destabilizing effect upon the Government securities market, the Federal funds market, and the ability of the Federal Reserve to carry out monetary policy. These impacts would be particularly pronounced during the transition period, as the Federal Reserve discontinued its operations.

It appears from the discussion in its final report that the Privacy Commission intended Recommendation 11 primarily to apply to the operation of the Federal Reserve's automated clearing and settlement facilities. Federal Reserve ACH facilities currently distribute 78 million Government payments, at considerable cost savings to the Department of the Treasury, and about 7 million commercial payments each year. These payments are made to individuals and require that computer data identifying

individuals pass through the Reserve Banks. The Privacy Commission was concerned by Federal Reserve operation of such an EFT system.

The Privacy Commission's recommendation in this area is based on the belief that Federal Reserve Bank involvement in EFT payments will increase the likelihood and opportunity for Government agencies to obtain and possibly misuse information about individuals. Federal Reserve policy now provides for release of payments information only upon receipt of a subpoena or under other limited circumstances. Moreover, the intent of Recommendation 11--to prevent the Federal Reserve from releasing transaction information to other Government agencies--is largely accomplished by Recommendation 9.

For these reasons, the National Commission on Electronic Fund Transfers concluded that continued ACH operation by the Federal Reserve is appropriate at the present time.

*The Commission recommends (21-3-1) that Federal Reserve operations meet privacy objectives in two ways: (1) the Federal Reserve should follow rules and procedures with respect to privacy that are at least as confidential as those of private-sector EFT system operators; and (2) access by other Government agencies to records of ACH transactions in the temporary possession of the Federal Reserve should be restricted by rules and procedures that are at least as restrictive as those for access to*

---

[34] *See Appendix C, "The Payment System in the United States."*



ACH records maintained by private-sector financial institutions.

This recommendation, along with the Commission's recommendations concerning Government access to depository information,[35] provide strict protections for the privacy of information flowing through ACHs, without requiring the economic disruption that Federal Reserve withdrawal from the operation of ACHs at this time might involve.

---

[35]These recommendations are discussed earlier in this chapter.

Digitized by Google

Digitized by Google



Chapter 2

# Establishing and Operating an EFT Account

In addition to the broad issues related to privacy, there are many narrower--though equally important--consumer concerns regarding electronic fund transfers. This chapter discusses consumer issues related to the establishment and operation of EFT accounts. The Commission's deliberations and recommendations on establishing EFT account relationships between consumers and their depository institutions, presented in the first section of this chapter, focused on the following issues:

- The preservation of the consumer's freedom to choose among methods of payment in an EFT environment.

- The need for adequate disclosure by depository institutions of the consumer's rights and liabilities in EFT.

- The desirability of allowing unsolicited distribution of cards that access EFT accounts.

The second section of this chapter deals with consumer concerns relating to the ordinary operation of EFT accounts. That discussion also comprises three topics, as follows:

- Records, account statements, and proof of payment.

- Stop payment and reversibility of EFT transactions.

- Float.

## ESTABLISHING AN EFT ACCOUNT

### Choice

EFT should be a means to expand consumer choice among financial services, not to narrow it. Choice in this context has two elements. First, the Commission concluded that it is essential that consumers have the ability to choose among payment alternatives, and that any attempts to restrict such choice should be prohibited to the extent possible. The Commission recognized that social and economic pressure to

41

Digitized by 

conform and accept an unwanted service might be over-whelming, as one witness testified:

> While no proposal would legally require a person to enter the system, as a practical matter there may be a great deal of persua-sion and pressure put on people to become part of a system because it may become so much more convenient, and there may be sub-tle pressures such as the employers saying, "Well, I can't require you to have your check deposited directly, but you know everybody else is doing it and you would make it much easier for me if you have it done this way."

> What is the employee going to do? He's going to feel a great deal of pressure to cooperate, esepcially a low-income con-sumer who is usually not in the most se-cure position.[1]

The second element of choice is the consumer's ability to choose the kinds of EFT services that ap-pear most attractive. The Commission concluded that this type of choice is best protected by allowing EFT competitors the greatest possible freedom to develop and promote, at their own risk, a wide variety of EFT services, consistent with safe and sound financial practices.

Public policy decisions should take account of both elements of choice regarding EFT. Indeed, they are complementary. To the extent that consumers are free to choose among various payment alternatives, there is less need to legislate a "perfect" EFT sys-tem at the expense of evolutionary innovation. As long as basic consumer protections are provided, the marketplace can be allowed to determine which system features are most desirable and which features, al-though desirable, cannot be cost justified.

*In support of its belief in the importance of choice as both a consumer protection and a promoter of competition, the Commission approved the proposi-tion that freedom of choice among available payment instruments should be preserved.* (Unanimous voice vote in favor.)

*In view of this principle, the Commission makes the following recommendations:*

> *First, it should be unlawful to require an individual to accept a particular EFT service or do business with a particular depository institution as a condition of employment or receipt of Government benefit.* (Unanimous voice vote in favor.)

> *Second, it should be unlawful for depository institutions to require as a condition to a loan that a customer agree to pre-authorized debiting as a method of repayment.[2]* (21-3-0)

---

[1] *Statement of Mark Budnitz, Executive Director, National Consumer Law Center, Boston, Mass., in National Commission on Electronic Fund Transfers, "Consumer Issues in EFT, Part I, Testimony Presented to the National Commission on Electronic Fund Trans-fers, October 26, 1976," Internal Working Document IWD-56 (October 1977).*

[2] *See Chapter 4, "Additional Consumer Concerns,"*


Digitized by Google

*Third, where an employer pays his consenting employees by pre-authorized EFT credits, the employees should have the right to choose the depository institution to receive the credits. This recommendation also applies to pension and Social Security benefits. (23-0-0) In addition, no geographic restrictions should be imposed by law to limit the ability of a payor to transmit any pre-authorized credit to a deposit account specified by the payee, wherever the payee's depository institution may be located. (25-0-0)*

These recommendations on consumer choice pertain to pre-authorized payments. The Commission recognized that choice among payment alternatives in purchase transactions is desirable as well. Although the Commission realized that such choice is important, it did not conclude that it is necessary or appropriate to enact legislation to prohibit merchants from limiting payment to a particular mode; nor should legislation require that merchants accept payment through all payment mechanisms, including checks, credit, EFT debits, or cash. There are legitimate business reasons why a merchant may favor one payment mechanism over another. For example, some gas stations that stay open late at night fear that the acceptance of cash will encourage robberies. On the other hand, merchants who require consumers to use unpopular payment methods are likely to lose business to their competitors. Accordingly, the Commission concluded that the marketplace will protect consumer choice at the point of sale (POS).

The Commission recognized that a merchant who accepts electronic transfers in payment will not necessarily agree to accept from every customer all transaction options that may be available through the customer's EFT card. The Commission concluded that merchants should not be precluded from promoting the use of a particular option (such as debit payments) or refusing to accept others (such as credit). However, the Commission also concluded that a merchant should not be entitled to know what EFT transaction option a consumer's card will trigger unless that information could affect the merchant's cost or risk in accepting payment.

*Therefore, the Commission recommends enactment of Federal legislation to ensure that to the extent that the merchant is unaffected as to cost or risk, the type of transaction that the customer's EFT card triggers at the point of sale should be confidential between the customer and his depository institution. (17-1-0)*

The Commission considered (and rejected) the notion of requiring the issuers of multipurpose cards to disclose at the point-of-sale terminal the type of transaction that would be triggered in each instance. In that way, the merchant and the consumer would know whether the consumer was paying for merchandise with his own funds or a line of credit. In the latter case, the consumer might then decide or be persuaded to use a payment mechanism less expensive to him and perhaps more advantageous to the merchant. The Commission rejected this idea because such a disclosure to the merchant would violate the consumer's privacy,

---

[2] *Continued for a discussion of the enforcement of consumer rights.*



and because the disclosure would be technically diffi-
cult and potentially costly to implement.

## Disclosure

The Commission concluded that the consumer
should be informed of the terms and conditions of an
EFT account before or at the time he opens the ac-
count. Without such disclosure it is not possible
for consumers to make meaningful choices among serv-
ices offered by depository institutions. It is also
important that consumers be made aware of rights and
duties involved in their participation in an EFT sys-
tem. For example, unless a consumer is clearly in-
formed of his duty to examine promptly his EFT de-
scriptive statement and to report errors or unauthor-
ized uses, it is unfair to penalize him for failing
to do so. Similarly, a consumer's right to obtain
prompt resolution of allegations he may make about
errors is not meaningful unless the consumer knows
how to exercise that right.[3]

*Therefore, the Commission recommends that Federal
legislation should be enacted to provide that prior to
or at the time of contracting for any EFT service, the
provider of the service should supply the user with a
written statement that informs him in clear and mean-
ingful terms of his statutory and contractual rights
and obligations with respect to procedures for error
resolution, liability for unauthorized use of his ac-
count, procedures for redress, and any costs that he
may incur for use of the system. An EFT provider
should disclose to the consumer any change in costs
or other terms or conditions of use a reasonable time
before the change becomes effective.[4] If the account
offers more than one transaction feature (for example,*

*debiting plus one or more credit features) and a
particular feature (such as an overdraft) may be
triggered without an explicit direction from the ac-
count holder at the time of the transaction, the
provider should also disclose the criteria used to
determine which feature to employ in any particular
transaction, and the costs or charges for each type
of transaction. (20-3-0) Such disclosure should aid
the consumer by letting him know, for example, whether
a transaction that may overdraw his account by a small
amount will be covered by his depository institution
without charge, will result in a loan for the amount
of the overdraft, or will result in an overdraft loan
of a prearranged amount and cost to him.*

*The Commission further recommends that the con-
sumer protection afforded by the preceding disclosure
recommendations should not be subject to waiver by
contract. (20-3-0)*

---

[3] *See Commission's recommendations on error
resolution in Chapter 3, "EFT Theft, Error, and
System Malfunctions."*

[4] *The Commission has also recommended that prior
to establishing EFT relationships, EFT institutions
should be required to provide their customers with
written notice that they are entitled, upon request,
to a detailed statement of the institution's prac-
tices regarding disclosure of financial information.
See Chapter 1, "Privacy."*



## Unsolicited Cards

Many EFT services are accessed by plastic cards (debit cards) used in conjunction with unique identifying codes commonly known as personal identification numbers (PINs). The Commission recognized the potential for consumer liability, coercion, inconvenience, or distress that could occur if EFT providers send debit cards and PINs to consumers who have not requested them. The Commission was also aware that some consumers consider the receipt of unsolicited plastic cards to be a nuisance.[5] The Commission was concerned, in addition, that the interception of unsolicited debit cards and PINs could lead to theft from a consumer's account and to that consumer's liability for losses. Moreover, some nonbank issuers of credit cards believe that they would be unfairly disadvantaged by the unrestricted distribution of debit cards with credit features, because they are prohibited from sending cards to customers without specific requests.[6]

On the other hand, it was argued before the Commission that the ability to place debit cards in the hands of existing or potential customers is a means of market entry for many institutions.[7] Some institutions believe that the ability to distribute debit cards to their customers has been crucial to their successful introduction of an EFT service, and that prohibition of unsolicited debit card distribution would preclude relatively small institutions from competing with larger depository institutions in the market.

In weighing this issue, the Commission struck a balance between the two positions. The Commission concluded that competition among EFT providers is

important. The Commission also concluded that most of the objections discussed above could be minimized or eliminated without banning unsolicited debit card distributions.

Fears of coercion could be assuaged by requiring a signed contract before the EFT account could be activated and by prohibiting the distribution of PINs until the card issuer has received the customer's signed contract.

Limiting unsolicited debit card distribution to an institution's existing depositors would prevent a profusion of plastic cards being sent to individual consumers.

---

[5] The Commission received correspondence from over 6,000 consumers concerned with the potential implications of EFT. Among the concerns cited by some was an annoyance with the idea of receiving unsolicited debit cards.

[6] 15 U.S.C. Section 1642.

[7] See, for example, Statement of David M. Phillips, Senior Vice President, Citibank, N.A., New York, N.Y., in NCEFT, "Consumer Issues in EFT, Part II, Presented to the National Commission on Electronic Fund Transfers, October 27, 1977," IWD-57 (October 1977), and Statement of Stephen Gardner, Vice Chairman, Board of Governors, The Federal Reserve System, Hearings, September 22, 1977, Subcommittee on Consumer Affairs, Committee on Banking, Finance, and Urban Affairs, U.S. House of Representatives, 95th Congress, 1st Session.



Potential disadvantages to credit card issuers could be avoided if the distribution of debit cards with credit features were prohibited.

Finally, the problem of consumer liability for theft or other unauthorized use of an unsolicited card could be eliminated by placing all liability for unauthorized use of a card prior to its acceptance on the card issuer.

*Therefore, the Commission recommends that Federal legislation should be enacted to provide that debit card issuers may distribute unsolicited debit cards without credit features only to their own depositors, provided that the PIN does not accompany the card and that each distribution is accompanied by a full disclosure of the recipient's rights and liabilities and a contract for the recipient to sign to indicate his acceptance of the card. After the card issuer receives the cardholder's signed contract, it would be permitted to send its customer the PIN needed to access the account. The card issuer would bear all liability for any loss due to unauthorized use prior to the date the contract is signed. (15-9-1)*

*The Commission also recommends that unsolicited distribution of debit cards with overdraft or other credit features should not be permitted as long as unsolicited credit card distributions are prohibited. (20-3-1)*

Although the Commission took no position regarding the current ban on the unsolicited distribution of credit cards, it concluded that the limited permission it has recommended for the distribution of unsolicited debit cards should not become a vehicle for putting unsolicited credit cards in the hands of

consumers by adding credit features to unsolicited debit cards after they have been accepted.

*Accordingly, the Commission recommends that Federal legislation should be enacted to render it unlawful to convert an unsolicited debit card into a card with credit features unless the cardholder subsequently requests the conversion. A separate written contract should be required before the conversion could become effective. (18-3-4)*

## OPERATING AN EFT ACCOUNT

### Account Statements, Records, and Proof of Payment

The Commission concluded that consumers should be provided with frequent, accurate, and comprehensive statements of account activity. Although account statements are important in a non-EFT environment, they become crucial in an EFT system in which a single account is being accessed by different means, such as check, debit card, telephone transfer, preauthorized transactions, and the like. Comprehensive statements that include a copy of transaction records or fully describe each transaction are essential to enable the customer to monitor his account activity and to detect errors.

Under the check system, the consumer relies on cancelled checks accompanying the account statement in order to prove payment. There are two forms of monthly statements in the credit card system: "country club billing," which includes copies of all chits issued at the point of sale and itemizes them briefly on the accompanying statement, and



"descriptive billing," which does not return the chits but describes each transaction in a detailed fashion.

Functional equivalents of one or the other of these records must be available to consumers using EFT systems. As one expert stated to the Commission:

> Consumers have been trained for at least 50 years to use checks as receipts and proof of payment in transactions. Checks are so used not only to resolve disputes with obligees, but also in tax audits, etc. . . . Thus, any EFTS should provide hard copies of the transaction which are acceptable to resolve disputes and evidence payment in the same manner as checks are now. It may not be necessary that these hard copies take a particular form as long as they are in fact, by custom or regulation, accepted by obligees, the IRS, etc.[8]

Consumer research suggests that the recordkeeping potential, proof of payment, and tax information contained on cancelled checks are viewed as extremely important by consumers. In a recent survey, 100 percent of checking account customers queried indicated that they kept their cancelled checks, and half of the respondents said they kept checks for 5 years or more. Among the reasons cited for keeping checks were to provide proof of payment, to verify income tax for audit purposes, to assist in income tax preparation, to provide proof in case the bank made an error, and to provide proof of values in insurance claims.[9]

The Commission concluded that depository institutions should offer their customers, at a minimum,

records that provide the same information and can be used in the same way as cancelled checks. Based upon its belief that the consumer will not use EFT services if he cannot obtain records that meet his needs, the Commission made the following statement in its interim report, EFT and the Public Interest:

> [I]n view of rapidly changing technological capabilities and the varied needs of different markets and different customers, the Commission sees no advantage to the consumer in recommending that particular recordkeeping devices be mandated. If consumers have choices among alternative payment services, this competition will insure that record systems will be available to meet their needs.[10]

---

[8]John A. Spanogle, Professor of Law, State University of New York, in NCEFT, "Compendium of Submitted Papers on Issues in EFT Presented for the Record of the National Commission on Electronic Fund Transfers," IWD-38 (October 1977).

[9]Opinion Research Corporation, "Virginia Consumer Attitudes Toward Payment Systems," prepared for the Virginia Special Committee on Paperless Entries of the Virginia Bankers Association (February 1974), p. 47.

[10]National Commission on Electronic Fund Transfers, EFT and the Public Interest (Washington, D.C.: U.S. Government Printing Office, February 1977), p. 21.



In view of the response to that interim recommendation, the Commission concluded upon further consideration that the need for adequate consumer EFT records today outweighs the Commission's earlier concern that the market be allowed to determine the type and frequency of EFT records that consumers desire and for which they are willing to pay. In regard to receipts, the Commission concluded that a consumer should have a right to receive a receipt in connection with most EFT transactions initiated at electronic terminals. *Specifically, the Commission recommends that Federal legislation be enacted to require that a printed or written receipt be provided to the user in conjunction with every EFT transaction that occurs at an electronic terminal, except that no receipt need be mandated for a cash withdrawal.* (18-3-2)

*Furthermore, the consumer needs up-to-date information on activity in his account. Therefore, the Commission recommends that Federal legislation should be enacted to require that the depository institution mail or deliver to the consumer a descriptive statement of his account for any month or monthly billing cycle in which an electronic fund transfer occurred.* (19-5-0)

*This statement should be as informative as possible. Therefore, the Commission recommends that Federal legislation should be enacted to require that for any transaction for which the transaction record or a facsimile thereof is not enclosed, the descriptive statement should reasonably identify each transaction in a manner that enables the account holder readily to ascertain the date of the transaction or date of charge, the amount, the location or other party to the transaction where applicable, the means of transfer (e.g., point of sale, automated teller*

*machine, or automated clearing house), and the type of transaction (e.g., deposit, cash withdrawal, purchase, etc.). Each transaction identified on the descriptive statement also should have a transaction number or other means of identification providing an audit trail. All service and transaction charges also should be clearly identified.* (18-4-2)

It must be recognized, however, that for certain types of accounts, particularly passbook savings accounts, where the only EFT activity involved is a recurring credit, such as a Social Security deposit, account holders do not normally need a monthly statement. In such cases a monthly statement would increase the cost of EFT without serving a necessary or useful purpose.

*Therefore, the Commission further recommends that the legislation recommended above provide that descriptive statements need not be mailed or delivered to customers whose only electronic transactions are pre-authorized credits, provided that the depository institution notifies the customer by use of a positive or negative notification system that his deposit has been received.* (21-3-1)[11]

The Commission also decided that it should strengthen its previous conclusions regarding the

---

[11] *Under a positive notification system, the customer is notified when his credit is received. In a negative notification system, the depository institution warrants to its customer that a recurring pre-authorized credit will be on deposit by a certain date each period unless the customer is notified to the contrary before that date.*



use of descriptive statements as proof of payment.
In its interim report, the Commission recommended
that:

> . . . the descriptive account statement, any
> debit or credit memorandum or receipt re-
> garding electronic funds transfer should be
> admitted as evidence of payment in disputes
> between the customer and any third party
> other than the depository institution and
> as proof of payment, and that thereafter
> the creditor should have the burden of
> proving that the debt was not paid.[12]

On further deliberation, the Commission con-
cluded that its recommendation could be improved. Re-
ceipts received at the point of sale are already ad-
missible in courts of law as evidence of payment.[13]
Therefore, there is no need for special EFT legisla-
tion regarding such receipts. Moreover, the Commis-
sion concluded that it would be unwise to mandate
broadly that "any debit or credit memorandum regard-
ing electronic funds transfer" constitutes proof of
payment. The types and sources of some memoranda
could render their validity questionable.

What the consumer needs most is assurance that
the descriptive statement that he receives in lieu of
cancelled checks will be as acceptable as his can-
celled checks as proof of payment.[14] *Therefore, the
Commission recommends that Federal and State legisla-
tion be enacted to provide that a descriptive state-
ment be accepted in evidence as prima facie proof of
payment when authenticated by the testimony of the
account holder.* (25-0-0)

*The Commission recommends that the consumer pro-
tections provided in the recommendations relating to
account statements, records, and proof of payment
should not be subject to waiver by contract.*
(23-0-1)

## Stop Payment and Reversibility

"Stop payment" refers to the ability of a payor
who has initiated payment or pre-authorized its ini-
tiation at a later date to halt the process before
final payment is made by the payor's depository in-
stitution. The most common form of stop payment
available to consumers in today's payment system in-
volves checks. The Uniform Commercial Code (UCC)
provides that the writer of a check may stop payment
of that check, providing that the bank receives the
stop-order in sufficient time to prevent the item
from being paid.[15] The amount of time a consumer has

---

[12]NCEFT, *EFT and the Public Interest*, p. 21.

[13]See, for example, *Federal Rules of Evidence*,
*Rule 803(6), 28 U.S.C.*

[14]*Cancelled checks have the added advantage of
facilitating the detection of debit errors in de-
pository institution statements. With EFT, consumers
will rely on receipts, bills, and pre-authorized pay-
ment agreements to detect debit errors in descriptive
statements.*

[15]*U.C.C. Sections 4-303; 4-403.*



to exercise this right is a function of the efficiency of the check payment system rather than a legally specified period of time.[16]

The ability to stop payment on a check gives consumers a degree of protection for a short period of time against merchants who would sell defective goods or others whose goods or services are less than the consumer feels he was promised in the bargain. Although the right to stop payment has been exercised infrequently in relation to the total number of checks written,[17] it is likely that the potential to stop payment on checks has an inhibiting effect on some who might otherwise take unfair advantage of consumers. On the other hand, the ability of consumers capriciously to stop payment no doubt causes many vendors of goods or services to refuse to accept checks.[18]

A consumer who uses credit cards for his retail purchases also obtains some protection against defective merchandise and unsatisfactory service. If, for example, a local purchase exceeds $50, the card issuer may often be subject to the claims of the purchaser against the person who honored the credit card.[19] Moreover, the cardholder is entitled to an investigation by the card issuer if he alleges that the goods in question were not delivered in accordance with the agreement made at the time of the transaction.[20] However, this protection--just as the protection provided by the ability to stop payment on checks--has its costs. Credit investigations are necessary to obtain credit, and not all consumers can obtain credit cards.

Cash--the most widely accepted payment medium-- provides no protection of the type afforded by stop payment. A consumer who pays with cash takes the risk that his purchase will be defective or the service delivered, unsatisfactory. His payment is final at the time of purchase, and his only protection is to deal with reputable parties.

With EFT, stop payment could be provided in at least two ways for POS transactions. First, a procedure called "value dating" could be used. Under that system the debiting of the consumer's account and crediting of the merchant's account are delayed for a short time--such as two days--although all the

---

[16]*Improved methods of processing checks have progressively shortened the time required for final payment of checks. The Federal Reserve System's implementation of Regional Check Processing Centers enables intraregional checks to clear within two days.*

[17]*In 1973, stop payment orders were entered for approximately .029 percent of all checks written. Bank Administration Institute, The Impact of Exception Items on the Check Collection System (Park Ridge, Ill.: 1974).*

[18]*To stop payment on a check does not affect the underlying obligation, but the expense of taking legal action against a consumer is often prohibitive in view of the amount of the purchase.*

[19]*See 15 U.S.C. Section 1666i; 12 C.F.R. Section 226.13(i).*

[20]*See 15 U.S.C. Section 1666(a)(3)(B)(ii); 12 C.F.R. Section 226.14(a)(2)(iii).*


Digitized by Google

necessary information is captured at the time of the transaction. A consumer could be permitted to "stop payment" before the value date.

With on-line POS systems, however, the payment between consumer and merchant is typically made instantaneously. It is literally not possible to stop a payment before it has been effected. Therefore, the second method of stopping payment is more accurately a reversal of payment. The purpose of reversibility is to give the consumer a two- or three-day period within which he could reverse his payment merely by instructing his depository institution to do so. As with checks, the consumer could stop payment for any reason or for no reason at all.

Some people believe that stop payment or reversibility should be mandated for all EFT systems in order to protect consumers.[21] Others believe that consumers may not accept EFT without reversibility. For example:

> If payments are to be "final" in the EFTS context in a shorter time than in the current "paper world," it may be necessary to make some provision to permit customers to reverse charges to their accounts in a way similar to stop payment even after "final payments." This may be required in order to satisfy consumer advocates and to gain wider acceptance in marketing the system to the public.[22]

The Commission concluded that reversibility for EFT payments at the point of sale should not be required by legislation. Conflicting market interests and differing operational characteristics of EFT systems are likely to allow for reversibility in some cases but not in others. Many merchants consider POS services advantageous only if they eliminate the risks involved in check acceptance. With mandatory reversibility, ultimate payment could not be assured. Even if the return of merchandise was required--as some have suggested--sellers of consumable goods, such as restaurants, would not be protected against fraud. Moreover, the merchants most likely to accept EFT services are the large retailers who generally allow customers to return merchandise within a reasonable period of time if it is accompanied by the sales receipt. Disreputable merchants are unlikely to accept EFT with required reversibility.

One of the primary advantages of POS debit transactions to consumers is acceptability of the debit card without need for any type of credit or background check at the point of sale. If an EFT system indicates that there are funds available (either directly or through the cardholder's overdraft line), a merchant needs no other information regarding the

---

[21] See Statement of Mark Budnitz, National Consumer Law Center, in NCEFT, IWD-38, for a response to questions regarding reversibility asked by the Commission.

[22] Statement of Norman Penney, Professor of Law, Cornell University and member of the Permanent Editorial Board of the UCC, in NCEFT, "Consumer Issues in EFT, Part I, Testimony Presented to the National Commission on Electronic Fund Transfers, October 26, 1976," IWD-56 (October 1977).


Digitized by Google

consumer. If reversibility of all transactions were mandated, many merchants would probably refuse to accept EFT at all, and those who did would probably seek some way to evaluate the risk that a potential EFT user might reverse a transaction without returning the merchandise. On the other hand, EFT providers may prefer reversibility on the theory that it will improve consumer acceptance of EFT, and many reputable merchants may be willing to accept EFT even with reversibility because it eliminates check handling and many of its attendant risks, such as insufficient funds.

Some consumer advocates seem to endorse the concept of mandatory reversibility of EFT transactions because they fear that eventually EFT will be the only method of payment available. It is clear, however, that all consumers will not use EFT systems, just as all consumers do not use checks, and it is unlikely that any consumer will use EFT services exclusively. EFT is likely to expand the range of payment alternatives rather than replace existing methods. Thus, a consumer who wishes to retain the leverage afforded by the "stop payment" tool and whose EFT system does not offer this feature would be able to use a check or credit card. In addition, EFT systems can offer features such as value dating, which is a deferred payment that could make a stop-payment privilege possible.

The Commission concluded that the proper arena for resolving these different views on the reversibility of consumer-initiated EFT transactions is the marketplace, where competing interests will vie for market acceptability. *Therefore, the Commission recommends that no legislation be passed at this time that specifies rights or procedures for stop payment or reversibility in customer-initiated EFT transactions.[23] (16-8-0)*

Many depository institutions now offer check-guarantee services, and the Commission concluded that Federal legislation is warranted with respect to such services. Check-guarantee services may offer the consumer the ability to have his checks accepted in a wider variety of places than before. On the other hand, check guarantee could be required by merchants who previously accepted checks without a check guarantee card. Because check-guarantee services are essentially an arrangement between merchants and depository institutions for redistributing the risk of check acceptance, the Commission concluded that such an arrangement should not alter the ability of the consumer to stop payment on his checks.

*Therefore, the Commission recommends that no one engaged in electronic check guarantee, authorization, or verification should be able to obtain from a customer a valid waiver of his right to stop payment on a check, nor should a check guarantor be able to assert a claim of holder in due course based on its guaranty of a check. (16-0-0)*

*Regarding pre-authorized EFT transactions, the Commission believes that consumers should be able to stop or reverse pre-authorized EFT debits. Evidence indicates that the marketplace currently enables consumers to do this. Therefore, no legislation is*

---

[23]*Some State EFT legislation mandates reversibility for EFT transactions at the point of sale. The Commission concluded that it would be wise to monitor State experiments in this area.*



recommended at this time. (17-2-3) In fact, the provisions for reversibility of pre-authorized debits that have been developed by the various automated clearing house associations are considerably more liberal than one would reasonably expect of a legislative solution.[24]

The Commission concluded, however, that consumer protections are necessary in situations where the contract that a consumer signs provides for reversibility of pre-authorized credits to the consumer's account. Therefore, the Commission recommends (20-3-2) that Federal legislation should be enacted to provide that if a payee has agreed that erroneous pre-authorized credits to his account may be automatically reversed, without obtaining his consent, such errors may be reversed only upon the following conditions:

- The receiving bank consents; and

- The reversal occurs within five days of the credit; and

- Where the payee has been notified of the original credit, he must be notified of the change before it occurs; and

- The payee's account must be corrected at approximately the same time as the credit is reversed.

The Commission also recommends that Federal legislation be enacted to provide that whenever a payor requests that a pre-authorized credit be reversed, the payor and the originating bank warrant the correctness of the reversal to the receiving bank, but the receiving bank remains liable to its customer for any improper reversal. (23-0-0)

Float

In testimony before the Commission and at other forums, consumers have expressed concern over the possible loss of float under EFT.[25] As the banking industry has developed more rapid means for clearing checks, float has decreased.

The Commission was not able to determine to what extent consumers need and value float. Consumer surveys suggest that the majority of consumers at some time have written checks knowing that their accounts had insufficient funds.[26] Whether consumers in general would be inconvenienced without float is unclear, but some consumers believe they would be.

---

[24]The rules of National Automated Clearing House Association, for example, allow a payor to reverse a pre-authorized credit without cause up to 15 calendar days after he is informed of the debit.

[25]"Float" is a term used to refer to the phenomenon whereby funds have been credited to one account before they have been debited from another account, and therefore, are temporarily credited to two accounts.

[26]James T. LePage and Associates, "Kansas Banking: Public Attitude Study on Kansans' Usage and Attitudes Toward Kansas Banking," prepared for the Kansas Bankers Association (October 1976).



Float can be provided in an EFT environment. One suggested approach is value dating, which was defined earlier in this chapter. *The Commission recommends, however, that the needs of the consumer regarding float should be handled, not by requiring any mandatory float or any automatic deferral, such as "value dating," but by offering provisions for deferred payment as a marketable and attractive service option upon which EFT accounts could be sold. The determination regarding the availability and characteristics of this service are best resolved by local market conditions.* (22-0-1)

Digitized by Google



Chapter 3

# EFT Theft, Error, and System Malfunctions

EFT systems, just as credit and check payment systems, are subject to theft, errors, and system malfunctions. Theft includes fraud and other types of unauthorized access to a depositor's account. The Commission uses the term "error" in this chapter to refer generally to accounting or arithmetic mistakes by the depository institution that appear in a customer's descriptive statement. Error also includes incorrect or unauthorized debits or credits and failure to enter debits or credits that were properly conveyed to the depository institution. System malfunction occurs when an entire EFT system or any part of it fails to operate properly. System malfunctions may cause errors, delay the payment of obligations, or result in overdrafts or nonpayment if deposited funds are not credited to an account before subsequent withdrawal orders reach the depository institution.

In the credit and check payment systems the problems of theft, error, and malfunctions are covered by laws and regulations that assign rights and liabilities between depository institutions and their customers.[1] There are no such uniform rules governing EFT systems. Rights and liabilities are assigned by contract, or the parties must rely on common law or statutory principles that were not designed to cover EFT.

The Commission viewed as unequal the bargaining power between EFT providers and most customers, and therefore rejected private contract as an appropriate vehicle for establishing these rights and liabilities. The Commission concluded that the Congress should legislate these rights and liabilities so that EFT, which eventually may become a national payment alternative, will have uniform rules. The principle that guided the Commission's recommendations in this area is that maximum protection should be provided to the individual consumer consistent with sound business practices that serve to protect the public at large.

---

[1] *The primary sources of these laws and regulations are the Consumer Credit Protection Act, 15 U.S.C. Section 1601, et seq., the Uniform Commercial Code, as enacted by the various States, and regulations issued by State and Federal agencies including the Federal Trade Commission (FTC) and the Federal Reserve Board (FRB).*

Digitized by Google


## THEFT

The problem of theft arises primarily from un-authorized use of an EFT account caused by a lost or stolen EFT card and its individual identifying device, such as the PIN (personal identification number). With a stolen or found EFT card and PIN, a thief may be able to gain access to an individual's EFT account funds and overdraft line of credit through an automated teller machine (ATM) or a point-of-sale (POS) terminal.[2] The thief can obtain cash from an ATM. At the point of sale, the thief can purchase goods or services, as well as obtain cash in some instances.

In the check system, the bank is responsible for identifying who has ordered it to pay. The bank is liable to its depositor for payments it makes pursuant to an unauthorized signature and for payments not in accord with its depositor's order, unless the depositor's negligence substantially contributes to a material alteration of the order or the making of an unauthorized signature. Where the depositor's negligence substantially contributes to the unauthorized payment, the bank is protected if it has acted in good faith and in accordance with reasonable commercial standards.[3]

In the credit card system, the cardholder is liable for the first $50 of loss from a lost or stolen credit card that occurs before the loss is reported, if the card issuer has complied with a series of statutory prerequisites.[4] In practice, credit card issuers absorb most losses caused by un-authorized use of lost or stolen cards.[5]

The Commission concluded that neither of these models is entirely appropriate for assigning liabilities for unauthorized use of an EFT account. The check model is appealing in that it requires the depository institution to bear all loss unless the depositor has substantially contributed to the loss through his negligence. However, the differences between checks (using signatures as an identifying device) and plastic cards (with PINs) as account-access

---

[2] A thief who obtains a customer's account number and PIN also may effect unauthorized payments by telephone from a customer's account to creditors already designated by the account holder. As long as depository institutions require their customers to sign any changes in the list of authorized creditors, however, the thief would be unable to obtain the funds by making payments to creditors of his own choosing.

[3] See U.C.C. Sections 3-401; 3-404; 3-406; and 4-401.

[4] 15 U.S.C. Section 1643; 12 C.F.R. 226.13(b) and (c).

[5] See for example Statement of David M. Phillips, Senior Vice President, Citibank, N.A., New York, N.Y., in National Commission on Electronic Fund Transfers, "Consumer Issues in EFT, Part II, Testimony Presented to the National Commission on Electronic Fund Transfers, October 27, 1977," Internal Working Document IWD-56 (October 1977), and Board of Governors of the Federal Reserve System, "Examiners Manual, Truth in Lending, Regulation Z."



devices render a simple negligence standard undesirable.[6]

The need to remember a number (the PIN) each time the EFT card is used may tempt many EFT cardholders to write the number in a place that is convenient to find each time the card is used. This procedure, however, neutralizes the security purpose of the PIN and permits a thief easy access to the account whenever the card is obtained. It may be essential that persons unable to memorize PINs be allowed to write their PINs somewhere without fear that a court might subsequently find that their methods were negligent and that they are liable for losses incurred through unauthorized use. Therefore, an unauthorized use rule that would expose an EFT cardholder to liability based on an undefined negligence standard would place a hardship on the cardholder.

The $50 liability limit of the credit card system has great surface appeal. It has worked well for credit cards--encouraging protection of the card and relieving anxiety over major losses with far less litigation than a simple negligence standard could have allowed. It is not, however, well suited to the EFT account for at least two reasons.

First, the EFT cardholder who suffers a loss in excess of $50 from unauthorized use of his card would probably lose $50 regardless of his care or negligence if the loss occurred before he could report the missing card. If a thief removed $200 from an EFT account, the depository institution would simply deduct $50 and recredit $150 to the depositor's account. There would be no need to bill and collect the forfeited amount, as with credit card accounts.

Thus, the careful customer would be penalized by $50 even when he could not have prevented the loss.

Second, a $50 limit on liability would be inadequate to encourage sufficient care in the protection of the EFT card and PIN. Theft by someone close to a cardholder (such as a relative or employee) of a card with the PIN written on it or kept nearby could easily lead to the draining of the cardholder's account. Despite the cardholder's failure properly to protect the account accessing devices, the cardholder's liability would be limited to $50. Once a thief had the card and PIN, he could withdraw cash from a series of ATMs without fear of detection, as these transactions require no signature and there is no one present to identify the user. If the liability of the cardholder were limited to $50 despite his negligence or even gross negligence, the depository institution and ultimately all EFT users would bear the added cost caused by an individual cardholder's failure to protect his own money. A credit card holder's line of credit is typically limited to less than $1,000. A thief using a stolen credit card must normally come face to face with people who could identify him, and he usually cannot directly obtain large amounts of cash. None of these inherent limitations on loss applies to an EFT account.

---

[6]Although current EFT systems use PINs as identifiers, technologies are being developed for more secure identifiers, such as electronic signature verification. When EFT identifying devices become as secure as check identifiers, it may be appropriate to reconsider the check model.

Digitized by 

*To protect EFT account holders from incurring any liability when they have not been negligent and to protect the account holder from vague negligence standards, the Commission recommends that the following four provisions be enacted as Federal legislation:*

1. *An EFT account holder should have no liability for an unauthorized use of his account unless the depository institution can prove, without benefit of inference or presumption, that the account holder's negligence substantially contributed to the unauthorized use and that the depository institution exercised reasonable care to prevent the loss. Negligence in this instance should be limited to writing the PIN on the card, keeping the PIN with the card, or voluntarily permitting the account accessing devices, such as the PIN and the card, to come into the possession of a person who makes or causes to be made an unauthorized use. (21-4-1)*

2. *Failure to notify the depository institution of an unauthorized use within 30 days after the receipt of a descriptive statement containing an unauthorized use should render the customer liable for any subsequent unauthorized use that could have been prevented by timely notification. (19-3-2)*

3. *An EFT account holder should have no liability for further unauthorized use of his account once he has reported that the device that accesses his account has been lost or that the security of his PIN has been violated. (23-2-0)*

4. *The customer's liabilities under this set of recommendations should not be increased by contract. (23-0-0)*

Under these recommendations, the cardholder need not worry that a court may find to be negligent some act that the cardholder thought was prudent. The provisions of the first recommendation warn the cardholder not to write his PIN on his card, not to keep his PIN and card in the same place (such as a wallet or purse), and not to give the card and PIN to another person. If the cardholder refrains from these three acts, he is assured of incurring no liability in the event his account is accessed in an unauthorized manner.

The depository institution has a heavy burden if it seeks to hold the cardholder liable for an unauthorized use of his account. If the depository institution can prove, however, that one of the specific acts of negligence set out in this recommendation substantially contributed to the loss, the cardholder will be liable for failing to protect his own funds. The Commission concluded that the effect of this recommendation would be that depository institutions would absorb the overwhelming majority of losses from unauthorized use, but that the specific negligence standards would encourage most account holders to avoid those practices most likely to result in unauthorized use.

The second recommendation requires the cardholder to exercise diligence to detect unauthorized use of his account. If the cardholder receives from his depository institution a descriptive statement that reflects an unauthorized use of his account, he should promptly bring that matter to the attention of



the depository institution so that steps can be taken to prevent further unauthorized use. If the cardholder takes no steps to assist the depository institution in stopping unauthorized use, he should not be able to hold the institution liable for subsequent unauthorized transactions.[7] However, this recommendation would not preclude the cardholder from recovering losses incurred from the unauthorized use that appears on that statement even if he did not bring it to the attention of the institution within 30 days. Prompt notification of the institution could not have prevented the unauthorized use that had already occurred when the statement was received.

The third recommendation parallels the rule for lost or stolen credit cards by terminating an account holder's responsibility for unauthorized transactions as soon as his lost or stolen card is reported. Reporting that the secret PIN has been discovered by an unauthorized person also absolves the account holder from any loss that occurs after that time. Once the depository institution has been put on notice that the account is vulnerable, it has the ability to close the account or take other steps to protect the funds of its depositor. Accordingly, the depository institution should bear the risk for any subsequent loss caused by an unauthorized use of the account. The fourth recommendation would allow a depository institution to agree to shoulder a greater risk for unauthorized use of an EFT account than the Commission has recommended, but would not allow that institution to disclaim or limit its liability beyond these recommendations.

The Commission's recommendations regarding unauthorized use of the EFT account are intended to apply only to theft of the cardholder's own funds. Where a thief obtains goods, services, or funds through an overdraft or other credit feature of an EFT card, the Commission recommends that the $50 liability rule applicable to credit cards should continue to apply. (21-1-0) Thus, an EFT account holder--even if negligent in any of the three ways set out above--would never be liable for more than the amount in his account plus $50.

Under these recommendations, the depository institution will be liable for all thefts of its customer's funds unless it can prove that the customer ignored the specific warnings set out in the first recommendation and thereby substantially contributed to the loss. The Commission concluded that placing all liability on depository institutions in most cases will create a strong incentive for institutions to develop and use the most secure technology possible for customer identification.

ERROR RESOLUTION

In EFT systems, as in other payment systems, errors inevitably occur. There are various types of errors. One results from computation mistakes. Another occurs when an incorrect debit or credit is entered; this may involve a debit or credit in the wrong amount or the entry of an unauthorized debit or credit. A third type of error involves the

---

[7]This assumes that the depository institution has provided sufficient information for the reasonably diligent customer readily to detect unauthorized uses of his account.



failure to enter a legitimate debit or credit into the account.

Many banking errors are routine and can probably be resolved without resort to a formal error resolution process. However, the Commission concluded that an error resolution procedure is desirable for several reasons. A formal procedure assures the customer that his error allegations will be addressed by the depository institution and that a record will be established in the event that his allegation of error results in a dispute. The procedure also encourages the customer to examine his descriptive statement promptly. It ensures that the customer will be properly debited or credited as quickly as possible if the account has been over-debited or under-credited. It enables the customer to obtain an explanation when he does not understand a portion of his descriptive statement.

The checking and credit card systems offer contrasting approaches to error resolution. Although the Uniform Commercial Code (UCC) sets out rights and responsibilities for depository institutions and their customers, it provides no formal procedures for resolving disputes. The Fair Credit Billing Act,[8] on the other hand, sets out explicit steps to resolve credit card billing disputes.

Under the checking system, a customer normally brings an alleged error to his bank's attention, and the bank takes whatever corrective action it deems appropriate, or it denies the error. If the dispute involves an allegation of a forged or altered item, the bank has the burden of proving that the signature was not a forgery, that the item was not altered, or that the customer's negligence substantially

contributed to the loss. However, it is the customer who must sue to recover if the bank does not agree that it has made an error.

In the credit card system, the customer brings his allegation of error to the attention of the card issuer, who must then investigate the claim. If, after investigation, the card issuer determines that the account statement was correct, the issuer may attempt to collect on the statement.[9] If the cardholder refuses payment, the burden of collection--including litigation--is on the card issuer. If the issuer turns over information regarding the nonpayment to a credit bureau, it must inform the bureau that the customer has contested the billing, and it must inform the customer of the name and address of the credit bureau.[10]

The type of error resolution procedure needed for EFT systems must take into account the various situations that may exist when a depositor alleges error in his account statement. The easiest situation is that of a mere computational error or other transcribing mistake made by the depository institution or its agents. An investigation should show that the original records do not support the account statement and the error can be readily rectified.

---

[8] 15 U.S.C. Section 1666, et seq.

[9] 15 U.S.C. Section 1661(a)(3)(B)(ii); 12 C.F.R. Section 226.14(a)(2)(iii).

[10] 15 U.S.C. Section 1666a(b); 12 C.F.R. Section 226.14(e)(2).



A more difficult situation involves an unauthorized entry--particularly a debit--to the account. In this case the depositor informs the institution that his descriptive statement shows a debit on a certain date at a certain location, and he denies having originated or authorized the transaction. If the transaction is a pre-authorized debit or a POS transaction, there will be records to test the validity of the depositor's allegation. If, however, the transaction occurred at an ATM, there is no current method to determine who made the withdrawal. In this situation, the depository institution must, under the Commission's theft recommendation, recredit its depositor's account unless it is prepared to prove fraud on the part of the depositor or that the depositor was negligent in one of the ways set out in the theft recommendations, thus substantially contributing to the loss.

A third error situation involves error not made by the depository institution. The error, for example, may have been made by a merchant at the POS terminal or by the depositor's employer in preparing the payroll tape. In this situation, the Commission concluded that the depository institution should investigate the circumstances and inform its depositor whether the institution's records confirm that the amount transferred at the POS terminal or the amount on the payroll tape was correctly entered on the depositor's descriptive statement. If it was, the financial institution should have no further obligation once it has informed the relevant third party of the depositor's error allegation. If the depositor has a POS receipt showing a lesser amount than the descriptive statement, or a payroll record showing he was underpaid, the dispute should be amenable

to settlement in the normal fashion between these parties.[11]

A fourth situation involves a dispute over the amount of a deposit, particularly where cash is involved. Where the depositor has received a receipt verifying the amount of the deposit, that receipt should be _prima facie_ evidence of the amount of deposit, and the depository institution should be required promptly to correct a descriptive statement that indicates a lesser deposit. Cash deposits made at ATMs pose a more difficult problem because there is no one to verify the amount of the deposit at the time it is made. Therefore, deposit-generated receipts should not be treated as _prima facie_ proof of the amount of deposit.

The Congress should enact an error resolution procedure for consumer EFT accounts that will resolve error allegations within a reasonably short, yet realistic, timeframe. This procedure should be capable of minimizing those occasions when a depositor is deprived of funds because of a dispute with his

---

[11]There are many types of potential third-party disputes that could be considered--some of which could cause problems. However, these problems are not inherently different from the day-to-day problems presently involved in commercial transactions. The Commission concluded that it would be futile and unwise to try to anticipate all such situations and to legislate solutions. If future experience demonstrates that particular problems are not being equitably handled by the marketplace, legislative solutions might then be appropriate.


Digitized by Google

depository institution over an alleged unauthorized access to his account.

*The Commission therefore recommends that:*

1. *The depository institution should provide its EFT depositor with a procedure by which the depositor can readily notify the institution in the event of any account error, unauthorized use of the account, or lost or stolen card or PIN.* (23-0-0)

2. *If the depositor brings any alleged error (including unauthorized use) to the attention of his depository institution within 60 days after receiving the descriptive statement on which the alleged error appears, the depository institution should, not later than 10 business days after receiving notice of such alleged error, either inform the depositor that the error has been corrected, or send a written response to the depositor, acknowledging receipt of the error allegation.* (21-0-1)

3. *The depository institution, not later than 45 days after receipt of the original notice of an alleged error, should correct the error or explain to the depositor, in easily understandable language, the absence of error on the part of the depository institution and send the depositor such evidence as is available supporting the absence of such error.* (18-3-4)

4. *If the transaction for which the depositor alleges error involves a party other than* *the depository institution, and the depository institution denies error on its part, the institution, at the time it explains the absence of error on its part to the depositor, should also notify all relevant third parties of the alleged error and inform the depositor that they have been notified.* (16-4-1)

5. *If the depository institution denies the alleged error or its responsibility for the error or unauthorized use, the customer should have the burden of initiating any further proceeding, such as a lawsuit, to establish his right to have his account credited or recredited. Once a lawsuit has been initiated by a depositor, the depository institution has the burden to prove that there was no error or unauthorized use for which it was responsible.[12] If the customer establishes his right to a credit or recredit based on an unauthorized use of his account or an error for which the depository institution was responsible, the depository institution was responsible, the depository*

---

[12]*Once a lawsuit over an unauthorized use has been initiated by a depositor, the depository institution must prove that the account holder's negligence substantially contributed to the unauthorized use in one of three specified ways. Additionally, the depository institution must prove that it exercised reasonable care to prevent the loss. (See the Commission's "Theft" recommendation.) Alternatively, the depository institution may attempt to prove that the depositor's claim of unauthorized use is fraudulent.*



*institution which had not corrected the error within the 45-day period should have to pay the depositor, for the time his money was not available to him, the highest rate of interest for a consumer loan at that institution, as well as all reasonable attorneys' fees and court costs incurred by the depositor in establishing his right to a credit or recredit of his account. Further, if the depositor proves that the denial was not made in good faith, the depositor should recover any and all damages proximately caused by the error or unauthorized use, including consequential damages. (19-2-1)*

6. *The rights and liabilities established by these recommendations should not be subject to waiver by contract, in regard to the accounts of individuals. (22-0-0)*

A single depository account can, of course, be used both as a checking account and for electronic transactions. *The Commission intends that these rules apply to any EFT account, whether or not non-EFT methods can also be used to access the account. (18-3-0)* The rights and liabilities governing checking relationships, contained in the UCC and elsewhere, would continue to apply. They would be supplemented by these rules.

One type of error that has not been addressed in this discussion involves wrongful dishonor. Wrongful dishonor refers to a situation in which a depository institution refuses to pay an item that is properly payable. In the check system, this would refer to the nonpayment of a check when there should have been sufficient funds in the account and when there was no other reason not to make payment.

In an EFT environment, this type of error could occur in a situation in which a customer uses his debit card at an ATM or at the point of sale, and the depository institution refuses to accept the transaction even though there should have been sufficient funds in the account to cover the transaction and there was no other valid reason to refuse the transaction. In the checking system a payor bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item.[13] When the wrongful dishonor occurs through mistake, liability is limited to the actual damages proved. This may include damages for arrest, prosecution, or other consequential damages proximately caused by the wrongful dishonor. *The Commission recommends that the wrongful dishonor rules for checking transactions should also apply to EFT transactions. Moreover, the Commission recommends that where the wrongful dishonor of an attempted EFT transaction is willful or deliberate, the damages should include damages to reputation as fixed by the trier of fact. (20-1-0)*

SYSTEM MALFUNCTIONS

If an EFT system were to malfunction, payments that had been initiated or pre-authorized for initiation on a certain date might be delayed until the system was repaired. Although neither the payor nor the payee would necessarily be at fault, one or the other would be temporarily disadvantaged even if the

---

[13]*U.C.C. Section 4-402.*

63



EFT provider were ultimately liable. If the debt was considered to be unpaid, the payor would have to repay his debt or suffer the consequences of defaulting on his obligation. If the debt was considered to be paid, the payee would lose the use of the money until the system was repaired.

In the check-payment system, a debtor's obligation is met once the creditor receives a check. When the creditor accepts a check and initiates its collection, the UCC "suspends" the obligation pending the creditor's receipt of final payment or dishonor of the check.[14] When payment is received, the date of payment is considered to be the day on which the check was accepted.

Thus, in the check system, lost opportunity costs occasioned by "collection float" fall initially on the creditor during the suspension period. Once a consumer's check for payment on a mortgage, a life insurance policy, or the like has been accepted for collection by the consumer's creditor, the consumer is not in default as long as the collection is ultimately effected.

A depository institution that delays check collection exposes itself to liability. Normally, final payment on a check is made in a matter of days. Where a depository institution delays payment of an item, the penalty in most cases is liability for the face amount of the item whether or not the drawer has sufficient funds with which to make the payment.[15] However, the depository institution's delay "is excused if caused by interruption of communications facilities, suspension of payments by another bank, war, emergency conditions or other circumstances beyond the control of the bank provided it

exercises such diligence as the circumstances require."[16]

The Commission concluded that the protection that a debtor receives under the checking system, once he has initiated payment, should be extended to EFT. When a consumer initiates an electronic payment to his creditor, who has agreed to accept payment in this form, the underlying debt should be suspended pending completion of the payment. If a malfunction of the EFT system delays final payment, the creditor rather than the debtor should initially bear the lost opportunity costs occasioned by the delay in payment.

As in the check system, depository institutions should ultimately be liable for delays where the institution's reasonable care could have prevented the delays. However, where the delay results from causes beyond the institution's control and the institution exercises reasonable care to prevent the EFT system malfunction, the institution should not be liable, provided it exercises such diligence as the circumstances require. The Commission also concluded that depository institutions should be held liable for any wrongful dishonor when a system malfunction causes an unreasonable delay in crediting a deposit. As with failures to debit promptly, delays in crediting a deposit should be excused where the cause of the system malfunction is beyond the control of the depository

---

[14]U.C.C. Section 3-802(1)(b).

[15]U.C.C. Section 4-302(a).

[16]U.C.C. Section 4-108(2).



institution and the institution has acted with reasonable care.

Further, the Commission concluded that a party who fails to obtain funds from a cash dispenser or an ATM to meet an obligation should have no recourse against a depository institution that has employed reasonable care to prevent EFT system failure. Ordinarily, cash is used for relatively small purchases and damages caused by delay are inconsequential. Moreover, the opportunity to claim fraudulently an inability to pay substantial obligations in cash when a cash dispenser is found to be "down" is so great that it would be unfair to impose liability on careful depository institutions in this situation. Finally, the Commission concluded that a customer who has notice that an EFT system is not functioning properly acts at his own risk if he attempts to initiate a transaction.

The rights and responsibilities discussed above in relation to system malfunctions are stated more specifically in the following paragraphs. *The Commission recommends that the Congress enact legislation embodying these rules:*

1.  *As between debtor and creditor, if a debtor having the requisite balances in his account initiates an electronic fund transfer in payment of an obligation to a creditor who has agreed to receive payment in an electronic mode, and the payment is delayed through no fault of the debtor, the obligation is suspended pending completion of the payment. However, a creditor should be entitled to receive payment from its debtor in a nonelectronic mode if it requests such*

*payment in writing after the EFT system has malfunctioned, provided that the payor's account has not yet been debited, or, if debited, it has been recredited.* (15-2-0)

2.  *A depository institution offering an EFT system should be liable (1) for damages caused by delay or failure to make a payment resulting from system malfunction, or (2) for damages proximately caused by a wrongful dishonor resulting from failure promptly to credit a deposit because of a system malfunction, except that:*

    a.  *A depository institution that has employed reasonable care to prevent EFT system failure should not be liable for damages resulting from system malfunction occasioned by a lessening, an increase, or an interruption of electric power, delay in or failure of communications facilities, strikes, war, riot, civil commotion, vandalism, or other circumstances beyond its control, provided it exercises such diligence as the circumstances require; and*

    b.  *A depository institution that has employed reasonable care to prevent EFT system failure should not be liable for damages based upon a debtor's failure to meet an obligation because a cash dispensing machine failed to function.* (19-1-1)

3.  *A customer may not recover damages from a depository institution if the customer knew,*

65

Digitized by Google


or had reason to know, when he attempted to initiate a transaction, that the system was not functioning properly.  (22-0-1)

4.  The foregoing should not be subject to variation by agreement except that a depository institution may, in specific cases, assume a greater liability, or that ultimate liability for malfunction may be allocated among EFT providers by agreement among them.  (24-0-0)

Digitized by Google



Chapter 4

# Additional Consumer Needs

In addition to the consumer concerns discussed in earlier chapters, there are several important consumer issues that should be considered by the Congress or other appropriate groups. The ability of consumers to assert their rights effectively and to benefit from the protections recommended in the previous chapters is one example. This will depend upon enactment of legislation that gives consumers and others acting on their behalf the ability to redress violations of rights and protections.

Other issues are protection of an individual's earnings from attachment or garnishment in an EFT environment, consumer education to enable the public to make informed choices about the benefits and risks of EFT, and the need for study of the ways in which the benefits of EFT can be realized by low-income consumers.

## CONSUMER REDRESS

Even if the consumer protections recommended in previous chapters are enacted into law, violations may occur. Some may result from unintentional errors that occur despite the use of preventive procedures. Informal resolution of these violations may avoid costly and protracted litigation and, therefore, should be encouraged. However, suitable formal procedures should also exist for enforcing consumer rights and bringing violators into compliance with those EFT consumer protections that are enacted into law. There are three appropriate approaches for redress of violations of consumer EFT rights: administrative enforcement, criminal liability, and civil liability.

Compliance by most depository institutions with the Commission's consumer recommendations that become Federal law could be enforced by the administrative agencies that regulate federally chartered depository institutions and the Federal agencies that insure deposits. Compliance by others could be enforced at the administrative level by the Federal Trade Commission, which is already empowered to use a variety of tools, including cease and desist orders, to prevent unfair or deceptive acts or practices. Criminal penalties, including fines and imprisonment, could also be provided for intentional violations of EFT consumer laws.

Digitized by Google


In addition, consumers should be granted the right to recover damages through civil litigation for violations of EFT consumer protection legislation. Prompt error resolution, choice among payment mechanisms, privacy, disclosure of rights, and receipt of proper account statements, for example, are important consumer rights, and the consumer's ability to obtain compensation when such rights are violated to any substantial degree will discourage violations.

*Therefore, the Commission recommends that Federal legislation should be enacted giving consumers a right to recover damages through civil litigation for injury suffered as a result of violations of the consumer protection provisions recommended in this report. (19-1-3)*

A right to sue for compensation could be useless if the dollar amounts of actual damages are low. Consumers whose rights have been substantially violated may be discouraged from seeking redress when they cannot prove significant monetary damage, although they have suffered considerable inconvenience.

*Therefore, the Commission recommends that a minimum recovery without regard to actual damages may be appropriate in cases where substantial actual damages are unprovable. Punitive damages may be appropriate when the violator has acted maliciously or with willful and wanton disregard for consumer rights, such as the right to privacy. (19-1-3)*

Despite provisions for minimum recoveries, individual consumers may find it impractical to initiate and carry through complex or time-consuming legal actions. When large numbers of consumers have been injured in relatively small dollar amounts by the same or similar violations of EFT consumer rights, class actions may be the most practical consumer-initiated remedy. In the Commission's judgment, however, consumer class actions should not be permitted to become a tool to obtain leverage for settlements in cases where alleged violations are minor or result from good-faith errors.

*Therefore, the Commission recommends that with appropriate safeguards against harassment suits, class actions may be an appropriate means of seeking redress for actual damages. Successful plaintiffs in all litigation over EFT consumer rights should be awarded reasonable attorneys' fees and costs of litigation. The right to civil recovery recommended in this chapter is intended to be in addition to any specific rights to recovery that a consumer may have, based on other EFT consumer recommendations of this Commission, such as the right to recover damages caused by system malfunction or unauthorized use of a consumer's EFT account. (19-1-3) Moreover, none of the provisions for consumer redress recommended by the Commission should be subject to waiver by contract.*

## PROTECTION OF EARNINGS FROM ATTACHMENT OR GARNISHMENT

Attachment and garnishment are legal processes established by State laws for the seizure of a debtor's property. The laws concerning these processes vary considerably from State to State. "Attachment" generally refers to the process by which an individual's assets, including bank accounts, are seized for payment of a debt. If a debtor's bank account can be identified, the entire amount may commonly be attached.


Digitized by Google

"Garnishment" generally refers to a legal process served on a debtor's employer, directing him to withhold a percentage of the debtor's earnings over a period of time to satisfy a debt. In some jurisdictions, periodic payments pursuant to a pension or retirement plan can also be garnished.[1]

Congress has determined that unrestricted garnishment of compensation for personal services encourages predatory extensions of credit, causes loss of employment, and forces employees into bankruptcy. To deal with this problem, Congress enacted legislation placing restrictions on garnishment as Subchapter II of the Consumer Credit Protection Act.[2] These provisions establish a self-executing exemption from garnishment for 75 percent of disposable earnings in most cases. This exemption also applies to periodic payments from a pension or retirement program.

Although 75 percent of an individual's disposable earnings are normally protected from garnishment, it is unclear whether that protection effectively continues if the individual deposits the exempt 75 percent in a depository institution. Indeed, in a recent decision, a U.S. District Court held that a bank has no obligation to object to an attempt to attach wages deposited into an account it holds.[3]

A person who is paid by cash or check could protect exempt portions of his disposable earnings or income from further seizure by not depositing the cash or check. However, if a person receives payment through a pre-authorized EFT direct deposit, that portion of an individual's disposable earnings that Congress intended to exempt from garnishment may be threatened by attachment of his depository account, at least until the pre-authorized direct deposit

agreement can be revoked. The increased use of pre-authorized payroll deposits by large corporations may also enable creditors to identify more easily the depository institutions where debtors hold accounts if, as the Commission expects, many employees with no previous depository relationship choose the employer's depository institution.

Pre-authorized payroll deposit is not new, but EFT is likely to increase the use of this payment method because it may offer cost savings to employers. EFT may also extend pre-authorized payroll deposits to many low- and moderate-income wage earners who did not

---

[1] "Garnishment" is a word of art that is defined differently by individual State statutes. It is sometimes used broadly to include attachment of a debtor's earnings held in a bank account. In this report, "garnishment" is used more narrowly to indicate a procedure for withholding earnings at their source.

[2] 15 U.S.C. Section 1671. et seq.

[3] *Dunlop* v. *First National Bank of Arizona*, 399 F. Supp. 855 (D. Ariz. 1975), app. pending as *Usery* v. *First National Bank of Arizona*, No. 85-3763, 9th Circuit. Other cases have held that the exempt earnings of a debtor do not lose their exempt character by being deposited in a bank account. See, e.g., *Rutger* v. *Shumway*, 26 P. 321 (Colo.); *Staton* v. *Vernon & Oskaloosa National Bank*, 279 N.W. 763 (Iowa); *Colonial Discount Co.* v. *Wilhelm*, 40 N.Y.S. 2d 298 (N.Y.); *Williams* v. *U.S. Fidelity & Guarantee Co.*, 107 F. 2d 210 (D.C.); and *Gaddy* v. *First National Bank of Beaumont*, 238 S.W. 472 (Tex.).


Digitized by Google

previously have an account at a depository institution. If this happens and if depository institutions are not required to segregate pre-authorized deposits of earnings from other deposits and protect them from attachment, protection of an individual's earnings may be seriously compromised in an attachment proceeding.

In the Commission's judgment, the Congressional intent to protect an individual's earnings or income should be carried out regardless of the mode of payment chosen by that individual. For this reason, the Commission recommends below that Congress establish an exemption from attachment or garnishment whenever earnings are deposited directly into an individual's account in a depository institution on the basis of a pre-authorization agreement.

The Commission was aware, however, that practical problems preclude basing an exemption on earnings on deposit in an individual's account. An individual may receive payments from many sources. Although the depository institution can identify pre-authorized payments, it cannot easily distinguish between pre-authorized deposits of earnings, pension payments, and other kinds of payments, such as interest or dividends. As the use of pre-authorized payments expands, the problem of distinguishing earnings from other types of payments will become more difficult. A depository institution does not know the total compensation due its account holder, the amounts devoluntarily withheld at the source, or amounts deposited in other institutions. Nor does a depository institution know whether any part of the account holder's earnings have been garnisheed at the source. Any unauthorized communication of that information would be an invasion of privacy. Finally, the depository institution does not know how to allocate withdrawals from an account between earnings deposits and deposits from other sources. The depository institution, therefore, does not know when an earnings deposit has been fully withdrawn. In view of these considerations, the Commission makes several specific recommendations.

*First, the Commission recommends that Federal legislation should be enacted exempting an appropriate dollar amount of a depositor's balance in a depository account from seizure by legal process, whether attachment or garnishment, if any part of that balance is due to pre-authorized direct deposits from any source.[4] An additional dollar amount may be specified for joint accounts.* (22-2-0)

*Second, the Commission recommends that Congress provide for increases in this exemption to accommodate inflation by indexing the specified dollar amount to the Consumer Price Index or some other appropriate measure of inflation.* (22-2-0)

*Third, the Commission recommends that the exemption from seizure by legal process should be applied automatically, regardless of whether any part of the account holder's earnings has been garnisheed at the source. In addition, the exemption should not be subject to waiver by the account holder.* (20-0-3)

---

[4]*California exempts the first $500 of a depository account from levy of attachment or execution in any manner where one depositor to the account is the designated payee of a directly deposited payment. If two or more depositors to the account are designated payees of separate payments, the exemption is $750. California Code of Civil Procedure Section 690.30.*



*Finally, the Commission recommends that States be permitted to adopt legislation providing for a larger dollar amount exemption than the dollar amount provided by Congress. Moreover, nothing in these recommendations is intended to preclude an account holder from claiming any other exemptions provided by law. (18-4-1)*

The recommended exemption could be implemented easily. If a deposit account were attached, only funds in excess of the exemption level, if any, could be paid to the creditor. Funds up to the amount of the exemption would remain in the account for the use of the account holder.

## EFT EDUCATION

The public will be most successful in obtaining the advantages of EFT (and avoiding those aspects of EFT that it deems undesirable) if it understands the operation of EFT--its potential benefits and limitations.

*The Commission recognizes that failure to understand the basic operations involved in financial transactions--and EFT transactions in particular-- hampers consumers in making informed choices among payment alternatives. The Commission urges EFT providers to educate the public in this regard. (17-6-0)*

## EFT AND THE LOW-INCOME CONSUMER

Regardless of its costs or benefits, EFT, as it is now developing, will be fully available only to those individuals who have accounts with depository institutions. The Commission was concerned that this fact may prevent a large segment of the population from participating in EFT systems.

A significant portion of the Nation's households do not use available financial services, as shown by the data summarized in Table 4.1.[5] Some consumers

| Table 4.1. | HOUSEHOLDS WITHOUT FINANCIAL SERVICES |
|---|---|
| 16% | No financial assets |
| 24% | No checking accounts |
| 23% | No savings accounts |
| 49% | No credit cards of any kind |

choose not to use these services; others are not familiar with the range of available payment alternatives. Certain persons, however, are denied services by depository institutions when the institutions determine that these consumers are poor risks or would

---

[5]*Louis Harris Associates, Second Study* (1972); George Kantana and others, *1970 Survey of Consumer Finances* (Ann Arbor, Mich.: Braun-Brumfield, Inc., 1971); and Lewis Mandell, *Credit Card Use in the United States* (Ann Arbor, Mich.: Institute for Social Research, University of Michigan, 1972).



not generate a sufficient volume of business to make their accounts profitable. Low-income consumers constitute a large portion of the group that is involuntarily excluded in this manner.

Testimony before the Commission indicated that consumer groups fear that the exclusion of low-income consumers from participating in EFT systems would result in their having to continue to pay more for goods and services because they will be forced to use more expensive payment methods. Moreover, such exclusion would deprive these consumers of the added convenience of EFT services. It would also foreclose the protection from robbery that EFT provides by reducing the individual's need to use cash, and in other ways.

Low-income consumers now use payment services that, in some cases, are more expensive and less convenient than those available to depository institution customers. Cash is the primary means of payment. The major--and often only--noncash money transfer service available to this segment of the population is the money order, which is less convenient (a trip to the offeror is required) and more costly than a check. Although users of Government money orders (issued by the U.S. Postal Service) have access to an efficient and fairly risk-free service, those who use money orders issued by some private companies may not have the same privileges and rights as those who use other payment services.[6]

Low-income consumers often have difficulty cashing the checks written to them by employers and others because they do not have depository accounts. Check-cashing services generally will cash only Government checks (welfare, Social Security, and similar payments), or payroll checks of known corporations-- and these only for a fee.[7]

Clearly, low-income consumers often pay more for payment services and receive fewer benefits from them. EFT offers an opportunity to provide less costly and more convenient financial services to this group. In the estimation of depository institutions, the high cost of building brick and mortar installations often has exceeded the potential benefits from locating financial facilities in disadvantaged neighborhoods. Conceivably, less costly EFT terminal-based systems could eliminate this barrier and provide financial services within such neighborhoods.

---

[6] *The issuance of money orders, unlike other payment services, is not regulated. The failure in 1977 of a major money order firm, U.S. Navigation, and the subsequent loss to consumers, has led many States to establish insurance funds and other protections for consumers using money orders issued by private firms.*

[7] *One of the benefits of EFT that may be available to the low-income consumer is the check-guarantee service. For example, Allan D. Nichols, Executive Vice President, First National Bank of Atlanta, testified before the Commission that the Atlanta Honest Face EFT system will guarantee checks for any Georgian who is not in their file of persons who have tried to negotiate bad checks. See National Commission on Electronic Fund Transfers, "Consumer Issues in EFT, Part II, Testimony Presented to the National Commission on Electronic Fund Transfers October 27, 1976," Internal Working Document IWD-57 (October 1977).*



It is far from certain, however, that most depository institutions will be willing to take the necessary risks or that low-income consumers will perceive the advantages of a depository institution transaction account. If natural market forces are going to bring EFT services to low-income consumers, low-income consumers must become more familiar with the variety of ways in which payments can be made, and depository institutions will have to conclude that the potential for profit is acceptable.

If EFT can offer lower costs, increased personal safety, and greater convenience to consumers--and the Commission concluded that this potential clearly exists--low-income consumers should not be involuntarily excluded from these benefits. If depository institutions perceive the risks of providing EFT services to low-income consumers as too great, and if experience confirms their fears, Federal and State governments may wish to consider providing economic incentives to depository institutions to offer these services to low-income consumers, just as governments have provided similar incentives in other areas to provide services--such as housing--to the low-income.

Another approach would be to develop an alternative EFT payment system for low-income consumers that is more suited to their particular needs and wishes. An examination of the European experience provides some insight into this problem.[8] Although a much higher proportion of European households do not have transaction accounts in depository institutions, most have access to convenient, efficient, and inexpensive payment services. These are provided primarily by postal Giro systems that provide non-interest bearing accounts for consumers.[9] Giro payment orders are

similar to money orders except that there is little or no charge to the consumer. The system allows, and in some cases requires, consumers to receive as well as to make payments through these accounts, which can be connected to EFT networks.

Other alternatives to provide EFT services to low-income consumers also should be explored. *Therefore, the Commission recommends that the Congress should direct an appropriate existing Government agency to study and determine what actions need to be taken by the Congress or other authorities to make the benefits of EFT available to low-income persons, while ensuring that their rights and freedom of choice are preserved. The feasibility and desirability of a Giro-like system in this country is one of the alternatives that should be explored.* (17-2-3)

Further recommendations on this subject are presented in Chapter 15.[10]

---

[8]*The European situation is not directly analogous to that in the United States. Two obvious European differences are the presence of a highly centralized banking system and the absence of a vigorous consumer movement. See the more detailed discussion in Chapter 15, "EFT in Other Industrial Nations:  Observations and Implications."*

[9]*Many European banks also offer Giro services.*

[10]*During the Commission's work on Chapters 1-4, contact was maintained with Hal S. Scott, Reporter to the 3-4-8 Committee of the U.C.C.'s Permanent Editorial Board, which is studying many of the same consumer issues.*



# Developmental Issues in EFT



Digitized by 



Chapter 5

# The Branch/Terminal Issue

This chapter presents the Commission's findings and recommendations in answer to the following question: what statutory or regulatory restrictions, if any, should be imposed on the offering of terminal-based EFT systems and services away from the premises of a depository institution? The chapter discusses the important issues subsumed in this question; states the Commission's position on the proper basis for regulating the availability and deployment of terminal-based EFT systems and services; presents the Commission's recommendations on these topics; and highlights arguments and evidence for these recommendations.

The "branch/terminal" question has its origin in the fact that the courts have used statutes on the establishment of brick and mortar branches by commercial banks as a basis for determining the legality of the deployment of terminal-based EFT systems by National banks.

The rationale for doing so can be traced to the Supreme Court's decision in <u>First National Bank in Plant City</u> v. <u>Dickinson</u>, in which the Court held that it was the intention of Congress that National

and State banks compete on a basis of competitive equality with respect to certain banking functions.[1] National banks are subject to the limitations of State laws in at least three areas: trust powers, interest rates, and branching. The appearance of EFT terminals was viewed by many as a direct threat to current branching powers--and hence, to the dual banking system and the doctrine of competitive equality--because these terminals could quickly and radically alter the balance between National and State banks.

The McFadden Act provides that a National banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches at any point within the State in which it is situated "if such establishment and operation are at the time authorized to State banks by the statute law of the State in question." But what is a branch? Section 36 (f) of the McFadden Act characterizes the term as follows:

_____

[1] *396 U.S. 122, rehearing denied, 396 U.S. 1047 (1969).*

Digitized by Google


The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

Because of the circularity of this "definition," and the obvious difficulty that EFT terminals did not come into existence until 40 years after the McFadden Act was written, it was unclear prior to the resolution of various cases whether terminals had to be considered branches under the Act.

In interpreting the McFadden Act, the Supreme Court ruled in Plant City that the Federal statutory definition of "branch" included an armoured car messenger service and an off-premises receptacle for packages containing cash or checks for deposit. The Supreme Court granted that while State law "comes into play in deciding how, where, and when branch banks [of National banks] may be operated," State law definitions of what constitutes "branch banking" do not control the Federal definition of "branch"; the Federal statutory definition of "branch" must not be given a restrictive meaning that "frustrates Congressional intent" to place National and State banks on a basis of competitive equality with respect to branch banking.

These concerns first became apparent when, in 1974, the Comptroller of the Currency issued a ruling stating that branch applications were not required for EFT terminals,[2] and some National banks began aggressively deploying terminals in States that did not permit branching. The Independent Bankers Association of America (IBAA) brought suit against the Comptroller, claiming that the terminals were branches under the McFadden Act, and that he had exceeded his authority in allowing this deployment.

The IBAA's suit was resolved in October 1976, when the Supreme Court refused to grant certiorari in Independent Bankers Association of America v. Smith.[3] This let stand a lower court ruling which held that there is no functional difference between the way a customer makes a deposit in a remote terminal and the way a customer in the Plant City case used a stationary receptacle to make deposits that would be picked up later by an armored car. In short, the lower court had held that a terminal constitutes a branch as defined in the McFadden Act.[4] This determination has served to eliminate the competitive advantage in terminal deployment that National banks presumably gained over State banks following the Comptroller's ruling.

---

[2] Fed. Reg. 44416 (1974).

[3] 402 F. Supp. 207 (D.D.C. 1975), 534 F. 2d 921 (1976), cert. denied, 45 U.S.L.W. 3238 (Oct. 5, 1976).

[4] A more detailed discussion of the legal background on this ruling and its relevance in the EFT environment is presented in National Commission on Electronic Fund Transfers, "The Branch/Competitive Impact Issue," Internal Working Document IWD-18 (revised Aug. 20, 1976).



There remains, however, a legal uncertainty that results from the various Federal court decisions holding that terminals are branches under the McFadden Act. This uncertainty arises because many States have legislated that terminals are not branches and are subject to fewer deployment restrictions.[5] Whether National banks in those States are subject to the State's branch or terminal restrictions is unclear at this time. This uncertainty places the National banks at a disadvantage.

It may be argued, for example, that whereas National banks must now view terminals as branches, and must therefore conform to the requirements and restrictions associated with the establishment of brick and mortar branches, this is not the case for most State banks. On the other hand, given the doctrine of competitive equality, it may be argued that a National bank should be able to deploy terminals in any location that is permitted for a State bank operating in the same State.

This issue should be resolved, because differences between State and Federal law on the deployment of terminals challenge the doctrine of competitive equality, a doctrine with which the Commission was seriously concerned.[6] Because the Supreme Court had not spoken, thereby letting stand a variety of lower court opinions, the Commission concluded that the appropriate way to eliminate the legal uncertainty is through legislative action.

The Commission's first and basic recommendation in this regard is that the off-premise deployment of EFT terminals should not be regulated under the same set of rules that govern the establishment of brick and mortar branches of depository institutions. Specific recommendations as to these new rules will be presented later in this chapter.

Another dimension of the branch/terminal question can be found in the trend toward more bank-type powers for thrift institutions and the growth in inter-industry competition. The question here concerns the larger powers of thrift institutions over commercial banks to deploy off-premise terminals. For example, the regulators of federally chartered savings and loan associations and credit unions can allow these institutions to deploy terminals across State lines. Because EFT has become a factor in the competition for consumer deposits, differences such as these can be important. Other competitive aspects are also involved, however, and the public interest requires the evaluation of these other conditions affecting access to consumers.

---

[5] As of July 1977, only five of the 32 States that have enacted EFT legislation define terminals to be branches. Of the remainder, nine States are silent on the matter, two have not yet addressed the question, and 17 explicitly say that terminals are not branches. See American Bankers Association, _Analysis of Enacted EFTS State Legislation_ (revised July 1977).

[6] For example, in a resolution passed Dec. 3, 1976, the Commission called for "separate and distinct" and "less restrictive" rules for the deployment of terminals, but it emphasized that it did "not intend, by this resolution, to recommend any alteration in the division of powers between individual States and the Federal Government in regard to the regulation of depository institutions."



The issue of the deployment of terminals has another dimension in that it affects non-depository organizations, such as retailers, that operate EFT terminals connected to depository institutions. These organizations are fearful that they will be regulated as if they were depository institutions, thereby incurring an administrative burden and a loss of control that may reduce their efficiency and competitive effectiveness in their primary business. Retail stores do not wish to lose control over the deployment and use of their own terminals or those they lease, nor do they wish to be compelled to offer EFT services unrelated to their operations. [7] The Commission has found it appropriate to investigate these concerns as well.

From the viewpoint of public policy, potential competitive differentials and imbalances of the sorts outlined in the preceding pages are not in the best interest of the consumer. Free, innovative, and aggressive competition among all businesses and financial institutions on equal terms should be maximized to the extent feasible, as was indicated in the Act establishing the Commission.[8]  To limit competition would have the effect not only of protecting inefficient institutions, but also of preventing the individual consumer from realizing the benefits of EFT services.

## TYPES OF REGULATION

*As indicated earlier, the Commission recommends that the rules governing the deployment of off-premise EFT terminals should be separate and distinct from and less restrictive than the rules regarding the establishment of conventional branches.*

(Unanimous voice vote in favor.)  The remainder of this chapter presents the Commission's guidelines on the nature of these "separate" and "less restrictive" rules for the deployment of terminal-based EFT systems and the availability of EFT services through these systems.

It is important to emphasize that, except for changes provided in the Commission's recommendations, the Commission's conclusion is that depository institutions should continue to be held accountable, under existing State and Federal regulatory laws and powers, in their deployment and use of terminals.  This accountability should apply to such factors as security, privacy, arrangements on sharing, and operational features of the system, including provision for adequate audit trails.

The Commission's investigations led it to conclude further that certain requirements—such as those regarding privacy and security—should be met by all installations used by depository institutions.

---

[7] *These concerns are explained more fully in NCEFT, "Retail Point of Sale Terminals," IWD-29 (October 1977).*

[8] *12 U.S.C. 2403.  The Commission was directed to take into account "the need to preserve competition among the financial institutions and other business enterprises," and "the need to prevent unfair or discriminatory practices by any financial institution or business enterprise using or desiring to use [an EFT] system."*



It should be emphasized, however, that these factors alone should not be considered as a sufficient basis for regulating the deployment or availability of terminal-based EFT systems and services.

## REGULATORY FACTORS DIRECTLY PERTINENT TO DEPLOYMENT

The Commission concluded that the necessary and sufficient basis for such regulations is to be found principally in those factors generally regarded as pertinent to the deployment decision itself. These factors are of two kinds. First, there are the factors traditionally taken into account by regulators in reviewing and approving the establishment of brick and mortar branches. Examples include location, evidence of ability to finance the new branch, evidence of market opportunity, and so on.[9] Second, there are the factors that are specifically related to EFT: the nature of the terminal itself and the nature of the services that might be provided through the terminal.

### Traditional Factors

The Commission concluded that the traditional factors can be adequately monitored and controlled through existing regulations governing "safe and sound" business practices on the part of the deploying institutions and through the current framework of antitrust law. Therefore, the Commission recommends no changes in this area. *Further, the Commission emphasizes that none of its recommendations in this chapter is intended to modify or erode existing regulatory powers to ensure "safe and sound" practices by depository institutions.* (22-0-0)

### Special EFT-Related Factors

Regarding the regulatory factors associated specifically with EFT--the terminal and its services--the Commission concluded that the deployment or availability issue should not be decided on the basis of the nature of the terminal itself. Terminals are of regulatory interest only after they have been connected to a system, at which time regulations regarding use and control come into effect.

Moreover, because terminals can be made to perform a wide variety of functions, regulators should be indifferent to the actual hardware used. If they are not, several serious problems could result. For example, regulators would almost certainly be compelled to devise a complex set of regulations, which in turn might inhibit technological innovation and inspire manufacturers to seek ways to circumvent the regulations.

Accordingly, the Commission concluded that the fundamental consideration in the decision of any regulatory agency regarding the deployment of terminal-based EFT systems and services should be the functions or services to be provided through a system's terminals.[10]

---

[9]*For a list of regulatory factors used in deployment decisions by Federal regulators, see NCEFT, "The 'Competitive Impact' Criteria in the Branch Approval Process of Federal Regulatory Agencies," IWD-15 (Aug. 2, 1976).*

[10]*Witnesses who appeared before the Commission and discussed the question of the proper basis for*

79

Digitized by Google


The services that are currently provided through a terminal-based EFT system are described below.

## TYPES OF EFT SERVICES

Terminal-based EFT services can be divided into two broad categories: information services and funds transfer services. The basic distinction between the two categories is that information services involve only the access to or transmission of data related to financial transactions, while funds transfer services always involve the actual movement of funds into or out of a deposit account.

### Information Services

The Commission identified two classes of information services. The first embraces what are usually called "authorization/verification" services and includes, but is not necessarily limited to, the following activities.

- **Credit Authorization.** The credit authorization service pertains only to the process of making a purchase with a credit card--either a bank card or a private label card. This service informs the consumer or non-depository institution that the grantor of credit will extend credit to the consumer and pay the record of charge when presented by the non-depository institution.

- **Check Verification.** The check verification service permits a consumer or non-depository institution to verify the existence, at that time, of funds in a demand deposit account, but does not guarantee that the check will be honored upon presentation.

- **Check Guaranty.** The check guaranty service permits a consumer to have payment of his check guaranteed. The guarantee, usually based on a prior agreement between the consumer and a depository institution, provides that if agreed-upon conditions are met, the depository institution will honor and pay the check when presented for payment, whether it is collectible at that time or not.

The second type of information service, here called the "file look-up" service, makes it possible to access, through a terminal, individuals' financial records stored in computers. A customer's entire record or some part thereof--name, account number, account balance, amount and date of deposits or withdrawals, number of times overdrawn, etc.--can be accessed in this manner. Depending on the rules governing systems entry, these data could be accessed by anyone understanding how to operate the equipment. In practice, these rules are strict, and access is well controlled. For

---

[10]Continued

regulatory deployment concurred generally with the Commission's conclusion. See testimony in NCEFT, "The Branch Terminal Issue in EFT, Parts I and II, Testimony presented to the National Commission on Electronic Fund Transfers, October 28-29, 1976," IWDs-58 and 59 (October 1977).



example, only certain bank personnel are permitted to perform maintenance on the files.

## Funds Transfer Services

The Commission defined three classes of funds transfer services available through terminals. The first, the deposit function, permits a consumer to make a deposit and have it credited electronically to his demand deposit, savings, or other deposit account. The second class includes the debit functions, which comprise at least the following four types of activities.

- **Debit for Cash Withdrawal.** This service permits a consumer to debit his demand deposit, savings, or other deposit account to obtain cash.

- **Debit for Bill or Loan Payment.** This service permits a consumer to initiate a debit to his demand deposit, savings, or other deposit account, and then, as part of the same transaction, enables the customer's depository institution to transfer those funds automatically as a payment to the account of the creditor.

- **Debit for Purchase.** This service permits a consumer at a point of sale to have his demand deposit, savings, or other account debited and, without further action on his part, have the depository account of the recipient non-depository institution credited for the amount of the sale.

- **Debit for Interaccount Transfer.** This service permits a consumer to debit one of his accounts at a depository institution and to credit another of his accounts.

The final class of funds transfer services includes the credit functions, which for the Commission's purposes are divided into three types:

- **Debit With Overdraft Privileges.** This can be viewed as an add-on to the debit services discussed above. It is a part of the debit capability in that a consumer without adequate funds on deposit to cover a cash withdrawal, bill or loan payment, or purchase can complete the transaction because of a prior overdraft or transfer arrangement with a depository institution.[11]

- **Credit Purchase.** This is a charge service that permits a consumer to authorize a charge to a credit account maintained at a depository institution. Payments for charges made against a credit account may be by whatever means and at a time agreed to by the consumer and the credit-granting institution.

- **Cash Advance.** This service provides the user with the ability to make a cash withdrawal

---

[11] How this service should be initiated at the automated teller machine (ATM) or point of sale is a subject of discussion among various credit grantors. The Commission addresses this issue in Chapter 8, "The Impact of EFT on Credit."

Digitized by Google

against an existing line of credit at a depository institution.

## Observations About These Services

Three points about these services--information services and funds transfer services alike--should be emphasized. The first is that each of them is presently being offered through one or more data communication systems in the United States. These EFT services are a reality today.

Second, the list of services that could be offered through terminal-based systems is longer than the 12-item list presented here. For example, systems currently operating in other countries allow the customer to use a terminal to open an account, initiate a loan application or have it approved, and so on. Because such capabilities are precluded by regulation in this country, the Commission's recommendations in this chapter concern the present service offerings only.

Third, perhaps the key fact about the services provided through terminal-based EFT systems is that, although the number is very much smaller than the number of services provided at a brick and mortar branch of a depository institution, the services that appear to be at the center of competition among depository institutions are offered both by conventional branches and by terminal-based EFT systems. For this reason, the Commission strongly concluded that service offerings represent the appropriate basis for its recommendations on terminal-based EFT systems deployment.

The Commission's recommendations regarding the availability of these services are presented below.

## AVAILABILITY OF THE INFORMATION SERVICES

All of the information services are now available through EFT systems offered by both depository and non-depository institutions. When provided by depository institutions, these services are not regulated with regard to availability. Nor are they regulated when offered through proprietary non-depository EFT systems that do not access the data base of a depository institution.

The Commission recognized that the safeguards already provided through operational and audit procedures are adequate to permit the continued availability of those services. The Commission also recognized that depository and non-depository institutions have established appropriately strict rules on access to these services, especially the file look-up service.

The Commission concluded, therefore, that in the absence of evidence that present safeguards are inadequate, EFT-related information services should be available to the same degree that they are available today.[12] This conclusion pertains to all EFT information services offered, by depository or

---

[12] *The Commission's recommendations concerning access by third parties in the private sector or by the Government would apply, of course, to these files. See Chapter 2, "Establishing and Operating an EFT Account."*


Digitized by Google

non-depository institutions, on a local, statewide, or national basis, through an organization's own terminals or terminals leased under appropriate contractual agreements.

## AVAILABILITY OF THE FUNDS TRANSFER SERVICES

The Commission's recommendations on the availability of funds transfer services through EFT systems involve highly complex public policy issues. The Commission heard much testimony, reviewed studies, and debated at length in order to develop a practical program of recommendations on this subject. An important step in these deliberations was to consider the implications of various policy alternatives, beginning with the least restrictive one--that is, the policy that there be no limit on the freedom of depository institutions to offer any funds transfer services now available through terminal-based EFT systems.

If this policy were enacted into law, negative developments could ensue. It has been argued, for example, that this free market approach would lead eventually to the domination of banking by a handful of giant depository institutions and to the collapse of the dual banking system.[13]

The Commission concluded that this danger is not great[14] and that it can be avoided by an evolutionary approach to the elimination of geographical restrictions on the availability of funds transfer services, consistent with the nature of the U.S. banking system and the functional distinctions among the different types of depository institutions.

## Availability of the Debit Functions

The Commission found that competitive opportunities would be enhanced and the consumer's interest would be served if no new restrictions were placed on the availability of the debit functions, i.e., the functions that involve payment from a deposit account. The availability of the debit function is not restricted nationally in the paper-based payments system. It is common practice

---

[13] *Ralph Nader is among those who foresee that the unlimited availability of these services would lead to "nationwide [EFT] networks of control [that] would result in the McDonaldization of the banking industry . . . and a cartelized banking structure." Yet he is aware that there are ways to prevent this outcome. For example, Mr. Nader has endorsed the actions of States such as Missouri, Iowa, Tennessee, New Jersey, and New Hampshire in enacting laws that impose deposit concentration limits on multibank holding companies and he has recommended legislation that would "limit commercial banks to ten percent of total nationwide commercial bank deposits." Statement of Ralph Nader, Financial Institutions and the Nation's Economy (FINE) "Discussion Principles," Hearings, Dec. 11, 1976, Subcommittee on Financial Institutions Supervision, Regulation and Insurance of the Committee on Banking Currency and Housing, U.S. House of Representatives, 94th Congress, pp. 929-932.*

[14] *See the discussion of the competitive impacts of EFT presented in Chapter 7, "The Impact of EFT on the Competition for Deposits."*



to cash a check or make a payment by check for goods or services anywhere in the country, independent of where one's deposit account is located. Comparable EFT services should be no less available.

*The Commission recommends, therefore, that State and federally chartered depository institutions should have the power to offer debit services anywhere in the country through terminal-based EFT systems.* (19-5-1)

*The Commission further recommends that all non-depository institutions willing to permit the debit functions to be offered on their premises in an EFT mode be free to do so* (19-5-1), by entering into the appropriate contractual agreements with the depository institutions whose accounts will be accessed. This recommendation is consistent with the position taken unanimously by the Commission in its resolution of Dec. 3, 1976, that non-depository institutions "by reason of permitting their customers to utilize electronic terminals to communicate with depository institutions should not be considered to be regulated depository institutions or branches thereof." Under existing legislation, regulatory agencies appear to have sufficient authority to control effectively the operations of non-depository enterprises acting as agents for depository institutions. Through this authority, the regulators can control the nature of the EFT services offered, as well as the manner in which they are offered, without regulating other aspects of the non-depository institution's business.

To the extent that this regulatory authority does not presently exist, the Commission concluded that appropriate State and Federal regulators be

given the authority to require that the relationships between depository institutions and non-depository institutions in providing EFT services be subject to minimum terms and conditions to ensure safe and sound practice. Regulators should also be given the power to order a depository institution to cease participation in the EFT program if its provisions do not meet with the regulator's approval.[15]

## Availability of the Deposit Function

If the debit functions are not restricted as to availability, should the same be true of the deposit function? The Commission did not believe so. Given the character of the U.S. banking system, the Commission concluded that there should be some positive control over the initial offerings of terminal-based deposit services. It was not clear from evidence available to the Commission whether nationwide deposit-taking from electronic terminals would alter the Nation's banking structure in a way that would be inimical to the public interest. The Commission concluded that under these circumstances a course of moderation is called for.

The Commission, therefore, developed rules on the availability of the deposit-taking service via

---

[15]*The Bank Services Corporations Act, 12 U.S.C. 1861-1865, and the Federal Home Loan Bank Board's rule on the performance of EFT services by non-depository institutions on behalf of federally chartered savings and loan associations provide models for such legislation.*


Digitized by Google

EFT terminals.  The purpose of these rules is not to limit any depository institution's present powers to take deposits.  On the contrary, the aim is to enlarge the geographic area in which these institutions may offer this service, and to do so without causing a major disruption or discontinuity in the orderly evolution of EFT or the paper-based payments system.  *Specifically, the Commission recommends that deposit-taking through EFT terminals should be gradually expanded* (22-2-1), beginning with the following two steps.

*First, the Congress and State legislatures should enact legislation, as appropriate, authorizing regulatory agencies to permit federally or State-chartered depository institutions to offer deposit-taking services through terminal-based EFT systems throughout the State in which these institutions are chartered.* (23-0-2)  Interstate availability of the deposit-taking service should not be restricted.

*Second, State and federally chartered depository institutions should be permitted by appropriate State and Federal legislation to offer the deposit-taking function through EFT terminals across contiguous State lines to serve natural market areas, but only after the States involved have permitted such terminal access arrangements through reciprocal legislation.* (25-0-0)

This recommendation is based on the Commission's recognition that natural market areas often cross State borders and that to prohibit depository institutions from crossing these borders in order to provide EFT services to their actual customer base is not reasonable.  Such restriction does not serve

the consumer and it inhibits the growth of new avenues of competition.  The Commission concluded that the basic remedy is to be found in reciprocal legislation between the States.[16]

The Commission also concluded that State authorities should enact, as soon as possible, the reciprocal legislation that will authorize the offering of EFT services throughout the interstate market areas.  *However, it further recommends that Congress establish a date after which time federally chartered depository institutions would be authorized to cross contiguous State lines to offer EFT deposit-services in natural market areas, regardless of whether or not State-chartered institutions are permitted to do so.*  (18-7-0)

The Commission was aware of arguments that the Federal Government should enact such legislation now, thereby compelling the States to move instantly.[17]  Although the Commission appreciated

---

[16]*It should be understood that the Commission is speaking here only about the offering of EFT services interstate through natural market areas that cross State lines.  The Commission did not attempt to define the phrase "natural market area" and, hence, makes no recommendation as to the definition that should be used by legislators.  The concept of Standard Metropolitan Statistical Area (SMSA) or some similar statistical tool should be investigated as a means of defining such areas.*

[17]*See, for example, the Statement of Thomas E. Kauper, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, on The*



the merit of these positions, it indicated through its resolution of Dec. 3, 1976, that legislative action by Congress on issues such as this "should take into consideration the amount of time it will take for the individual States to enact, implement and phase in electronic funds transfer laws." To be oblivious to the States' need for time--or, to put it positively, to ignore the fact that the States have already begun to look at this very issue[18]--would be to challenge the States' rights to regulate State-chartered institutions. In this recommendation, the Commission emphasizes that legislative action is appropriate, but that the States should take the initiative.

All of the preceding recommendations on the deposit-taking function pertain to deposits to individuals' accounts that are originated by the account holder at a POS or banking electronic terminal device. *In the case of deposits to merchant accounts that are generated as a result of a customer payment by debit, debit with overdraft, or credit purchase through electronic means at the point of sale, the Commission recommends that merchants should not be limited geographically by statute or regulation in selecting the financial institution to receive such credits.* (14-7-1) The Commission concluded that the absence of such restrictions would not be harmful to local financial institutions because businesses now have the ability to transfer funds electronically in order to maintain desired balance levels at local banks.[19]

Moreover, the Commission concluded that by not restricting the locale of merchant credit acceptance, the competition for corporate banking services may be promoted in a desirable way. In addition,

unrestricted merchant credits may reduce the cost of corporate cash management.

## Availability of the Credit Functions

*Finally, with respect to the remaining funds transfer services--the credit functions of debit with overdraft privileges, credit purchase, and cash advance--the Commission recommends that no*

---

[17] Continued
*Financial Reform Act of 1976*, Hearings, March 17, 1976, Subcommittee on Financial Institutions Supervision, Regulation and Insurance of the Committee on Banking Currency and Housing, U.S. House of Representatives, 94th Congress, p. 616.

[18] As of early February 1977, at least four ATM or point-of-sale (POS) networks crossed State lines. None of these arrangements was functioning on the basis of reciprocal legislation between the States involved. It appears that these systems are viewed as tests or experiments, and the intent is to use the experience as a guide to the formulation of law.

[19] Similarly, as pointed out in its recommendations in Chapter 2, "Establishing and Operating an EFT Account," the Commission concluded that preauthorized credits in EFT systems should not be limited geographically because to do so would significantly limit the ability of individuals, firms, and the Government to achieve in an electronic system the benefits that are available in the paper-based payments system.


Digitized by Google

geographic restrictions be imposed on their avail-
ability through terminal-based EFT systems.
(22-3-1)  This proposal reflects the Commission's
fundamental belief that because EFT is still at a
very early stage in its evolution, no new laws or
regulations prohibiting the electronic form of funds
transfer services already commonplace in today's
payment system should be created unless there is
evidence that such rules are needed.

The Commission's investigation of the potential
effect of EFT on consumer-oriented credit suggested
that the total supply of such credit would be little
affected, although some concerns were raised regard-
ing the effects of EFT on the different classes of
credit grantors and their customers.  The latter
concerns would be minimized if the Commission's [20]
recommendations in the credit area were adopted.

## DEPLOYMENT OF TERMINALS

The Commission recommends that the rules govern-
ing the deployment of EFT terminals by a depository
institution should be no more restrictive than the
rules governing that institution's ability to offer
EFT services.  (20-3-2)  Accordingly, the Commission
recommends that appropriate State and Federal legis-
lation be enacted, if necessary, to authorize regu-
latory agencies to permit State and federally char-
tered depository institutions to deploy their own
EFT terminals, without restriction, for the following
purposes:

- To provide debit services for their own
  customers intrastate (24-0-1).

- To provide the deposit-taking service for
  their customers intrastate (24-0-1).

- To provide the credit functions for their
  customers intrastate (20-3-2).

- To provide debit services for their custom-
  ers interstate (17-6-2).

- To provide the deposit-taking service for
  their customers within natural market areas
  that cross contiguous State lines, as per-
  mitted by the Commission's recommendations
  on the availability of the deposit-taking
  service (18-7-0).

- To provide the credit functions for their
  customers interstate (20-3-2).

- To sell transaction services to other deposi-
  tory institutions that wish to offer the
  debit and credit services intrastate and are
  permitted, under the Commission's recommenda-
  tions, to offer the deposit-taking service
  intrastate (23-0-2).

- To sell transaction services to other deposi-
  tory institutions to enable them to offer
  the debit, deposit-taking, and credit serv-
  ices interstate where these institutions are
  permitted to do so under the Commission's
  recommendations (17-4-4).

---

[20]See Chapter 8, "The Impact of EFT on Credit."


Digitized by Google

In sum, these recommendations permit a depository institution to deploy or utilize EFT terminals, subject to the restrictions presented earlier on the services that may be provided through such terminals. These recommendations on terminal deployment allow a deploying institution to have the opportunity to offer any authorized service through its own terminals and to sell transaction services to other depository institutions that are permitted to offer a service in the State or region in which the terminals are placed.[21]

*The Commission recommends that an evolutionary approach be taken to the implementation of its guidelines on terminal deployment. (22-2-1) As in the case of rules on the availability of EFT services, the Commission also recommends that Congress specify a date after which time federally chartered depository institutions would be authorized to deploy terminals according to the rules presented above. (18-7-0)*

The Commission concluded that the Congress should act immediately on one specific recommendation regarding terminal deployment. At the beginning of this chapter, it was pointed out that one of the reasons why the branch/terminal issue was important to the Commission was that confusion and perhaps even a competitive imbalance had been created between State and Federal commercial banks as a result of court decisions dealing with branching. Today, State-chartered banks appear to have gained an advantage over National banks in States that have passed legislation that defines terminals not to be branches. In those States, the State-chartered banks may deploy terminals more freely than National banks. One consequence is that many National banks

have not filed branch applications for previously deployed terminals, indicating that they would prefer to withdraw the terminals rather than go through the cumbersome branch application process.

Until all the States and the Congress have acted on the Commission's recommendations on the deployment of terminals, there will continue to be confusion and potential competitive inequality between State and National banks concerning the deployment of terminals. These problems should be resolved. *Accordingly, the Commission recommends that National banks be authorized immediately to deploy terminals in the State in which they are located, in accordance with the provisions of that State's laws pertaining to the deployment of EFT terminals by State banks. (24-0-0)*

OTHER REGULATORY FACTORS

It should be emphasized again that the Commission's recommended rules on the deployment and availability of terminal-based EFT systems and services are not intended to limit either State or Federal regulators' rights to require additional information about these systems or services as a condition of deployment.

Regulation of other aspects of EFT systems or of the circumstances under which they may be deployed

---

[21]*These recommendations, it should be added, are not intended to restrict the ability of non-depository organizations, such as retailers, to deploy terminals.*



or operated is possible.  Some of the regulatory
factors, cited earlier, that are currently considered
in evaluating branch applications or terminal-based
systems appear to be applicable to EFT systems.
Others do not.  For example, the Commission examined
the possibility of restricting terminal deployment
solely on the ground of numbers.  It concluded that
this type of regulation would amount to denying in-
stitutions the opportunity to develop proprietary
systems in large market areas in which many terminals
must be deployed to serve consumers adequately.

The Commission also concluded that to mandate
a capitalization requirement on terminal systems
comparable to the requirement on new brick and mortar
branches would be inappropriate.  Regulatory agen-
cies already have the ability to impose investment
limitations on depository institutions to help ensure
"safe and sound" business practices.

In these and other cases of specific regulatory
factors, legislators and regulatory authorities
should keep in mind the fact that EFT is an evolving
payments system.  An inappropriate regulatory scheme
can impede innovation, inhibit competition, and
jeopardize potential consumer benefits.

Digitized by Google

Digitized by Google



Chapter 6

# Sharing

One of the major issues raised by the development of EFT systems is the extent to which institutions may cooperate in order to establish and operate such systems.[1]  While some institutions have established unshared proprietary systems, many institutions have established EFT systems as joint ventures.  Some institutions have established EFT systems and permitted competing institutions to have access, and others have established systems that they franchise.

These developments are the source of two important concerns.  The first is that competition will be diminished if institutions form consortia or sharing arrangements that are overly inclusive in the sense that more competing institutions in a market will join one EFT system than the economics of operation requires, thus lessening competition in that market.  The second concern is that an institution unable to develop its own EFT system may suffer a substantial competitive disadvantage if it is not allowed access to a system operating within its market.

Based on its review of research, testimony, and information from other types of public participation, the Commission proposes a policy to accommodate these concerns that will benefit the public by promoting competition while protecting institutions that could be seriously harmed by the competitive effects of EFT development.

The Commission concluded that "pro-competitive sharing" of EFT systems will best serve both consumers and industry.  By "pro-competitive sharing," the Commission means that parties may agree to share but, if challenged, such sharing arrangements will be permitted, required, or prohibited on a case-by-case basis depending upon the effect such sharing

---

[1] In this chapter, the phrase "EFT systems" refers to automated teller machine (ATM) and point-of-sale (POS) systems.  The Commission's recommendations on sharing automated clearing houses (ACHs) are presented in Chapter 14, "Government Operation of ACHs and POS Switches."

Digitized by 

would have upon actual and potential competition in the relevant market. The Commission recommends later in this chapter that the Congress enact legislation that affirms the applicability of Federal antitrust law to sharing arrangements and that would nullify the effect of State mandatory sharing laws. In recognition of the problems that might face an institution denied access to an EFT system pending the outcome of antitrust litigation, the Commission also recommends a procedure by which judicial resolution may be expedited should regulatory mediation fail to resolve the dispute.

## LEGAL ENVIRONMENT

To understand the significance of these recommendations, it is necessary to review briefly the legal environment within which shared systems now operate. The relevant laws at the State and Federal levels, and the potential conflict between Federal antitrust law and State mandatory sharing laws are discussed below.

### State Legislation

To date, 32 States have enacted EFT-related legislation focused primarily on branching and sharing.[2] At least 24 States have addressed the sharing issue, and 14 of these have made sharing mandatory in one form or another.[3] State sharing statutes and regulations vary with respect to what must be shared, whether sharing is mandated among all depository institutions or only like institutions, and whether sharing is mandatory, permissive,

or subject to antitrust law. The State of Washington, for example, makes sharing mandatory among banks, but makes sharing permissive between banks and thrift institutions.[4]

Only a few States have passed permissive sharing statutes, which permit but do not require specified classes of institutions to share systems. Several State statutes purport to apply to federally chartered institutions as well as to State-chartered institutions.[5]

### Federal Antitrust Law

A number of major Federal antitrust issues have arisen with the development of EFT. These issues involve potential competition and entry, access, and discriminatory practices.[6]

---

[2] *American Bankers Association, "Analysis of Enacted EFTS State Legislation" (revised July 1977).*

[3] *Ibid.*

[4] *Chapter 166-XXX, Laws of 1974, State of Washington.*

[5] *The legal authority of States to require that federally chartered institutions share is not clear.*

[6] *See National Commission on Electronic Fund Transfers, "The Legal Environment for the Sharing of EFT Systems," Internal Working Document IWD-31 (October 1977), Part I.*



As noted earlier, one major question raised by shared systems is whether they diminish substantially the opportunity for competition. Antitrust law would forbid the development of a large joint venture involving many institutions if individual participants or smaller groups of participants could reasonably be expected to develop competing systems. Although antitrust principles generally favor maximizing the number of effective competitors in a given market, this is not to say that joint ventures generally are or would be unlawful. The legality of any particular joint venture would depend upon antitrust analysis applied to the economic characteristics of its market.

Another major question relates to the issue of access to EFT systems. Under antitrust law, if a facility is a natural monopoly or an essential facility, access to it must be allowed on a reasonable and nondiscriminatory basis, either by membership in the venture or by offering reasonable terms for access.[7] Although access to an essential facility must be permitted, antitrust law also requires the owner to refrain from unnecessarily inhibiting competition among the system's participants by compelling uniform pricing, allocating markets, forcing unnecessary standardization, or the like.

Even when an EFT system is not a natural monopoly or an essential facility, competitors excluded from the system may have a right to obtain access. When a substantial degree of market power is derived from a collective agreement or joint venture, arbitrary exclusionary policies may be unlawful.[8] This does not mean that all competitors must necessarily be permitted access because such a policy might

inhibit intersystem competition. However, one group of competitors may not pool power to discriminate against other competitors.

## State Legislation and Federal Antitrust Law

There is a substantial question about the extent to which anti-competitive actions permitted, prompted, or mandated by State law or regulation may be shielded from Federal antitrust law. If State sharing laws conflict with Federal antitrust law, a business that shares its EFT system pursuant to State law may expose itself to liability under Federal law.

Generally, private conduct is not immunized from the effects of Federal antitrust law unless State regulation mandates that conduct, and the conduct in question is in complete compliance with the mandate.[9] It is probable, therefore, that mandatory

---

[7] *The leading case in this area is* United States *v.* Terminal Railroad Association of St. Louis, *224 U.S. 383 (1912), in which a rail terminal corporation owned jointly by several railroads was obligated to permit access to nonproprietor railroads upon reasonable and nondiscriminatory terms and conditions.*

[8] *See* Associated Press *v.* The United States, *326 U.S. 1 (1945).*

[9] *For a detailed discussion of this issue, see NCEFT, IWD-31, Part II.*



sharing statutes are more likely than permissive sharing statutes to immunize private conduct. Even with respect to mandatory sharing statutes, however, it is not clear that private conduct in compliance with such statutes would be shielded from Federal antitrust enforcement.[10] Such determinations are made on a case-by-case basis by examining the statute, its underlying policy framework, and the conduct in question. For example, the Department of Justice, in a business review opinion,[11] examined the Nebraska Electronic Terminal System (NETS), a state-wide EFT system involving only commercial banks, and concluded that the State's mandatory sharing statute did not, in that case, necessarily insulate the joint venture from liability under Federal antitrust laws.[12] There is sufficient uncertainty with respect to this issue that legislative clarification is desirable.

### PRO-COMPETITIVE SHARING

After evaluating a number of alternative policies for the sharing of EFT networks, the Commission determined that pro-competitive sharing best serves the public interest.[13] A pro-competitive environment exists today in States that have not enacted EFT laws that contain sharing provisions. No types of sharing arrangements are automatically precluded under this policy. Unshared proprietary systems are permitted if the single proprietor is not monopolizing the market. Contractual access to proprietary systems is permitted if the systems that the institutions share or grant access to are not so pervasive and broad as to exclude the possibility of forming competing systems.

[10]Some State mandatory sharing statutes explicitly provide that in the event of conflict between the State statute and Federal antitrust law, Federal antitrust law prevails.

[11]The Antitrust Division of the U.S. Department of Justice may "review proposed business conduct and state its enforcement intentions." See 28 C.F.R. §50.6.

[12]Letter to William B. Brandt, Nebraska Bankers Association, from Donald I. Baker, U.S. Assistant Attorney General, Antitrust Division, pursuant to business review request (March 7, 1977).

[13]The Commission evaluated three sharing policies in addition to pro-competitive sharing. The most inflexible of these is mandatory sharing. Under this policy, any organization providing components or services subject to the mandatory sharing requirement must share those components or services, if requested to do so by any other organization covered by the mandate. A commonly suggested modification of this concept is permissive/nondiscriminatory sharing, according to which any single organization might legitimately choose not to share its network or facilities. If the system were shared with any other individual organization, however, the owner would then be required to share with any covered organization that requested to share. A third policy, permissive sharing, is intended basically to operate as a shield from the uncertainty of the antitrust laws. Under this policy any operator wishing to share an EFT network or facilities would



Similar principles apply to joint ventures. A limited group of institutions probably could form a lawful joint venture to share certain components of an EFT system that they would be unable to provide individually. However, a joint venture involving a large group of institutions that shares all systems components would probably violate antitrust law if some participants, alone or jointly, were capable of establishing competing systems.

The legality of any particular joint venture depends upon an analysis of factors such as the size and number of the institutions sharing the system, the relevant geographic and product markets, and the feasibility and likelihood of competition among the sharing institutions absent the joint venture. These factors vary greatly among markets, and what may be legal in one market may not be legal in another. Moreover, the costs of EFT systems vary according to the scope of the system and the services offered. The higher the costs of developing and operating EFT systems, the more likely it is that sharing would not be unlawful. Evidence to date appears to indicate that the costs of EFT systems today are substantial, although such costs may decrease in the future.[14]

Problems arising from the exclusion of smaller institutions from EFT systems have not yet been significant.[15] If, as the Commission's data seem to indicate, the costs of establishing EFT systems and the volume requirements of such systems are very high,[16] it is likely that sharing and access would occur as a result of natural market forces, and that no institution would be unfairly excluded. On the other hand, if the ultimate costs and volume

requirements of EFT systems are low, smaller institutions would be able to develop their own systems. The Commission's recommendations provide that if an institution is unlawfully excluded from participation in an EFT system, judicial redress should be available on an expedited basis.

As indicated earlier, the Commission concluded that pro-competitive sharing offers major advantages over the alternative policies considered. Pro-competitive sharing maximizes the opportunities for competition and thus provides profit-based incentives for innovation and the development of low-cost, quality services for consumers. In a pro-competitive sharing environment, institutions will compete for consumer and retailer account relationships. In markets that will accommodate more than one system,

---

[13]Continued

be free to do so without fear of antitrust consequences. Additionally, regardless of the competitive effect, no organization would be required to share a system or, if sharing a system, to do so with all competitors on equal terms.

[14]See Chapter 9, "Cost Analysis of EFT."

[15]Exclusion of institutions has been a problem with respect to ACHs, although the exclusion in such cases has been based on institutional type, not size. See Chapter 14, "Government Operation of ACHs and POS Switches."

[16]See Chapter 9.


Digitized by Google

the systems will compete on the basis of cost, range of services, reliability, security, and other factors. Non-competitive environments, which are more likely under mandatory sharing laws, offer few incentives for innovation because the "free rider" problem is virtually unavoidable.[17]

Another significant advantage of pro-competitive sharing is its flexibility. EFT is in the early stages of development, and today's economic and technological realities could change significantly in the foreseeable future. Because it does not pre-determine the course of EFT development, pro-competitive sharing does not inhibit natural growth and innovation within this field. Moreover, the case-by-case approach inherent in pro-competitive sharing is more responsive to individual markets than any fixed legislated arrangement. Further, the existence of different sharing rules in the States poses a potential problem if, as the Commission has recommended, interstate EFT networks are permitted to expand.[18]

Proponents of mandatory sharing, which is the alternative policy most strongly advocated by opponents of pro-competitive sharing, argue that mandatory sharing offers several significant advantages.[19] The major advantage attributed to this policy is that smaller institutions are completely and explicitly protected against exclusion from EFT systems. Mandatory sharing proponents generally are not convinced that small depository institutions will be protected adequately by Federal antitrust law against loss of their current market share of retail deposits incurred because they are financially unable to establish proprietary EFT networks or gain access to the

network of others. Moreover, many thrift institutions doubt that banks would voluntarily share their POS systems, given the problems that thrift institutions have had in obtaining ACH membership.[20] It is further argued that retailers, likely to want only one POS system within each store, would choose bank-run systems over thrift-run systems because of their ongoing relationships with the commercial banks from which they obtain other services, including commercial financing. However, as noted above, the Commission found no evidence that smaller institutions are likely to be excluded from participation in POS systems. Participation by small institutions is likely to be actively solicited, given the high fixed costs involved, the volume required for efficient operation,

---

[17] The "free rider" problem refers to the situation in which an institution develops an innovative service or system to which competing institutions can demand access, thereby minimizing the competitive advantage enjoyed by the innovator. The right to demand access minimizes the competitive pressures that foster innovation.

[18] See Chapter 5, "The Branch/Terminal Issue," for the Commission's recommendations with regard to this issue.

[19] For a full discussion of mandatory sharing, permissive sharing, and permissive/nondiscriminatory sharing, see NCEFT, "Sharing Analysis: Point-of-Sale Systems," IWD-32 (to be published).

[20] See Chapter 14.



and the desire of retailers to serve the maximum number of customers.

Although owners of essential facilities, as defined by antitrust law, risk heavy penalties if they exclude those unable to establish competing facilities, mandatory sharing proponents are afraid that the case-by-case approach of the antitrust law is too uncertain, expensive, and time-consuming. It is not likely, however, that access disputes will be the subject of persistent antitrust litigation because fairly clear standards should be established after just a few cases. In addition, the expediting procedure recommended by the Commission should reduce the length of time needed for judicial redress.

Another advantage attributed to mandatory sharing is that it reduces uncertainty about the legality of sharing arrangements or access policies, and such uncertainty may inhibit EFT development. Although mandatory sharing establishes certainty as to the fact of access, it does not create certainty with respect to the terms and conditions of access. Thus, access disputes might still occur and require judicial resolution. Moreover, pro-competitive sharing should not unduly inhibit institutions from making business decisions. Even in today's uncertain environment, institutions are moving ahead and developing systems. The Department of Justice business review procedure is available to all institutions.

Moreover, if Federal antitrust law and mandatory sharing laws continue to coexist, systems may be forced to admit members until a monopoly system results. Business uncertainty would be increased if

system operators were forced to choose between violations of a State mandatory sharing law and Federal antitrust law.

A third advantage claimed for mandatory sharing, particularly of POS systems, is that it will promote universal acceptance of EFT payment methods. If mandatory sharing laws were to provide that all POS terminals accept all cards (of like technology) and the necessary communications links be made available to all card issuers (either through switches or batch-mode clearance), cards issued by any institution could be used at any terminal. In such a case, it is argued, EFT might quickly become as widely accepted as credit cards or checks. The benefits of this level of sharing, however, would accrue from sharing--not from the mandating of sharing. As noted above, the costs, volume requirements, retailer pressures, and, indeed, antitrust law are likely to promote the development of shared systems without the need for mandatory sharing. Although the benefits of widespread acceptability might be realized more quickly if sharing were mandated, the Commission concluded that the benefits derived from competitive EFT development would outweigh the benefits resulting from development in a non-competitive environment.

IMPLEMENTATION

*The Commission recommends enactment of preemptive Federal legislation that would affirm the applicability of Federal antitrust law to sharing arrangements involving EFT systems and that would expressly nullify the effect of the mandatory*



*sharing provisions of any State EFT statutes.*[21]
(17-5-3)  A pro-competitive sharing policy should be applied nationally to prevent States from insulating anti-competitive sharing arrangements from antitrust law.  Moreover, an explicit national standard for EFT sharing is desirable because it would increase certainty in the market by eliminating potential conflicts between State and Federal laws.

The Commission concluded that the economic incentives of the marketplace will induce institutions to share equipment and services in order to realize economies of scale, either through jointly owned projects or common use of systems provided by others.  If in the course of such sharing, anti-competitive exclusions or discriminations take place in a manner cognizable under antitrust law, prompt determination of grievances is desirable.  If an institution denied access is not able, within such time as it deems reasonable, to negotiate terms of access with the assistance of its primary regulator and, if different, the primary regulator of the lead institution of the system, then it or its primary regulator may pursue remedies available under the antitrust law.  *The Commission recommends that Congress provide for giving such suits a preferred position on the docket of the appropriate U.S. District Court.  (18-6-1)  The criteria to be used by the courts to judge access disputes should be the competitive and public interest policies embodied in the antitrust laws.  (16-8-1)*

The Commission was concerned about the ability of smaller institutions to become involved in EFT.  It considered many proposals for expediting the procedures available for resolving access disputes,
including changes in judicial and regulatory procedures and the broadening of the criteria by which access disputes would be judged.[22]

One type of proposal considered by the Commission involved the establishment of a panel of regulators when an access dispute incapable of informal resolution arises.  This approach envisioned a regulatory opinion that could, alternatively, be a binding agency action or an advisory opinion that could be used by aggrieved institutions in seeking a preliminary injunction.  Another proposal involved prior review of all consortia arrangements by one or more Federal agencies.  This model provided that proposed consortia would file their plans with the nominated regulator, who would make a determination with respect to both access (should a competing institution so petition) and whether the proposed venture would lessen actual or potential competition.[23]

---

[21] *The Commission did not address the question of whether any special arrangements should be made for systems formed under State mandatory sharing laws in the event that Federal law is passed to nullify such laws.*

[22] *See NCEFT, "Alternative Approaches to Resolving Access Disputes," IWD-41 (October 1977).*

[23] *Accompanying this proposal was a provision that access to the terminal component of such systems must be available to all financial institutions, along with some method (batch or on-line) by which all payments could be cleared and settled.*



These proposals reflect the concern that the resolution of access disputes should not involve lengthy proceedings, during which institutions might be significantly harmed, or be so costly as to impose a substantial barrier to smaller institutions. However, the Commission sees no need at this time to expand or establish bureaucratic structures and procedures for resolving problems that may not arise. The Commission's conclusion was that State and Federal regulators can and will mediate effectively between aggrieved institutions and system operators on an informal basis. Indeed, regulators might, in appropriate circumstances, go to court on behalf of aggrieved institutions.[24] Congressional implementation of the Commission's recommendation that such suits be given a preferred position on court dockets should expedite judicial resolution to the extent practicable.[25] In cases where it is likely that an aggrieved institution will suffer substantial and noncompensable damages caused by exclusion from a system, the aggrieved institution can seek a preliminary injunction[26] or temporary restraining order.

The Commission was also greatly concerned about the appropriate criteria to be applied in cases of access disputes. In recommending pro-competitive sharing, the Commission affirmed the use of competitive principles embodied in antitrust law as basis for resolution of access disputes. However, recognizing the public importance of a sound financial industry, the Commission considered whether factors relating to safety and soundness and other public policies should also be explicitly included as balancing criteria in resolving access disputes.

Although many types of criteria were examined, most were related to the safety and soundness

---

[24] The Commission makes no recommendations with respect to increasing the authority of financial regulators to permit regulators to go to court on behalf of aggrieved constituent institutions.

[25] Such preferences are not unprecedented. For example, in cases concerning employment discrimination, Congress has provided that:

> (5) It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to Rule 53 of the Federal Rules of Civil Procedure (42 U.S.C. §2000c-5(f)(5)).

[26] In its interim report, the Commission recommended that Congress consider altering the standard to be applied by courts considering applications for preliminary injunctions in access disputes. That recommendation is unnecessary in light of the recommendations of this chapter. NCEFT, EFT and The Public Interest (Washington, D.C.: U.S. Government Printing Office, February 1977).



of financial institutions or to the public benefits that could be derived from EFT development. With respect to safety and soundness, none of the Commission's recommendations is intended to impair or alter the ability of financial regulators to monitor and act to preserve the safety and soundness of their constituent institutions.[27] No additional measures designed to assure safety and soundness appear to be necessary.

The Commission's concern that decisions with respect to access reflect adequate recognition of the public interest considerations inherent in EFT development led to extensive consideration of criteria designed to protect these interests. The Bank Merger Act of 1966, which reflects similar concerns, balances competitive criteria with "the convenience and needs of the community to be served."[28] Applying such criteria in access disputes could result in the mandating of access in cases where the application of competitive principles alone would not.

However, the public convenience considerations inherent in bank mergers are far more important, particularly in failing bank situations, than those likely to be raised in disputes over access to EFT systems. Courts applying antitrust law to access disputes will not be blind to factors relating to public convenience, industry structure, or other public policy considerations. In such cases, courts would apply the "rule of reason,"[29] thereby considering all of the factors and circumstances in a given situation, including those facts and circumstances peculiar to the industry involved.[30] As the Supreme Court noted in 1933,

The restrictions the [Sherman] Act imposes are not mechanical or artificial. Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce, but they do not seek to establish a mere delusive liberty either by making impossible the normal and fair expansion of that

[27] *Moreover, State and Federal financial regulatory agencies currently possess authority under a number of State and Federal statutes to protect the public from unfair and deceptive practices on the part of financial institutions. None of the Commission's recommendations affect the applicability of such laws and regulations to financial institutions involved in shared systems.*

[28] *12 U.S.C. §1828(c).*

[29] *The doctrine of the rule of reason, which provides for a rational and nonmechanical construction of the Sherman Act, was first articulated by the Supreme Court in two cases in 1911. See Standard Oil Co. of New Jersey v. United States, 221 U.S. 1 (1911) and United States v. American Tobacco Co., 221 U.S. 106 (1911).*

[30] *See Board of Trade of the City of Chicago v. United States, 246 U.S. 234 (1918); The White Motor Co. v. United States, 372 U.S. 253 (1963); and United States v. Marine Bancorporation, Inc., 418 U.S. 602 (1974).*


Digitized by Google

commerce or the adoption of reasonable measures to protect it from injurious and destructive practices and to promote competition upon a sound basis.[31]

The application of the antitrust laws to access disputes would permit appropriate consideration of public policy concerns without compromising the competitive principles upon which antitrust law is based.  The Commission concluded therefore, that the application of the competitive and public interest criteria contained in the antitrust law, without additional criteria designed to protect the public interest, will result in the adjudication of access disputes in the public interest.

---

[31] *Appalachian Coals, Inc.* v. *United States*, 288 U.S. 344, 360 (1933).

Digitized by Google



Chapter 7

# The Impact of EFT on the Competition for Deposits

Witnesses before the Commission argued that EFT could affect the competitive relationships that now exist among financial institutions and retailers by limiting the ability of some types of institutions to compete effectively. Significant policy questions would arise if EFT were to inhibit the ability of a particular class or type of institution to compete effectively for deposits, credit customers, or both. Indeed, if such institutions were systematically harmed by competitive factors unique to EFT, their functional safety, soundness, and stability could be threatened, and legislative or regulatory action might be necessary. This chapter discusses the impact of EFT on the competition for deposits, focusing principally on the implications for depository institutions. Chapter 8 addresses the impact of EFT on credit-granting institutions.

## COMPETITION AMONG DEPOSITORY INSTITUTIONS

Depository institutions compete for both the sources (e.g., deposits) and the uses (e.g., loans and investments) of funds. Depository institutions face competition in both areas from a variety of firms, financial and nonfinancial. In the competition for deposits, depository institutions compete with any firm that seeks financial resources. In the competition for loans and investments, they again face considerable competition from numerous firms, especially retailers and finance companies in the consumer credit market.

Depository institutions also compete among themselves, but the nature of this competition is limited in some ways by extensive Federal and State regulations intended to promote the safety and soundness of the financial industry. In general, competition expands choice among products, improves their quality, reduces their costs, and encourages efficient allocation of economic resources. It also carries with it the risk of failure and bankruptcy. The social benefits derived by minimizing this risk through regulation are generally thought to outweigh the social costs that may result.

Regulation has determined the character of competition among depository institutions over the past several decades by:



- Establishing barriers to market entry (such as limits on branching, chartering requirements, and capitalization requirements).

- Limiting the kinds of services that particular types of depository institutions may offer (such as the prohibition of certain kinds of third party payments by thrift institutions).

- Regulating the price of services (such as interest rate ceilings).

Within the framework defined by limitations such as these, competition for deposits and loan customers has changed considerably to reflect the changing economy. During the 1960's, the emphasis on the competition for the sources and uses of funds shifted as the demand for funds began to exceed the supply, a situation caused by accelerated economic growth. Depository institutions, in response, turned their attention to the competition for deposits.

Greater attention to deposits led to a growing interest in the household sector as a source of funds and to increased competition on the basis of price, or interest rate paid on deposits. As credit tightened, depository institutions often found themselves at a competitive disadvantage with respect to other institutions in the competition for scarce funds. During such periods, when the market price for funds rose above the allowable rate of interest that can be paid on time deposits, many depositors shifted their financial holdings from deposits to direct market investments. To improve their competitive position, depository institutions

introduced new and higher yielding instruments, including the certificate of deposit and the variable rate certificate. As corporate funds were shifted into higher yielding instruments, there began a similar shift in household funds from demand deposits to interest-bearing accounts.

At the point at which depository institutions were paying the highest allowable interest rates, and thus no longer able to compete on the basis of price, they shifted their competitive focus to providing better customer services. This is the situation that exists today, and depository institutions now are devoting greater attention--and investment--to providing more convenient, efficient, and profitable customer services. This fact explains, in part, the considerable interest in and controversy over EFT in the financial industry. EFT offers the potential both to heighten competition for funds through new service offerings and to reduce the costs of some financial services.

Clearly, some institutions will compete more effectively than others in attracting deposits, and some institutions will benefit from EFT as others make mistakes. The fundamental public policy question in this regard is not whether EFT has competitive implications, but whether the introduction of EFT discriminates against the ability of a particular class or group of institutions to compete for deposit dollars.

An examination of the traditional means of competition among depository institutions and the available (but limited) EFT market data leads to the preliminary conclusion that, assuming equal access to and participation in EFT systems by all depository



institutions, EFT _per se_ should not affect the competition for funds among depository institutions. Some of the factors affecting this competition are discussed below.

## Availability of Services

The ability of an institution to offer services to its customers is a function primarily of regulation and secondarily of tradition. Of the four major types of depository institutions (commercial banks, savings and loan associations, credit unions, and mutual savings banks), commercial banks have the broadest charter to offer varied financial services and, as a result, often call themselves "full-service" institutions. The heightened competition for customers and their funds, however, has increased pressure to broaden and enhance the authority of all depository institutions. Until recently, for example, only commercial banks could offer demand accounts or checking accounts.[1] Regulatory and legislative decisions have since expanded the powers of some thrift institutions to offer check-like instruments, which have proved to be popular with consumers.[2] Innovative applications of technology also have permitted some institutions to compete in markets from which in certain cases they were otherwise precluded. The extension of third-party payments through telephone bill payer services by some thrift institutions is an example.

The primary factor that determines the effectiveness of competition on the basis of services is not EFT or any other particular service _per se_, but rather the necessary regulatory authority to offer consumer services in competition with other

depository institutions. For instance, it is probable that EFT systems that supplement a consumer's transaction account will be more successful than those that do not. Any depository institution, therefore, that is not empowered to offer third-party payments is likely to be at a disadvantage. Conversely, the prohibition of interest payments on demand deposits would place commercial banks at a disadvantage if third-party payment powers were extended to thrift institutions. To eliminate such potential competitive problems, the Commission generally endorsed steps to ensure that all depository institutions can participate equally in the offering of these services.

---

[1] _Exceptions to this rule exist in Delaware, Maryland, and New Jersey, where mutual savings banks have had long-standing authority to offer checking accounts._

[2] _For instance, NOW accounts were authorized for all depository institutions in Massachusetts and New Hampshire on Jan. 1, 1974. Within three years, 1.2 million accounts totaling more than $1.6 billion had been opened. Statement of G. A. LeMaistre, Chairman, Federal Deposit Insurance Corporation, on_ Nationwide NOW Accounts, Interest on Reserves and Related Issues, _Hearings, June 20, 1977, Subcommittee on Financial Institutions, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, 95th Congress. NOW accounts have since been authorized on an interest-bearing basis throughout New England and on a non-interest-bearing basis in several other States._



Ability to compete equally in a payments system, however, is not simply a function of the powers extended by law and regulation, but also depends on access to a network or system that will transfer, clear, and settle transactions.

Such a system is provided by the Federal Reserve for check clearing and settlement. A similar system is developing for electronic payments through the implementation of regional automated clearing houses (ACHs).[3] If certain types of institutions are arbitrarily denied fair access to ACH facilities, these institutions will be precluded unfairly from offering certain services, whatever their charter. To promote competition and prevent such exclusion, the Commission recommends that all ACH associations permit full access and membership for all types of depository institutions.[4]

Price and Rate

Depository institutions also compete on the basis of the price of services and the interest paid on deposits. This rate is limited by law, with limits varying by type of institution and State. Such differences affect competitive relationships, as they are usually intended to do.

Financial services traditionally have been implicitly priced. Because regulation forbids the payment of interest on demand deposits, banks compensate their customers for use of these funds through associated services, some of which are provided "free." Assessing the implicit costs and benefits of these services, however, is difficult at best for the consumer, and when demand deposit services are combined with other services, the consumer's ability to shop comparatively for financial services is further complicated.

Because of the increased competition that is likely to result from EFT and the desire of institutions to encourage consumer acceptance of the new services, it is probable that market forces will eventually provide an incentive for depository institutions to explicitly price their individual service products.[5] If so, the consumer will be more aware of the cost of these services, and competition on the basis of price probably will increase accordingly.

EFT per se, however, should not change the ability of depository institutions to compete on the basis of price, assuming that all institutions have

_____

[3] See Appendix C, "The Payment System in the United States."

[4] See Chapter 14, "Government Operation of ACHs and POS Switches." The U.S. Department of Justice has signaled its intention to litigate on access questions if necessary. It recently brought suit against two ACH associations (The Rocky Mountain Automated Clearing House Association and the California Automated Clearing House Association) for excluding thrift institutions from membership). As of Oct. 28, 1977, these suits had not gone to trial.

[5] See, for example, Neil B. Murphy, "Bank Credit Cards, NOW Accounts and Electronic Fund Transfer Systems: The Role of Explicit Pricing," The Magazine of Bank Administration (August 1977).



equal authority to participate in and have access to EFT systems. As discussed below, the Commission concluded that all depository institutions, regardless of size or charter, will have the opportunity to participate and compete fairly through sharing and expanded correspondent relationships.

## Other Competitive Factors

Other factors affecting competition among depository institutions for funds include customer convenience in the location of services and ease of access to such services.

Because regulation in the past has led similar depository institutions to offer similar products at approximately the same price to the consumer, the location of these consumer services has been a significant competitive factor. Consumer attitude studies indicate that, all other things being equal, location is a major factor affecting the consumer's choice among depository institutions.[6]

The importance of location has increased greatly in recent years. Although the number of commercial banks was virtually unchanged from 1950 to 1970, the number of banking offices increased by 88 percent. Depository institutions also expanded their banking hours and made their services more convenient by drive-in, walk-up teller windows and, now, by 24-hour automated teller machines.

The ability to compete by opening new branch offices is largely determined by law, which differs by State and class of depository institution. Generally, branching has been limited to promote the

safety and soundness of depository institutions and to ensure that a given region is not "overbanked," a situation that could weaken depository institutions in the market area and contribute to their failure. In some regions, however, such policies have resulted in "underbanking," which can result if one institution has monopoly or near monopoly influence over the market.[7]

EFT will increase consumer locational convenience because terminals offering EFT services can be deployed virtually anywhere, and accounts can be accessed by telephone. Although competition on the basis of geographical location could decline as systems proliferate, several factors make it likely that consumer acceptance will be greatest for systems that supplement a local presence rather than substitute for one. First, as previously mentioned, the physical presence of a local institution remains an important factor for the consumer.[8] Second, the ability to open accounts rests with the institution itself, not its EFT facilities. Finally, the limited service capabilities of terminal-based systems render the presence of a local institution essential for

---

[6] See, for example, *The Cambridge Report 2* (First Quarter 1975), p. 144.

[7] The Commission noted that the underbanked situation may lead to competitive disadvantage due to EFT *per se*, in the sense that local monopoly institutions may face some loss of market share as non-local institutions enter their market through EFT.

[8] See, for example, *The Cambridge Report*, *op. cit.*



providing some of the consumer's most important financial services, such as loans, home mortgages, and estate and trust services.

In any event, the question of deployment of terminals is central to EFT competition. To the degree that one type of depository institution is treated preferentially in the regulation of this deployment, such institutions could well be at a competitive advantage in competition for deposits based on service offerings.

Thus, the Commission was concerned that rules on the deployment of terminals and on the availability of EFT services through terminal-based systems be applied equally to all depository institutions. These services and systems can then be offered at the same pace by the various types of federally and State-chartered depository institutions. If the Commission's recommendations in this area are enacted,[9] no class of institution should be at a competitive disadvantage in competing on the basis of location solely because of EFT.

In sum, a review of the methods of competition used by depository institutions leads to the general observation that, assuming all depository institutions are able to participate equally in EFT systems and offer competing services, then no class of depository institution will be placed at a competitive disadvantage solely because of the introduction of EFT. The following section reviews the available empirical evidence to determine if, in fact, the limited market experience available supports this conclusion.

## EMPIRICAL EVIDENCE

In its investigation of the impact of EFT on competition for funds, the Commission used consultant studies,[10] issued a request for public comment,[11] held public hearings, conducted research,[12] and reviewed existing studies in the area.

Because EFT is relatively new, evidence from the market-place is sparse and varies widely in quality. Insofar as competition for deposits among depository institutions using EFT is concerned, this

---

[9] See Chapter 5, "The Branch/Terminal Issue."

[10] National Commission on Electronic Fund Transfers, "A Description of Electronic Fund Transfer Activities in 28 States," Internal Working Document IWD-36 (March 1977); NCEFT, "Summary of Data on Major Terminal-Based Electronic Funds Transfer Projects in the United States," IWD-37 (March 1977); NCEFT, "An Appraisal of Regulatory Agencies Papers on the Competitive Impact of EFTS," IWD-40 (October 1977).

[11] NCEFT, "Summary of Responses to Request for Comment on Competitive Implications of EFT," IWD-53 (October 1977).

[12] NCEFT, "The Economics of Electronic Fund Transfer Systems: An Analysis of Data Derived from Twenty Case Studies," IWD-43 (May 1977); NCEFT, "Compendium of Papers Prepared for the National Commission on Electronic Fund Transfers," IWD-51 (October 1977); NCEFT, "Electronic Fund Transfers and the Availability of Credit," IWD-52 (October 1977).



evidence strongly suggests that EFT _per se_ has not placed any particular type of institution at a competitive disadvantage to date, nor is EFT anticipated to do so in the foreseeable future.

## Deposit Shifts Among Institutions

A central concern is that widespread proliferation of terminals offering EFT services will lead to substantial shifts in deposits within and between market areas, and may even result in significant interregional shifts in deposits, thereby concentrating assets in money center banks.

This concern was expressed in a statement submitted to the Commission:

> The nationwide terminal deployment makes it possible for a Citicorp, Bank of America, etc. to, in effect, open a branch in our market. This is a rather frightening prospect for a $60 million institution. We can only speculate on the effect. The potential for funds flowing out of our market into the metropolitan market is much greater. We are a capital short area, and we need the money here.[13]

The Commission found no evidence to suggest that EFT has caused significant competitive impact as measured by changes in market share of deposits among depository institutions.

In general, the data tend to confirm another statement submitted to the Commission:

With regard to the future competitive implications of EFT, we foresee a minimal effect, on the whole, upon financial institutions. Historically, segmentation of market share among institutions is relatively stable....The danger that banks will lose market share to "out-of-town" competitors who establish terminals in their market area is minimal. It is obvious that the need for traditional banking offices will still exist.[14]

In its statement, the American Bankers Association (ABA) summarized results of its survey of 120 banks concerning the impact of EFT on market share of deposits:

> A significant majority of banks offering EFT services have not detected market shifts due to EFT.
>
> - Over 70 percent of banks surveyed which are active in EFT services have not noted shifts in market

---

[13] _Statement of Joe C. Morris, President, Columbia Savings, Emporia, Kan., on May 9, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977._

[14] _Statement of Stephen W. Vineberg, Vice President, The Fidelity Bank, Philadelphia, Pa., on June 14, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977._



share in terms of deposits or accounts.

- A small number of banks reported favorable market shifts but generally were unable to quantify results. Those banks which were willing to quantify results to date were generally the only EFT providers in that particular market.[15]

These findings were confirmed by the Federal Deposit Insurance Corporation (FDIC). Based on two surveys of commercial bank EFT experience, one in 1974 and one in 1976, the FDIC developed a model to determine the extent to which various EFT characteristics have influenced the market shares of banks that have already installed retail EFT-related terminals. The FDIC also sought to determine whether and to what extent the deployment of terminals has enabled banks offering EFT services to increase their market shares. The FDIC analysts concluded that:

> While EFT-related variables have demonstrated little competitive impact (as measured by shifts in market share) for EFT banks alone, these variables have had even less of an impact for EFT banks relative to institutions without EFT machines.[16]

Another FDIC analysis contrasted the structural and operating characteristics of EFT banks in 1974 with those in 1976. This analysis concluded that EFT was a neutral force and that banks have not yet realized significant benefits from it:

As was the case between 1972 and 1973, it is still true that banks with EFTS machines are showing deposit growth rates that are not so high as all banks in each regulatory class. Moreover, the composition of deposits at banks with EFTS machines is somewhat less dominated by time and savings deposits than is true of all insured banks in each regulatory class. Banks that have installed EFT machines seem to have had relatively low growth rates for demand and time and savings deposits between 1974 and 1975.[17]

Those institutions that did experience shifts in market share found these shifts to be small and often temporary. One study found that:

> In case after case, where one institution offers EFT and it becomes clear that

_____

[15] American Bankers Association, "Results of Competitive Impact Survey," on July 21, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[16] Gary G. Gilbert and David A. Walker, "The Influence of Electronic Fund Transfer Systems on Changes in Bank Market Shares," Working Paper 77-2 (Federal Deposit Insurance Corporation, 1977), p. 11.

[17] David A. Walker, "Contrasts Among Banks with Retail Electronic Banking Machines and All Insured Banks: 1974 versus 1976," Working Paper No. 77-1 (Federal Deposit Insurance Corporation, 1977), p. 10.


Digitized by Google

customers, deposits, and credit will be attracted by the service, the institution's direct competitors offer the service also.[18]

This finding was confirmed by the ABA's survey:

> Quantitative market shifts are very modest, and expected to be short-lived. Shifts reported by the few banks which can quantify results appear to be modest--under two percent in terms of accounts. These results appear to be the gain of introducing an innovative service package by an early entrant.

> The providers of EFT services are unsure whether market shift was clearly due to EFT, or to an accompanying aggressive promotion of overall bank services. Additionally, most respondents felt that any edge in the market would be recaptured by competitors' later entry.[19]

Only in the case of EFT check authorization and check guarantee at the point of sale is there empirical evidence of a shift in market share. The analyses of both the FDIC and the ABA agree on this point.[20] If the correlation between these services and shift in market share is significant, however, the shifts may nevertheless be transitory. That is, they may be eliminated when competitors counter with their own offering of check verification services.

## Size of Depository Institutions

Another EFT competitive issue is whether a depository institution will be disadvantaged in the competition for funds simply because of its size.

Some analysts and representatives of depository institutions argue that only large institutions can afford the capital investment required for an EFT network. They also argue that only large institutions have access to a customer base sufficiently broad to build the necessary transaction volume to realize substantial economies of scale. Two statements submitted to the Commission are representative of these views:

- The competitive situation could be disastrous. Smaller financial institutions would be at the mercy of the corporations with working capital to back the EFT experiments.[21]

---

[18] Peat, Marwick, Mitchell & Co., "The Competitive Impact of EFT: Lessons Learned," on July 5, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[19] ABA, *op. cit.*, p. 2.

[20] Gilbert and Walker, *op. cit.*, p. 11, and ABA, *ibid.*, p. 3.

[21] Statement of E. Shelton Lackey, Vice President and Treasurer, First Federal Savings & Loan Assn., Orangeburg, S.C., on May 12, 1977, in response to

Digitized by  Google

- Smaller banks would most likely be frozen out and, as a result, could possibly fail.[22]

Others argue that EFT offers smaller institutions new and better opportunities to compete with larger institutions because the costs favor sharing (and therefore, shared economies of scale) and because EFT-related terminals are much less costly than brick and mortar branches:

- Generally, EFT tends to offer more opportunity for smaller institutions to achieve parity without significantly increasing the advantages to the larger institutions.[23]

- EFT services will be made available to the small banks in much the same fashion that data processing and credit card services are made available by the larger financial institutions.[24]

- The lower cost of electronic banking equipment vis-a-vis physical branching locations will permit smaller banks to offer access to banking services at substantially less cost, enabling them to more effectively compete with large banks in servicing existing customers.[25]

This last point is supported by available research data, which show no evidence of harm to the small institution:

Small banks with less than two branches in unit banking States (some of which allow a nearby service office) seem to be the ones that are most inclined to install retail EFT machines.... (T)he point is, however, that those who claimed that small banks would not be able to participate in electronic banking systems do not appear to be correct at this early stage of EFTS development.[26]

In fact, to the degree that any institution has experienced any measurable benefit from EFT, it may well be the small institution. A recent analysis of

[21]Continued
NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[22]Statement of Rollin Michael, Vice President and Cashier, Lloyds Bank of California, on June 14, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[23]Statement of John F. McNair, III, Immediate Past President, North Carolina Bankers Association, on June 3, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[24]Statement of Richard L. Jones, Communications Facilities Officer, Sun Banks of Florida, Inc., on June 6, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.

[25]ABA, op. cit., p. 4.

[26]David A. Walker, op. cit., p. 14.



the 1,260 insured commercial banks with EFT-related terminal systems concluded that:

> Contrary to the belief of many, the size (total assets) of EFT banks does not confer a competitive advantage to larger institutions....Rather...improvements in market shares are relatively greater for <u>smaller</u> banks with cash dispensers or point-of-sale terminals.[27]

The same study found preliminary evidence that small banks are already attempting to compete with larger banks by offering EFT services and that banks in general may be employing terminals offering EFT services as a substitute for brick and mortar branches.[28]

The Commission concluded, therefore, that the size of a depository institution does not necessarily carry with it significant advantages in the comly petition for deposits based on offering EFT services to consumers.[29]

---

[27] *Gilbert and Walker, <u>op</u>. <u>cit</u>., p. 10.*

[28] *<u>Ibid</u>.*

[29] *However, this may not be true for retailers. The Commission heard conflicting testimony relating to whether smaller retailers may be placed at a competitive disadvantage <u>vis a vis</u> larger retailers by the proliferation of EFT systems. EFT may become a necessary cost of doing business for the retailer,*

[29]*Continued*

*whatever its size, if point-of-sale (POS) systems become popular with consumers. This cost could be significant for the small retailer, especially a retailer whose transaction volume is low. Of course, if EFT eventually becomes less costly than alternative means of payment, which was the judgment of the Commission, then retailers large and small could benefit.*

*In part, the degree to which EFT will affect small retailers will depend upon the extent to which consumers alter their shopping habits to take advantage of EFT. Because of the limited consumer experience with such services, the Commission lacked conclusive evidence on this subject.*

*Nonetheless, the Commission was concerned that all institutions, small or large, should have an opportunity to participate fairly in EFT systems. The Commission shared the expressed concern of the American Retail Federation that "a failure to achieve an adequate and competitive means for small retailers to participate effectively in EFT will weaken them relative to large ones." (Statement of Loyd Hackler, President, American Retail Federation, on June 15, 1977, in response to NCEFT's "Request for Comment on the Competitive Impact of EFT," dated Apr. 27, 1977.) Lacking empirical evidence, however, the Commission was not prepared to make any specific recommendations other than that this matter should be monitored by the appropriate agencies.*

*The role of retailers in the delivery of EFT systems is discussed more extensively in Chapter 8, "The Impact of EFT on Credit."*


Digitized by Google

## Economies of Scale and EFT

Several studies have concluded that significant economies of scale are associated with EFT systems. This would suggest that the larger the institution's per-customer and transaction base, the lower its per-transaction costs. Although the limits of EFT scale economies are not known, experience with large-scale computer-based information systems suggests that the marginal cost per transaction will continue to decrease until the system's processing and transmission capacity is saturated. At that point, significant capital investment would be necessary to sustain additional volumes.

The economies of scale that will accrue to large volume systems could place the small institution at a competitive disadvantage if it has an insufficient customer and transaction base to sustain necessary volumes. Available evidence indicates, however, that consortium arrangements allow small institutions to pool their transactions to produce sufficient volume to achieve economic return similar to that of large institutions.[30] Small institutions that decide not to share the ownership of a system still may have a facilities and service capability through expanded correspondent relationships, much as data processing and credit card processing services are available to small institutions today.

The Commission concluded that, in general, cost reductions resulting from economies of scale achievable through EFT will be available to small depository institutions.[31]

## Depository Institution Access

Another competitive issue is whether all depository institutions will have access to EFT systems and be able to compete in the offering of EFT services to their customers. If, as the Commission concluded, consumers will use and benefit from EFT services, then those institutions that are denied access to EFT systems will be at a competitive disadvantage.

In general, the Commission concluded that market forces will encourage extensive sharing of systems. The capital costs of developing and building an EFT network are so large that it is likely that only the very largest institutions will develop wholly owned (proprietary) systems of substantial size.[32] The need for sufficient transaction volume should be a further incentive for depository institutions to grant access to other institutions. Considerable evidence was presented to the Commission to suggest that economic incentives will encourage widespread sharing of EFT terminal-based systems, especially POS systems.[33] (Proprietary terminals, of course, could be attached to such shared networks.)

---

[30] ABA, *op. cit.*; Gilbert and Walker, *op. cit.*

[31] See Chapter 6, "Sharing."

[32] See Chapter 9, "Cost Analysis of EFT."

[33] A major survey of EFT experience found that all but one POS terminal system was shared. See David A. Walker, "An Analysis of EFT Activity Levels, Costs and Structure in the U.S.," Working Paper 76-4 (Federal Deposit Insurance Corporation,

114

Digitized by Google


Because of market forces and existing procedural remedies in the case of access disputes, the Commission concluded that, in general and in most locations, access to terminal-based EFT networks has been or could be made readily available to all classes and sizes of depository institutions through sharing, franchising, and expanded correspondent relationships.

## CONCLUSIONS AND RECOMMENDATIONS

The Commission found that EFT is still evolving and that data on its competitive impacts are comparatively limited. As this chapter indicates, however, a review of the factors upon which depository institutions compete for funds leads to the conclusion that, assuming equal participation, EFT terminal-based systems have not affected and probably will not affect the competitive relationships among depository institutions so as to cause significant or lasting shifts in the share of deposits held by a given institution.

This is not to suggest that all institutions will benefit from EFT. There are risks to individual institutions as they attempt to adapt to an evolving technology. The Commission did not conclude, however, that these risks are cause for alarm or action.

The competitive structure of the financial industry is undergoing significant change and EFT could act as a catalyst for regulatory change. In fact, without regulatory change, some institutions could eventually be placed at a competitive disadvantage. As indicated earlier, the Commission concluded that

the remedy is to establish rules that allow depository institutions to participate equally in EFT systems and to offer competing EFT services. In this way, an institution's ability to attract deposits will not be decided by EFT *per se*, but by the managerial, marketing, planning, and creative capabilities of the institutions in meeting the needs of consumers.

Because today's marketplace is dynamic and today's data are limited, the Commission concluded that judgments about the competitive impacts of EFT in the more distant future are necessarily speculative. This fact underscores the need for careful and continual monitoring to protect against unsafe and unsound practices that may develop as EFT is implemented.

*Therefore, the Commission recommends that the appropriate State and Federal regulatory agencies should continue to monitor the proliferation of EFT systems in light of their competitive implications and take necessary action consistent with the agency's charter. (25-0-0)*

---

[33]Continued

1976). Analysts also argue that sharing of POS systems is essential in most cases if the system is to operate efficiently. See David A. Walker, "Economies of Scale in Electronic Fund Transfer Systems," Working Paper 76-5 (Federal Deposit Insurance Corporation, 1977), and ABA, *op. cit.*, pp. 2-3.



Digitized by Google