# Separate Statements




Digitized by Google

This section presents statements from Commissioners who wished to comment on a range of issues, both substantive and procedural, that occupied the Commission during the past two years.

These statements provide a significant additional resource for the Congress, State legislatures, and other Federal and State policymaking groups as they, too, examine the difficult and controversial questions raised by EFT.

Although these statements necessarily highlight the differences in points of view among Commissioners, it is important to note that there was, in fact, remarkable unanimity on most issues, despite the diversity of background and interests of the Commissioners. This is shown in the vote tally that follows each recommendation in the preceding chapters of this report.

The Chairman of the Commission, William B. Widnall, concludes this section with some final observations about the work of the Commission.

237



STATEMENT OF VERNE S. ATWATER

UNFINISHED BUSINESS:  A NATIONAL DEVELOPMENT
CORPORATION FOR U.S. PAYMENTS SYSTEMS

This is not a dissenting opinion, for I support
the basic thrust of the Commission's final report and
its emphasis on consumer needs in an EFT world.

However, a thoughtful consideration of the Com-
mission's findings over the past 18 months and a re-
examination of the charge given the Commission by the
Congress indicate important unfinished business that
I believe should be considered by the Congress in
acting on the Commission's recommendations.  Particu-
larly, I believe that stronger action is called for
to safeguard the security of future electronic pay-
ments systems and to provide for a continuing study
of such public policy questions as the special needs
of low-income consumers of payment services.  Spe-
cifically, I would recommend the following proposal
for consideration by the Congress.

## Recommendation

To ensure that the future development of EFT
systems will serve all segments of our society and
provide essential safeguards for the future of our
Nation's financial payments systems, I would recommend
that the Congress create and fund a National Develop-
ment Corporation for U.S. Payments Systems, modeled
after the Corporation for Public Broadcasting, to
carry out two specific missions.

- To make grants to private and governmental
  organizations in support of promising tech-
  nological research and development programs
  with the potential to enhance the security
  of the Nation's vital payments systems.  The
  research effort in electronic payments sys-
  tems would be comparable in some respects
  to programs now sponsored by the Transporta-
  tion Systems Center to apply advanced tech-
  nology to the safety and modernization of
  national transportation systems in the public
  interest.



- To make grants in support of applied public policy research programs with universities, private research organizations, and Government agencies. The purposes of such grants would be:

  --To focus public attention on innovative approaches to provide better solutions to important issues of the national payments systems, with particular reference to the impacts of EFT in areas such as EFT and consumers, EFT and national communication policies, and EFT and the implications for Government social programs (including Government transfer payment systems and matters of public policy); and

  --To develop an active, current, and reliable EFT research data bank of information useful to corporate planners, EFT practitioners, and regulators, as well as, and importantly, the various Congressional committees and State legislative bodies and members of the public concerned with EFT problems and issues.

I would recommend that the Corporation be structured along the lines of the Corporation for Public Broadcasting, with public and governmental representation on the Governing Board, and that an initial appropriation be made to provide funding for a five-year experimental period, with provision for matching funds from the private sector.

## Background

The Congress instructed the Commission in Section 203 of the NCEFT law to take into account ". . . the implications of . . . [an EFT system] expanding . . . into other forms of communications." The Commission has not considered the possible implications of future technological innovations on the security of EFT systems nor has it attempted to establish the potential beneficial results of such innovations on important public policy issues such as, for example, the implications of new EFT technology or new payments systems on the effectiveness of Government transfer payments for welfare, Social Security, and food stamps to low-income consumers.

In both areas the critical missing link is the appropriate mechanism, such as a National Development Corporation for U.S. Payments Systems, to stimulate the design and application of advanced technology and human-sensitive systems to achieve important public policy objectives.

## Security

The security of EFT systems is an issue of continuing concern among consumers and, perhaps more significantly, among experts well acquainted with the capability and vulnerability of computer and electronic systems. Although no major breakdowns in EFT systems were uncovered during the course of our examination of the security issue, the potential threat to financial institutions prompted a proposal by the Commission for a task force of financial regulators to coordinate EFT security audits and systems. Although this may be adequate for the present, there are important reasons



why I believe that a more fundamental approach to the problem may be needed in the future.

First, the accelerating expansion and integration of this Nation's payment and credit system through EFT could increase the potential vulnerability of the payments system to illegal access. Concerns about possible deficiencies in the security of large-scale EFT systems also may deter investments in development of modern payments systems to their full potential.

Evolving EFT systems with common identification techniques and on-line computer and communications links increasingly will provide for instantaneous electronic transactions among consumers, retailers, financial institutions, computer service corporations, and a host of other non-depository institutions. Predictably this will create the need for new and more complex security systems.

Second, the pace of technological innovations has been rapid in recent years, particularly in consumer-activated communication systems (e.g., the mini-computers and the $10 hand-held computer/calculator). This has lowered the cost and greatly increased the availability of electronic systems with the potential capability to penetrate the security of established EFT systems.

Third, a new generation of consumers, sophisticated in the design, construction, and operation of computer and communication technology, creates both an exciting promise for consumer acceptance of EFT services and a continuing threat to the future security of EFT systems.

Consumer electronics is now a large and growing business, ranging from kits for the construction of computers to voice-activated toys to the infamous little blue boxes built by precocious teenagers to activate complex telephone and computer systems. These new, talented, and creative consumers no doubt will enlarge the scope of EFT security measures required in the future.

Public Policy Research

These important trends also create tremendous new opportunities for developing more flexible, reliable, consumer-controlled, and decentralized EFT systems in the future. These, in turn, may suggest different and possibly better solutions to current EFT concerns about consumer convenience, freedom of choice, costs, privacy, and the role of Government. For example, it is now possible by mini-computer to extend traditional banking services to the consumer through automated teller machines and for depositors in their homes to transfer funds to their bank electronically by touch-tone telephone. In view of these recent developments, it is not difficult to speculate on the possibility that in the future a consumer with a hand-held low-cost computer with an audio signal might maintain personal financial accounts and records for current transactions in his own computer and transfer debits or credits from this computer to other hand-held computers or to the bank or merchant account electronically in lieu of cash or checks. This not only would create an exotic new form of legal tender but conceptually would suggest new privacy and security policy alternatives.



Although such "blue-sky" speculations about the
future are not useful for the design of new regula-
tions, they do suggest the importance of advanced EFT
planning by financial institutions and the potential
power of technological innovations to force changes
in the ground rules for the future operation and con-
trol of EFT systems.

In such a rapidly changing and unpredictable
technological and social environment, I believe that
there is a strong need for a continual monitoring
of real changes in EFT systems and technology.  For
that reason, I recommend formation and funding of a
National Development Corporation for U.S. Payments
Systems to prepare for future consumer needs and
changes in the Nation's payments systems.


*Verne S. Atwater*
*President*
*Central Savings Bank, New York*
*Representing Mutual Savings Banks*

Digitized by Google

STATEMENT OF JAMES E. FARIS,
FREYDA P. KOPLOW, WILLIAM B. LEWIS,
AND GEORGE W. WATERS

THE DEVELOPMENT OF EFT SHOULD NOT THREATEN THE
EXISTING STRUCTURE OF THE NATION'S FINANCIAL SYSTEM
OR THE DUAL BANKING SYSTEM

We agree with many of the observations and
recommendations contained in the final report. We
believe that, while EFT can and will develop and
that change due to EFT is inevitable, this change
should be designed to meet demonstrated consumer
preferences exhibited in the marketplace and should
evolve within the existing structure of the Nation's
financial system. It should not be imposed uni-
laterally by Government fiat. The Commission's
recommendations which advocate wholesale changes in
the existing regulatory environment with the estab-
lishment by depository institutions of electronic
terminal branches and the offering of EFT services
do not adequately take into account the risks of
precipitous changes or the serious consequences
which those changes could have on the dual banking
system and the competitive financial structure which
have served our country for so many years. This
dissenting statement is submitted to offer some
perspective on these matters.

We believe that the impact of the majority's
recommendations on the structure of the financial
system should be given careful study. What would be
the impact of such changes on:

- The existing financial structure of
  this country.

- The rights and privileges of consumers.

- The existing consumer protection
  legislation.

- The relative status of small local
  depository institutions to large de-
  pository institutions.

- The competitive balance between the
  various types of depository institutions.

- The responsiveness of the financial
  system to local needs for capital funds
  for local development.



- The efficiency and effectiveness of State supervision and regulation.

- The functions of specialized institutions such as credit unions, finance companies, savings and loan associations, and mutual savings banks.

- The gradual evolution of EFT systems and EFT services.

- The safety and soundness of depository institutions.

Would the recommendations result in the migration of depository accounts and the siphoning off of capital funds to the detriment of particular localities and the concentration of deposits in any particular type of depository institution or in any particular geographic area of the country? Would the recommendations result in depository institutions becoming computer or communications service organizations? Finally, would the recommendations cause precipitous change in the existing structure of the Nation's financial system and the development of what in effect could be an oligopolistic national branch banking system?

### The Commission's Task

Congress created the National Commission on Electronic Fund Transfers to conduct a thorough study and investigation and recommend appropriate action in connection with the development of EFT in the United States. Congress instructed the Commission to take into account the need to preserve competition among financial institutions and other business enterprises; the need to promote competition among financial institutions; the need to prevent unfair or discriminatory practices, and the need to afford maximum user and consumer convenience, privacy, and confidentiality.

Congress did not instruct the Commission to recommend a new structure for the financial industry of this country, but rather to recommend ways in which EFT might develop within the existing structure of this Nation's financial industry.

The recommendations which a majority of the Commission has adopted show that these Commissioners believe that EFT should be the means to change the structure and balance of the Nation's financial industry. We do not agree. These changes could cause considerable disruption in the financial industry for no more immediately pressing reason than to accommodate an additional payments system at the consumer level. EFT has been in use in transferring funds among financial institutions, industry, government, and international operations for nearly two decades without restructuring our financial system. Surely, if changes have not been necessary to accommodate highly sophisticated financial transactions, the majority should not have concluded that consumer operations required drastic change.

The majority should not use the promotion of consumer EFT to mandate Federal preemption of State laws and regulations that would undermine the foundation of the dual banking system. Changes can and will take place, but any changes should be made



carefully and cautiously.  Consumers can obtain the benefits of EFT and the convenience of an additional payments mechanism without a dramatic restructuring of the financial industry.  Examinations of existing EFT projects should proceed at their own pace and changes, if any, should be based on the results of those examinations and on the gradual and evolutionary changes necessary to respond to demonstrated consumer needs.

### Offering of EFT Funds Transfer Services

The majority recognized the many problems the offering of EFT funds transfer services could cause and that "negative developments could ensue."

The majority acknowledged that a number of examples of potentially detrimental developments had been presented to the Commission:  "that the free market approach would lead eventually to the domination of banking by a handful of giant depository institutions and to the destruction of the dual banking system," or that "the unlimited availability of funds transfer services would lead to 'nationwide [EFT] networks of control [that] would result in the McDonaldization of the banking industry . . . and a cartelized banking structure'."  The majority stated that they believed that these dangers might be avoided by methods other than the restricting of the availability of EFT deposit and debit services, but the majority failed to state what those other methods might be.  The majority did not evaluate the important interrelationship between the offering of funds transfer services and the existing regulation of the financial industry or what might be the

ultimate effect of their recommendations on the financial industry or on the dual banking system.

### The Deposit Service

The majority recommended that the deposit service should be offered intrastate without restriction and interstate throughout local market areas between contiguous States where permitted by reciprocal legislation or, if there is no reciprocal State legislation, then under Federal preemptive legislation.  The majority offered no reasons in support of its recommendation.  The majority merely observed that "[g]iven the character of the U.S. banking system, the [majority] concludes that there should be some positive control . . . ."  The majority's recommendations would, however, provide little, if any, positive control of the deposit service.

The deposit service is the single service still unique to depository institutions.  It is at the heart of competition among depository institutions.  Deposits are, in fact, the name of the game.  They are the primary measure of the size of depository institutions.  Deposits are also the primary source of funds used for lending.  The Commission recognized the importance of deposits by recommending greater regulation for that EFT service.  Allowing the deposit service to be offered intrastate or interstate has the potential for causing significant changes in the competitive positions of depository institutions.  Opening up this new, relatively unrestricted avenue of competition for deposits could result in undesirable shifts in service offerings



by financial institutions in an attempt to enlarge their market shares.

Further, allowing the financial industry to expand its deposit-taking capacity into previously restricted markets could result in the domination of the markets by the large depository institutions to the detriment of the smaller depository institutions. Whether it is in the best interests of the smaller local banks or the consumer to allow the rapid expansion of the deposit service in a manner that might cause any unforeseen effects in the competitive balance which exists in the heavily regulated financial industry is a matter for State determination and regulation.

## The Debit Service

Without substantiation and on the basis of no evidence whatsoever, the majority "found" that "competitive opportunities would be enhanced and the consumer's interest would be served if no new restrictions were placed on the availability of the debit [service]." The majority recommended, therefore, "that State and federally chartered depository institutions should have the power to offer debit services anywhere in the country through terminal-based EFT systems."

This recommendation was based on the premise that, since the availability of the check service was "not restricted nationally in the paper-based payments system," the comparable EFT services should be made no less available.

The majority erred in its assumption that EFT debit transactions are equivalent to transactions involving checks and that EFT debit transactions would have the same impact on the financial industry as check transactions. The reality is that a personal check is a conditional means of payment dependent on acceptance by a third party. Because of bad check losses, checks are not accepted at many depository institutions or point-of-sale locations, and consumers must generally suffer the inconvenience of producing extensive identification and often the humiliation of having their picture taken. An on-line EFT debit, on the other hand, accesses an account and transfers funds instantaneously and is not subject to the same risks of nonpayment. An EFT debit would, therefore, be much more readily accepted by merchants. EFT debit services must necessarily be on-line, real-time so that depository institutions can maintain control of deposit accounts, preventing fraud, theft loss, and electronic robbery.

The EFT debit service offers an ease of accessing deposit accounts which is just not available in the paper-based system. This ease of access would permit depositors to draw on money regardless of where the depository account is located, even when the depository institution is located far away from that consumer's residence. This capability would encourage depositors to move their accounts in response to competitive incentives of pricing and services offered by depository institutions. A depository institution could offer low interest rates on loans or high interest rates on deposits and, by taking a loss on those rates, attract deposits and develop new banking relationships. Deposits would flow to



the aggressive depository institutions offering the most attractive incentives.  In other words, deposits follow ease of access to funds on deposit.  Further, the larger aggressive depository institutions need and want deposits and will find new ways to facilitate the ability of depositors to have them made through EFT.

The EFT debit could thus create the problem of migrating deposit accounts.  The risk this presents is that there could be a concentration of funds in the control of the larger depository institutions which could afford such aggressive pricing with the consequent loss of those funds to the smaller depository institutions from which they came and a corresponding loss, as a result of the reduction of available loanable funds, to the localities in which those institutions conduct business.

The majority has not adequately considered the effect of the unrestricted offering of the debit service on deposits.  As the debit service has the real potential to affect the deposit service, the debit service should be regulated and permitted only in a proper manner which minimizes its impact upon the existing structure of the financial industry.

## Interrelationship of Debit and Deposit Services

The debit service and the deposit service are closely interrelated.  For there to be a deposit, there must be a corresponding withdrawal and, when there is a withdrawal, there will very likely be a deposit of the withdrawn amount elsewhere.  This interrelationship between the services indicates a need for the regulation and control of both the debit and the deposit services.

In the one instance where the majority recognized the relationship of deposits to debits, the majority chose not to restrict deposits.  Specifically, as to the merchant credit--the deposit that occurs when a consumer makes a purchase and debits his account or, in fact, when a consumer deposits cash--the majority recommended that the merchant deposit "should not be limited geographically by statute or regulation."  The effect of this recommendation is to exclude from regulation a substantial number of deposits.

Because of the direct interrelationship between deposits and debits, it is difficult to understand how the majority conceived that the development of EFT can be regulated and controlled so as to avoid any adverse effects on the Nation's financial structure by regulating only the consumers' deposits and not merchants' deposits or debits of any kind.  As consumers' deposits are only a small segment of total EFT transactions processed, regulation based only on that service would not permit regulation or control of the development of EFT.

## Alternative Development

The Commission failed to consider the means by which EFT services could be made available to consumers within the framework of the existing financial system.  While State and Federal laws on branching

246



confine depository institutions to the States in
which they are chartered, those laws do not prohibit
correspondent relationships, such as have developed
among commercial banks to provide customers with the
convenience of financial services in remote locations.
Other types of depository institutions are at lib-
erty to establish similar relationships to provide
interchange among depository institutions in
different States.

Thus, depository institutions could by contract
develop a system for the interchange of debit items
by arranging with a remote depository institution
to have the debit service of the card honored by
that institution, retailers, and others which have
established EFT relationships with it. Such trans-
actions could be batch processed off-line by ACHs.
Moreover, States are now able to enact enabling
legislation and enter into reciprocal agreements
with other States to permit the offering of EFT
services interstate. The offering of EFT services
in either of these ways would permit the development
of EFT within the existing framework of the finan-
cial industry. It would also permit State and
Federal legislators to maintain existing regulatory
control over depository institutions. Furthermore,
these approaches are legal and practical today and
do not require Federal laws that could disrupt the
dual banking system and Federal-State relationships.
The offering of EFT services by these means would
provide consumers with the EFT services they need
and would not encourage depositors to move their
accounts to depository institutions geographically
remote from their residences.

## Deployment of EFT Terminals

The Commission concluded "that the off-premises
deployment of EFT terminals should not be regulated
under the same set of rules that govern the establish-
ment of brick and mortar branches of depository insti-
tutions." The majority concluded, however, over our
strenuous objection, that the different regulation
originally contemplated by the Commission should be
no regulation. The majority recommended that deposi-
tory institutions should be permitted to deploy their
own EFT terminals interstate nationwide, without
restriction, to provide EFT services in accordance
with the majority's recommendations with respect to
those services. This recommendation has serious
implications and is not the proper means by which to
provide the debit service to consumers.

EFT terminals perform all the important services
and are in fact electronic branches. While they
should not be treated in the same manner as brick
and mortar branches are today, some regulation is
necessary or the existing regulatory framework will
be destroyed. There is nothing gradual or evolution-
ary about recommendations which would permit the
deployment of terminals and the offering of EFT serv-
ices interstate. If this country is to have national
branch banking and interstate deployment of terminals,
it should be as a result of a Congressional determi-
nation that such a banking system would better serve
the Nation. It would subject the smaller institu-
tions to the domination of the larger institutions
capable of such deployment and would permit the large
depository institutions to put in place the machinery
for national branch banking.



Furthermore, under these recommendations, a single federally chartered depository institution could deploy terminals and offer EFT services in each of 50 States. Even if a particular State enacted such a statute, a State-chartered institution in that State could not deploy terminals and perhaps not even offer EFT services in another State until that other State had enacted appropriate reciprocal legislation or until the insitution had qualified to do business in that State. Even if Congress attempted to enact legislation permitting State-chartered depository institutions to deploy terminals and offer EFT services in the other States, such legislation could be subject to Constitutional challenge by any State opposing that legislation. If the majority recommendations were implemented, therefore, the result at the minimum would be to afford federally chartered depository institutions a significant competitive advantage for what could be a critical period of time.

Furthermore, the majority's recommendation that depository institutions be permitted to deploy EFT terminals interstate to serve other depository institutions would encourage depository institutions to become computer and communications companies. This development flies in the face of the established principle that the public interest requires that depository institutions be restricted to their primary purpose of providing financial services and be prohibited from entering into risk-taking ventures which could jeopardize funds on deposit and the safety and soundness of the institutions themselves.

## The Consumers' Interests

EFT services are offered to benefit consumers. The deployment of EFT terminals and the offering of EFT services should, therefore, reflect the needs and preferences of consumers demonstrated in the competitive environment of the free market. Consumers do not need the nationwide automated teller machine (ATM) and point-of-sale (POS) terminal systems the majority's recommendations would encourage, nor do the potential benefits warrant the risk that such systems could foster an oligopolistic national branch banking system.

Consumers do not need or require an EFT system that encompasses more than a local area. Studies in California indicate that 90 percent of checks processed there are drawn on California banks. Other studies indicate that approximately 90-95 percent of payment transactions of all types take place within consumers' local market areas. Consumers affecting the remaining transactions, particularly travelers, have other payment mechanisms available to them.

The development of EFT technology does not provide a rational justification for abandoning all of the geographic limitations which have historically been imposed on depository institutions.

No studies have indicated that EFT systems serving more than local market areas are cost effective. Experimental systems have affirmed that costs



increase as the size of the system increases. Since markets appear to be local, since transaction costs increase with distance, and since EFT requires a substantial volume of transactions to achieve cost efficiency, no practical reasons exist at this time to provide for more than local EFT systems.

Consumers require extensive protections as EFT develops. The millions of dollars which depository institutions are spending for sophisticated EFT equipment is a compelling incentive for these institutions to recoup these expenditures by utilizing their superior bargaining power to push consumers toward EFT services they may not want. As a result, consumers will require various safeguards, including full disclosure of their obligations and costs in using EFT and active regulation to protect their interests. It would be a mistake to permit the reduction of regulatory authority of States over depository institutions doing business within their borders, as this would make it difficult for the States to protect their residents.

The majority's recommendations will not serve the best interests of the public. Although competition by remote depository institutions might result in some short-term benefits for consumers--such as higher interest rates on deposits--interstate deployment of terminals and the interstate offering of EFT services by depository institutions could cause adverse long-term effects. Such systems would weaken local depository institutions which provide services to their community and undermine the network of correspondent institutions that fosters commerce and the orderly formation of capital. Recommendations of the majority which would permit revolutionary

changes in the competitive relationships of financial institutions are not in the public interest. The consumer would be best served by the evolutionary development of EFT services which does not push consumers toward accepting EFT services but rather responds to their real needs.

Federal Preemption

We do not believe that the doctrine of Federal preemption should be invoked, absent overwhelming national need, especially where Federal preemption could seriously disrupt existing State-chartered depository institutions. The majority, however, has taken the position that the Federal Government should legislate and supervise the implementation of EFT. We do not believe that EFT provides such an improvement to existing payment mechanisms that it should be imposed on the Nation by Federal edict. We believe that EFT would develop much more efficiently and economically if it developed in response to demonstrated demand at the State and local levels under the supervision of the appropriate State regulators.

The majority has recommended that the Congress preempt the rights of States to determine the manner in which depository institution services are offered within their borders. There have been no studies which indicate what will be the effect of the intrastate or interstate offering of electronic services on local banking systems, nor have there been any studies which indicate what would be the effect of establishing different geographic limitations for

249


Digitized by Google

"deposit-taking" than for the other financial serv-
ices offered by depository institutions.  Moreover,
Federal preemption is not necessary.  Correspondent
relationships have been and may be established to
provide interconnection and interchange among deposi-
tory institutions in different States.  This approach
is legal and practical today and would not require
Federal laws which could disrupt the dual banking
system and Federal-State relationships.

The Commission unanimously agreed on two recom-
mendations:

"that none of its recommendations in [the
branch/terminal] chapter is intended to modify or
erode existing regulatory powers to ensure 'safe
and sound' practices by depository institutions"
and that "the appropriate State and Federal regula-
tory agencies continue to monitor the proliferation
of EFT systems in light of their competitive impli-
cations and take necessary action consistent with
the agency's charter."

These recommendations become pious platitudes
when viewed in the perspective of other majority
recommendations that call for Federal preemption of
existing regulatory authority which was designed to
provide for public need and convenience and for
depository institution safety and soundness.  By
recommendations preempting State regulatory author-
ity with regard to sharing and access and to the
intrastate and interstate deployment of terminals
and the offering of EFT services, the majority's
recommendations would limit what "action consistent
with [their] charter," such agencies could perform.

## Impact on Financial Structure

The Nation's present financial industry is
diverse.  It consists of State and federally char-
tered commercial banks, savings and loan associations,
credit unions, finance companies, State-chartered
mutual savings banks, and non-depository credit
grantors.  The competition among different types and
sizes of institutions provides a well-balanced finan-
cial industry structure.  This financial system is
one of the Nation's most valuable assets.  The exist-
ence of competing types of depository institutions,
subject to different regulations permitting them to
offer different services, promotes competition and
encourages commerce.  The availability of either
State or Federal charters through the dual banking
system encourages equitable regulation.  There are
approximately 50,000 separate depository institutions
in the United States.  They serve our broad national
needs, while they remain highly responsive to local
requirements.  Most important, this has been achieved
without Federal Government dominance over the banking
system.  The decentralized and balanced structure of
the existing financial system has also avoided
dominance by any group of depository institutions
or by any particular geographic area of the Nation
and avoids the pitfalls of an oligopolistic national
branch banking system.  No other country has such a
flexible and effective financial structure.  It would
be a great error if the development of EFT were per-
mitted to alter that basic structure unnecessarily
and unintentionally to the detriment of the financial
system and to the detriment of consumers.



Pressures for structural changes in the financial system are already developing. Recent trends have led to a blurring of the distinctions between commercial banks and thrift institutions as each type of depository institution struggles for authority to offer those services previously offered only by the others. Loan production offices and other remote facilities are already eroding the well-established and well-reasoned geographic limitations which fostered the growth of local institutions. The effect of the majority's recommendations for interstate EFT systems would be to maximize these pressures and cause precipitous changes to the structure of the Nation's financial system.

The Commission's competitive impact study concluded that there was no evidence to indicate that EFT caused significant market share shifts measured by depository footings. The majority failed to state that this conclusion was attributable to the fact that EFT is in its infancy and has produced little evidence to date. This lack of existing evidence does not support the majority's conclusion that EFT will not cause market share shifts in the future. The study ignored the direct relationship between the development of EFT and the nature and rapidity of recent regulatory innovations in the financial industry, such as the offering by thrifts of third-party payment powers. More importantly, subsequent market shifts are difficult to measure and often cannot be isolated in the short run. However, once established, such shifts are enduring.

Moreover, the majority ignored other meaningful measures of competitive impact, such as gross revenues or profits. The limited empirical data

referred to by the majority show that institutions active in EFT have achieved higher than average revenues but lower than average profits. Economic analysis indicates that start-up costs for EFT systems are substantial and that a substantial volume of transactions are required to make the system cost effective. Further analysis also indicates that, once these institutions achieve the requisite transaction volumes to make their POS systems cost-effective, their higher-than-average revenues give them the potential to achieve higher-than-average profits. These profits could in turn be used in a number of marketing strategies designed to attract new deposits.

Many representatives of small banks believe that EFT has a great potential for altering market share. A dramatic easing of geographic restraints for terminals could well make their beliefs a reality. Therefore, it was improper for the majority to have made such drastic recommendations for the almost unrestricted deployment of terminals and the offering of EFT services without considering the effect of the recommendations on the competitive relationship between large and small depository institutions; between national and State-chartered depository institutions; between commercial banks and thrift institutions; and between depository and non-depository institutions. It should further have considered what would be the effect of the majority's recommendations on the dual banking system, upon Federal and State regulation, and on the consumer's ability to obtain the EFT services he wants within the evolving structure of our financial system. At a minimum, State supervision of the development of EFT within the existing regulatory framework should continue.

251


Digitized by Google

The individual States and the entire Nation have a vital interest in the continued existence of the financial system.  Increased competition between individual depository institutions of similar charters and between institutions of different charters strikes at the core of the system.  EFT has been and will continue to be used as a marketing tool as depository institutions seek to increase their deposit base and market share.  This competition should continue to be closely supervised so that potentially detrimental effects are averted.

The interstate deployment of terminals by depository institutions, if permitted without the close supervision of State and Federal regulators, could create a very different financial world. The majority's recommendations would enable a depository institution to bypass its correspondent institutions and establish terminals in direct competition with them.  As competition for deposits and financial services intensifies, some institutions could over-extend themselves while others find their positions undermined.  EFT threatens to remove depositors from smaller depository institutions, particularly the country banks, and increase the deposits of the larger institutions which can achieve the economies of scale to offer more attractive services.

Without appropriate regulation and control, EFT could undermine the current diversified and decentralized financial structure and lead to a super-concentration of deposits, financial resources, and power in the hands of a limited number of depository institutions.  Further, unless the effective date of Federal legislation is coordinated with State

legislation, Federal law could provide Federal depository institutions with significant competitive advantages that will undermine the safety and soundness of State depository institutions and the continued existence of the dual banking system.

Sharing and Access

The majority recommended that the competitive and public interest policies embodied in the antitrust laws should be used to judge sharing and access disputes.  Alternative recommendations which would have required the consideration of such essential financial institution criteria as public need and convenience and safety and soundness were rejected. State laws on sharing are a part of the existing system.  To remove those laws without providing appropriate alternatives may well put small depository institutions at a disadvantage in their efforts to participate in EFT systems.  Furthermore, we are concerned about what will happen to EFT systems in States that now have mandatory sharing statutes and to the depository institutions participating in those systems.  We believe that the sharing and access issues are much more complex than the report indicates and that further consideration of these issues is necessary.

Impact on Other Institutions

We are also concerned that the majority has not fully examined the potential impact of EFT on other institutions which are of major importance to the country.  For instance, what would be the impact on



our already heavily subsidized Postal Service of a massive shift of bill payments from the mails to EFT? What would be the impact on the interstate communications system of extensive EFT traffic? Some careful, detailed consideration should be given to these, and other, ancillary problems before Congress permits the full-scale embrace of interstate EFT.

If we focus only on the development of EFT and not on the impact that that development might have, a technology will have accidentally (and perhaps irrationally) chosen our course. It is far better, we believe, to allow needs and costs to be seen and tested in a gradual evolution of EFT without the risks of precipitous change. We have an existing functioning laboratory in which to study the development of EFT, and we should use it.

### Automated Clearing Houses

Automated clearing houses (ACHs) batch-process EFT transactions off-line. The ACH system permits bulk processing of periodic payment transactions. ACH batch-processing could easily handle a large number of the checks written today, including checks of corporations for salary, wages, and dividends; checks of Government for Social Security and other recurring payments; and checks of individuals for recurring obligations, such as utilities, insurance premiums, mortgages, or credit accounts. Processing these items by ACH would relieve existing strains on the check-settlement system. ACH systems would broaden the payments alternatives available to consumers and would increase the certainty of delivery of checks and minimize risks of potential theft.

While ACHs offer these many advantages, the Commission did not actively examine ACH systems or consider the many ways ACHs could be utilized to facilitate payments in this country. Rather, the Commission expended its energies debating the controversial POS systems. POS systems offer an opportunity for depository institutions to offer new services and to compete for consumer deposits and market share. POS systems are extremely expensive. Start-up costs, including equipment purchase and consumer education, are substantial. Such systems also require high transaction volume to be cost-effective. Considerable consideration should be given to whether it is in the public interest to permit depository institutions to expend substantial amounts on POS systems which have not been and do not soon appear to be cost-effective in efforts to increase market share when those investments could more beneficially be used to improve the more productive and cost-effective ACHs. Since the consumer would ultimately bear the cost, it is not in the public interest that depository institutions use EFT as a "loss leader" to increase use and acceptance while subsidizing that effort with profits from other parts of their business.

The other countries which have utilized EFT have developed systems which use ACH off-line batch processing. No country has developed POS systems due to the fact that low demand does not warrant the high cost of such systems.

ACH systems can be established within the Nation's existing financial structure through correspondent relationships among depository institutions. ACHs promise to create few competitive



disadvantages for those depository institutions ad-
mitted to the ACH system, nor will they otherwise
disrupt the existing financial structure.

Since ACH systems will be available for both
federally chartered depository institutions and
State-chartered depository institutions, they would
not create competitive imbalances between these types
of institutions which could threaten the dual bank-
ing system.  Further, ACH systems do not pose diffi-
cult issues regarding the rights of States and the
prerogatives of the Federal Government.  Such sys-
tems would not then disrupt the current balance
between the Federal and State regulations governing
depository institutions.

CONCLUSION

In conclusion, we urge that the Congress and
State legislatures seriously consider the impact
the deployment of EFT terminals and EFT systems may
have on the financial system.  We recommend that
no Federal legislation be enacted which would permit
or encourage the interstate deployment of EFT termi-
nals and the offering interstate of EFT services or
restrict the right of States to control EFT systems.
While EFT affords the opportunity for revolutionary
change, we strongly believe that any changes to a
financial system which has worked so well and so
long should be considered on their merits, and not
as unforeseen byproducts of the implementation of
an untested technology.  Consumer demands can be met
as they develop, and unintentional detrimental
alterations of the existing financial system can be

corrected.  We believe that the best way to achieve
the development of EFT is through experimentation
with both systems and regulations.  In the early
phases we believe that these types of experimentation
can be most constructively carried out at the local
level under the supervision of the respective States.
The individual States have the expertise as well as
a knowledge of their needs, and there is ample time
to permit wider, less restricted experimentation.
This Commission has the obligation to recommend to
the Congress how best to permit the development of
EFT.  We, the minority, urge that the best, safest,
and most effective method for development is the slow
and gradual evolutionary adaptation of the new
technology to a long-established, balanced, produc-
tive system.

*James E. Faris*
*Director, Department of Financial Institutions*
*State of Indiana*
*Indianapolis, Indiana*
*Representing State Regulators of Banks*

*Freyda P. Koplow*
*Former Commissioner of Banks*
*Commonwealth of Massachusetts*
*Wellesley, Massachusetts*
*Public Representative*

*William B. Lewis*
*Deputy Commissioner*
*Division of Savings and Loan Associations*
*State of New Jersey*
*Representing State Regulators of Thrift Institutions*



*George W. Waters*
*Executive Vice President*
*American Express Company*
*New York, New York*
*Representing Non-Bank Institutions Offering*
*Credit Card Services*

STATEMENTS OF CONCURRENCE

We recognize the need of consumers for EFT debit services at locations remote from their homes or depository institutions. This service can be developed on an evolutionary basis through the existing financial structure such as the correspondent system. We, therefore, concur in this dissent that the Commission's approach of permitting interstate deployment of EFT terminals by depository institutions is not necessary and could disrupt the balance and diversity of the Nation's financial structure.

*Verne S. Atwater*
*President, Central Savings Bank, New York*
*Representing Mutual Savings Banks*

*Gordon R. Worley*
*Executive Vice President*
*Montgomery Ward & Co., Incorporated*
*Chicago, Illinois*
*Representing Retailers*

I concur in the recommendations of the Commission relative to "merchants credits" and "sharing and access."

*Gordon R. Worley*
*Representing Retailers*

I concur in the conclusions and recommendations set forth in this minority statement for the reasons expressed in my separate statement.

*Fairfax Leary, Jr.*
*Professor of Law*
*The Delaware Law School of Widener College*
*Wilmington, Delaware*
*Public Representative*



STATEMENT OF ALBERT A. FOER*

There are certainly many bold and even imaginative positions taken in the majority report that go some way in shaping a payments system that in theory could bring new benefits to consumers. The shortcomings of the report that I will be addressing were largely programed in by the statutory structure of the Commission. Organized consumers, the poor, minorities, civil libertarians, and small business, to name a few relevant interest groups, were not directly represented. Each could have made a valuable contribution. In theory, of course, each could have attached well-informed lobbyists to the Commission--as did many major financial institutions, corporations, and trade associations--to make certain its interests were understood at every juncture. This was not done. Because so many important interests in the society were under-represented, no one should misconceive the deliberations of the Commission to be those of a mini-Congress.

This report is only a beginning point for consumers. Greater consumer protections must be obtained, but they will have to be fought for in the usual forums--Congress, State legislatures, regulatory proceedings, and civil courts. Consumers should not overlook, however, the forum of the market, in which the report places so much faith. Expertise and interest must be developed now by consumer groups at the local level so that they can enter into negotiations with the private developers of EFT systems and the large merchants who are essential to the success of such systems.

Education

Although the report urges consumer education in general terms, it fails to suggest a specific program, and thereby gives inadequate recognition to the degree of sophistication that consumers will need to make realistic decisions about EFT. The following proposals, which received the vote of nine Commissioners, ought to be considered:

● States should include in the high school curriculum courses that will expose students, as consumers, to basic financial

_____

*Commissioner Foer's views are not intended to be construed as a statement of policy adopted by the Commissioners of the Federal Trade Commission.

Digitized by Google

transactions, including the operations, benefits, and potential drawbacks of EFT systems. The U.S. Office of Education in the Department of Health, Education, and Welfare, in conjunction with the Federal Reserve Board, should develop model material to assist the States.

- Federal funds should be made available to State and community organizations to develop other educational approaches to introduce EFT to low-income consumers, including the elderly and non-English speakers.

The first proposal aims at putting young consumers into a position where they can independently judge the relative value of EFT services that will be offered to them. The second proposal recognizes the need to reach out specially to other groups that could probably benefit from EFT, but will almost certainly not do so without assistance. An example would be elderly Social Security recipients whose persons and finances could both be much more secure if pre-authorized electronic payments of Social Security were used, but who need someone trusted to explain this, help with the paperwork, and arrange an introduction to an appropriate financial institution.

## Privacy:  Real-Time Surveillance

The report's consideration of privacy protections is far stronger in rhetoric than achievement. I will focus on several areas of weakness.

The most dramatic danger of EFT, from the civil liberties perspective, is real-time surveillance. By this I mean a use of an EFT system to pinpoint at the time of an EFT transaction the physical location and/or identification of activities of a cardholder, for purposes unrelated to the functioning of the EFT system itself.

EFT systems have the obvious potential of providing private business and government at all levels with an unprecedented capacity for tracing an individual's activity. There are many potentially useful services, unrelated to the functioning of the system itself, that EFT could provide. Watergate-type governmental abuses aside, EFT could be an efficient aid in capturing suspects; locating persons for purposes of alimony, child support, or welfare abuses; or tracing debtors for collection purposes. While I think it is proper that a system be able to deny authorization for a transaction and to seize an expired, stolen, or otherwise questioned card, I do not think it appropriate for debt collectors to be notified when a particular cardholder is located through an EFT transaction, or for the police to be notified, unless a proper warrant exists. According to testimony before the Privacy Protection Study Commission, at least one national check authorization company already uses its EFT facilities for these purposes.[1]

More than an abstract right to privacy is involved. EFT drastically alters the present balance of other rights and responsibilities. For example, skip tracing through EFT real-time surveillance fundamentally changes the delicate balance between

---

[1]*Testimony of Floyd N. Dennee, Executive Vice President of Telecredit, Inc., Aug. 5, 1976.*


Digitized by Google

creditors' remedies and debtors' rights by providing creditors a much greater leverage over consumers, including those who would withhold payment for legitimate reasons.

The report makes a number of recommendations that are relevant. First, it recommends that EFT not be used for surveillance of individuals, either as to their physical location or patterns of behavior. This is a fine principle, but where are the teeth? Substantial criminal sanctions and mechanisms to assist in the identification of violations should be included. I will say more on the latter in the context of "security." But to what extent is the report's antisurveillance principle undercut by its other positions?

Let us deal with law enforcement first. The report advocates release of information, without consent or court order, to law enforcement officials, where such information regards any crime involving an EFT transaction. My understanding is that this is not intended to authorize the police to have an arrangement to be plugged into the system and thereby be notified when a cardholder shows up at a terminal unless the transaction at the terminal is suspected to involve a crime. Even if this narrow interpretation is correct, this standard could easily be abused. The question that weighs heavily with me is, when I stand in an unpopular minority and the people in power are unscrupulous, what devices will be available for my persecution? If the local police can convince their buddies in the EFT system that I am suspected of intending to use a debit card for a fraudulent purpose, I could be subjected to real-time surveillance anywhere in the Nation. At the very least, a warrant should be required before this is allowed.

In fact, the report does call for a court order or subpoena in other contexts, i.e., where government authorities seek to obtain information concerning an individual's depository account from a depository institution or EFT system operator without the individual's consent. This principle should be applied to crimes involving EFT transactions as well. I would also note that the report would allow access to account information through administrative subpoena, albeit under some additional tests. I would have preferred to see some evidence as to why even administrative agencies cannot follow the court order procedure.

On the private side, the main problem seems to be skip tracing. The report would allow disclosure, without consent, of an individual's address (residential or occupational) to a debt collector. (A motion was made, but defeated, to provide the same information to appropriate persons in welfare, child support, and alimony matters.) It is my understanding that this position is intended to prohibit real-time surveillance for debt collection purposes. However, it is unclear whether an EFT system would be (or should be) prohibited from flashing a message to the clerk at the point of sale asking the clerk to obtain verification of the cardholder's present address, for purposes of debt collection. My problem is that if this type of red-flag message to the point of sale is allowed, it will be difficult to enforce against further uses of the information (such as delaying the cardholder while notifying the police or a collection agency of his presence) that would amount to real-time surveillance. Additional restrictions should be considered.



## Privacy:  Access to Personal Data

The report establishes categories of primary and secondary uses of personal data in EFT systems.  Primary uses may be accomplished without specific consent or court order, subpoena, or summons.  Consent is in effect implied by accepting the debit card.  Debate should continue as to which uses are "primary" and what limitations should exist.  For example, information regarding your slow payment could be provided, according to the report, to any credit grantor or credit bureau.  There is not even a requirement that the recipient certify the existence of a legitimate business purpose in requesting the information.  Information regarding attempted fraud, and presumably suspected attempted fraud, could be provided to a credit bureau or credit grantor.  Again, there is no test of legitimate purpose.  Admittedly, the report advocates procedures for correcting erroneous information, but a great deal of harm could occur in the meanwhile.  Consumers should look very carefully at what uses they are willing to consider "primary."

With respect to secondary uses of information, the report also has several weaknesses.  First, it seems to authorize blanket-type consents, which in practice will probably result in little privacy protection.  Second, the report seems to give the consumer the authority to select precisely which bits of information could be released pursuant to his consent.  This sounds like consumer sovereignty, but in fact will probably prove unworkable.  The following language, incorporating the permissible use concept from the Fair Credit Reporting Act, would appear to me to offer a substantial improvement:

Upon receipt of express written consent from an individual, an EFT institution may disclose information concerning the individual to any third parties (1) specifically named or (2) described according to class or category, provided that any class or category so described must consist only of persons having a legitimate need for the information in connection with a business transaction involving the individual.  No individual shall be denied an EFT account as a result of a refusal to permit the release of information pursuant to this paragraph.

Third, the conditions of disclosure are important terms in an EFT agreement and should be provided to the individual prior to the establishment of an EFT relationship.  They should not--as recommended by the report--merely be available on request.  The report's approach downgrades the importance of these privacy considerations to the point where they will generally be ignored.

## Privacy:  Accuracy of Information

The thrust of the report is to apply applicable Fair Credit Reporting Act standards to EFT transactions, for purposes of protecting the accuracy of EFT information.  In general this is appropriate.  I am concerned, however, that notices of adverse action will not be given at the point of sale.  Departing from the FCRA model, the report would authorize such notices to be given orally at the point of transaction or "in writing at a location designated by the institution."  This is an open invitation to abuse.  You should be informed at or near the point of transaction,



and in writing, of the name, address, and telephone number of the provider of information that was in whole or in part responsible for an adverse decision.

## Security

The report acknowledges that the security of EFT systems is an important concern for consumers and financial institutions alike. What the report fails to acknowledge, unfortunately, is that the current fears of system compromise are very much justified. Focusing narrowly on past incidents, in which the unauthorized penetration of electronic systems resulted in losses that were "small" and in security problems that were "not difficult to correct," the report concludes both that EFT systems are potentially more secure than current paper-based funds transfer systems and that "technical and procedural solutions to virtually all security problems are currently available."

The evidence does not entirely support the Commission's optimistic approach to the security question. Contrary to the majority's stated belief that "the vulnerability of EFT systems is easily overstated," the Commission has been informed by leading Government security experts that EFT systems are "totally vulnerable." Some estimates of the current annual cost of computer-related fraud run as high as $100-300 million;[2] the prospective losses that might occur when electronic networks span the continent and reach into everyone's demand deposit accounts could be staggering. Improved technological safeguards can be made available for a price, as the Commission points out. But methods of penetrating present safeguards (and perhaps some more expensive

safeguards) are also available for a price, and there will be elements in society, especially in organized crime, that will probably be willing and able to pay that price.

The Commission advises that "State and Federal regulatory agencies . . . should continue to monitor EFT [security] developments closely." A stronger recommendation is appropriate. Because of the importance of the security issue, the Federal Government should be urged to establish a security coordinating group, composed of agencies involved in EFT security, to serve as a clearinghouse for EFT security data. This group could serve the dual function of reducing bureaucratic overlap and duplication of effort while assuring that major matters do not fall into the cracks separating the various Federal agencies. The coordinating group should be required to make an annual report to the Congress on the security of systems in operation in the United States. Although the coordinating group should not make available information that could facilitate the compromise of EFT systems, it should publish sufficient information to enable consumers and purchasers of EFT equipment to make intelligent comparisons as to the relative security of various systems.

The private sector should also provide the consumer with information concerning the security of EFT systems. Financial institutions and other EFT systems operators should be required to designate a security officer whose primary responsibility is to oversee

---

[2] *See Thomas Whiteside, "Annals of Crime, Dead Souls in the Computer – I," New Yorker (Aug. 22, 1977), p. 38, cols. 1 & 2.*



the security of the system.[3] Whenever the security of the system is breached, the security officer should investigate the matter and furnish a report to any consumer whose account information is known to have been revealed or otherwise affected. This will give you, the consumer, notice to check your balance and to pay special attention to the next periodic statement. It will also make you aware of a possible weakness in the handling of your financial affairs, which could lead you to change depository institutions. Such reports should also be forwarded to systems regulators, and through them to the Federal clearinghouse.

These measures will not guarantee the invulnerability of EFT systems and, of course, absolute invulnerability may not be worth the price. They would provide, however, the information necessary to generate marketplace demand for improved security devices and techniques. Electronic fund transfer systems can maintain the integrity of the Nation's payments mechanisms only if a concerted effort is made to keep the public and the Government aware of the existing problem concerning computer security.

I will mention one other aspect of the security issue that should be of concern to consumers. At my bank there is an automated teller machine (ATM) that cannot be used without strangers literally having the opportunity to look over my shoulder and not only learn about my transaction (am I about to walk out with a large amount of cash in my wallet?), but watch me enter my personal identification number (PIN). In the absence of performance standards, the market may or may not bring out a more protective ATM; consumers should consciously examine terminal hardware, to the extent possible, before selecting their EFT service provider. Consumer groups, with the help of expert consultants, could assist consumers in evaluating competing systems in this and many other areas.

Unsolicited Debit Cards

From the perspective of maximizing competition, I would favor allowing the mailing of unsolicited debit cards to any consumer, and not merely to depositors. However, a more important consideration in this matter is whether the consumer recipient is fully protected. There will be problems of interceptions, whether by strangers (e.g., postal employees) or household members, that will result in the depletion of at least some depository accounts of innocent consumers. What recourse will there be? Under the report's approach, you, the innocent consumer who denies having accepted a card but whose account was accessed, will have to convince either the card issuer or a court that your version is the correct one. It is true that the bank would have the burden of proving that "your" signed contract was not a forgery but, if there is a dispute, you will get your money back only after the court rules.

A more reasonable approach would apply the concept of semi-automatic recrediting.[4] Unsolicited

_____

[3] *The Bank Protection Act of 1968, 12 U.S.C. Section 1881 et seq., has been implemented in part through the designation of security officers, though their responsibilities may not reach some important EFT issues. See 12 CFR Section 21.2 (1977).*

[4] *Semi-automatic recrediting would entail*



debit cards could be distributed, provided that in the absence of an injunction based on allegations of fraud, you would be entitled to a relatively quick re-crediting of your account if you swear to the follow-ing: (1) you did not request the card; (2) you did not appear personally at an office or agent of the issuer to agree in writing to accept the card;[5] (3) you did not in fact receive both the card and a per-sonal identifier for the card; and (4) you did not knowingly provide either the card or its identifier to anyone else for use.

The problem of liability when a _requested_ debit card is intercepted before it is received was not specifically considered by the Commission. Pre-sumably it is subject to the same rules as other un-authorized uses of debit cards. There may be a dis-tinction, however, between unauthorized use of a card that has been under control of the consumer and one that was requested but never received, which should be reflected in procedures for semi-automatic recrediting.

Stop Payment and Reversibility

In general, I favor reversibility, and would seek to use my debit card primarily with merchants who promise reversibility, but I agree with the re-port that it should not be mandated, at least by the Federal Government, on the ground that such a mandate could severely reduce the acceptability to merchants of debit cards at points of sale. Despite my per-sonal misgivings about the desirability to consumers of point-of-sale (POS) EFT systems, I would not want to deprive consumers of their informed choice to use systems without reversibility, especially if the

alleged efficiencies of EFT turn out to be signifi-cant and cost savings are passed on to customers. What is important is that the market be flexible enough to permit consumer demand, if it is present, to convince merchants to offer reversibility. This means that the system, including hardware and soft-ware, either be created with the capacity for per-mitting a merchant to choose to offer reversibility, or that the necessary changes can be made relatively easily and cheaply by the merchant. I am not aware of evidence on this point, and therefore accept the report's reliance on the marketplace with some hesi-tation. Evidence as to the need for a performance standard that would make the option of reversibility feasible seems in order. Similar considerations apply to the report's treatment of float and value dating.

Unauthorized Use and Error Resolution

The basic standard of strict liability on the depository institution except in fraud and a limited number of easily understood situations would seem to

_____

[4]_Continued_

_recrediting by the financial institution within a short time, such as two weeks, unless the institution obtains an injunction based on a likelihood of fraud involving the consumer._

[5]_Personal acceptance is more expensive than present modes of marketing, but it adds security to the agreement process and seems a reasonable alterna-tive to the risk of semi-automatic recrediting._



give the consumer a good deal of protection against unauthorized uses of his card. I am very much bothered, however, by two aspects of the report's recommendations.

First, a test of consumer liability as loose as "keeping the PIN with the card," does not add clarity and is sure to be a cause of much litigation. The consumer can understand that liability may result from writing the PIN on the card; but you will not know whether carrying the PIN in a separate compartment of your wallet, or disguising the PIN as a phone number in a small phone list carried on the person will be deemed negligent. The penalty for negligence--forfeiture of your account--is too great to justify this ambiguity.

Second, there is no special machinery for getting your money back if your account is penetrated and you are not at fault. Under the report's approach, you would proceed as if an error occurred in the billing: that is, you ask your depository institution to correct the error; it does so in its discretion, or it disagrees with you as to its liability and welcomes you to sue. This takes a good deal of time, at the minimum; meanwhile, your account may have been emptied through no fault of your own. Indeed, there is a further problem. The report would give you 60 days to report an error after you receive your periodic statement. But unless you report an unauthorized use within 30 days, you are liable for any subsequent unauthorized uses. How are you going to know whether a debit reported on the statement reflects an error or an unauthorized use? In some situations, you won't; and if you wait till the 60th day to report an error, you may be liable for uses you thought were billing errors. The time allowed

for reporting should not depend on the characterization of the transaction.

Of course, you should realize that an unauthorized use may have occurred if your card were missing. To encourage early reporting of missing cards, it might make sense to require that there be semi-automatic recrediting of funds when a card alleged to have been used without authorization has previously been reported missing or stolen. On the other hand, you should have a duty to report a missing or stolen card within a reasonable time after learning of its absence, with the penalty for failure to give notice being liability for unauthorized uses arising after your failure. The burden should be on the financial institution to show the failure. A rebuttable presumption that a report of loss of a card was made within a reasonable time should be created if the report were made within two weeks of the actual loss.

In general, a semi-automatic recrediting approach to the resolution of error and unauthorized use controversies would be best from the consumer's perspective, since the consumer is deprived of what may be essential funds until there is a resolution. Of course, such an approach carries the risk of fraud by some consumers. The question is, who should bear that risk? Arguably, financial institutions, with an ability to spread the risk among all consumers and an incentive to develop secure and error-minimizing systems, are in a better position to withstand losses from fraud than are individual consumers deprived of the use of their rightful funds. But the Commission has no empirical data to evaluate this type of argument.



In one specific area of error resolution, the report is especially weak. When a depository institution determines that a consumer's alleged error reflects a dispute between the consumer and a third party (e.g., a retailer), its only obligation under the Commission's recommendation is to notify both the consumer and the third party of this fact, thereby leaving the consumer to fight it out with the third party, while the money remains with the third party. It seems to me that a better solution would be to require the institution to recredit the consumer's account and debit the third party's account--a form of reversibility that places the burden of going forward on the third party rather than leaving the burden on the consumer. This seems clearly appropriate if it is only a billing error that is involved. The problem is more complicated if the error really involves the consumer's dissatisfaction with goods or services purchased, since recrediting would leave the consumer with both the goods or services and the money. Perhaps a solution would be to require a recredit unless the third party certifies to the financial institution that the problem is not a billing error and that the consumer has not returned or attempted to return the goods (in the same condition as originally purchased).

## Consumer Redress

The recommendations of the report concerning consumer redress should be supplemented by authorizing appropriate administrative agencies to seek equitable relief, including restitution, where an institution's EFT activities violate the law and damage consumers.

## Disclosure at the Terminal

Widespread use of EFT will require consumers to keep more accurate and up-to-date records of their accounts than they generally do today. It is inevitable that many mistakes in arithmetic will be made. In addition, the presence of some off-line transactions may leave it unclear as to precisely when a given deposit is credited or withdrawal is debited. The consequences of not knowing exactly how much is in your account at the time of a transaction, through a mistake or otherwise, may be severe because of the penalty for overdrawing. If there is an overdraft privilege, the consumer may often trigger it unknowingly. Under present overdraft agreements, it is common for an overdraft to initiate a loan far in excess of the actual overdraft. For example, I recently made an error resulting in a $3 overdraft-- and a $100 loan. I think that within an EFT context, involving contracts of adhesion, it is unfair for increments of overdraft loans to exceed the actual amount of overdraft by much more than the cost of handling the transaction. In addition, I think that the consumer should be mailed a statement within a few business days after an overdraft, identifying the overdraft and the terms and procedures for repayment.

Ideally, there should be a disclosure at the point of transaction as to whether the transaction will necessitate a draw on the consumer's line of credit. With this information, you might decide to pay cash or use a separate credit arrangement with terms more favorable than those associated with the overdraft privilege. I am not certain how this disclosure would work, however, since there is a strong



possibility that one or more recent transactions would not appear in the balance relied upon to determine whether an overdraft will occur.  (For example, a recent payment by check may not have been debited from your account.)

If an appropriate mechanism for identifying overdraft credit transactions can be designed, it could serve another purpose besides informing the consumer. That is, it could inform the merchant of the nature of the payment mechanism about to be used.  This sounds at first like an invasion of privacy, and the report does take the position that the type of transaction triggered by a debit card at a POS should be confidential between the consumer and his depository institution.  I would suggest that the privacy loss, if any, is small and might be outweighed by another factor.

The report suggests that the credit worthiness standards that must be met to qualify for a bank card are higher than the standards imposed by retail credit card issuers.  While some retailers now accept bank cards as well as their proprietary credit cards, many major retailers compete with the bank cards for consumer credit business.  Because a debit card can only be issued by a depository institution, retailers may not be able to compete with depository institutions in the offering of the new debit/credit cards.  If a merchant has no way of knowing when a debit card is being used as a credit card, he will be required to accept the credit issued by the depository institution, and will not be able to insist that only his own proprietary card be used for credit.  Again, this sounds like a matter of little concern to consumers. But if retailer credit becomes unprofitable and gradually disappears from the credit market, the

segment of the consumer population that presently qualifies for retail credit cards, but not for bank cards, may be foreclosed from credit.  The Commission was not able to predict how large a population will be so affected, in part because we did not know how many lower-income consumers will be welcomed into EFT systems as a result of lower information costs.  Competition between retailers and depository institutions in the credit market should not be reduced through an artificial secrecy that deprives consumers of relevant information about transaction costs and at the same time may result in the removal of credit from a potentially significant portion of the consumer population.

The report provides for the consumer to receive a written receipt for any transaction at an ATM, cash dispenser (CD), or POS terminal, where the consumer has not received value.  That is, no receipt is required if the consumer merely receives cash from the machine.  What evidence will the consumer have a month later when a statement reports a debit of $50 and the consumer knows he only withdrew $20?  None. For that matter, what happens when a receipt is received from an unattended terminal, and it is clearly wrong?  Will the consumer's word be accepted?  Once? Twice?  Suppose à terminal gives an incorrect receipt a third time and, in accordance with a system's internal policy, the card is revoked?  What will happen to the consumer's credit rating if this is reported to credit grantors or credit bureaus?

Conclusion

Consumers should look at EFT with a skeptical eye.  Some EFT functions will probably be to their



advantage, especially when accompanied by consumer
protections that are generally acceptable to most
interested parties.  Other EFT functions--and I have
in mind POS functions in particular--may never be
offered in a manner that provides enough solid bene-
fits to overcome the very real risks that are created.
It would be a terrible mistake at this point in time
to assume that EFT in all forms is inevitable; by
clarifying and making their interests understood now,
consumers can still shape the various EFT systems,
relying upon the ultimate weapon of consumer resist-
ance in those areas where sufficient protections are
not forthcoming.


*Albert A. Foer*
*Associate Director*
*Bureau of Competition*
*Federal Trade Commission*

Digitized by Google

STATEMENT OF FAIRFAX LEARY, JR.

At the Commission's Denver meeting in May 1977, several Commissioners believed that the work of the Commission could not be thoroughly researched and completed in the time remaining. Accordingly, I made a motion, which was seconded, that the Commission request the Congress for an extension of time for the final report and provide some small additional funding. The majority defeated the motion and, thus, the Commission has attempted the completion of a final report within a year and nine months from the first meeting of the Commission.

There are three points to be made: First, some decisions were made by the Commission, in my opinion, without adequate research when such research might have resulted in some modifications of the stated positions. Second, other issues, due to time pressures, have not been researched or discussed at all by the Commission. Finally, there are decisions taken with which I am in such disagreement that I feel compelled to state my arguments against them.

## Decisions Taken Without Adequate Research

The decisions on the competitive impact issues were taken, in my opinion, without adequate research on whether convenience of withdrawal through terminals not offering the deposit function would nevertheless attract deposits.

Chapter 7 claims no present determinable impact. However, it becomes vague and general as to future impact, merely recommending monitoring. If there is to be no competitive impact of significance, one wonders why sharing must be "pro-competitive" and why denial of access to an EFT system assumed such importance in making recommendations on the sharing issue. It is inevitable that a question will be raised whether the prior decision on the branching issue by those forcing it to early judgment had any impact on the development of the position on the competitive impacts issue. If there are no visible competitive impacts, one wonders why so many large institutions are spending so much to develop EFT capabilities. One would think that the investment is to increase the institution's share of the approximately



$1.1 trillion of deposited funds in all depository institutions combined, of which, one study shows, about 60 percent represents deposits of individuals. Institutions spending the funds must certainly expect to gain market share. If so, competitive impact will be great.

The issue that should have been more fully investigated is whether deposits follow the availability of service and, if so, what will be the effect of the resulting increased concentration if terminals may be widely deployed. Depository institutions must think terminals will increase market share, or why would so much be invested in terminals and terminal equipment? Indeed, a Peat, Marwick, and Mitchell study that was "sponsored in part by the National Commission on Electronic Fund Transfers" had this to say:

> Although one of the least heralded E.F.T. approaches, ATP ("Automated Telephone Payments") seems to be carving a successful niche for itself. Perhaps more than any other type of E.F.T. activity, it has readily demonstrated a capacity to attract new accounts.

The Linda Fenner Zimmer Fourth Status Report, a report by a private individual, in Appendix C, pp. 308-315, has a listing of comments by surveyed depository institutions on the importance of having a deposit function in automated teller machines (ATMs).

But if, as I suspect and the ATP experience shows, the attraction of convenience of disbursement will draw deposits, widely deployed terminals will affect market share even if the terminals themselves are not able to accept deposits. One must not forget that deposit accounts can be opened by mail without ever visiting a bank's office. I have just done so. Thus, even if terminals are denied the depository function, the postal service and preauthorized deposits forwarded by a bank are not bound by geographic limits. They can, and do today, function across State lines.

The Commission also makes the point that small banks are acquiring terminals to indicate that all is well. But the Commission ignores the fact that nearly nine out of every 10 point-of-sale (POS) terminals in place or on order are those of banks of $1 billion or more in size. As for the terminals on hand or on order for the smaller banks and other depository institutions, the report furnished does not distinguish between those owned or ordered by banks that are parts of a holding company or other group, and those, if any, that are owned or ordered by independent small banks. Nor has it distinguished between "on premises" terminals and those at other locations owned by small banks. The former may be acquired in an effort to reduce teller lines on premises.

I am not impressed by a justification that the percentage of small banks with terminals increased at a greater rate than the percentage of large banks did. There are so many more small banks than there are large banks that these percentage changes have little significance.



Doesn't this deserve consideration equal to the effort spent on procedures to aid the wrongfully excluded?  What consideration was given in the sharing issue to the use of shared systems under the aegis or "lead" of a large bank or other institution as a means of making permanent the present correspondent relationships or creating a satellite chain of smaller banks?  If such could be the effect, are the Commissioners' present sharing recommendations really in favor of a free market?

Without research on secondary effects, the majority desires explicit pricing by the Federal Reserve System for the services it offers in the payments system.  It suggests that interest be paid on reserve balances held by the Federal Reserve banks and that institutions pay interest (from day of deposit to day of withdrawal) on the transaction accounts of individuals.  But, nowhere are the full implications of these recommendations described.  What will be the impact on the housing market?  What will be the impact on consumers?  If one large depository institution had, under free checking, 50,000 accounts with an average daily balance of under $100, and a transactional cost of $35 a year per account, will not explicit pricing drive many of these "unprofitable" accounts out of the depository system to join the 15 to 20 percent of the population now believed to have no banking connection?  Where there has been a change from "free checking" to a resumption of service charges, did not many banks quite happily lose demand deposit accounts?  But the Commission did not have time to investigate whether any substantial portion of these customers, as a result, no longer use available payment systems of depository institutions.

Time prevented a Commission investigation of the impact of explicit transaction pricing in the payments system on small business.  If each check costs a consumer approximately $.30 (the cost to process), and this is explicitly charged, plus the current $.15 for postage and envelope, will not the $.45 cost have an effect in concentrating consumer credit purchases in fewer stores to reduce the number of transaction costs to be incurred by the bill-paying consumer?  Will not this create an additional obstacle for small business?  To what extent will this affect the impact of "skimming," resulting from the depository institutions' capture of the better credits from the retailers' credit mix?

On the other side of the picture, time and budgetary pressures resulted in little study of the effect of a lack of explicit pricing in these areas on interest rates, especially those charged on consumer loans, or whether, with explicit pricing, there would be any reduction in the interest rates on consumer loans.

These pressures also prevented careful study of the interrelationship of recommendations made in the reports of separate committees of the Commission.  For example, how do the recommendations for explicit pricing, the prohibition on discriminatory pricing, and the recommendation of no contracts at all on pricing interrelate?  Is pricing discriminatory only if it is cost related?  Or is pricing non-discriminatory only if the same price is charged for the same end result without regard to the system used to reach the result?  How does a policy of enforcing no discrimination in pricing mesh with a policy of no control of pricing?



In formulating its recommendations on the sharing issue, I believe additional matters should have been evaluated.

Certainly the future impact on market share of preempting State mandatory sharing laws and of permitting widespread deployment of terminals by large institutions in Fortune Magazine's "Top Fifty" and, more importantly, the impact on the availability of loans to small business deserve more study than merely assaying the present effects under present branching restrictions of presently deployed terminals, and the present antitrust overhang. If the future cannot be seen clearly, perhaps a policy of gradual experimentation would be the better part of valor. This can best be accomplished by providing in an amendment to the McFadden Act, that off-premises terminals are not to be considered branches (as the Commission has recommended), but shall remain subject to any limitations on deployment of off-premises terminals applicable to State banks in the same area until competitive impacts, including the impact on financing small business, can be measured.

Only a common user network for off-premises terminals will prevent substantial market shifts. We have learned that we cannot have two telephones from two separate phone companies. The merchant only wants one terminal in every store, and Glendale Federal's experience is that, normally, one institution cannot go it alone unless all customers of the store have accounts. This leads me to believe that POS terminals will not succeed unless every store can be connected to every depository institution in the relevant market area. Thus, I conclude that "pro-competitive" sharing means a common user

network ultimately. Long ago, the Pillsbury Company put it succinctly: "Eventually, why not now?"

The branch-terminal issue was decided before any study of competitive impacts. Lack of time and funds or other pressures did not permit the evaluation of that decision in the light of other research. There is much talk about competition among about 14,500 commercial banks, but nowhere is it stated that 39.7 percent of commercial bank deposit liabilities as of December 31, 1976, were to be found in the 15 largest institutions, up from 25 percent about 20 years ago. The Top Fifty commercial banks had 55¼ percent of all deposits at the end of 1976. Moreover, it is nonsense to speak of 14,500 competing commercial banks, as the relevant market is far from a national one except, perhaps, where the Top Fifty are concerned.

But perhaps the Standard Metropolitan Statistical Area (SMSA) represents the best test of relevant market in view of the local nature of most bank transactions. There are 69 SMSAs in States having statewide branching laws. In 63 of these, according to June 29, 1974, figures, the five largest banks or bank groups have more than 80 percent of all commercial bank deposits; that is, 91.3 percent of these SMSAs have a more than 80 percent five bank concentration. For limited branching States, there are 116 SMSAs and a five bank concentration of 80 percent or more occurs in only 75 SMSAs, or 65.2 percent of the total. Thus, where there is statewide branching, there is a greater five bank concentration at the 80 percent level.

270

Digitized by Google

This seems to be the case when we look at the five bank concentrations on a statewide basis. Where there is statewide branching, the range of five bank concentration for 20 States is from 97 percent to 49 percent, with five States more than 90 percent, an additional four States from 80 percent to 89.4 percent, and an additional four States in the 70 to 78.7 percent bracket, the last percentage occurring in California. For limited branching States (16), the range is from 66 percent in Massachusetts to 24.6 percent in Indiana. Unit banking States bring up the rear with a range from 57.8 percent in Minnesota to 15.6 percent in West Virginia with Illinois in the middle at 45.9 percent. Thus, the percentage ranges of statewide concentration also indicate that branching has an effect on concentration.

To see if total size of the SMSA had any effect on concentration, an analysis was made eliminating all SMSAs with less than $1 billion in deposits. Where there was statewide branching, the five bank concentration in the 24 remaining SMSAs was from 94.7 percent to 73.7 percent. (The District of Columbia SMSA was eliminated by reason of the heavy percentage of its population in Virginia and Maryland with quite different banking laws, giving it a 43.4 percent figure.) For 47 SMSAs with $1 billion or more of commercial bank deposits in limited branching States, the range was from 96.9 percent in Buffalo, N.Y., to 53.2 percent of Trenton, N.J. The following table shows the distribution for SMSAs having $1 billion or more of deposits:

| Percentage | Statewide Branching | | Limited Branching | |
|---|---|---|---|---|
| | No. | % | No. | % |
| 90.0-96.9 | 6 | 25 | 8 | 17.02 |
| 80.0-89.9 | 15 | 62.5 | 16 | 34.04 |
| 70.0-79.9 | 3 | 12.5 | 13 | 27.65 |
| 60.0-69.9 | -- | -- | 5 | 10.64 |
| 53.2-59.9 | -- | -- | 5 | 10.64 |
| | 24 | 100 | 47 | 99.99 |

The difference between three bank concentration and five bank concentration is often quite small.

Obviously, there are other characteristics besides branching that account for the size of the largest banks. Of the 15 largest, five are in California, eight are in New York, and two are in Illinois. Thus, something other than the branching laws must account for the behemoths of banking and that factor is probably the location and concentration of corporate headquarters. Thus, if large banks may freely deploy terminals, they may be able to siphon balances and savings from local areas and local business to the uses of the larger corporations—to the detriment of the local areas.

I am disappointed that more study was not given to the problems of interconnecting local and regional networks. Here is where a planned ultimate goal with standards for interfaces and message formats would be most desirable lest, when the time comes, we shall suffer much economic waste from the necessity to scrap much expensive equipment. We could afford such waste when natural resources appeared to be unlimited. That is not the case today.


Digitized by Google

## Areas Not Researched

As the majority states in the report, there was no work done on what provision, if any, should be made for shared systems already in place and operating for which investment has been committed under State mandatory sharing laws if the Commission's recommendations for Federal preemption should be adopted.

There was no study of the competitive impact of the interstate deposit-taking of merchant credits on market share. Another area not investigated by the Commission is the dampening effect on possible POS systems of the no-competition clauses in shopping center leases. Shopping centers appear to be a desirable location for off-premises terminals. But if one depository institution has a branch there under a lease with a non-competition clause, it can hold up the location of the terminals of a shared system until its terms for consent are satisfied. How extensive and how enforceable are such clauses? If not enforceable when attacked in court, how expensive will the attack be?

The Commission adopted a stance that free market forces would solve many problems without examining whether free market forces, in fact, had any impact in the areas involved. That so-called free market forces are not effective in consumer-depository institution contract terms should not, today, need demonstration. The depository institutions are certainly to be congratulated on the very high degree of accuracy obtained in their operations, as are the vast majority of users of the check system, where only two-thirds of 1 percent of checks are returned unpaid, and where statement errors are of the same or lesser magnitude. Thus, even if disappointed consumers were to be organized, their exertable pressure for a change in unfair risk allocations by contract would not be significantly effective, especially in view of the apathetic attitude of many consumers that "a heavy loss won't happen to me." Yet, the effect of a deprivation of funds on an individual is quite drastic. It is only when disaster has struck that the impact of the contract terms is really appreciated by the consumer. Here, then, is a proper area for Government intervention to equalize the lack of market bargaining power of consumers, and ensure a fair allocation of risks. Fear of what the results would show may possibly be the reason there was no collection and analysis of debit card contracts and empirical data, despite frequent requests of the staff and, finally, a vote that this be done.

In short, the Commission has just not done the job it was established to do. The report contains no draft legislation yet it recommends much legislation. Experience tells us that many issues do not surface until one gets down to the nitty-gritty of drafting details. Thus, recommendations that are expressed in high sounding generalities break down when detailed application is sought in the complexities of particularized day-to-day transactions. The report contains no evidence that the Commission considered the impact of the various types of EFT on the possible differing financial systems that may result should various types of reform be enacted as a result of the Hunt Commission Report or the work of the House Committee on Banking, Housing, and Urban Development and its "FINE" discussion principles, or the governmental responses that should ensue on each of several alternatives.



## Recommendations With Which I Disagree

The majority has set forth a number of consumer protections, but these suffer, in several instances, from the defect of vagueness and lack of precision. Nowhere is this more evident than in the recommendation as to consumer remedies. What sort of recommendation is it to say a "minimum recovery without regard to actual damages may be appropriate in cases where actual damages are unprovable?" What guidance does that language give the Congress? This is followed by another meaningless statement: "Punitive damages may be appropriate." Then "with appropriate" (but unmentioned) "safeguards against harassment suits, class actions may be an appropriate means of seeking redress for actual damages." Well, are they or aren't they?

It must be recognized that redress through the court system is completely beyond the reach of most consumers where the amounts of the normal consumer checks are involved. In its recommendations on minimum damages when substantial damages cannot be proven, the Commission should have specified a dollar figure for the minimum and a method of determining substantiality. The Truth in Lending Act clearly provides a model. In addition, substantial damages should be awarded if the institution uses delaying tactics for harassment or refuses a recredit to a consumer's account what is clearly due, even if the refusal is neither malicious nor wanton or willful under the rules of law governing those terms.

The protection of accounts containing pre-authorized deposits from seizure by legal process is an appropriate idea, but why the Commission refrains from recommending a dollar amount is not clear. Why not fix an amount based on average factory weekly wages times 40? Moreover, the index to be used to adjust for inflation should be an hourly wage index. The reason for a fixed dollar amount is ease of administration, and the claimed difficulty of identifying pre-authorized wage deposits despite descriptive billing. It should be made crystal clear, however, that the exemption is self-executing, requiring no claim of exemption to be made by the depositor.

The error resolution procedure suggested seems far too complex. It results from an attempt to follow an unacceptable model, namely the credit billing error resolution procedure. The difference is that, in the present case, the consumer is not being dunned for payment. The consumer's account has been debited, as Commissioner Albert Foer has so ably pointed out in his separate statement. But compelling a recredit pending settlement of a dispute as to correctness of the charge to the account may be too drastic a remedy. I would favor liability for wrongful dishonor of orders on the account--even those initiated while the dispute was in progress--plus attorneys' fees and costs plus a fixed minimum to cover the time lost and human stress, if prompt recredit is not made <u>and</u> it is ultimately determined that the institution was in error.

In the error resolution procedure, the Commission has been persuaded by the bankers to continue the U.C.C. rule of non-liability for the errors of other institutions participating in a payment or transfer transaction. The proposal doesn't even require that the consumer be given the name, address,



and person to whom communications should be sent in the institution that the consumer's bank states is the one that made the mistake.

The rule was included in the U.C.C. as a result of banker pressure not to adopt the so-called New York rule of banker liability for the negligence of other banks in the collection process. Yet, bankers accept the warranty of title of other banks and, in the case of a forged indorsement on an incoming check (order to debit), they recredit the customer's account, relying on the warranty for recovery. I urge that error resolution and the recredit for unauthorized use proceed on the same basis, namely a rule of law be adopted making the depository institution liable for any erroneous debit, but with a warranty of accuracy and authorization as to each message sent, running from creditor or retailer to depository institution, to switch, to the bank having the account to be debited, to the account holder, with each one in the chain making a like warranty to subsequent parties.

With such a rule, the consumer deals only with his own depository institution and is not "fobbed off" to distant and unknown persons, perhaps located in a distant jurisdiction. In 1948, I inveighed against the adoption of the no-liability for others in the then-proposed U.C.C. check-collection system. Wearily, I take up the cudgels again for EFT transfers. The consumer's bank should have warranty protection from those who send it messages, guaranteeing the correctness of the dispatched message, but should remain directly liable for unexcused system errors.

One exception to the above seems fair. When investigation shows that what is claimed by the consumer is neither an unauthorized charge nor an error in the amount, but a dispute arising out of a breakdown of the underlying transaction by reason of a claim as to adequacy of performance, then, except for the right of reversibility (to be discussed next), the depository institution, on disclosing its findings, including names and addresses, should not be liable.

This leads to a discussion of a substitute for the stop-order capability used 5,830,000 times a year in the check system, according to a Bank Administration Institute study. There is no quarrel with the Commission's proposals, except as to POS transactions. In such a situation, retailers appear to have successfully sold the majority on the cash transaction analogy, with the theory that value-dating by mutual agreement can be a substitute for the stop-order in the check system. But this is pure hogwash! If a merchant will not accept an EFT transfer if there is a reversibility rule built into the system, because of a risk equivalent to 0.01943 percent of all checks, why would the merchant accept value-dating and be exposed to the full 0.67 percent risk?[1]

The issue concerning reversibility is who is to bear the burden of explaining to the consumer the

---

[1] *Analysis identifies 17 risks incurred in accepting a check of which the principal risk (71 percent) appears to be Not Sufficient Funds when the time for posting the charge to the account occurs. Reversibility is only one risk, and a small one at that, occurring in only 2.9 percent of returns.*



loss of the stop-payment privilege?  The merchants say that, if the consumer wants the privilege, let the consumer use a check.  This is a valueless option, for it is the merchant's hope to eliminate all check verification procedures and costs in the EFT-POS mode.  Merchants will refuse checks in the world of debit and credit cards, or at the least use very high credit standards.  If a reversibility concept is built into EFT, a merchant, in the brave new electronic world, can always insist on cash, and the friendly full service banker or other depository institution will install a cash dispenser or ATM for the purpose on the merchant's premises.

The retail merchant should have the burden of disclosing to the consumer that payment is to be final, just as most merchants now do when goods are "On Sale--No Returns Accepted."  Otherwise, the consumer should have the same reversibility privilege that exists in the check mode, as it is often the only weapon to use in the case of shoddy merchandise. Of course, a consumer exercising the privilege remains liable for the value of his purchase.

I reject the argument that value-dating or reversibility can be left to the marketplace.  The merchant is under no pressure to grant the privilege, as the lost sales resulting from a failure will not be significant to any one merchant.  The loss of a good weapon will be significant to consumers as the inability to reverse leaves the merchant the funds and the consumer with the burden of initiating remedial action through the court system--usually too expensive a remedy to use.

Reversibility within two business days following the transaction at a POS terminal (not at a cash dispenser (CD) or an ATM) will not place any burden on the depository institutions.  The consumer's institution will have a warranty from the receiving institution, which, in turn, can make such arrangements as it may desire with its merchant customer, including, if it rejects its customer's warranty to return, the gain of two days float time on "the funds" involved by not giving "final credit" until the period in which reversibility can occur has lapsed.

The Commission's recommendation on the use of "float" by, for example, the Thursday night shopper who is paid on Friday--namely value-dating--is, in my opinion, of no more use to the persons needing the privilege than Marie Antoinette's "Let them eat cake" was to the bread-starved French peasantry. Clearly, the opulent may obtain a value-dating privilege.  The poor will not and, if the move towards electronics is fostered by the merchant's desire to shuck-off the costs of check authorization, the alternative of "Use a check" will not be acceptable either.  I see the difficulties with a mandatory deferral of transfer, but I have much less difficulty with mandating an overdraft privilege of 48 hours for a limited amount of money in connection with automated payroll or Social Security or other pre-authorized deposit schemes.  This, too, would be a good point for selling pre-authorized payroll, etc., deposits.  An appropriate "bad EFT" law, patterned after the current "bad check" laws should effectively reduce losses.  There also should be a provision for a 48-hour notice from payors when a payee in the scheme was laid off or discharged, or is otherwise not going to be paid at all, so that the depository institution could "hot card" the account of one who is not going to be paid on Friday.



There are several places in the consumer recommendations on privacy, both as to government access and private disclosures, and again in the case of the "Freedom of Choice" recommendations, where the recommendations simply state that something should be made "unlawful" or "should not be done" with no specification of a penalty. This makes no sense, since in most of these areas the rules of damages for such unlawful action will result in miniscule recoveries. The penalty for a loss of the use of expected funds, or a denial of credit, absent special legislation, is one half of 1 percent a month or $.50 per $100 a month, which obviously is not compensation for one deprived of the wherewithal to purchase necessities. It will even result in loss to one who can access a line of credit at 1.5 percent a month. The "or else" for unlawful conduct should be specified.

In the privacy area, the Commission's section on controlling the accuracy of information misses a point. The law of credit reporting is founded on the law of defamation and, in most States, there is a conditional privilege protecting the communication of false information if believed to be accurate. There is also no obligation on the giver of information to do more than believe that the inquirer has a legitimate need for the information. In today's world of rapid communication, a caller's identity can be readily checked by a call-back, and gathered information can be more readily verified. I am in favor of the ready availability of <u>correct</u> credit information. It is high time that the antique privilege to spread untruths be abolished. Credit agencies are big business. They can afford to dispense only accurate information to legitimate recipients, or pay the piper. The sole exception to the rule

of absolute liability should be where accurate information cannot be obtained after a reasonable attempt to verify the information received and believed in good faith to be true.

## Conclusions

The foregoing explains some of the reasons why I believe the Commission did not allow itself sufficient time to do its job adequately. The Commission may have been doomed from the start to reach this result, as the position was taken that each Commissioner was a special advocate for a particular interest or point of view, and interest in other areas lagged when desired results were obtained in preferred areas. This tended to stifle compromise, of which there was, nonetheless, a considerable amount. The report may not be perfect, but given the makeup of the Commission and staff, it is probably quite remarkable that the report is as good as it is.

The record should show that I agree in the separate statements of the Commissioners Donald Scantlebury and Verne Atwater. I also concur with many of Commissioner Foer's positions. Clearly, when the competitive impacts recommendation, the security recommendation, and other recommendations are merely for continued monitoring, some coordinating agency is necessary. Perhaps the proposed corporation could also serve in that capacity, as well as the agency for monitoring and studying the impact of



EFT on consumer credit and low income customers.
Verne Atwater is on target with his suggestions in
this area.


*Fairfax Leary, Jr.*
*Professor of Law*
*The Delaware Law School of Widener College*
*Wilmington, Delaware*
*Public Representative*

Digitized by Google

STATEMENT OF WILLIAM B. LEWIS, JAMES E. FARIS,
FREYDA P. KOPLOW, AND THOMAS W. TAYLOR

This is to record my dissent from the position taken by the Commission on the subject of sharing. As Chairman of the Committee that was appointed to study that subject and make recommendations, I am quite disappointed that the pressure of time prevented careful deliberation by the full Commission on the issue. Hasty action resulted in the adoption of a position which our Committee had previously considered fully and rejected as inadequate both procedurally and substantively.

Our Committee concluded that access questions could be best dealt with by means of an interagency task force composed of financial regulators. We considered and rejected leaving such issues solely in the hands of those responsible for antitrust enforcement, the procedural alternative which the Commission chose. We did so after discovering the delay and expense which such antitrust proceedings have entailed.

After assessing the public policy implications of sharing, our Committee concluded that both competitive and banking factors should be considered. We were not satisfied that antitrust considerations were the sole factors which should be taken into account. The Commission's determination to recommend analysis based solely on competitive consideration was, in my view, too narrow. It would exclude from evaluation the effect of sharing decisions upon the safety and soundness of the financial institutions affected and the banking needs of the communities to be served.

For the foregoing reasons, I respectfully dissent from the Commission's action on the subject of sharing.

*William B. Lewis*
*Deputy Commissioner*
*Division of Savings and Loan Associations*
*State of New Jersey*
*Representing State Regulators of Thrift Institutions*

*James E. Faris*
*Director, Department of Financial Institutions*
*State of Indiana*
*Representing State Regulators of Banks*



*Freyda P. Koplow*
*Former Commissioner of Banks*
*Commonwealth of Massachusetts*
*Wellesley, Massachusetts*
*Public Representative*

*Thomas W. Taylor*
*Associate Deputy Comptroller for*
*Consumer Affairs and EFTS*
*Comptroller of the Currency*

Digitized by Google

STATEMENT OF GEORGE W. MITCHELL, FREYDA P. KOPLOW,
AND FAIRFAX LEARY, JR.

MINORITY POSITION ON SHARING

In our opinion, the Commission's recommenda-
tions on sharing, if adopted, would significantly
retard the development of on-line POS systems and
create an environment contrary to the best interests
of consumers generally and of many businesses.  The
recommendations are at variance with the position
taken by the Commission in its interim report, and
the need for departure from those earlier recommen-
dations was not established, either by the record or
by staff studies.  In that report, the Commission
endorsed sharing of POS systems when doing so is
pro-competitive.  It also recommended both expedited
judicial procedures and a role for the depository
institution regulators in evaluating sharing arrange-
ments.  This document offers an alternative, three-
part proposal to implement the position taken by the
Commission in the interim report.

The Commission's present stance is embodied in
two recommendations:  (1) exclusive reliance on anti-
trust laws as the framework for judging sharing
questions, and (2) initiation of remedial action
primarily by depository institutions unable to parti-
cipate in exclusive POS systems.  These positions
in effect endorse the status quo.  They fail to pro-
tect the interests of consumers and of other users
of POS because they rely on an indirect and pro-
tracted remedial procedure that often involves ex-
cessive delays.  They also make the doubtful
assumption that a depository institution, by protect-
ing its own interests, will automatically protect
those of the general public.  Such a position seems
in direct conflict with recent policies which have
required direct, prophylactic methods for consumer
protection.

The evidence to date indicates that on-line POS
services are being provided primarily by very large
banks or consortia of large banks, or by cooperative
organizations composed of the whole universe of like
institutions in a region.  Thus, for the most part,
cooperative arrangements determine the cost and
quality of POS services available to the public.
Under these circumstances confidence that competition



would exist and protect the public interest cannot be justified. The public benefits of a free market cannot be realized unless participants are numerous, vigorously seeking to improve their position, and independently engaged in supplying the market. By ignoring these preconditions, which are necessary for a truly competitive market, the Commission has used the phrase, "pro-competitive," more as a slogan than as a workable, identifiable state of affairs and has reached a result that nullifies the emphasis it has placed on the welfare of consumers in other sections of this report.

Given present-day technology, an on-line POS system requires transaction volumes which can only be achieved if the system is able to serve a very large number of deposit accounts in a large number of institutions. For all except a few communities in the United States, this fact of technology means that some type or condition of sharing must occur if on-line POS systems are to develop. The alternative to sharing is to wait until technology greatly reduces the cost to individual institutions, or their processors, of moving funds electronically on a transaction-by-transaction basis to and from large numbers of depository institutions. The near-term prospects for such improvement in the technology are highly doubtful. Therefore, the early development of shared on-line systems can and will come about only through the offering of POS services by consortia or combinations of financial institutions. The safeguards and conditions that must be met by these shared arrangements to protect the public interest should be defined by statute in broad general terms and, where necessary, interpreted by regulatory authorities and the courts.

## Access to Terminals

To best serve the public, point-of-sale systems should be available to consumers as universally as currency or checks. This means that individuals should be able to make payments by drawing electronically on their account in a depository institution of their choice when dealing with any merchant of their choice. For debit cards to be used in lieu of checks or currency, they must be usable at the terminal in the merchant's establishment on the same general basis on which the merchant would accept a check.

The wisest course of action would be to make open access to terminals a precondition to operation of any POS system. However, considering the character of depository industry structure in most market areas of the country, an exception might be made for proprietary systems serving only the customers of one depository institution.

With respect to the use of any *shared* system, consumers should be granted access to all terminals in such systems, but that access *does not* require or imply mandated sharing of the on-line features of POS systems. It does mean that any consumer using a debit card issued by a depository institution would receive a basic level of POS service from such shared arrangements which would parallel the service the consumer now receives in the check system. The consumer could use a debit card for payment, if a merchant was willing to accept the card, just as the consumer can use a check if a merchant is willing to accept it. The shared POS service arrangement would be required to collect the resulting debit item at



par through available electronic facilities, includ-
ing automated clearing houses.  Requiring shared POS
terminal arrangements to provide the basic service
of accepting all items for collection at par merely
parallels existing commercial practice of accepting
all checks at their par value.  The broader range
and higher quality of service that can be provided
by on-line POS systems *would not* necessarily be
available to consumers holding cards issued by non-
participating depository institutions, nor to
merchants when they accept such a card.

The POS market will be more competitive and
hence more responsive to the public interest if, in
contrast to the bank credit card market, it consists
of a number of competing national, regional, and
local debit cards and service lines.  Few consumers,
however, will want to use more than one debit card,
because each such card must be backed by a trans-
action deposit account.  The majority of consumers
have no more than one such account, and a consumer
holding a debit card of a local depository institu-
tion should not be required to establish additional
deposit accounts in order to use the POS service.

Open access thus means that consumers may bene-
fit from POS terminal deployment while holding only
one transaction account.  Furthermore, merchants
will not favor the proliferation of attended or un-
attended terminal instruments that might take place
under the Commission's recommendations.  Hence, the
convenience and needs of consumers, as well as the
retailer's interest in economy of operation, would
be better served, in our judgment, under the recom-
mendations of this document.

Even if terminals are accessible to debit cards
generally, payees may be subject to fees or other
terms and conditions of use of the on-line features
of POS systems.  Depository institutions that have
had no part in and have borne none of the costs of
developing on-line, full-range systems need have no
access to these other features.  In consequence, at
any POS terminal, some cards will access regional or
national on-line systems providing a wide range of
services, while other cards, through the same termi-
nals, will provide a minimal payments service by
means of off-line operations.  That such hybrid
arrangements are technically, operationally, and
economically possible is not an issue.

Access by consumers to terminals and to a basic
level of service using cards issued by any depository
institution of their choice is a sufficient condition
for at least a reasonable level of sustained competi-
tion.  Competition will determine the type of service
and cost of service associated with each card.  Com-
petition will provide the incentive for institutions
to join an on-line network or to establish an on-line
network to serve merchant customers better and to
earn fees.  In the absence of open access to termi-
nals, a short-lived flurry of competition, reminis-
cent of the early days of the bank credit card market,
would be likely.  Competition would then diminish as
the larger systems garnered increasingly larger
market shares by absorbing local operations.

Finally, it must be recognized that the merchant
should be able to exclude individual debit cards for
the same reasons that some merchants, as a matter of
course, refuse to accept any checks or refuse to



accept some checks on a selective basis. Included
as legitimate reasons for refusing to accept a card
are expiration of the card, suspicion that the card
may be forged, doubt that the card user is author-
ized, and concern that the account may be overdrawn.
Such reasons should justify a merchant in rejecting
a card. But if POS is going to afford consumers a
viable alternative to checks and cash, no debit card
may be excluded by a shared POS terminal arrangement
from access to basic payments services by reason of
the identity of the card-issuing depository institu-
tion. If a merchant is willing to accept a con-
sumer's debit card for payment, the payment system
must accept it as it would a check.

## Regulatory Review

Early in the development of a particular POS
sharing proposal, sponsors should have the right to
request a public review by a competent body. If the
reviewing body raises no objections, the sharing
arrangement could proceed under the presumption that
the public interest considerations had been
officially evaluated. Such review is needed to re-
move the uncertainty and to minimize the delay in
ascertaining the legality of proposed sharing
arrangements.

Delays arising from the uncertain legal status
of proposed sharing arrangements have already in-
hibited the development of POS networks. Litigation
will make for more delays because of the slow pace
at which most lawsuits proceed. The Commission
recognized that resolution of access disputes
through litigation may be a time-consuming process

and, therefore, it recommends that such suits be
given expedited treatment in the Federal courts.
However, no justification is advanced to show why
sharing disputes are more important than most other
disputes that come before Federal courts and, there-
fore, more deserving of expedited treatment. The
Commission stated that it is not unprecedented for
legislation to provide for such expedited procedures,
and cited as an example the expedited treatment given
to disputes arising under an employment discrimina-
tion statute. Undoubtedly, some types of cases de-
serve quicker resolution, and Congress provided for
expedited procedures in the employment discrimination
statute due to the special sensitivity it generally
accords to civil rights matters. Although arguments
may be made that the sharing of EFT systems is a
vital issue, it is not clear that Congress would see
sharing as a problem of the same magnitude as racial
discrimination or speedy trials for those accused of
crimes. In thus weighing the priority of cases,
Congress may not award such expedited treatment to
EFT sharing disputes.

In another section dealing with delays inherent
in court proceedings, the Commission referred to the
business review procedure of the Department of Jus-
tice as a means of more quickly obtaining an opinion
on the legality of a proposed sharing arrangement.
The Commission neither described the expected length
of time for the Justice Department to give such a
review, nor mentioned that Justice assigns such re-
quests a priority that is, by admission, not as high
as on-going or planned litigation cases.

The need for knowledgeable, expert, and expedi-
tious review of proposed sharing arrangements is



painfully evident today. Such a review could be provided by depository institution regulators. All depository institutions that have the potential to provide shared POS services are subject to supervision by one or more regulatory agencies which are well qualified to interpret statutory criteria for judging the appropriateness of a particular sharing proposal. The precedents established under existing banking law relating to mergers, acquisitions, and depository institution business practices have provided guidelines for meeting the convenience and needs of the public, maintaining the safety and soundness of depository institutions, and proscribing anti-competitive results. Standards drawn from these precedents could be applied cooperatively by the regulatory agencies to proposed POS sharing arrangements. To ensure prompt consideration by regulatory bodies, it might be appropriate to establish a review period of 60 days. Of course, while regulatory review would not necessarily preclude the parties from taking their dispute to court, nor the Justice Department from enforcing applicable antitrust laws, there should be a requirement that, in any court procedure, the regulatory result should be shown to be erroneous in the light of the criteria established for regulatory decisions.

## Statutory Standards for POS Sharing

In reviewing sharing arrangements and in settling sharing and access disputes, three factors should be considered: (1) the safety and soundness of the depository institutions, (2) the convenience and needs of the public, and (3) the competitive impact. These principles have traditionally been of primary importance in assessing actions concerning depository institutions, but for purposes of regulating the development of POS systems, the Commission appears to endorse a departure from this historical framework. It is possible, for example, that some depository institutions will be adversely affected by the impact of EFT technology; they may become unsound or even fail, much as other firms have often been adversely affected during periods of active competition for market share. In consequence, the convenience and needs of the affected communities might suffer. The Commission seems prepared to accept this price for the efficiency derived from a conjured or conjectured "free market."

The Commission recommended that courts use traditional antitrust principles to resolve sharing disputes, and recommends against including either the "public convenience and needs" or the "safety and soundness" criteria of the Bank Merger Act. The reason given is that antitrust law, except for certain types of per se violations, allows courts to apply the "rule of reason" for determining whether an antitrust violation has occurred. Presumably, using a rule of reason, a court could consider public interest considerations in a manner similar to that which is required under the Bank Merger Act. However, the Commission neglects to point out that a court would have absolutely no obligation to accept or even consider such criteria. In fact, it would not be unreasonable for a court to interpret the absence of such criteria in an EFT statute to imply that Congress did not wish for convenience and needs factors to be applicable to sharing disputes. Thus, resulting court decisions may be based purely on competitive factors and totally ignore public



interest considerations.  The Commission recommenda-
tion is deficient for not acknowledging this
possibility.

Had the Commission proposed criteria based on
antitrust and bank regulatory law and precedents
to guide deliberations concerning POS sharing
arrangements, it would have recognized the basic
nature of the depository industry--highly regulated,
protected, and conditioned to moderation in competi-
tive behavior.  The Commission could have profitably
drawn on the ways in which regulatory experience
and skill has been used to supplement competition
in protecting the public interest in the depository
industry.  The resulting criteria should be enacted
into law for the guidance of participating deposi-
tory institutions, of regulators, and of the courts.

The noncompetitive aspects of the depository
industry have their roots in the public concern for
the continuing liquidity and soundness of banks and
thrift institutions.  That concern has given rise to
limited chartering, the public insurance of deposits,
access by banks to a public lender of last resort,
a rigorous system of examination and surveillance of
institutions, and numerous deliberate constraints
on competitive activity.  In recent years there has
been more competition, but industry reliance on
government intervention that limits competition is
still evident.  The depository industry has favored
such governmental measures as deposit interest rate
ceilings and differentials, and constraints on
branch office location.

In addition to restraining competition to pro-
tect the viability of individual depository

institutions, the viability of the entire payments
system depends upon cooperation among the institutions.
The money payments system involves thousands of insti-
tutions and tens of millions of depositors.  Its func-
tioning requires an infrastructure of extensive coop-
eration through clearing houses employing a variety of
clearing conventions.  In the absence of cooperation,
money flows arising from money transfers and other
shifts of deposits could threaten both individual in-
stitutions and the viability of the entire financial
system.  In the past, such cooperation among competi-
tors has served the public interest reasonably well,
under the public overview and presence of the Federal
Reserve.  But without that presence or other public
surveillance, cooperation could be subverted to an
environment of common consent or collusiveness lead-
ing to excessive prices and low standards of money
service.  The Commission's recommendations on sharing
ignores this potential threat to the public interest.
The threat can and should be dealt with by enacting
statutory standards as qualifications to private
sharing arrangements.

<u>Summary</u>

The Commission's present recommendations on
sharing are basically inconsistent with its stated
objective of affording "consumers and depository
institution participants in EFT as much freedom of
choice and action as possible."  Instead, these
recommendations are likely to result in an environ-
ment in which consumers will be offered limited
choices at noncompetitive prices, and, in addition,
the safety and soundness of some depository finan-
cial institutions may be jeopardized.



In this dissent we have set out a three-part
proposal that offers both a procedure and a set of
criteria to implement the position taken by the
Commission in its interim report.  These proposals
will be largely costless if the POS infrastructures
turn out to promote competitive behavior.  However,
they will ensure protection of the freedom of choice
and action of consumers, smaller retailers and de-
pository institutions in the event that "pro-
competitive sharing" fails to offer POS users any
real competitive alternatives.  And these proposals
will encourage the early development of POS systems
and the benefits the Commission has said that POS
systems can offer the public.


*George W. Mitchell*
*Former Vice Chairman, Federal Reserve Board*
*Consultant to the Board of Governors*
*Federal Reserve System*


*Freyda P. Koplow*
*Former Commissioner of Banks*
*Commonwealth of Massachusetts*
*Wellesley, Massachusetts*
*Public Representative*


*Fairfax Leary, Jr.*
*Professor of Law*
*The Delaware Law School of Widener College*
*Wilmington, Delaware*
*Public Representative*



STATEMENT OF DONALD L. SCANTLEBURY

The General Accounting Office agrees with the general thrust of the Commission's final report. We believe that most of the Commission's recommendations will enhance consumer protections in the use of electronic fund transfers (EFT) and provide greater competition among financial institutions. Nonetheless, we have some fundamental disagreements with some of the Commission's recommendations. In some other cases, we think the recommendations are not supported by adequate study or discussion. Our principal concerns involve certain recommendations on (1) privacy, (2) unsolicited debit cards, (3) error resolution, (4) consumer choice, (5) merchant deposits, (6) sharing, (7) competition among EFT suppliers, (8) standards, and (9) monetary policy.

### Privacy Rules Recommended for the Federal Reserve System

The Commission recommends that the Federal Reserve in its operation of automated clearing houses (ACHs) follow privacy rules and procedures that are at least as restrictive and confidential as those followed by private-sector financial institutions.

We do not concur in this position because the Commission did not fully evaluate the practices followed by the private sector, and therefore does not know if they represent a sufficient standard for the Federal Reserve to follow. Furthermore, the fact that the Privacy Protection Study Commission itself made 11 recommendations for enhancing privacy protection in the private sector suggests that the current practices in the private sector are not sufficient.

### Unsolicited Debit Cards

The Commission recommends that financial institutions be permitted to issue, only to their own customers, unsolicited debit cards without credit features and without personal identification numbers (PINs). (The number would be assigned later if the customer accepts the card.) The Commission also recommends that unsolicited debit cards with credit features not be permitted as long as the present ban on unsolicited credit cards continues.

We do not concur in the first recommendation because it will not enhance competition among financial



institutions since an institution can send cards only to its own customers. In our view, unsolicited debit cards offer no benefit to consumers. In fact, such cards could expose the funds of the financial institution's customers to unauthorized access if the PIN becomes available. For example, the card could be intercepted prior to delivery to the customer, or the card could be obtained by someone else if the customer decides not to accept the card and unwittingly throws it away. If that person also obtains the PIN, he could access the customer's account.

We also do not concur in the second recommendation because we do not think that the potential lifting of a ban on unsolicited credit cards should be tied to any ban on unsolicited debit cards with credit features. From a consumer point of view, the two cards are significantly different because credit cards access only bank funds whereas debit cards access consumer funds.

Error Resolution

The Commission recommends that if a depositor claims that an error was made by a financial institution, such institution has 45 days within which to correct the error or explain the absence of an error on the part of the institution. Further, if the institution denies an error on its part but other parties may be involved (e.g., other financial institutions or merchants), then the institution must inform the depositor and the other parties of the alleged error.

We do not concur in this recommendation because it does not give the customer adequate protection

against the possibility of being given the runaround and it does not clearly place responsibility for error resolution on the provider of the service. The consumer is not a party to the contractual agreements among and between all the financial institutions and merchants who provide and participate in a single EFT system. A consumer cannot be expected to know who all these participants are and should not be required to go from participant to participant to get an error corrected. The providers of the system should designate a single place or focal point where a consumer may have an alleged error resolved that may have been generated in an EFT system. Also, the burden of litigation should not be placed upon the consumer.

Consumer Choice

The Commission recommends:

To the extent that the merchant is unaffected as to cost or risk, the type of transaction that the customer's EFT card triggers at the point-of-sale should be confidential between the customer and his depository institution.

We strongly support the notion in the recommendation that a consumer should be able to select confidentially the type of transaction he wishes to make at a point-of-sale (POS) terminal (e.g., a withdrawal of consumer funds or an advance of funds against an overdraft agreement). However, the wording of the recommendation suggests that the consumer's confidentiality and freedom of choice would be preserved only as long as the merchant is unaffected by cost or risk. Since



all transactions involve cost, if not risk, it is possible that the wording of the recommendation permits merchants to inquire into the types of <u>all</u> transactions. The recommendation also fails to identify who will determine whether the merchant will be affected. The merchant will most likely make that determination, not the consumer. Consequently, the merchant will probably determine whether a consumer will have confidentiality and freedom of choice in POS transactions. In our opinion, these should be absolute, not conditional, rights. While we do not disagree with the thrust of this recommendation, we would prefer to see the wording more specific so that the consumer has clearer rights to confidentiality of transaction types.

Merchant Deposits

The Commission recommends that merchants should not be limited geographically in selecting depository institutions to receive deposits that are automatically generated as a result of a payment made by a consumer at a POS terminal. On the other hand, the Commission also recommends that certain geographical restrictions be placed on the use of terminals for accepting consumer deposits. In other words, depository institutions may deploy terminals anywhere for accepting merchant deposits; however, they may deploy terminals for accepting consumer deposits only within their State lines and within their local market areas that may cross the lines of adjacent States. Consequently, merchants have more freedom in selecting depository institutions than do consumers. We do not concur in this recommendation because a sound case has not been made for giving merchants preferential treatment and it is not consistent with the Commission's

other position that restrictions on the deployment of terminals for accepting deposits should be gradually relaxed.

Sharing

In its interim report, the Commission endorsed a concept described as pro-competitive sharing. In effect, this would allow or prohibit almost any kind of sharing, depending ultimately upon a case-by-case court determination of the antitrust implications of sharing arrangements. The Commission also recommended Federal legislation that would expressly nullify any mandatory sharing legislation enacted by the States.

In the interim report, we abstained on these recommendations because we did not believe that the competitive implications of other sharing alternatives were adequately evaluated; namely, (1) mandatory sharing, (2) permissive/nondiscriminatory sharing, and (3) permissive sharing. These recommendations also seemed to be inconsistent with one another. The first recommendation calls for a case-by-case analysis to determine if sharing should be permitted, required (i.e., mandatory), or prohibited. The second recommendation, however, wipes out, <u>carte blanche</u>, all mandatory sharing laws without a case-by-case analysis. In our opinion, the Commission's subsequent work did not adequately explore alternatives; therefore, we do not concur in this recommendation.

To resolve expeditiously any sharing disputes, the Commission also recommends that the Congress provide for placing antitrust suits filed as a result of alleged anticompetitive sharing arrangements in a preferred position on the docket of the appropriate



U.S. district court.  We do not concur in this rec-
ommendation because we believe it is tantamount to
requiring an antitrust proceeding in nearly all shar-
ing disputes.  In our opinion and the opinion of many
others, an antitrust proceeding is not workable, par-
ticularly for small institutions.  The time and ex-
pense of such proceedings are usually prohibitive.
We also think it is inappropriate and not very mean-
ingful to recommend to Congress that it provide that
antitrust cases on sharing be given preferential
treatment over any other antitrust case or, for that
matter, any other court case.  We would have pre-
ferred the Commission to recommend that the Congress
empower the regulators to form panels composed of the
primary regulators of the financial institutions in-
volved.  These panels would decide sharing disputes
and enforce their decision through the courts in the
event their decisions were not followed by the
parties to the proceeding.  Naturally, the parties
would always have the alternative of court proceed-
ings, but only after a determination by the panel.

In our opinion, the sharing issue is one of the
most important EFT issues from the perspective of
consumers because sharing will be the key to assuring
that consumers will have freedom of choice among fi-
nancial institutions.  Unfortunately, the Commission's
recommendations on sharing do not provide a positive
national policy statement on sharing; they merely
throw the sharing issue to the courts to decide on a
case-by-case basis.  Furthermore, the recommendations
do not provide any guidance or workable solutions
either to the Congress or the courts in resolving
the sharing issues.

## Competition Among Suppliers of EFT Equipment and Related Services

The Commission recommends that regulated com-
munications common carriers should be permitted to
offer EFT system services and related terminal equip-
ment, but not under tariff.

The problems addressed by this recommendation
are broader than EFT.  They include:

- The distinction between data processing
  services and communications services, which
  is becoming more blurred with time.

- The question of what should be regulated
  when these two services are combined.

- The restrictions of the 1956 Consent Decree
  on AT&T, which are not placed upon other
  common carriers.

While we favor the recommendation's intent to
increase competition, we believe that further con-
sideration should be given to the implications and
ramifications of the recommendation on the many non-
EFT areas in which data processing and communications
services are jointly used.

## Standards

The Commission recommends that it is premature,
at this time, to establish federally mandated stand-
ards for EFT terminals and systems.  The Commission
also recommends that communication protocols used by
EFT equipment manufacturers and other providers that



are not in accordance with published American National Standards Institute standards must be published when adopted for use by the manufacturer or provider.

In our opinion, the first recommendation fails to present any positive policy on when, if at all, standards should be mandated. The second recommendation is too narrow because it specifies only one interface standard--communication protocols; however, several other interface standards are also necessary to provide interchangeability of equipment and services and hence to promote competition. Consequently, although we believe standards are necessary, we do not concur in either of these recommendations.

The Commission also recommends that financial regulatory agencies should assume an active role in the voluntary standards-making process for EFT-related standards; it also suggests that this participation be limited to one Federal and one State regulator on each standards committee and subcommittee. As representatives of the public, regulators must assume an active role in setting standards; they must bring their expertise or assure that expertise is provided to the committees and technical subcommittees to counterbalance domination by any special interest group. The recommendation adopted by the Commission runs counter to this goal because it limits regulators to only two representatives.

This limit was placed in the recommendation out of concern over domination by regulators of the standards-setting process. It fails to recognize that the rules of the voluntary standards-making process already provide for equal representation on committees by all interest groups. There are no such rules for technical subcommittees, which special interest groups sometimes can and do dominate. To place a numerical limit on regulatory participation when no such limits are placed on other participants puts the regulators at a significant disadvantage in representing the public. We therefore concur in the recommendation to the extent that it will ensure participation by regulators, but we do not approve of the arbitrary limit.

Monetary Policy

The Commission recommends that depository institutions be permitted to pay interest on demand deposit (checking) accounts and suggests that the approval of NOW accounts would probably be the best approach to achieving this result. The Commission also recommends that the Federal Reserve be permitted to pay interest on reserve balances held by member banks at a Reserve bank.

We do not concur in these recommendations because the issues addressed by these recommendations are not related to EFT and therefore are outside the scope of the Commission's work. Any relationship is remote at best. Additionally, the Commission did not undertake indepth studies on the use of NOW accounts, let alone the need for paying interest on demand accounts or Federal Reserve balances.

*Donald L. Scantlebury*
*Director*
*Financial and General Management*
*Studies Division*
*General Accounting Office*

291



STATEMENT OF GORDON R. WORLEY

We commend the Commission for its rejection in its work on the chapter on sharing of proposals to mandate or require sharing of the point-of-sale (POS) terminals operated by retailers and other non-depository institutions or to require retailers and other payees to accept EFT-based debit cards as a universal substitute for cash.

## I.  RETAIL CREDIT GRANTORS

The majority of Commissioners, including the retailing representative, have consistently been proponents of free enterprise and the principle that minimizing regulation allows the market to operate with lower costs and greater flexibility to respond to consumer needs.  Retail credit grantors support a free market approach which allows them to compete directly with the credit services of depository institutions.  This discussion, therefore, does not call for legislation to ensure that this competition be conducted on an equal footing.  Rather, this discussion calls on the depository institutions which issue EFT cards in order to gain retail acceptance of EFT to take steps voluntarily to design their EFT cards to permit this competition to develop and

further to allow the consumer, as the arbiter in the marketplace, the greatest degree of freedom of choice.

The issue is whether the many retail credit grantors who do not now accept a credit card issued by banks and other third parties will be able to continue to decline a third-party revolving credit service in an EFT environment.

This retailing policy serves the public interest in two ways.  First, independent retail credit plans promote competition and prevent the nationwide bank card systems from obtaining a monopoly or oligopoly on consumer revolving credit, potentially raising the fees for both merchants and consumers.  Second, a broad customer base for retail credit grantors diversifies the risk of credit extensions, enabling merchants to extend credit to marginal credit customers who generally are the less affluent consumers.

The EFT-based debit card threatens to evade this retailing policy of not accepting third-party credit service.  The debit card may be programmed to include a credit service.  When a consumer presents a

292



debit card with a credit service, the retailer will probably not be able to determine whether payment is made by accessing funds on deposit or by activating a line of credit which deposits funds in the consumer's account.  The EFT card will mask the instances when it functions as a credit card and deprive the retail credit grantor of his present opportunity to reject a third-party credit service. By accepting an EFT card, a retailer may unknowingly facilitate extension of third-party credit, which erodes his credit customer base and skims off the retailer's preferred credit customers.  EFT cards thus have the potential to shift the retailer's share of the credit market to third-party credit grantors.

The Act establishing the Commission indicated that free, innovative, and aggressive competition should be maximized to the extent feasible.  This competition cannot materialize if the credit service connected with an EFT debit card is not revealed to the customer or the retailer at the point of sale.

The Commission's recommendation in Chapter 2 regarding the consumer's choice of payment services at the POS terminal also failed to guarantee to consumers the right to elect at the time of the transaction the type of payment service which the EFT debit and credit card activates.  The depository institution which issues an EFT card may place terms in the master contract governing the card which lock a consumer into a fixed manner by which the card will make payments at the point of sale.  A multipurpose card, thus, may function as a single-purpose card: for some consumers, the payment method may be debiting; for others, 30-day convenience credit, and for others, revolving credit.  The multipurpose card is

likely to look the same and bear the same name for all card holders and neither the appearance nor the name of the card will inform the merchant as to the type of payment service it activates.

Therefore, many retail credit grantors are likely to accept only those EFT cards which are clearly limited to debiting funds on deposit and decline to accept cards which might include any credit accommodation.

The Commission, therefore, responded with two recommendations regarding retail credit grantors. The first recommends that no law limit the merchant's current right to select and decline the types of transaction services which he will honor.  This recommendation affirms the status quo, that is, that a merchant is free to insist that a multipurpose card activate only some payment services such as only debits against funds on deposit and not any form of credit accommodation.

While the Commission recommendation recognizes the problem of retail credit grantors, the Commission fails to provide adequate protection for merchants, particularly small merchants, who lack the bargaining power with the depository institutions to insist upon this right.  The Commission's second recommendation permits a grantor or lessor of EFT services-- that is, an issuer of a multipurpose card--to offer a merchant only a package of all of the services, including credit activated by the multipurpose card, as long as some other card issuer in the market offers these services separately.

This antitrust principle provides scant protection:  if five card issuers are servicing a given



geographical market, four may insist that the mer-
chant accept a package deal if only one offers the
services separately. Pressures from other retailers
who accept all cards issued and the merchant's de-
sire to accommodate the debit service for all of
his customers will tend to force a merchant to
accept all of the cards issued, including those
which are packaged to require the merchant also to
accept a credit service. Moreover, the merchant's
need to maintain good relations with his customers
will tend to force him, once he has accepted a
multipurpose card for one service, not to question
consumers as to the service selected but to relent
and accept the other payment services which may be
activated by the card.

The Commission's recommendation places heavy
reliance upon the possibility that one card issuer
will offer these services separately. This scheme
is not likely to be workable. If all but one card
issuer offers these services as a package, then that
one may not change his system without placing all
other card issuers and himself in jeopardy. In
addition, if separating the debit card from the
credit card proves to be more expensive for each
issuer, a card issuer cannot offer consumers separate
cards unless his competition also offers separate
cards. Further, the cost of separating the cards
for established card issuers may over time become
prohibitive: the better solution is to separate
the cards now, while EFT is in its infancy.

The textual explanation of the Commission's
recommendation notes that one way to sever the pay-
ment services is to issue two separate cards: one
card for debiting deposits and another for credit
accommodations. We strongly support this concept

and urge that depository institutions issuing EFT
cards provide that debit cards be separate from and
not include any credit accommodation (except for a
modest overdraft).

This separation serves the public interest in
several ways: (1) Separation provides a large
measure of disclosure at the time of the transac-
tion--both the consumer and the merchant will clearly
be informed as to the type of payment method ten-
dered for payment of purchase. (2) Separation in-
sures the consumer's right to choose between the
payment methods to tender for a purchase. (3) Sep-
aration minimizes the confusion and dialogue at the
checkout counter, maintaining its efficiency.

(4) Separation permits retail credit grantors
to enforce their right to decline credit services
issued by others, a policy which we have noted in-
hibits a potential monopoly by the bank card systems
and facilitates credit for less affluent consumers.
(5) As the rights and obligations and probably also
the fees charged will vary between the debit service
and the credit service, this separation removes
any confusion as to the type of payment service
accepted and the resulting rights, obligations, and
costs for the consumer, the merchant, and the deposi-
tory institution.

(6) Separation facilitates the merchant and
depository institution's negotiating fair and appro-
priate pricing of the debit service and the credit
service. (7) Separation also minimizes the diffi-
culties of retailers who do not maintain a credit
operation but depend on third-party credit. Without
separation, these retailers would be forced either
to give up the third-party credit service or to

294



accept the new cards which have both the debit and credit service. This election would be particularly difficult if the card issuers were to price the debit service in the same manner as the credit service, which would cause a substantial increase in their fees for financial services.

The retailing position in support of separation of the multipurpose card will eliminate potential conflict between retailers and the depository institutions which issue the EFT-based cards. The Commission's recommendation regarding tie-in of services is taken from antitrust law and could lead to protracted litigation to resolve complex issues involving economics. The retailing position, by contrast, is clear-cut and will give clear guidance for making business decisions. Some have argued that the merchant's position, if adopted, would permit invasions by the merchant of the consumer's privacy and that the consumer's choice of payment methods should be confidential between him and his depository institution, unless the choice affects the merchants as to costs or obligations. This argument fails. (1) The retailer will be required to know which payment service the consumer has tendered. The choice of payment methods will always affect the merchant, probably as to the fees charged, but always as to risks and obligations; Federal law suspending the holder-in-due-course doctrine provides the consumer with greater rights to return merchandise purchased on credit than purchased for cash, check, or debit.

(2) Further, the current practice of retailers is to ask the consumer "cash or credit?" and this inquiry does not today generate protests that merchants are violating the consumer's expectations of confidentiality. (3) Separation of the multipurpose card would obviate the need for the merchant's personnel to inquire as to which service the consumer is tendering for payment. Further, by posting signs similar to the present ones for credit cards, a merchant may notify the consumer whether he accepts debit cards with a credit service and the consumer may avoid any embarrassment which might be associated with the merchant's declining a credit service of a multipurpose card.

In short, separation of EFT cards by type of payment method aids disclosure to the consumer in advance of the transaction and will thereby enhance protection of the consumer's privacy.

The potential that EFT will enable bank cards to gain a monopolistic or oligopolistic hold on revolving credit to the detriment of consumers and the public interest was discussed at length by the National Commission on Consumer Finance in its final report:[1]

Risks to Consumers in Development of Multiparty Credit Card--EFTS

If an electronic funds transfer system is ultimately developed and combined with revolving or open end credit, the system must have adequate constraints to assure that consumers receive the benefits to

_____

[1] *National Commission on Consumer Finance, Consumer Credit in the United States* (Washington, D.C.: U.S. Government Printing Office, December 1972), pp. 205-214.



which they are entitled from the system. The Commission perceives significant dangers for consumers underlying current trends in the development of credit cards and the EFTS. Basically, the problems arise because the economies of scale inherent in the development of a massive electronic system for the exchange of funds and credit information lead naturally to oligopoly--that is, control of the industry by a few large credit grantors--with a consequent danger of restraint of competition and denial of its benefits to consumers seeking credit in the future.

Conditions leading to oligopoly and restraint of competition. Rather than engage in ruinous price competition, the temptation is strong among participants to reach accommodations that restrict competition. In some cases they may obtain legislation or a suitably protective government agency to shield them. . . .

The multiparty credit card-EFTS has characteristics that naturally lead to oligopoly. A very sizable investment is needed to provide the funds transfer system. . . . Once in operation, there is a great incentive to build volume, since incremental volume may often be handled at little additional direct cost other than the cost of capital invested in the receivables. . . . [at page 208]

Possible harmful effects of oligopoly upon consumers. The tendency for national multiparty credit card systems to be dominated by a few large credit grantors poses significant potential dangers to U.S. consumers. These dangers should be identified in order to design and to justify preventive measures.

. . . Among families with incomes of less than $5,000 who used credit cards, use of other-than-bank cards was about seven times the use of bank cards. Among families with incomes of $15,000 or more, the relative dominance was only about 1.5 to one.

Thus if banks offering credit cards should tighten their credit standards, consumers rejected from that market must turn to gasoline and retail credit cards to remain in the revolving sales credit market. If consumers are to have viable alternatives, these forms of credit cards must be encouraged to survive as vigorous competitors. . . .[at page 209]

. . . If many banks become discouraged and drop out of the credit field, introduction of the EFTS may be further delayed or concentrated in the hands of a few large banks. . . .[at page 207]

Many large retailers have consistently refused to accept multiparty credit cards for a number of reasons. In some cases they believe the cost of operating their



own credit plans is less than the discount required on other credit cards. They have also expressed concern about "losing their identity" and sacrificing their ability to deal directly with customers who need credit. They fear that if one of their customers fails to pay the bank because of his dispute with another retailer, the bank will turn off the consumer's credit at all locations. In addition, retailers use their monthly billings to notify customers of special merchandise promotions. While this is possible with third-party billings, each retailer using the billing would be competing with many others. Finally, <u>retailers realize that it would be dangerous to transfer all of their credit operations to a third party because it would be extremely difficult to reverse the decision.</u>  (Emphasis added.) Even though a bank might agree to a discount of, say, only 1 percent of credit sales for an initial period, retailers feel that they would be in a poor position to forestall higher rates in later years. Given the prohibition against the mass mailing of unsolicited credit cards and the normally heavy start-up costs of establishing a credit plan, the retailer who conveys his credit function entirely to a third party places himself in a poor bargaining position by becoming virtually locked into the third party's system.

The failure of large retailers to accept bank credit cards has understandably disturbed bankers. These retailers represent the greater part of the market for credit sales and probably have larger unit credit sales than many small retailers who accept bank cards. Entry into this market would assist the banks in several ways. Since they already have their computer systems, the added volume would provide greater economies in operations so long as there is unutilized computer capacity. Because of the higher average price per sales ticket, they would generate more revenues in relation to the volume of paper handled. Also, they could expect to find more consumers using the credit service rather than paying all or a large portion of the account within the "free" period. These advantages motivate banks to exert considerable pressure on retailers to accept their cards.

So long as these pressures are not in restraint of competition, they are entirely acceptable. Rising costs of providing credit--and in some cases requests by their own customers--have forced some large retailers to accept third-party credit cards, although few have gone so far as to abandon their own credit plans. The Commission believes the danger to consumers' interests lies in retailers' being forced to adopt third-party credit plans by means other than consumers' free choice. [at pages 206-207]

Retail credit grantors recognize that by accepting the debit card with overdraft, they are in fact

Digitized by Google

accepting a credit service. Banks which issue EFT cards are free to increase the overdraft beyond the level of a convenience accommodation to the level of substantial lines of credit. Retail credit grantors seek to avoid this potential abuse: they urge that the depository institutions which issue EFT cards voluntarily place a limit on the amount of the overdraft, such as $250. This limitation would prevent the possibility that the debit card with overdraft will erode the retailer credit customer's base, causing a curtailment of credit for less-affluent consumers. Moreover, this approach will broaden the consumer's freedom of choice by prompting retailers to accept EFT debit cards, making the EFT system viable and opening up for consumers new financial services.

Further, we urge that if depository institutions elect to charge interest for the use of this overdraft privilege, the subsequent deposit by the consumer of funds to his account be promptly applied to repaying the balance due on the overdraft. This approach will minimize the interest charges which a consumer must pay.

In conclusion, we urge, therefore, that those depository institutions issuing EFT cards should design their EFT cards, which provide access to a consumer's funds on deposit, so as not to include a credit service except a right of overdraft. This overdraft right should be not less than $100 nor more than $250. Interest may be assessed on any outstanding balance of an overdraft if subsequent deposits to the account are applied promptly to repay any outstanding balance.

## II. CONSUMER PROTECTION

To protect consumers in their use of electronic funds transfers, the following privileges and rights, in addition to or in lieu of those recommended by the National Commission on Electronic Fund Transfers in Chapters 2, 3, and 4, should be guaranteed by law.

### Loss of Funds on Deposit

1. <u>Unauthorized Use of Debit Cards</u>. The Commission's recommendation regarding unauthorized uses of debit cards effectively exculpates depository institutions from liability for theft and other unauthorized uses and places this burden entirely upon the consumer. This recommendation would hold the consumer liable, upon a showing that he was negligent, for all losses occurring from unauthorized use of his debit card up to the total amount of funds he has on deposit with the institution plus $50.00 on any credit service activated by the debit card. The Commission's recommendation is at substantial variance with the existing statutory protection of consumers for unauthorized use of credit cards, which limits a consumer's liability to a maximum of $50.00.

When the "unauthorized use" is a theft, the thief will rarely be found to testify as to whether and how the consumer acted negligently. An EFT security system, such as requiring a Personal Identification Number (PIN) to activate the account, although not absolutely safe, will make it difficult for a consumer to defend against evidence produced by the depository institution showing that the consumer was negligent.

298


Digitized by Google

The Commission's recommendation also varies substantially from the fundamental legal duty of a depository institution, as the fiduciary holder of the funds of others, to keep safe those funds. The recommended rule of negligence permits a depository institution to escape its duty and to place the liability for loss upon the depositor. The depository institution, as the provider of the EFT system which permitted the consumer funds to be stolen, should shoulder the burden of the loss as a cost of maintaining the system.

Depository institutions apparently seek to shift their liability because potentially large sums could be lost through unauthorized use. The potential size of the loss, however, is a major reason for placing the burden with the depository institution, which is more able than the consumer to bear the loss or, as appropriate, to obtain insurance to spread the risk.

Only the depository institution, and not the consumer, is in the position to devise the security system that protects against unauthorized uses. The proposed rule does not give a depository institution the needed incentive to devise an adequate security system.

The Commission's recommendation is particularly severe in that the proposed rule would also place on the consumer the burden of resolving the dispute. When a consumer alleges that a charge to his <u>credit</u> account was not authorized, the credit grantor stands the inconvenience during the period of the investigation and dispute because the consumer may decline to pay his credit bill until the dispute is resolved. By contrast, a consumer whose <u>depository</u> account is

debited without his authorization is deprived of the funds during the period of the investigation and dispute. The consumer not only must survive without the use of his funds, but also must bear the burden of instituting suit if the depository institution denies error. This can be far more than a mere inconvenience for the less-affluent consumer.

The language chosen by the Commission in this recommendation does not limit the consumer's liability to the loss of only those funds in the account which is activated by the debit card, but rather the language would hold a consumer liable for all the funds which he has on deposit with the institution in any account.

*We therefore recommend that Congress limit the liability of a debit card holder for an unauthorized use of his account through a lost or stolen card to a maximum of $50.00, following the general legislative pattern established for credit cards.*

2. <u>Error Resolution</u>. The Commission's recommendations regarding error resolution do not establish sufficient liability or sanctions against a depository institution which would spur the depository institution to make a speedy investigation of a consumer's allegation of unauthorized uses or error and to make early restoration of the consumer's lost funds.

The Commission's recommendations would not require a depository institution to pay interest on funds improperly deducted or take any compensatory action if the consumer fails to report an error in his account within 60 days after receipt of the periodic account statement reflecting the error. The



Commission's recommendations do not require a depository institution to pay interest on funds improperly deducted from the consumer's account if the institution restores the funds within 45 days after it receives notice, which could be a period as long as 105 days after the loss. This proposed rule provides a depository institution with an effective incentive to delay its investigation and resolution of an error for the full 45-day investigation period.

*We therefore recommend that Congress enact legislation to provide a depository institution with an economic incentive to act promptly to credit customer accounts for errors and unauthorized uses of the account, including requiring that depository institutions compensate a debit card holder for his actual damages and consequential damages.*

   3.   <u>Unsolicited Debit Cards</u>. The Commission's recommendation regarding unsolicited debit cards throws open the door to widespread distribution of unsolicited debit cards and even debit-and-credit cards. The recommendation permits a depository institution to mail unsolicited to its depositors a debit card and contract for the service; upon the consumer's return of the signed contract, the depository institution may forward to the consumer the PIN or other security device to activate the account. The Commission also recommends that on receipt of the consumer's signed consent, a credit feature may be added to the debit card. It may be assumed that the contract for debit services that is included in the initial mailing of the debit card will also include a clause establishing a credit line, or if necessary, an application for a credit line.

Late in the 1960's, many banks mailed a flood of credit cards to a wide spectrum of the citizenry in a pell mell rush to gain a share of the consumer credit market. The effort was a fiasco. Cards were lost in the mail; unauthorized credit charges were made, and disputes and litigation followed; a substantial portion of the credit charges were written off as bad debt. Although consumers were familiar with credit cards from other issuers, they resented this unsolicited intrusion. They were fearful that they would be dunned for a liability not of their making or be forced into court to deny credit charges they did not make. The effort served the interest of neither the banks nor the consumers. In 1970, Congress mercifully enacted a ban on the distribution of unsolicited credit cards (15 U.S.C. 1642).

Moreover, the present system for distributing cards to consumers is adequate and working. Card issuers may telephone consumers to ask whether they want a card. Card issuers may mail applications and promotional materials to consumers to induce them to apply for a card. Even to promote an infant industry like EFT, mailing of unsolicited debit cards to consumers is not necessary.

The Commission lacks a sense of history in advocating that depository institutions be permitted to repeat the recent intrusion on the consumer's interest by unsolicited cards.

The Commission's recommendation states that the consumer is not liable for uses of the debit card until the contract is signed. This protection, however, is illusionary. A debit card may be used readily prior to the consumer's signing a contract by presenting the card to an unsuspecting retailer



or other payee who is not connected on-line with the depository institution and who processes debit items in batch like credit items.  A debit card authorization service which is based on a negative list of bad accounts is not likely to include a list of cards mailed out but not activated and would not prevent use of this card.  Furthermore, mailing of a debit card and a contract does not ensure that the materials will reach the depositor; and the person who intercepts the debit card and contract may well be able to forge a signature on the contract and then intercept the PIN to use the debit card.  The account holder would not be aware that his account has been converted to EFT and be able to prevent the losses, until after his deposit is stolen.

This recommendation along with the Commission's recommendation regarding consumer liability for unauthorized uses of debit card work in tandem to ensure that some consumers will be deprived of their funds on deposit and be forced to plead for the restoration of their missing funds.

*We therefore recommend that Congress enact legislation prohibiting the issuing of unsolicited debit cards in the same manner that the issuing of `unsolicited credit cards is prohibited.*

#### Attachment and Setoff

4.  The Commission's recommendation regarding attachment urges Congress to establish limits on the amount of a consumer's depository account which may be seized in payment of a debt by legal process, such as attachment.  The premise of this recommendation is that most consumers require a minimum amount of funds between paydays to maintain themselves and their families.

By a vote of 22 to 2, however, the Commission rejected an additional proposal to place the same limitation on the right of setoff, which is a privilege peculiar to depository institutions.  The consumer has a greater need for protection as to setoff because this procedure permits a depository institution to seize the depositor's funds informally by contract right, without supervision of a court.  The consumer need for maintenance funds is not less when a depository institution is the entity that deprives him of his funds on deposit.

*We therefore recommend that Congress extend those limits that it may establish as to attachment or seizure by legal process of an EFT-activated account to apply equally to the right of setoff exerciseable by a depository institution and to any other means of seizing the funds of a consumer in such an account.*

#### Float

5.  The Commission's recommendation regarding float fails to find an effective substitute for float.

Consumers consider float to be an important benefit of the present check system.  At times, many consumers find that they have only a few dollars in their deposit account and need to buy groceries or other necessities for the family for the weekend or other short period of time until the paycheck arrives.


Digitized by Google

An effective solution may be formed by requiring depository institutions to grant each consumer a minimum amount of overdraft, such as $100.00, for every EFT-activated account. Such a small sum does not present a significant exposure for a depository institution. Charging interest will tend to discourage overuse. As a protection of the depository institution to minimize its exposure and as a protection of the consumer to reduce the interest due, the depository institution should be required to apply to the overdraft the subsequent funds deposited to the consumer's account until the overdraft is repaid.

*We therefore recommend that the Congress enact legislation requiring that every EFT-activated account include a provision for a $100.00 overdraft accommodation for which interest may be charged and that will be repaid by the subsequent funds deposited to the account.*

## Additional Overdraft Protections

6. The Commission also rejected additional protections of the consumer's rights regarding overdraft. By a vote of 17 to 2, the Commission rejected a proposal that, to the extent feasible in an online system, an EFT terminal should disclose to the consumer when use of a debit card triggers an overdraft. Payment by overdraft is likely to be more expensive to a consumer than payment by debiting a deposit. Yet the Commission rejected the concept that the consumer has a need and a right to know about this often involuntary triggering of overdraft and a right to control his finances.

The Commission's rejection of this point was based in large part on the assertion that it would be technically difficult or expensive. We believe that the same telecommunications system and computer programming that enables an on-line point-of-sale (POS) or automated teller machine (ATM) terminal to obtain approval for a direct debit can also respond as to whether the debit activated an overdraft credit line.

Further, the Commission rejected by a vote of 15 to 5 with 4 abstentions a proposal that depository institutions be required to provide a consumer with notice that an overdraft was triggered within three days after its occurrence and that overdrafts be limited to increments of $25.00. The right to know about overdrafts is a fundamental protection for consumers in controlling their finances and also an effective security check against unauthorized uses. This proposal also would have protected consumers by not requiring them to borrow an amount significantly greater than their needs.

*We recommend therefore that Congress enact legislation that requires that depository institutions, to the extent feasible with available technology, notify consumers at the time of the transaction when a transaction is paid by an overdraft accommodation or, in lieu thereof, provide a debit account holder with a written notice of use of an overdraft accommodation within three business days after such use.*

*We further recommend that Congress enact legislation that requires that an overdraft accommodation or any other line of credit which is activated to deposit funds in a consumer's account be exercised in increments not larger than $25.00.*



## Freedom of Choice

7.  The Commission's recommendation regarding consumer choice of payment systems stated that "freedom of choice among available payment instruments should be preserved" but *failed to insure that the consumer will have an effective right to choose between payment methods available at the point of sale.*

The Commission recommended only that the type of payment service triggered by a multipurpose card at the point of sale should be confidential between the consumer and his depository institution unless the choice affects the merchant or payee as to his costs or obligations.  This recommendation fails to provide choice at the time of a purchase transaction to the consumer, or payor, where his costs or obligations vary between type of payment service.

The consumer interest requires that the consumer be able to choose among the payment methods that can be activated by his EFT-based multipurpose card to select the one he wants to tender to pay for purchases at the point of sale.  By a vote of 15 to 8, the Commission rejected a proposal which would have guaranteed this right.

A multipurpose EFT card is frequently programmed for qualified consumers to offer a variety of payment or transaction services, such as (a) direct debit of funds on deposit; (b) direct debit plus overdraft ("overdraft" is defined as a check or EFT transaction drawn against a demand deposit in excess of the amount in the customer's account, which the bank honors.  Such overdraft is technically a loan usually subject to a service fee and/or interest, and which is "covered" or repaid by the first

deposit made by the customers to his demand account); (c) direct debit, plus overdraft, plus a revolving credit line activated by a deficit or the level of funds in a deposit account; or (d) the services of (c) above plus other alternative credit facilities that may be separate from the activity of the deposit account.  The Commission's position, however, effectively allows depository institutions to limit these options by contract with the consumer by requiring the consumer to elect at the time of contract which options he may use and in what order or priority.

Many consumers prefer at times to pay for purchases immediately by a withdrawal from their demand account and at other times to defer payment, depending on the size of purchase and the season of the year.  It will be to the consumer's advantage if he is able to compare the costs of credit services available to him through his debit card with those offered by the retailer or other credit grantors.  Competition between these various credit grantors for the consumer business will reduce credit charges or improve terms to the customer.  The Commission's recommendation effectively deprives the consumer of this flexibility and control over his financial affairs.

The ability of the consumer to choose, for example, whether he wishes a cash advance to be withdrawn from his demand deposit funds or charged to his credit line is currently provided in most ATMs.  The same flexibility should be provided to the consumer making a purchase through a POS terminal.

Economic incentives may prompt depository institutions to limit effectively the multipurpose card to

303



the credit service.  Requiring the consumer to use
the credit service retains the deposit balance in
the consumer's account that would have otherwise
been depleted and also generates interest revenues
for the depository institution.

*We recommend therefore that Congress enact leg-
islation which guarantees consumers the right to
choose at the time of the transaction among the var-
ious payment methods which can be activated by an
EFT-based multipurpose card.*

*Gordon R. Worley*
*Executive Vice President*
*Montgomery Ward & Co., Inc.*
*Representing Retailers*

Digitized by Google

STATEMENT OF WILLIAM B. WIDNALL

In offering some concluding remarks I hope to place the work of the National Commission on Electronic Fund Transfers and the individual comments of its members in a larger and proper perspective.

During my many years on Capitol Hill, we often were reminded of the saying that "all progress involves change, but not all change is progress." I sincerely believe that the deliberations of this Commission during the past 21 months led to recommendations that involve progressive change.

It has been an arduous task. EFT is a difficult, elusive, still-evolving technology. The issues are complex and the proposed solutions untested. The Commission sought to meet the problems and to deal with the issues on a forthright and open basis. As a long-time committee member, I never expected unanimity from 26 individuals on any point; that we achieved it as often as we did is something of a surprise. Neither did any of us ever expect everyone to agree with our recommendations.

In the preceding pages of this section, several Commissioners have availed themselves of the opportunity to present their own views on and analyses of the Commission's work. This is entirely appropriate. It also is understandable that there would be strong differences of opinion, given the wide variety in experience and backgrounds of our members.

For almost two years, we members were engulfed in information and opinions by a highly competent professional staff, by witnesses and consultants, by researchers, by representatives of various interests, and by the general public, which did not hesitate to write or otherwise make known their views. This was an intense learning experience, and it changed the thinking of many--perhaps all--members on a number of issues.

For example, I learned much about public concern about possible violations of personal privacy. I gained the impression that the majority of the people do not believe that privacy has been observed at all times. I also learned that many people have only a sketchy knowledge of computer fraud, although they worry about it. Some people believe that EFT provides a tempting morsel, and that its vulnerability to crime has yet to be fully exploited by the criminal.

305



I also came to believe that the majority of people in this Nation inherently want to control their own destinies. That belief, as much as any other value, led to my support of the Commission's position to depend, first and foremost, on the natural processes of consumer choice and private enterprise to build a framework for EFT.

I believe that the Commission recognized these concerns and that its recommendations respond accordingly. I think that the Commission's report also meets the public interest in other ways. For example, I have seen no evidence during the past two years to indicate that the Commission's recommendations will cause EFT to develop too rapidly. In fact, this Commission has bent over backward to encourage evolution and not revolution. If we erred, it is probably in that we did not go far enough in loosening the restrictions on the development of new products and services. I regard the dissenting views of my fellow Commissioners on this matter of pace as extremely good food for thought. If their remarks stimulate healthy controversy, so much the better.

In addition, I do not believe that there was a single action by the Commission motivated solely by the desire to protect some vested interest. In fact, I believe that all of the interests represented on this Commission gave very serious consideration to what is best for American society. By the end of the Commission, everyone on it, for example, was sensitive to the problem of State's rights. There was no argument among the Commissioners that these rights must be zealously protected. I did feel that, in some cases, those in pursuit of States' rights wanted it all, and in a way that could eliminate any progress at all.

In the main, the additional views of our Commissioners contribute significantly to the process of developing national policy on EFT. I would like to take this opportunity to reflect on some of these opinions and place them within the context of the Commission's final report.

I think, for example, that the statement addressing credit availability provides additional insights into the current concerns of retailing. It is fitting that these remarks be heard. In my judgment, however, the Commission's policy recommendations in this area go as far as they should in recognizing some of the changes that EFT may cause in the market share for retail credit. I believe that further attempts to regulate these changes would interfere with the consumer's right to manage his financial affairs privately, and to choose freely among the alternative programs for revolving and installment credit. In my judgment, Congress should monitor the allocation of credit to assure that changes in how credit is offered do not result in substantial reductions in the supply of credit, at nondiscriminatory prices, for any single group of people. I believe that the depository institutions, which depend so completely on the cooperation of general merchandisers, supermarkets, and small retail outlets, should listen carefully to the concerns of retailers.

Several dissenters comment on how they think the Commission's final recommendations will affect consumers. Mr. Foer and Professor Leary should be acknowledged in this area. I believe they have done a tremendous job in elevating the awareness and consciousness of our Commission. Consumer issues are central in this report, but we did not always agree on recommendations. For example, some dissenters



argue that the Commission was incorrect to apply the
check model to the recommendations on the unauthorized
access to or use of an EFT account. These Commission-
ers prefer the $50 limit of protection that is used
today to guard against unauthorized use of credit
cards. It is important to know that all members of
the Commission began from the same point, which was
a sincere concern to construct the best procedures to
protect the American consumer. If the check model
approach that we recommend is not the best for the
American consumer, it should be rejected in favor of
a different approach. The Commission's analysis of
the costs and benefits of rival approaches, however,
led consistently to the conclusion we are recommend-
ing in this report.

On another consumer issue, the Commission favors
unsolicited distribution of debit cards to an insti-
tution's own customer base, provided the card remains
invalid until the consumer takes steps to sign the
contract. In the Commission view, this expands con-
sumer choice. It is a fundamentally different ap-
proach from that taken with bank credit cards, which
are valid when mailed out to the unsuspecting con-
sumer and, if used, can immediately incur liability.
But, like the other recommendations, this one should
be reviewed for its usefulness and workability.

I am delighted that some of the dissenting
statements emphasize the importance of guarding
against the use of EFT systems for the surveillance
of our citizens. I look to agencies such as the Fed-
eral Trade Commission to act as a watchdog over these
systems. I do not believe, however, that this Com-
mission should recommend constraints on every theo-
retically possible abuse of this technology. I do
believe that developments of electronic funds trans-
fer should be monitored for years to come.

I believe that the matter of computer security
requires continual monitoring and evaluating. Some
members think that the Commission did not go far
enough in recommending the regulatory apparatus for
conducting such evaluations. To promote regulatory
steps today in the area of computer security could be
both ineffective and inefficient. I find it diffi-
cult to recommend such steps when we do not know ex-
actly what the problems are. It is one thing to
study computer security and to attempt to conjecture
about the future. It is another thing altogether,
however, to be recommending, at this stage, explicit
regulatory action.

Finally, as to other consumer concerns, not only
do I agree with the dissenters that consumers should
look very carefully at EFT, but I also believe that
consumers would be well advised to look at all new
products and services with a skeptical eye. I have
always felt that the more discriminating the American
consumer, the more responsive will be American com-
merce, and the more cost-effective will be our eco-
nomic system. I might add that consumer skepticism
is not so effective when Government fixes the shape
of new products and services at a time before the con-
sumer has had an opportunity to express his or her
wants and desires.

Some dissenters take issue with the Commission's
final recommendations in the area of sharing. Most
Commissioners would probably acknowledge that they
have not discovered the perfect remedy. The Commis-
sion hoped that it might be able to find a mechanism
more suitable for resolving these kinds of disputes



than classical antitrust enforcement, both to spare
our judicial system the task of having to deal with
these kinds of problems and also perhaps to serve the
more special needs of EFT participants for expeditious
handling of sharing disputes.  As Professor Leary so
aptly pointed out during our last Commission meeting,
we tried as hard as we could to find a better solution
and we failed.  In a sense, the Commission's recom-
mendations in this area are a second-best solution.
I also think, however, that it is the only solution
currently available that provides the proper balance
between the needs of EFT participants and the way our
Government is structured.  In my judgment the dis-
senters have never been able to offer an effective or
balanced alternative solution.  They have taken the
opportunity to offer several choices to the Commis-
sion.  I must say that it is far easier to criticize
an imperfect plan than to suggest a better one.  All
the alternatives that I examined were flawed more
seriously than the one the Commission recommended.
For these reasons, the Commission recommendation
still appears to be the best one available.

Some dissenting Commissioners argue that the
recommendations of the Commission will lead to
precipitous changes in the structure of the Nation's
financial system.  I am not insensitive to the deeply
felt concerns of these Commission members, and, with
the other members of the Commission, I have struggled
hard over and carefully weighed this issue.  But I
just cannot see how the change contemplated in the
recommendations of this Commission could be more
gradual and still permit the technology an opportunity
to grow.  The burden of proof in our society must be
placed upon those who wish to retard progress, whether
it involves technological or social change.  We found
no evidence that the Commission's recommendations

would lead to changes that would undermine the
economy.  We sought such evidence; none was produced.

Most of the facts pointed toward the gradual
evolution of EFT.  Although the technology has been
generally available throughout the United States for
at least 10 years, its penetration of our financial
sectors is still so modest that very little data
could be found about its consequences.  Some of the
dissenters allude to this fact in speculating about
future outcomes.  The Commission's cost analysis pro-
gram pointed to the fact that electronic funds trans-
fer systems are very expensive to build and are likely
to remain so for years to come.  Our credit avail-
ability investigations indicated a very high level of
concern within the retail community about EFT develop-
ment.  These concerns will not be easily overcome, and
may further slow down developments of EFT.  The four
chapters in this report that discuss consumer con-
cerns indicate further reasons why development of
electronic funds transfer will be gradual.  EFT simply
will not develop until it has answered these concerns
convincingly.

All of this adds up to an environment that will
not accommodate a hasty development of EFT.  I have
been unable to find any basis in fact for the fears
mentioned by those dissenters who see the recommenda-
tions of this Commission as producing revolutionary
changes.

Some dissenters seem to take the position that
technology, innovation, and new products should be
designed to fit into historical regulatory structures.
Is it not wiser to permit the development of tech-
nology, while asking appropriate public interest ques-
tions, and then to construct a regulatory apparatus to



correct the imperfections of normal market develop-
ments?  The dissenters, like most of us--certainly I
have been prone to take this position--claim to speak
for the consumer.  In my opinion, the consumer should
probably speak for himself, and I support regulatory
structures that attempt to increase the opportunities
that I, as a consumer, have for self-expression.

I suppose that every study group could do more
work and could justify a longer time for its in-
vestigations than the pressure of events often per-
mits.  In my opinion, this final report is not the
end of EFT research.  It is the beginning.  Future
research efforts now can be designed more effectively.
I think, for example, that Professor Leary's dis-
senting comments provide some interesting ideas for
future research.

The dissenting statements about a lack of re-
search must be evaluated in a proper light.  To my
knowledge, there is not a significant report or study
produced by an acknowledged (or unacknowledged) ex-
pert on EFT that went unconsidered by this Commission.
At the same time, the Commission helped produce the
most exhaustive data base anywhere on the cost of
EFT systems and on the availability of EFT systems.
More than 400 individuals received a personal request
to discuss competitive impacts, resulting in direct
opinions on their views.  Much more could be said
about the steps the Commission took to collect or
create data about EFT developments.

But I think that all of these concerns about
inadequate research reduce to this:  most of the
truly important questions addressed by the Commission
dealt with future impacts, human wants, and

philosophical perspectives.  Consumer needs, the role
of regulatory policy, States' rights, free enterprise,
the secondary effects of technological change--all of
these issues revealed choices that depend fundamentally
on subjective evaluation.  Each Commissioner brought
different values to the conference table; each was ex-
posed to the same dialogue, to the same staff research,
and to the same external arguments.  Finally, after
21 months, each exercised his choice on possible
outcomes.

I am most amazed that there was such overwhelming
agreement on so many issues.  I am just as pleased
that sharp divisions occurred on a number of others.
This further demonstrates the complexity of the sub-
ject.  It further shows that the Commissioners were
working extremely hard.

In my judgment, each and every part of this final
report serves the American public in expanding the
reach and accuracy of the dialogue about EFT.  All of
us, on and off the Commission, can take advantage of
these two years of effort; we can talk more intelli-
gently and less emotionally about EFT.  It should be
possible, with the completion of the Commission's
final report, to end careless rhetoric about EFT and
begin mature and informed thinking and decisionmaking.
I hope that we seize this opportunity.

I am proud of the members of the Commission and
wish to thank each of them for his or her contribu-
tion.  Herb Wegner was particularly helpful in his
capacity as Vice Chairman.  The chairmen of the pro-
gram committees deserve special mention for taking on
that second task.



I also would like to thank the Commission staff, many of whom gave of their time and talent in a way that I have seldom seen in similar activities.  I want especially to thank the Executive Director, John B. Benton, for his efforts.  On behalf of the Commission, I want to thank all other persons who assisted us in our endeavor.


*William B. Widnall*
*Chairman*
*National Commission on Electronic Fund Transfers*
*Public Representative*


**STATEMENT OF CONCURRENCE**

As Vice Chairman of the Steering Committee, I am pleased to join our distinguished Chairman in this Statement.


*Herb Wegner*
*Vice Chairman, Steering Committee*
*National Commission on Electronic Fund Transfers*
*President*
*Credit Union National Association, Inc.*
*Representing Credit Unions*



Digitized by Google

# Appendices







Appendix A

# Act Establishing the NCEFT

Public Law 93-495
93rd Congress, H.R. 11221
October 28, 1974

AN ACT

To increase deposit insurance from $20,000 to $40,000, to provide full insurance for public unit deposits of $100,000 per account, to establish a National Commission on Electronic Fund Transfers, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

* * * * *

TITLE II--NATIONAL COMMISSION ON ELECTRONIC FUND TRANSFERS[1]

### Establishment

Sec. 201.  There is established the National Commission on Electronic Fund Transfers (hereinafter referred to as the "Commission") which shall be an

independent instrumentality of the United States.

### Membership

Sec. 202. (a) The Commission shall be composed of twenty-six members as follows:

(1) the Chairman of the Board of Governors of the Federal Reserve System or his delegate;

(2) the Attorney General or his delegate;

(3) the Comptroller of the Currency or his delegate;

(4) the Chairman of the Federal Home Loan Bank Board or his delegate;

(5) the Administrator of the National Credit Union Administration or his delegate;

(6) the Chairman of the Board of Directors of the Federal Deposit Insurance Corporation or his delegate;

(7) the Chairman of the Federal Communications Commission or his delegate;

_____

[1]Title II of the Act of Oct. 28, 1974, Pub. L. 93-495, 88 Stat. 1500, 12 U.S.C. Section 2401 (Supp. IV) et seq., as amended by Title II of the Act of Dec. 31, 1975, Pub. L. 94-200, 89 Stat. 1124.

Digitized by Google 

(8) the Postmaster General or his delegate;

(9) the Secretary of the Treasury or his delegate;

(10) the Chairman of the Federal Trade Commission or his delegate;

(11) two individuals, appointed by the President, one of whom is an official of a State agency which regulates banking, or similar financial institutions, and one of whom is an official of a State agency which regulates thrift or similar financial institutions;

(12) seven individuals, appointed by the President, who are officers or employees of, or who otherwise represent banking, thrift, or other business entities, including one representative each of commercial banks, mutual savings banks, savings and loan associations, credit unions, retailers, nonbanking institutions offering credit card services, and organizations providing interchange services for credit cards issued by banks;

(13) five individuals, appointed by the President, from private life who are not affiliated with, do not represent and have no substantial interest in any banking, thrift, or other financial institution, including but not limited to credit unions, retailers, and insurance companies;

(14) the Comptroller General of the United States or his delegate; and

(15) the Director of the Office of Technology Assessment.

(b) The Chairperson shall be designated by the President at the time of his appointment from among the members of the Commission and such selection shall be by and with the advice and consent of the Senate unless the appointee holds an office to which he was appointed by and with the advice and consent of the Senate.

(c) A vacancy in the Commission shall be filled in the manner in which the original appointment was made.

Functions

Sec. 203. (a) The Commission shall conduct a thorough study and investigation and recommend appropriate administrative action and legislation necessary in connection with the possible development of public or private electronic fund transfer systems, taking into account, among other things—

(1) the need to preserve competition among the financial institutions and other business enterprises using such a system;

(2) the need to promote competition among financial institutions and to assure Government regulation and involvement or participation in a system competitive with the private sector be kept to a minimum;

(3) the need to prevent unfair or discriminatory practices by any financial institution or business enterprise using or desiring to use such a system;

(4) the need to afford maximum user and consumer convenience;

(5) the need to afford maximum user and consumer rights to privacy and confidentiality;

(6) the impact of such a system on economic and monetary policy;

(7) the implications of such a system on the availability of credit;

(8) the implications of such a system expanding internationally and into other forms of electronic communications; and

(9) the need to protect the legal rights of users and consumers.

(b) The Commission shall make an interim report



within one year of the date of the confirmation by the
Senate of the Chairperson or the appointment by the
President of an acting Chairperson and at such other
times as it deems advisable and shall transmit to the
President and to the Congress not later than two years
after the date of the confirmation by the Senate of
the Chairperson or the appointment by the President of
an acting Chairperson a final report of its findings
and recommendations.  Any such report shall include
all hearing transcripts, staff studies, and other ma-
terial used in preparation of the report.  The in-
terim and final reports shall be made available to the
public upon transmittal.  Sixty days after transmis-
sion of its final report the Commission shall cease
to exist.

(c) The Commission shall not be required to obtain
the clearance of any Federal agency prior to the
transmittal of any interim or final report.

Powers of Commission

Sec. 204. (a) The Commission may for the purpose of
carrying out this Act hold such hearings, sit and act
at such times and places, take such testimony, and
receive such evidence, as the Commission may deem ad-
visable.  The Commission may administer oaths of af-
firmations to witnesses appearing before it.

(b) When so authorized by the Commission, any mem-
ber or agent of the Commission may take any action
which the Commission is authorized to take by this
section.

(c) The Commission may secure directly from any de-
partment or agency of the United States information
necessary to enable it to carry out this Act.  Upon
request of the Chairperson of the Commission, the
head of such department or agency shall furnish such
information to the Commission.

(d)(1) The Commission shall have power to issue
subpenas requiring the attendance and testimony of
witnesses and the production of any evidence that
relates to any matter under investigation by the
Commission.  Such attendance of witnesses and the
production of such evidence may be required from
any place within the United States at any desig-
nated place of hearing within the United States.

(2) If a person issued a subpena under para-
graph (1) refuses to obey such subpena or is
guilty of contumacy, any court of the United
States within the judicial district within which
the hearing is conducted or within the judicial
district within which such person is found or re-
sides or transacts business may (upon application
by the Commission) order such person to appear
before the Commission to produce evidence or to
give testimony touching the matter under investi-
gation.  Any failure to obey such order of the
court may be punished by such court as a contempt
thereof.

(3) The subpenas of the Commission shall be
served in the manner provided for subpenas issued
by a United States district court under the Fed-
eral Rules of Civil Procedure for the United
States district courts.

(4) All process of any court to which applica-
tion may be made under this section may be served
in the judicial district wherein the person re-
quired to be served resides or may be found.

Administration

Sec. 205. (a) The Commission--
(1) may appoint with the advice and consent of
the Senate and fix the compensation of an Execu-
tive Director, and such additional staff personnel

315

Digitized by Google 

as he deems necessary, without regard to the pro-
visions of title 5, United States Code, governing
appointments in the competitive service, and with-
out regard to chapter 51 and subchapter III of
chapter 53 of such title relating to classifica-
tion and General Schedule pay rates, but at rates
not in excess of the maximum rate for GS-18 of the
General Schedule under section 5332 of such
title; and

(2) may procure temporary and intermittent
services to the same extent as is authorized by
section 3109 of title 5, United States Code, but
at rates not to exceed $150 a day for individuals.

(b) The Comptroller General is authorized to make
detailed audits of the books and records of the Com-
mission, and shall report the results of any such
audit to the Commission and to the Congress.

## Compensation

Sec. 206. (a) A member of the Commission who is an
officer or employee of the United States shall serve
as a member of the Commission without additional com-
pensation, but shall be entitled to reimbursement for
travel, subsistence, and other necessary expenses in-
curred in the performance of his duties as a member of
the Commission.

(b) A member of the Commission who is not otherwise
an officer or employee of the United States shall be
compensated at a rate of $150 per day when engaged in
the performance of his duties as a member of the Com-
mission, and shall also be reimbursed for travel, sub-
sistence, and other necessary expenses incurred in the
performance of his duties as a member of the
Commission.

## Assistance of Government Agencies

Sec. 207. (a) Each department, agency, and instru-
mentality of the executive branch of the Government,
including independent agencies, is authorized and di-
rected to furnish to the Commission, upon request,
such data, reports, and other information as the Com-
mission deems necessary to carry out its functions
under this title.

(b) The head of any department, agency, or instru-
mentality of the United States may detail such person-
nel and may furnish such services, with or without
reimbursement, as the Commission may request to assist
it in carrying out its functions.

## Authorization of Appropriations

Sec. 208.  There are authorized to be appropriated
without fiscal year limitations such sums, not to ex-
ceed $2,000,000, as may be necessary to carry out the
provisions of this title.

316


Digitized by Google



Appendix B

# Votes on Certain Issues

This appendix contains a tabulation of those issues on which there were dissenting or abstaining votes that the Commissioners wished to have recorded by name.

The vote count, in the text and in this appendix, is as recorded at the Commission meeting at which the issue was finally decided, with the subsequent addition of the votes of one commissioner, who was ill at the time of the final meeting.

After the final vote was taken, each Commissioner was given the opportunity to have his name recorded as dissenting or abstaining on any recommendation. Several Commissioners wished to do so. Because virtually all of the votes were taken by show of hands, rather than by roll call, the vote tally shown under each recommendation, which reflects the vote as originally taken, may not correspond to the number of names listed under the negative or abstaining column.

In addition, Daniel De Simone, Acting Director of the Office of Technology Assessment, asked to abstain from the recommendations and views of the Commission because he had only recently been named Acting Director of OTA and had not had the opportunity to review and analyze the Commission's report. Commissioner De Simone agreed to this blanket statement of abstention, rather than having his name set out following each recommendation.

## Chapter 1. Privacy

Therefore, the Commission recommends that Federal legislation should be enacted to provide that an individual has a property interest sufficient to establish standing in the information maintained by a financial institution concerning the individual, and that Government authorities may obtain information concerning an individual's depository account from a depository institution or EFT system operator without the individual's consent, only through judicial subpoena or court order, or through administrative summons. The administrative commons should issue only where:

- Explicit legislative authority for the issuance of the summons exists; and

Digitized by 

- The information sought is relevant to and is sought in conjunction with a proper investigation or for carrying out a statutory responsibility, or is essential to the protection of the health or safety of the individual or others; and

- The information is not readily available from other sources.

(Unanimous voice vote in favor with one abstention.)

Abstaining:  T. Greaney (for K. Anderson)

The Commission also recommends that the individual whose account information is being sought through judicial subpoena, court order, or administrative summons should be served with the subpoena, court order, or summons before the institution must respond thereto unless a court finds and so specifies in its order that notice should not be given, in which case Government should, within a reasonable time after issuance of a summons, subpoena, or court order without notice, notify the individual whose account information has been obtained.  The court should specify that notice not be given only if the court finds that such notification is reasonably likely to result in any of the following:

- The destruction of relevant evidence.

- Flight by the individual served to avoid prosecution.

- Physical harm to another individual.

- Other serious compromise of law enforcement effectiveness.

(Unanimous voice vote in favor with one abstention.)

Abstaining:  T. Greaney (for K. Anderson)

The Commission further recommends that when an individual is served with the subpoena, court order, or summons, he should have a reasonable period of time in which to respond, and have standing to contest the disclosure of the information by the institution holding it.

(Unanimous voice vote with one abstention.)

Abstaining:  T. Greaney (for K. Anderson)

Further, the Commission recommends that information necessary to verify the existence or good standing of an account may be disclosed to a third party stating a legitimate business need, including a credit bureau and services that authorize or guarantee a transaction.

| Affirmative | Negative | Abstaining - 4 |
|---|---|---|
| 21 | 0 | A. Foer |

The Commission recommends that information regarding the credit portion of an EFT account (that is, the portion of the account involving an extension of credit by the EFT institution to the individual) including balance, unused portion of a



line of credit, and repayment may be disclosed to a credit grantor, credit bureau, credit authorization service, check authorization service, check guarantee service, or EFT institution.

| Affirmative | Negative – 1 | Abstaining |
|---|---|---|
| 17 | A. Foer | 4 |

Therefore, the Commission recommends that information regarding the improper use of the account, including delinquency, default, fraud or attempted fraud, and closure of an account for misuse may be disclosed to other participants in an EFT system, an institution to which an applicant has applied to open a new EFT account, a credit grantor, or credit bureau.

| Affirmative | Negative – 1 | Abstaining |
|---|---|---|
| 19 | A. Foer | 1 |

Therefore, the Commission recommends that the residential or occupational address of the individual may be disclosed to a credit grantor for the purpose of collecting a debt.

| Affirmative | Negative – 9 | Abstaining |
|---|---|---|
| 13 | L. Connell<br>R. Thompson<br>(for G. Oram)<br>A. Foer | 2 |

Therefore, the Commission recommends that the address or name and address of an EFT account holder may be disclosed to a third party for the purpose of direct mail marketing or soliciting, provided that the individual has been provided a written notice that states that such disclosures may occur unless the individual expressly disallows such disclosures and provides a simple mechanism by which the consumer can expressly disallow such disclosures; and the individual has not exercised the option provided in above to disallow such disclosures.

| Affirmative | Negative – 8 | Abstaining |
|---|---|---|
| 16 | V. Atwater<br>L. Connell<br>A. Foer<br>F. Leary<br>G. Mitchell | 2 |

Upon receipt of express written consent from an individual EFT account holder, an EFT institution may disclose, to any third parties named or described by the individual, any information designated by the individual. No individual should be denied an EFT account as a result of a refusal to permit the release of information pursuant to this recommendation.

| Affirmative | Negative – 2 | Abstaining |
|---|---|---|
| 23 | A. Foer | 0 |



Prior to establishing an EFT relationship with an individual, an EFT institution should give the individual in writing a notice that a detailed statement of the institution's information practices, including the types of information generally disclosed and the types of recipients, is available on request.

| Affirmative | Negative – 5 | Abstaining |
|---|---|---|
| 16 | A. Foer | 2 |

Specifically, the Commission recommends that the Fair Credit Reporting Act should be amended to provide that organizations that provide check, debit, or credit authorization or guarantee services are subject to the provisions of the Act that apply to credit reporting agencies, except for the requirement that the organization notify prior recipients of information that is later disputed and found to be of questionable accuracy.

| Affirmative | Negative – 0 | Abstaining – 2 |
|---|---|---|
| 22 | F. Leary | G. Mitchell |

The Commission recommends that the Fair Credit Reporting Act should be amended to provide that institutions that decline to honor a check, debit, or credit presented by an individual in whole or in part because of a report by a check, debit, or credit authorization or guaranty service shall disclose to the individual the name and address or telephone number of such services and such disclosure may be made orally at the point of transaction or in writing at a location designated by the institution.

| Affirmative | Negative – 0 | Abstaining – 2 |
|---|---|---|
| 22 | A. Foer | G. Mitchell |
|  |  | F. Leary |

The Fair Credit Reporting Act should be amended to provide that an individual has the right to inspect, copy, and have interpreted to him in a reasonable form, records on him generated through his participation in an EFT system, subject to payment of a reasonable fee (in the absence of an adverse decision) and to reasonable time for compliance.

| Affirmative | Negative | Abstaining – 0 |
|---|---|---|
| 20 | 2 | G. Mitchell |

The Commission recommends that Federal Reserve operations meet privacy objectives in two ways: (1) the Federal Reserve should follow rules and procedures with respect to privacy that are at least as confidential as those of private-sector EFT system operators; and (2) access by other Government agencies to records of ACH transactions in the temporary possession of the Federal Reserve should be restricted by rules and procedures that are at least as restrictive as those for access to ACH records maintained by private-sector financial institutions.

320



| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 21 | F. Leary | 1 |

## Chapter 2.  Establishing and Operating an EFT Account

Therefore, the Commission recommends enactment of Federal legislation to ensure that to the extent that the merchant is unaffected as to cost or risk, the type of transaction that the customer's EFT card triggers at the point of sale should be confidential between the customer and his depository institution.

| Affirmative | Negative – 1 | Abstaining |
|---|---|---|
| 17 | G. Worley<br>A. Foer | 0 |

Therefore, the Commission recommends that Federal legislation should be enacted to provide that prior to or at the time of contracting for any EFT service, the provider of the service should supply the user with a written statement that informs him in clear and meaningful terms of his statutory and contractual rights and obligations with respect to procedures for error resolution, liability for unauthorized use of his account, procedures for redress, and any costs that he may incur for use of the system.  An EFT provider should disclose to the consumer any change in costs or other terms or conditions of use a reasonable time before the change becomes effective.  If the account offers more than one transaction feature (for example,

debiting plus one or more credit features) and a particular feature (such as an overdraft) may be triggered without an explicit direction from the account holder at the time of the transaction, the provider should also disclose the criteria used to determine which feature to employ in any particular transaction, and the costs or charges for each type of transaction.

| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 20 | A. Foer | 0 |

Therefore, the Commission recommends that Federal legislation should be enacted to provide that debit card issuers may distribute unsolicited debit cards without credit features only to their own depositors, provided that the PIN does not accompany the card and that each distribution is accompanied by a full disclosure of the recipient's rights and liabilities and a contract for the recipient to sign to indicate his acceptance of the card.  After the card issuer receives the cardholder's signed contract, it would be permitted to send its customer the PIN needed to access the account.  The card issuer would bear all liability for any loss due to unauthorized use prior to the date the contract is signed.

| Affirmative | Negative – 9 | Abstaining |
|---|---|---|
| 15 | G. Mitchell<br>G. Worley<br>A. Foer<br>G. Waters | 1 |



The Commission also recommends that unsolicited distribution of debit cards with overdraft or other credit features should not be permitted as long as unsolicited credit card distributions are prohibited.

| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 20 | G. Mitchell | 1 |

Accordingly, the Commission recommends that Federal legislation should be enacted to render it unlawful to convert an unsolicited debit card into a card with credit features unless the cardholder subsequently requests the conversion. A separate written contract should be required before the conversion could become effective.

| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 18 | G. Mitchell | 4 |

Specifically, the Commission recommends that Federal legislation be enacted to require that a printed or written receipt be provided to the user in conjunction with every EFT transaction that occurs at an electronic terminal, except that no receipt need be mandated for a cash withdrawal.

| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 18 | A. Foer | 2 |

Therefore, the Commission recommends that no legislation be passed at this time that specifies rights or procedures for stop payment or reversibility in customer-initiated EFT transactions.

| Affirmative | Negative – 8 | Abstaining |
|---|---|---|
| 16 | G. Mitchell<br>A. Foer<br>F. Leary | 0 |

Regarding pre-authorized EFT transactions, the Commission believes that consumers should be able to stop or reverse pre-authorized EFT debits. Evidence indicates that the marketplace currently enables consumers to do this. Therefore, no legislation is recommended at this time.

| Affirmative | Negative – 2 | Abstaining |
|---|---|---|
| 17 | A. Foer | 3 |

The Commission recommends, however, that the needs of the consumer regarding float should be handled, not by requiring any mandatory float or any automatic deferral, such as "value dating," but by offering provisions for deferred payment as a marketable and attractive service option upon which EFT accounts could be sold. The determination regarding the availability and characteristics of this service are best resolved by local market conditions.

| Affirmative | Negative – 0 | Abstaining |
|---|---|---|
| 22 | F. Leary | 1 |



## Chapter 3.  EFT Theft, Error, and System Malfunctions

To protect EFT account holders from incurring any liability when they have not been negligent and to protect the account holder from vague negligence standards, the Commission recommends that the following four provisions be enacted as Federal legislation:

1. An EFT account holder should have no liability for an unauthorized use of his account unless the depository institution can prove, without benefit of inference or presumption, that the account holder's negligence substantially contributed to the unauthorized use and that the depository institution exercised reasonable care to prevent the loss.  Negligence in this instance should be limited to writing the PIN on the card, keeping the PIN with the card, or voluntarily permitting the account accessing devices, such as the PIN and the card, to come into the possession of a person who makes or causes to be made an unauthorized use.

| Affirmative | Negative - 4 | Abstaining |
|---|---|---|
| 21 | G. Mitchell | 1 |
| | L. Connell | |
| | G. Worley | |
| | A. Foer | |

2. Failure to notify the depository institution of an unauthorized use within 30 days after the receipt of a descriptive statement containing an unauthorized use should render the customer liable for any subsequent unauthorized use that could have been prevented by timely notification.

| Affirmative | Negative - 3 | Abstaining |
|---|---|---|
| 19 | G. Mitchell | 2 |
| | L. Connell | |
| | G. Worley | |
| | A. Foer | |

4. The customer's liabilities under this set of recommendations should not be increased by contract.

| Affirmative | Negative | Abstaining - 0 |
|---|---|---|
| 23 | 0 | G. Mitchell |

The Commission's recommendations regarding unauthorized use of the EFT account are intended to apply only to theft of the cardholder's own funds.  Where a thief obtains goods, services, or funds through an overdraft or other credit feature of an EFT card, the Commission recommends that the $50 liability rule applicable to credit cards should continue to apply.

| Affirmative | Negative | Abstaining - 0 |
|---|---|---|
| 21 | 1 | G. Mitchell |

323



If the depositor brings any alleged error (including unauthorized use) to the attention of his depository institution within 60 days after receiving the descriptive statement on which the alleged error appears, the depository institution should, not later than 10 business days after receiving notice of such alleged error, either inform the depositor that the error has been corrected, or send a written response to the depositor, acknowledging receipt of the error allegation.

| Affirmative | Negative | Abstaining - 1 |
|---|---|---|
| 21 | 0 | A. Foer |

3. The depository institution, not later than 45 days after receipt of the original notice of an alleged error, should correct the error or explain to the depositor, in easily understandable language, the absence of error on the part of the depository institution and send the depositor such evidence as is available supporting the absence of such error.

| Affirmative | Negative - 3 | Abstaining |
|---|---|---|
| 18 | G. Mitchell<br>A. Foer<br>F. Leary | 4 |

4. If the transaction for which the depositor alleges error involves a party other than the depository institution, and the depository institution denies error on its part,

the institution, at the time it explains the absence of error on its part to the depositor, should also notify all relevant third parties of the alleged error and inform the depositor that they have been notified.

| Affirmative | Negative - 4 | Abstaining |
|---|---|---|
| 16 | A. Foer<br>F. Leary | 1 |

5. If the depository institution denies the alleged error or its responsibility for the error or unauthorized use, the customer should have the burden of initiating any further proceeding, such as a lawsuit, to establish his right to have his account credited or recredited. Once a lawsuit has been initiated by a depositor, the depository institution has the burden to prove that there was no error or unauthorized use for which it was responsible. If the customer establishes his right to a credit or recredit based on an unauthorized use of his account or an error for which the depository institution was responsible, the depository institution which had not corrected the error within the 45-day period should have to pay the depositor, for the time his money was not available to him, the highest rate of interest for a consumer loan at that institution, as well as all reasonable attorneys' fees and court costs incurred by the depositor in establishing his right to a credit or



recredit of his account.  Further, if the
depositor proves that the denial was not
made in good faith, the depositor should
recover any and all damages proximately
caused by the error or unauthorized use,
including consequential damages.

| Affirmative | Negative - 2 | Abstaining |
|---|---|---|
| 19 | G. Worley | 1 |
|  | A. Foer |  |
|  | F. Leary |  |

## Chapter 4.  Additional Consumer Needs

The Commission recommends that States be per-
mitted to adopt legislation providing for a larger
dollar amount exemption than the dollar amount pro-
vided by Congress.  Moreover, nothing in these
recommendations is intended to preclude an account
holder from claiming any other exemptions provided
by law.

| Affirmative | Negative - 4 | Abstaining |
|---|---|---|
| 18 | V. Atwater | 1 |

The Commission recognizes that failure to
understand the basic operations involved in finan-
cial transactions--and EFT transactions in particu-
lar--hampers consumers in making informed choices
among payment alternatives.  The Commission urges
EFT providers to educate the public in this regard.

| Affirmative | Negative - 6 | Abstaining |
|---|---|---|
| 17 | F. Leary | 0 |
|  | A. Phillips |  |

The Commission recommends that the Congress
should direct an appropriate existing Government
agency to study and determine what actions need to
be taken by the Congress or other authorities to
make the benefits of EFT available to low-income
persons, while ensuring that their rights and free-
dom of choice are preserved.  The feasibility and
desirability of a Giro-like system in this country
is one of the alternatives that should be explored.

| Affirmative | Negative - 2 | Abstaining |
|---|---|---|
| 17 | A. Phillips | 3 |

## Chapter 5.  The Branch/Terminal Issue

The Commission recommends, therefore, that
State and federally chartered depository institu-
tions should have the power to offer debit services
anywhere in the country through terminal-based EFT
systems.

The Commission further recommends that all non-
depository institutions willing to permit the debit
functions to be offered on their premises in an
EFT mode be free to do so.



| Affirmative | Negative - 5 | Abstaining - 1 |
|---|---|---|
| 19 | W. Riley (for J. Faris) F. Koplow W. B. Lewis G. Waters F. Leary | V. Atwater |

In the case of deposits to merchant accounts that are generated as a result of a customer payment by debit, debit with overdraft, or credit purchase through electronic means at the point of sale, the Commission recommends that merchants should not be limited geographically by statute or regulation in selecting the financial institution to receive such credits.

| Affirmative | Negative - 7 | Abstaining - 1 |
|---|---|---|
| 14 | J. Faris W. B. Lewis F. Leary F. Koplow | G. Mitchell |

Specifically, the Commission recommends that deposit-taking through EFT terminals should be gradually expanded beginning with the following two steps.

| Affirmative | Negative - 2 | Abstaining - 1 |
|---|---|---|
| 22 | F. Leary W. Riley (for J. Faris) | W. B. Lewis |

First, the Congress and State legislatures should enact legislation, as appropriate, authorizing regulatory agencies to permit federally or State-chartered depository institutions to offer deposit-taking services through terminal-based EFT systems throughout the State in which these institutions are chartered.

| Affirmative | Negative | Abstaining - 2 |
|---|---|---|
| 23 | 0 | F. Koplow F. Leary |

However, the Commission further recommends that Congress establish a date after which time federally chartered depository institutions would be authorized to cross contiguous State lines to offer EFT deposit services in natural market areas, regardless of whether or not State-chartered institutions are permitted to do so.

| Affirmative | Negative - 7 | Abstaining |
|---|---|---|
| 18 | V. Atwater W. Riley (for J. Faris) F. Koplow F. Leary W. B. Lewis G. Waters R. Green | 0 |

Finally, with respect to the remaining funds transfer services--the credit functions of debit with overdraft privileges, credit purchase, and



cash advance--the Commission recommends that no geographic restrictions be imposed on their availability through terminal-based EFT systems.

| Affirmative | Negative – 3 | Abstaining |
|---|---|---|
| 22 | J. Faris | 1 |
|  | F. Leary |  |

The Commission recommends that the rules governing the deployment of EFT terminals by a depository institution should be no more restrictive than the rules governing that institution's ability to offer EFT services.

| Affirmative | Negative – 3 | Abstaining – 2 |
|---|---|---|
| 20 | J. Faris | F. Leary |
|  | W. B. Lewis |  |
|  | F. Koplow |  |

Accordingly, the Commission recommends that appropriate State and Federal legislation be enacted, if necessary, to authorize regulatory agencies to permit State and federally chartered depository institutions to deploy their own EFT terminals, without restriction, for the following purposes:

- To provide debit services for their own customers intrastate.

| Affirmative | Negative | Abstaining – 1 |
|---|---|---|
| 24 | 0 | F. Leary |

- To provide the deposit-taking service for their customers intrastate.

| Affirmative | Negative | Abstaining – 1 |
|---|---|---|
| 24 | 0 | F. Leary |

- To provide debit services for their customers interstate.

| Affirmative | Negative – 6 | Abstaining – 2 |
|---|---|---|
| 17 | V. Atwater | G. Worley |
|  | W. Riley | F. Leary |
|  | (for J. Faris) |  |
|  | R. Green |  |
|  | D. Francis |  |
|  | (for W. B. Lewis) |  |
|  | G. Waters |  |
|  | F. Koplow |  |

- To sell transaction services to other depository institutions that wish to offer the debit and credit services intrastate and are permitted, under the Commission's recommendations, to offer the deposit-taking service intrastate.

| Affirmative | Negative | Abstaining – 2 |
|---|---|---|
| 23 | 0 | F. Leary |
|  |  | G. Worley |


Digitized by Google

● To sell transaction services to other deposi-
tory institutions to enable them to offer
the debit, deposit-taking, and credit serv-
ices interstate where these institutions are
permitted to do so under·the Commission's
recommendations.

| Affirmative | Negative – 4 | Abstaining – 4 |
|---|---|---|
| 17 | W. Riley | V. Atwater |
|  | (for J. Faris) | F. Koplow |
|  | R. Green | F. Leary |
|  | D. Francis | G. Worley |
|  | (for W. B. Lewis) |  |
|  | G. Waters |  |

The Commission recommends that an evolutionary
approach be taken to the implementation of its
guidelines on terminal deployment.

| Affirmative | Negative | Abstaining – 1 |
|---|---|---|
| 22 | 2 | G. Waters |

As in the case of rules on the availability of
EFT services, the Commission also recommends that
Congress specify a date after which time federally
chartered depository institutions would be author-
ized to deploy terminals according to the rules
presented above.

| Affirmative | Negative – 7 | Abstaining |
|---|---|---|
| 18 | V. Atwater | 0 |
|  | W. Riley |  |
|  | (for J. Faris) |  |
|  | F. Koplow |  |
|  | F. Leary |  |
|  | W. B. Lewis |  |
|  | G. Waters |  |
|  | R. Green |  |

## Chapter 6.  Sharing

The Commission recommends enactment of pre-
emptive Federal legislation that would affirm the
applicability of Federal antitrust law to sharing
arrangements involving EFT systems and that would
expressly nullify the effect of the mandatory
sharing provisions of any State EFT statutes.

| Affirmative | Negative – 5 | Abstaining – 3 |
|---|---|---|
| 17 | W. Riley | A. Thorndike |
|  | (for J. Faris) | (for |
|  | D. Francis | D. De Simone) |
|  | (for W. B. Lewis) | F. Koplow |
|  | V. Atwater |  |
|  | F. Leary |  |
|  | G. Waters |  |

The criteria to be used by the courts to judge
access disputes should be the competitive and
public interest policies embodied in the antitrust
laws.



| Affirmative | Negative – 8 | Abstaining |
|---|---|---|
| 16 | F. Koplow<br>G. Mitchell<br>J. Faris<br>W. B. Lewis | 0 |

The Commission recommends that Congress provide for giving such suits a preferred position on the docket of the appropriate U.S. District Court.

| Affirmative | Negative – 6 | Abstaining |
|---|---|---|
| 18 | G. Mitchell<br>W. B. Lewis<br>F. Koplow | 1 |

### Chapter 8.   The Impact of EFT on Credit

The Commission's recommendations as to the sharing of and access to EFT systems should be enacted into law.

| Affirmative | Negative – 0 | Abstaining |
|---|---|---|
| 20 | W. B. Lewis<br>G. Mitchell<br>F. Koplow | 0 |

### Chapter 10.   Competition Among Suppliers

Therefore the Commission recommends that the public interest would best be served by the participation of all interested parties in the EFT terminal and system marketplace.  Artificial barriers to entrance and exit from the market imposed by either State or Federal requirements and procedures should not apply to EFT terminal equipment systems.

(Unanimous voice vote in favor with two abstentions.)

Abstaining:  R. Lee, R. Hill, R. Morris

The Commission recommends that only the underlying communications transmission and distribution (transparent) facilities used with EFT systems should continue to be regulated for as long as is necessary by appropriate State and Federal communications regulatory agencies and only to the extent they are provided by first-level established or specialized common carriers.  The classification of EFT systems as "communications common carriers" by either State or Federal regulatory agencies would subject such systems to unnecessary and duplicative regulation.

(Unanimous voice vote in favor with two abstentions.)

Abstaining:  R. Lee, R. Hill, R. Morris

The Commission recommends that terminals offering EFT services should comply with FCC registration requirements for terminal equipment used in conjunction with the public telephone network.  FCC registration furthers the competitive marketplace by allowing connection of registered equipment under reasonable terms and conditions while protecting the public network from harm.



(Unanimous voice vote in favor with two abstentions.)

Abstaining:  R. Lee, R. Hill, R. Morris

Therefore, the Commission recommends that to promote fair competition with the widest participation possible, companies that provide regulated communications common carrier services should also be permitted to offer EFT system services and related terminal equipment, but not under tariff. It should be done in such a manner as to prohibit unreasonable and anti-competitive cross-subsidization of untariffed services from tariffed services, with appropriate enforcement by the FCC and the antitrust agencies.

| Affirmative | Negative | Abstaining – 6 |
|---|---|---|
| 20 | 0 | R. Lee |
| | | T. Greaney |
| | | (for K. Anderson) |
| | | R. Hill |

Therefore, the Commission recommends that it is premature, at this point, to establish federally mandated standards for EFT systems and related terminals.  At the same time, communications interface standards and communications protocols used by EFT equipment manufacturers and other providers that are not in accordance with published ANSI standards, must be published when adopted for use by the manufacturer or provider.

| Affirmative | Negative | Abstaining – 8 |
|---|---|---|
| 12 | 1 | R. Lee |
| | | R. Hill |

## Chapter 13.  EFT and Monetary Policy

The Commission recommends that a return in the form of interest be permitted on liabilities that are held for transaction purposes at all depository institutions.  Because of present restrictions on offering transaction balances by some nonbank depository institutions, the approval of NOW accounts for households for all depository institutions appears to be the best approach to achieving this result.

| Affirmative | Negative – 1 | Abstaining – 4 |
|---|---|---|
| 19 | J. Faris | G. Worley |
| | | F. Leary |

Therefore, the Commission recommends that the Federal Reserve should be permitted to pay interest on reserves held by member banks or held by any other depository institution at a Federal Reserve Bank.

| Affirmative | Negative – 2 | Abstaining – 8 |
|---|---|---|
| 13 | J. Faris | G. Worley |
| | | A. Foer |
| | | F. Leary |



## Chapter 14.  Government Operation of ACHs and POS Switches

The Commission recommends that the Federal Reserve should assess charges on an equitable and fully allocated cost basis to depository institutions using Federal Reserve ACH services, with due consideration being given to balances held by the Federal Reserve.

| Affirmative | Negative - 1 | Abstaining - 1 |
|---|---|---|
| 20 | T. Greaney (for K. Anderson)* | B. Berman (for R. J. Lewis)** |

The Commission recommends that the Federal Government should not be involved operationally, at present or in the foreseeable future, in POS switching and clearing facilities except for the provision of net settlement among depository institutions. The Commission, however, recommends against foreclosing completely at this time the possibility that, at some future point, it may become appropriate to have a Government operational role in POS switching and clearing facilities, either to correct market imbalances that might develop, or to ensure an efficient and effective national payments system.

| Affirmative | Negative - 6 | Abstaining |
|---|---|---|
| 15 | T. Greaney (for K. Anderson) R. Thompson (for G. Oram) R. Rogers T. Taylor G. Waters G. Worley | 0 |

## Chapter 15.  EFT in Other Industrial Nations

The Commission recommends that action should be taken to develop a program to involve labor unions, employers, and employees in explaining the advantages, benefits, procedures, and risks of receiving salary and wages by direct deposit.

| Affirmative | Negative - 6 | Abstaining |
|---|---|---|
| 14 | A. Phillips | 3 |

Therefore, the Commission recommends that positive steps should be taken to facilitate the conversion of pre-authorized payment drafts to electronic payments.

*The Department of Justice opposes the inclusion of the phrase "with due consideration being given to balances held by the Federal Reserve." A separate motion to delete this phrase failed by a margin of 7-15.

**At the time of this vote, R. J. Lewis represented the Federal Trade Commission.

Digitized by  Google

| Affirmative | Negative – 2 | Abstaining – 5 |
|---|---|---|
| 15 | A. Phillips | T. Greaney (for K. Anderson) |

The Commission recommends, therefore, that the Department of the Treasury should extend its credit-transfer payments program to demonstrate the feasibility of using credit-transfer systems for payments that are made to the Government as well as by it.

| Affirmative | Negative | Abstaining – 5 |
|---|---|---|
| 15 | 3 | T. Greaney (for K. Anderson) |

Therefore, the Commission recommends that the National Bureau of Standards and the regulatory agencies should cooperate with the financial industry and nonfinancial businesses to develop a standardized invoicing and billing procedure that will permit cost reductions for all participants through conversion of payments to Giro-like transfers.

| Affirmative | Negative – 5 | Abstaining |
|---|---|---|
| 10 | A. Phillips | 7 |

The Commission recommends that depository institutions participating in ACH arrangements should expand their rules and operating procedures to include specific rules, regulations, and data formats

that will permit Giro-like credit transfers to be processed by United States ACHs.

| Affirmative | Negative | Abstaining – 7 |
|---|---|---|
| 11 | 6 | T. Greaney (for K. Anderson) |





Appendix C

# The Payment System in the United States

Coin and paper currency are the Nation's official money and, by law, are legal tender for all debts, public and private. Used as cash they are universally acceptable but their significant role is for transactions involving small dollar values. The number of such transactions, however, has been estimated to be two-thirds of all payments. Total coin and currency in circulation in 1976 was $94 billion--26 percent of the Nation's money supply.

Demand deposits at commercial banks--amounting to $244 billion--comprise the rest of the Nation's money supply. Transfers among these accounts total more than 90 percent of the Nation's money payments. Coins and currency are often referred to as the "sovereign's money"; demand deposits as "bankers' money." In either case, the constitutional power to control and regulate the quantity and character of all money rests with the Federal Government.

In recent years balances in savings accounts in mutual savings banks, savings and loan associations, and credit unions have begun to be used in much the same manner as demand deposit balances in commercial banks. It is likely that such accounts will evolve into a full equivalent of demand deposits.

Credit cards, travellers' checks, money orders and other paper and, more recently, electronic means are used in hand-to-hand payment or to move funds from one account to another in depository institutions.

Today's payments media and practices are products of an historical evolution that continues to progress in response to economic incentives, as public and private providers of these services seek to improve transaction efficiency and to provide additional services and convenience to consumers. Tomorrow's consumers will continue to use cash and checks, but for many types of payment they will undoubtedly turn to electronic payment services as EFT's efficiency and convenience increase. This appendix describes how each of the payments media operates today, and it concludes with a short description of

Digitized by  Google

how tomorrow's payment system might function if EFT services continue to develop.[1]

The Bureau of Engraving and Printing prints the Nation's paper currency, and the Bureau of the Mint produces the coin. Both Bureaus are part of the U.S. Department of the Treasury. The Federal Reserve System, an independent agency, distributes currency and coin to commercial banks, which, in turn, provide coin and currency services to their merchant, depository institution, and consumer customers. A substantial proportion of this cash is paid directly to consumers who cash checks at the bank or other depository institutions and indirectly through checks cashed by merchants.

Thirty-seven offices of the Federal Reserve System provide regional processing centers for currency and coin. Each office receives new currency and coin from the Department of the Treasury and receives unfit or unneeded supplies of cash from commercial banks. Cash received from commercial banks is counted, sorted into fit (to be returned to general circulation) or unfit (to be retired from circulation), and checked for counterfeit. Unfit currency is destroyed by the Reserve Banks, while unfit or mutilated coin is returned to the Department of the Treasury. In 1976, 2.6 billion pieces of unfit currency were retired from circulation and destroyed.

CHECK PAYMENT SYSTEM

A check is a demand draft, drawn on a depository institution authorized to offer checking accounts, instructing it to pay the stated sum on demand to the named payee or his assignee. Checks are used directly for the payment of goods and services or to obtain cash for such payments. A check is a negotiable instrument that payees may transfer to another party by endorsement.

Transfers of funds by check require two deposit accounts and the paper instrument, the check. The check contains information that authorizes a charge to one account and a credit to the other. The transfer of funds is effected when the payor's institution subtracts an amount from the payor's deposit account and credits it to the payee's account. The payee's account may be in the same or another institution. If two institutions are involved, clearing arrangements are used to expedite settlement. As banks exchange items drawn on each other's customers in large number, the total of collection items they present to each other is offset and only net differences are entered in clearing settlements.

Since National banks and those State-chartered banks that are members of the Federal Reserve System are required to keep specified reserve balances, debits or credits to such balances are a convenient method of transferring funds from one bank to another where the two banks involved do not have mutual accounts or do not wish to use the ones they may have.

_____

[1]*Additional technical detail on the nature and operation of the current payment system and how it might be affected by EFT is presented in National Commission on Electronic Fund Transfers, "The Payment System: Today and the Future," Internal Working Document IWD-22 (December 1976).*



There is a variable time lag between the date a consumer hands or sends a check to the creditor and date the payment is posted to the creditor's account. The delay may be as little as one day or as much as a week or more, depending upon how promptly the merchant deposits the check, the location of the bank on which it is drawn, and transportation or processing delays. Depository institutions enter a provisional credit in a depositor's account when the deposit is made. Thus, the same funds may appear as deposits on the books of two institutions at the same time. This is a characteristic of the check system that is not applicable to electronic credit transfers.

There are approximately 106 million checking (demand deposit) accounts in depository institutions in the United States. A recent study by the Federal Deposit Insurance Corporation indicates that Americans wrote an estimated 28 billion checks drawn on such accounts in 1976. It is estimated that check volume has been growing at a rate of about 7 percent annually. More than half of the checks written are for amounts less than $50. In contrast, the 1 percent of checks written for more than $10,000 represent 80 percent of the dollar value of funds transferred by check.

Surveys of check usage from various sources indicate that approximately 50 percent of all checks are written by consumers, 43 percent by businesses, and 7 percent by the Government. Consumers receive 34 percent of all checks written, businesses 63 percent, and the Government 3 percent. Businesses write almost all checks for amounts in excess of $500 and more than 80 percent of those written for amounts between $75 and $500. Individuals, on the other hand, write the majority of the checks for less than $75. About two-thirds of business checks are for payrolls.

Other payment instruments handled by the check-clearing system include NOW account drafts and share drafts. Both instruments serve the same purpose as checks, but in many cases the deposits in the accounts against which these items are drawn earn interest.

## Participants in the Check Payments System

**Commercial Banks.** The 14,500 commercial banks and their 31,400 branches are full participants in the paper-based check system. They provide checking account services to individuals, governments, and both financial and non-financial businesses. In addition, some banks provide credit card services to individuals, and a smaller number offer electronic payment services. A comparatively few large banks provide correspondent services, which include clearing and collection of checks on behalf of other banks and other depository institutions.

**Thrift Institutions.** The thrift industry--including mutual savings banks, savings and loan associations, and credit unions--provides deposit services in the form of savings accounts and certificates of deposit. Withdrawals from savings accounts, which in practice are met on demand, are used as a ready source of cash and some thrift institutions have recently begun to offer check or check-like access to these accounts. Generally their check-

335



collection services are provided directly or indi-
rectly through commercial banks.  Thrift institu-
tions issue bank-like credit cards and also receive
direct deposit of wage, salary, and income items.
In addition, thrift institutions have been among the
leaders in the development of innovative electronic
financial services, such as the use of electronic
terminals at merchant locations and telephone bill
payment.

The 470 mutual savings banks and their 2,200
branches operate in 17 States and Puerto Rico.  Most
mutual savings banks operate in the Northeastern
part of the United States.  The 4,850 savings and
loan associations and their 11,800 branches operate
in all 50 States, Puerto Rico, and Guam.  More than
23,000 credit union offices operate without geo-
graphic limitations, but their operations are nor-
mally limited to their members' place of employment
or other "common bond" locality.

Statutes in 23 States authorize industrial
banking companies, sometimes referred to as Morris
Plan banks or thrift and loan companies.  More than
175 industrial banking companies operate more than
1,600 offices mainly in 11 States where they are
most active.

Industrial banking companies accept consumer
deposits, sell investment certificates, and es-
sentially limit their investments to consumer loans.
None have checking account authority, but a number
of them participate in the direct deposit program
for Federal recurring payments.

## The Functioning of the Check System

Surveys indicate that, of the checks presented
to a bank for deposit or cash, approximately 30 per-
cent are drawn on that institution (on-us items).
The institution of first deposit is responsible for
the subsequent steps involved in collection by for-
warding checks drawn on other depository institutions
directly to them or to clearing facilities.  Thus,
checks presented to the bank of first deposit are
sorted into three groups:  (1) for posting to cus-
tomer accounts, (2) for direct exchange with other
depository institutions, and (3) for presentation to
distant depository institutions with which the insti-
tution of first deposit has no direct exchange
relationship.

The regional or national check-collection system
is a semi-autonomous and complex network of deposi-
tory institutions, independent processing centers,
clearing houses, and Federal Reserve offices.

The simplest interbank collection arrangement
is a direct exchange between two depository institu-
tions of checks drawn on each other.  When several
local institutions are involved, they exchange checks
at a clearing house, usually at some specified time
of day.  The clearing house arrangements may be in-
formal or, in the case of large cities, involve
written rules and procedures.  Smaller depository
institutions often depend on larger (correspondent)
institutions and data processing centers to perform
check-collection functions for them.

The Federal Reserve System provides check-
collection services, primarily to its member banks,



at 48 check-clearing centers. Checks are ultimately presented for payment either directly to the depository institution upon which the checks are drawn or to a processing center designated by that institution. If the payor depository institution is distant from the institution of first deposit, the Federal Reserve Transportation System transports the checks to the region in which the payor institution is located. (About 40 percent of Federal Reserve check volume is deposited outside the region in which the check is payable.) Within a region, transportation of checks from Federal Reserve offices to the depository institution on which checks are drawn or to processing centers designated by the depository institution is accomplished by contract courier services and the U.S. Postal Service.

## CREDIT CARD PAYMENT SYSTEM

Today more than half the families in the United States use credit cards. A cardholder may use the card for making payments, drawing on a pre-authorized line of credit. Four types of credit cards predominate in the United States: the store card issued by a single store or chain of stores; the gasoline card issued by major petroleum companies; the bank card, of which there are two national systems, NBI (formerly BankAmericard but now known as VISA) and the Interbank Card Association (Master Charge); and the travel and entertainment cards, principally American Express, Diners Club, Carte Blanche, and a number of airline cards. Statistics indicate that the most widely used credit card is the store card (used by 35 percent of all families), followed by the gasoline card (used by 34 percent of all families), the bank card (used by 16 percent of all families), and the travel and entertainment card (used by 9 percent of all families). The two bank card systems alone have approximately 70 million cardholders and about 46 million accounts. There are approximately 5 billion credit card transactions annually, representing $71 billion in value exchange.

Income appears to be the major determinant of credit card ownership and use. Eighty-one percent of families with incomes of $25,000 per year or more use credit cards. Higher income users tend to pay for credit balances as quickly as possible to avoid interest charges. Low-income users are more likely to pay credit balances in minimum monthly installments.

Credit card issuers must have authorization and processing facilities. They may own these facilities themselves or share them with others. For example, some card-issuing depository institutions join regional "bank card" associations. Nationwide, on-line authorization systems are prevalent. The credit card processing systems are similar to those used for checks. However, transition to descriptive billing, in which individual transaction receipts do not accompany monthly statements, is taking place and greatly reducing the volume of paper associated with credit card transactions.

## ELECTRONIC FUNDS TRANSFER

Transfers of funds electronically were first carried out on interbank telegraphic communications networks. Thus, the first applications of EFT were limited to financial institutions and did not affect

337



consumers directly.  Today's EFT continues in the interbank mode, but it also is directly available to the consumer by offering him an electronic option to the paper-based system for depositing and with-drawing funds, purchasing goods or services, and making or receiving recurring payments.

## Interbank Networks

There are two interbank networks in the United States for the electronic transfer of funds:  the Fed Wire (the Federal Reserve Communications System)[2] and the Bank Wire, which is operated by a consortium of large commercial banks.

Fed Wire.  This is an on-line communications network linking Federal Reserve offices and member banks nationwide.  About 48,000 wire fund transfers are handled on the Fed Wire each day, with a value of about $104 billion.  The average value of a wire transfer in 1976 was about $1.7 million.

The Federal Reserve System has maintained a wire communications network since 1918.  In 1970, the first components of the present network were installed, and the system was fully automated in late 1973.  All of the Federal Reserve district offices now have installed communications switches to which Reserve Banks, branches, offices, the De-partment of the Treasury, and 300 member banks are interconnected nationwide through a central switch facility in Culpeper, Va.  This system allows for same-day movement of funds among member banks and aids banks in the efficient handling of reserve balances.  In addition to transfers of reserve ac-count balances, the system also handles transfers of

U.S. Government and Federal agency securities, and administrative and research information used inter-nally by the Federal Reserve System.  The system is currently being used in a pilot program in cooper-ation with the National Automated Clearing House Association (NACHA) to evaluate the effectiveness of the Fed Wire in delivering ACH payments.

All money transfers of reserve balances on the Fed Wire are credit transfers; that is, the origi-nator of the transfer is the member bank owing the reserve balance.  The member bank owing the reserve balance instructs its Federal Reserve Bank to trans-fer funds to another member bank.  The reserve bal-ances of the member banks are debited and credited accordingly, and the transfer is completed usually in a matter of a minute or two.  Nonmember banks, other depository institutions, non-depository finan-cial institutions, businesses, and consumers may send funds on the Federal Reserve wire network by using the facilities of a member bank.

Bank Wire.  The Bank Wire is a private communi-cations system serving commercial banks in 75 cities throughout the United States and Canada.  On an aver-age day, about 12,000 messages are handled on the Bank Wire, resulting in transfers in correspondent accounts of about $27 billion.  In addition to funds

_____

[2] *For a more complete description of Federal Reserve System payments mechanism operations, see "Federal Reserve Operations in Payment Mechanisms: A Summary," Federal Reserve Bulletin (June 1976).*



transfers, the system is used for a variety of other interbank business communications. Funds transfers over the Bank Wire can be effected on the same day by means of debits or credits to interbank demand deposit balances, and the transmitted information can include instructions to credit the accounts of third parties.

There are approximately 115 subscribers to this service. These include most of the major banks in the country that have a large volume of interbank business. The computer switches for the system are located in New York and Chicago. The operations of the Bank Wire are managed by a wholly owned subsidiary of the consortium of commercial banks. New York banks also make use of the computerized Clearing House for Interbank Payments Systems (CHIPS) for making large transfers on behalf of foreign banks.

A new system for the Bank Wire, Bank Wire II, is scheduled to be operational by the end of 1977. The new system will have improved payment-settlement features, as well as facilities for new types of traffic such as the transmission of batch files.

### Automated Clearing Houses (ACHs)

The roles of the consumer, the depository institutions, and the Federal Reserve in ACH operations essentially parallel such roles in the check system. The major difference is that the check instrument is replaced by a magnetic image on computer tape that greatly facilitates clearing and settlement of the payment.

In an ACH operation, depository institutions create computer tapes containing payment information based upon instructions received from their customers. These tapes are transmitted or delivered to an ACH for clearing and settlement. This process requires computer sorting of the payment information and delivery to the designated depository institution for use in debiting or crediting customer accounts, depending upon whether payments are to be made or funds deposited. Settlement among depository institutions participating in ACH arrangements is made through the reserve accounts of member banks of the Federal Reserve.

Figure C.1 illustrates the steps in the ACH process for one type of transaction--direct deposit of payroll credits. The steps shown in Figure C.1 also apply to the processing of direct deposit of Federal recurring payments, such as Social Security benefits, with two exceptions. First, a disbursing office of the Department of the Treasury, rather than a financial institution, originates the items. Second, the rules, procedures, and time schedules for Government payments are established by the Department of the Treasury and the Federal Reserve, rather than by the private ACH associations.

There are 29 ACHs in operation nationwide. The Federal Reserve provides clearing facilities for all but those in New York and Chicago. The Federal Reserve's courier system, used to deliver the payment information to participating depository institutions, is used by all 29 ACHs. All other functions are provided by the participating depository institutions. Payment volume is small in ACH facilities at present.



Figure C.1.     **ACH Processing: Direct Deposit of Payroll Credits**



Digitized by Google

The ACH associations have established a national organization, NACHA, that now has 32 regional ACH association members, including the 29 that are currently operational. In mid-1977, the 29 ACH associations handled approximately 7 million payments per month, the great majority of which were direct deposit of Federal recurring payments initiated by the Department of the Treasury.

## Point-of-Sale (POS) Systems

POS systems, in which funds are transferred between accounts at the time of a purchase, have not yet developed widely in this country. In such a system, consumers pay for goods and services at the point of purchase by presenting a card similar in appearance to a credit card rather than a check or cash. The card contains the necessary account information in machine-readable form to allow debiting of the consumer's account. When an account is debited, the merchant's account would then be automatically credited as a byproduct of the transaction. These transactions take place either instantaneously by use of direct communication linkages between the customer's and merchant's designated depository institutions or through end-of-day batched clearing and settlement.

Another form of POS service is provided through terminals located at merchant locations that provide principally deposit, withdrawal, and check-cashing services. Usually the terminals are located at one or more places in a merchant's store and are operated by the merchant's employees. They permit customers of participating depository institutions to make deposits and withdrawals against their deposit accounts and to authorize checks for cashing by the merchant.

This kind of POS service is being introduced by a number of different kinds of depository institutions. Savings and loan associations have been particularly active in this area. For example, recent figures show that 29 such projects have been approved involving 240 savings and loan associations and 187 other institutions under experimental regulations published by the Federal Home Loan Bank Board.

A final category of POS service available through a terminal in merchant locations is the authorization, verification, or guarantee of checks for cashing. Terminals providing these services may be operated by the customer or the merchant, depending on how the system is designed. This EFT application has been most popular with commercial banks and provides a readily acceptable service for consumers and merchants.

The "on-line" POS systems can be configured in what has become known as the switch "after" the financial institution (shown in Figure C.2), or the switch "before" the financial institution (shown in Figure C.3). It is also possible to have terminals record transaction information on magnetic tape. The magnetic tape can be processed through an ACH, providing end-of-day batched clearing and settlement. This is shown in Figure C.4.

341

Digitized by Google 

**Figure C.2.**          # Switch After the Depository Institution



Digitized by Google

Figure C.3. ## Switch Before the Depository Institution



Digitized by Google

**Figure C.4.** POS System with End-of-Day "Batched" Clearing and Settlement



Digitized by Google

## Automated Teller Machines (ATMs) and Cash Dispensers

ATMs and cash dispensers are customer-operated terminals, often available to an institution's customers 24 hours a day. They permit customers to perform deposit, withdrawal, credit, and payment transactions, depending on the type of terminal and the authority of the institution involved.

Data developed for the Commission suggest that there are about 10,000 ATM and POS devices installed off-premise in this country by depository institutions,[3] and more than 5,000 ATMs installed on-premise.

## Telephone Bill Payment

Telephone bill payment systems provide another way for consumers to make payments--in this instance by using the telephone. The customer can call his depository institution, provide information to identify himself, and direct his institution to make certain payments. As mentioned above, payments to third parties now generally take place by check, but the prospects are that such credit transfer payments could use the ACH system effectively to deliver such payments electronically.

Recent figures from a study by the U.S. League of Savings Associations indicate that telephone bill payment systems are now in use by 36 depository institutions.

As EFT is more fully implemented and accepted by the public, it will modify many financial habits

of Americans, become an important partner of the cash and check systems, and greatly reduce the flow of paper in both the financial and nonfinancial industries.

Businesses and governments as payors will make many of their recurring payments for salaries, wages, commissions, interest, dividends, annuities, Social Security, welfare, retirement, and the like through ACHs, which would deposit the funds automatically in the recipients' account. Consumers also will direct their depository institutions to make many of their recurring payments to businesses automatically, such as mortgage payments, utility bills, and insurance premiums. Consumers away from home now use plastic cards to make credit purchases. As on-line systems come into general use and are interconnected, consumers can obtain cash from their accounts or make deposits to them.

Tomorrow's payment system is often visualized as one that will reflect new technologies as they become available. But it is clear that money payment has not yet followed closely on the heels of technology. In the past, society's money mores have changed slowly and it seems reasonable to expect that a cultural lag will characterize the payments system of the future.

---

[3] See NCEFT, "Summary of Data on Major Terminal-Based Electronic Funds Transfers Projects in the United States," IWD-37 (December 1976).



Digitized by Google



Appendix D

# The Public Interchange Program

Throughout its deliberations, the Commission attempted to be fully receptive to the comments and suggestions of outside groups and individuals. To this end, the Commission undertook many activities--formal and informal. For example, individual Commissioners and staff members participated in dozens of forums to report on the work of the Commission and to invite a continuing public dialogue.[1] Many discussions were held at the Commission's offices at the request of various organizations and private citizens. The views of the public were sought in the course of newspaper, magazine, radio, and television interviews of Commissioners and staff; in one instance more than 6,000 letters were received from consumers as a result.[2] Additionally, several meetings of program committees of the Commission were opened to direct participation by the audience. Moreover, all papers and reports of the Commission were distributed without charge to those who requested copies, and reactions were solicited.

Among the more formal steps taken by the Commission to ensure that all viewpoints were heard were workshops of one kind or another; a series of hearings; notices published in the Federal Register

requesting comments and information on specific issues before the Commission; direct invitations to hundreds of organizations and individuals to express their opinions on these same issues; and a vigorous program of research that included site visits, interviews in the field, questionnaires, and study of the literature on EFT and of results from public opinion polls.

Publication of the Commission's interim report, EFT and the Public Interest, provided an especially important opportunity to elicit comment on the findings and recommendations of the Commission up to that time. Accordingly, the Commission decided to form a Public Interchange Committee, with responsibility to conduct

---

[1] *Examples of such involvement begin with the keynote address by Commission Chairman Widnall at the annual meeting of the American Institute of Industrial Engineers in April 1976.*

[2] *See National Commission on Electronic Fund Transfers, "A Collation of Poll Results and Other Data on Consumer Reactions to EFT," Internal Working Document IWD-42 (October 1977).*



a series of regional "town hall" meetings at which spokesmen for four areas--consumers, retailers, legislators and regulators, and financial institutions--could review the Commission's interim proposals from their own perspectives, with special reference to local, State, and regional circumstances. The objective in this activity was further to ensure that these proposals would be as carefully examined and as soundly based as possible when they were reported as final recommendations to the Congress and the President.

Three such "town hall" meetings were held: the first in May 1977 in Denver, Colo., and the second and third in July 1977 in Chicago, Ill., and Sacramento, Calif. Attendance was strong, with approximately 175 persons in Denver, 250 in Chicago, and 75 in Sacramento. Each meeting began with a review by Commissioners of the Commission's interim findings in the four subject areas, following which the group divided into four panels to discuss their common concerns. Commissions and staff were available to answer questions. Later, the panels presented their conclusions to the Commission and to the group as a whole. To round out the record, the participants at each meeting were invited to answer in writing a set of questions that dealt with some 35 major issues on which the Commission sought specific reactions. In Denver, about 30 of the attendees answered some or all of these questions; in Chicago, about 70; and in Sacramento, about 15. A report summarizing the oral discussion and the written results was published subsequently.[3]

In the written responses, as in the meetings themselves, attention focused not only on the Commission's recommendations, but also on issues of fact or interpretation underlying these recommendations. Considerable time was also devoted to the potential impact of the Commission's recommendations if they were to be enacted into law by the Congress or adopted as administrative changes by the regulatory agencies concerned.

The results proved to be useful in allowing the Commission to explore in depth how well it had answered certain fundamental questions. Had the Commission defined the issues precisely enough? Had it identified the significant policy alternatives? Had it considered all of the major arguments, pro and con, for these alternatives? Had it overlooked any data that might call its findings into doubt? Had its recommendations struck a proper balance between the public interest generally and the needs and desires of particular interest groups?

In the aggregate, the results suggested that the Commission had taken sufficient account of these issues. For example, many themes running through the discussions and the answers to the written questions were in close accord with the Commission's own conclusions: competition through EFT services and systems is desirable and should be promoted wherever possible; consumers and depository institutions alike can expect to benefit from EFT, as will retailers and non-depository financial institutions if the regulatory burden is minimized and the rules of access are generous; because much uncertainty exists as to the nature and timing of the impact of widespread availability of EFT, a gradual, evolutionary approach of

---

[3] *See NCEFT, "Summary of Results from the Public Interchange Meetings," IWD-48 (October 1977).*



the sort advocated by the Commission is appropriate; and so on.

On matters of fact, interpretation, and policy, the participants strongly concurred with the Commission in virtually all areas.  However, there appeared to be a few major differences--for example, on the issue of mandatory vs. pro-competitive sharing.  The Commission examined each of these differences and thoroughly evaluated the alternatives recommended.[4]

More important than any tabulation of written responses or summary of the overall opinion of the attendees on matters of substance was the Commission's first-hand exposure to the strength of conviction-- and sometimes the degree of uncertainty--among the participants regarding EFT.  Rarely if ever has a commission gone directly before the public in this way to discuss its findings and sample the reaction before presenting its conclusions officially.  Thus, it was instructive to learn, for example, of the thoughtful and deeply felt concern on the part of consumers and consumer representatives about fairness in pricing EFT services, the necessity to disclose the terms and conditions involved in using an EFT account, the need to preserve freedom of choice among payment methods, the vital importance of consumer education on EFT, and the like.  Such issues must be considered dispassionately, but not without an awareness of the intensely felt significance they hold for those persons who will be affected by their resolution.  It was in providing this awareness that the Public Interchange Program was perhaps most successful and worthwhile.

The results of the Public Interchange Program were considered carefully by the appropriate program committees as they prepared their final arguments and recommendations.  The information created through this program served this purpose well.

_____

[4]*For example, see Chapter 6, "Sharing," in which alternative sharing arrangements, including those proposed by participants in the Public Interchange Program, are discussed.*



Digitized by Google



Appendix E

# Meetings of the Commission and Its Committees

1. FULL COMMISSION
   February 6, 1976
   Washington, D.C.

2. INDIVIDUAL COMMISSIONERS
   (Workshop on EFT)
   March 2, 1976
   Washington, D.C.

3. INDIVIDUAL COMMISSIONERS
   (Workshop on EFT)
   March 5, 1976
   Washington, D.C.

4. FULL COMMISSION
   March 12, 1976
   Washington, D.C.

5. STEERING COMMITTEE
   March 26, 1976
   Washington, D.C.

6. BUDGET COMMITTEE
   March 31, 1976
   Washington, D.C.

7. STEERING COMMITTEE
   April 7, 1976
   Washington, D.C.

8. FULL COMMISSION
   April 9, 1976
   Washington, D.C.

9. USERS COMMITTEE
   April 23, 1976
   Washington, D.C.

10. PROVIDERS COMMITTEE
    April 30, 1976
    Washington, D.C.

11. STEERING COMMITTEE
    May 6, 1976
    Washington, D.C.

12. REGULATORY ISSUES COMMITTEE
    May 7, 1976
    Washington, D.C.

Digitized by 

13. SUPPLIERS COMMITTEE
    May 14, 1976
    Washington, D.C.

14. STEERING COMMITTEE
    June 10, 1976
    New York, N.Y.

15. FULL COMMISSION
    (Technology Workshop)
    June 15, 1976
    Washington, D.C.

16. USERS COMMITTEE
    June 24, 1976
    Washington, D.C.

17. SUPPLIERS COMMITTEE
    June 29-30, 1976
    Annapolis, Md.

18. PROVIDERS COMMITTEE
    July 7, 1976
    Boston, Mass.

19. USERS COMMITTEE
    July 7, 1976
    Boston, Mass.

20. REGULATORY ISSUES COMMITTEE
    July 8, 1976
    Boston, Mass.

21. STEERING COMMITTEE
    July 9, 1976
    Boston, Mass.

22. BRANCHING TASK FORCE
    August 12, 1976
    New York, N.Y.

23. PROVIDERS COMMITTEE
    August 25, 1976
    Cockeysville, Md.

24. REGULATORY ISSUES COMMITTEE
    August 26, 1976
    Cockeysville, Md.

25. USERS COMMITTEE
    August 27, 1976
    Cockeysville, Md.

26. STEERING COMMITTEE
    August 27, 1976
    Cockeysville, Md.

27. FULL COMMISSION
    September 9, 1976
    Washington, D.C.

28. BRANCHING TASK FORCE
    September 9, 1976
    Washington, D.C.

29. STEERING COMMITTEE
    September 9, 1976
    Washington, D.C.

30. SUPPLIERS COMMITTEE
    September 13, 1976
    Washington, D.C.



31.  REGULATORY ISSUES COMMITTEE
     October 7, 1976
     Atlanta, Ga.

32.  PROVIDERS COMMITTEE
     October 7, 1976
     Atlanta, Ga.

33.  USERS COMMITTEE
     October 7, 1976
     Atlanta, Ga.

34.  BUDGET COMMITTEE
     October 7, 1976
     Atlanta, Ga.

35.  FULL COMMISSION
     October 8, 1976
     Atlanta, Ga.

36.  USERS COMMITTEE
     (Hearings on Consumer
     Issues in EFT)
     October 26-27, 1976
     Washington, D.C.

37.  REGULATORY ISSUES COMMITTEE
     (Hearings on the Branch/Terminal
     Issue)
     October 28-29, 1976
     Washington, D.C.

38.  REGULATORY ISSUES COMMITTEE
     November 10, 1976
     Washington, D.C.

39.  PROVIDERS COMMITTEE
     November 10, 1976
     Washington, D.C.

40.  FULL COMMISSION
     November 10, 1976
     Washington, D.C.

41.  PROVIDERS COMMITTEE
     (Hearings on the Role of
     Government in EFT)
     November 11-12, 1976
     Washington, D.C.

42.  TASK FORCE ON POS SWITCHES
     (Workshop)
     December 1-2, 1976
     Omaha, Nebr.

43.  FULL COMMISSION
     December 3, 1976
     Washington, D.C.

44.  STEERING COMMITTEE
     (Senate Testimony)
     December 8, 1976
     Washington, D.C.

45.  PROVIDERS AND REGULATORY ISSUES COMMITTEES
     (Hearings on Sharing)
     December 9-10, 1976
     Washington, D.C.



46. COMMISSION PANEL
    (Testimony before Senate Subcommittee
    on Financial Institutions)
    December 13, 1976
    Washington, D.C.

47. SUPPLIERS COMMITTEE
    (Hearings on EFT Technology)
    December 14, 15, 16, 1976
    San Francisco, Cal.

48. USERS COMMITTEE
    January 3, 1977
    Washington, D.C.

49. SUPPLIERS COMMITTEE
    January 3, 1977
    Washington, D.C.

50. REGULATORY ISSUES COMMITTEE
    January 4, 1977
    Washington, D.C.

51. PROVIDERS COMMITTEE
    January 4, 1977
    Washington, D.C.

52. USERS COMMITTEE
    January 11, 1977
    Sawgrass, Fla.

53. SUPPLIERS COMMITTEE
    January 12, 1977
    Sawgrass, Fla.

54. REGULATORY ISSUES COMMITTEE
    January 13, 1977
    Sawgrass, Fla.

55. PROVIDERS COMMITTEE
    January 14, 1977
    Sawgrass, Fla.

56. INTERIM REPORT TASK FORCE
    January 28, 1977
    Washington, D.C.

57. FULL COMMISSION
    February 9-10, 1977
    Williamsburg, Va.

58. FULL COMMISSION
    March 11, 1977
    Washington, D.C.

59. STEERING COMMITTEE
    March 11, 1977
    Washington, D.C.

60. BUDGET COMMITTEE
    March 14, 1977
    Washington, D.C.

61. BUDGET COMMITTEE
    March 17, 1977
    Washington, D.C.

62. BUDGET COMMITTEE
    March 23, 1977
    Washington, D.C.



63. SUPPLIERS COMMITTEE
    April 6, 1977
    Washington, D.C.

64. SHARING COMMITTEE
    April 6, 1977
    Washington, D.C.

65. FULL COMMISSION
    April 7, 1977
    Washington, D.C.

66. SUPPLIERS COMMITTEE
    May 3, 4, 5, 1977
    Annapolis, Md.

67. COST ANALYSIS COMMITTEE
    May 11, 1977
    Denver, Colo.

68. PUBLIC INTERCHANGE COMMITTEE
    May 12, 1977
    Denver, Colo.

69. CONSUMERS COMMITTEE
    May 12, 1977
    Denver, Colo.

70. CREDIT MARKETS COMMITTEE
    May 13, 1977
    Denver, Colo.

71. INTERNATIONAL COMMITTEE
    May 13, 1977
    Denver, Colo.

72. FULL COMMISSION
    May 13, 1977
    Denver, Colo.

73. SHARING COMMITTEE
    May 14, 1977
    Denver, Colo.

74. CONSUMERS COMMITTEE
    May 25, 1977
    Washington, D.C.

75. SHARING COMMITTEE
    June 1, 1977
    Washington, D.C.

76. FULL COMMISSION
    June 14, 1977
    Washington, D.C.

77. INTERNATIONAL COMMITTEE
    June 14, 1977
    Washington, D.C.

78. INTERNATIONAL COMMITTEE
    (Symposium on Foreign
    Payments Systems)
    June 15, 16, 17, 1977
    Washington, D.C.

79. INTERNATIONAL COMMITTEE
    (Symposium on Foreign
    Payments Systems)
    June 20-21, 1977
    New York, N.Y.



80. SUPPLIERS COMMITTEE
    June 28, 29, 30, 1977
    Red Bank, N.J.

81. CREDIT MARKETS WORKSHOP
    July 6, 1977
    Chicago, Ill.

82. MONETARY POLICY COMMITTEE
    July 6, 1977
    Chicago, Ill.

83. PUBLIC INTERCHANGE COMMITTEE
    July 7, 1977
    Chicago, Ill.

84. FULL COMMISSION
    July 8, 1977
    Chicago, Ill.

85. PUBLIC INTERCHANGE COMMITTEE
    July 15, 1977
    Sacramento, Cal.

86. SHARING COMMITTEE
    July 18, 1977
    Washington, D.C.

87. FINAL REPORT COMMITTEE
    July 18, 1977
    Washington, D.C.

88. FINAL REPORT COMMITTEE
    July 21, 1977
    Washington, D.C.

89. FINAL REPORT COMMITTEE
    July 29, 1977
    Washington, D.C.

90. CONSUMER COMMITTEE
    August 10, 1977
    Washington, D.C.

91. PUBLIC INTERCHANGE COMMITTEE
    August 10, 1977
    Washington, D.C.

92. SUPPLIERS COMMITTEE
    August 11, 1977
    Washington, D.C.

93. SHARING COMMITTEE
    August 11, 1977
    Washington, D.C.

94. CREDIT MARKETS COMMITTEE
    August 12, 1977
    Washington, D.C.

95. COMPETITIVE IMPACTS COMMITTEE
    August 12, 1977
    Washington, D.C.

96. FINAL REPORT COMMITTEE
    August 12, 1977
    Washington, D.C.

97. FINAL REPORT COMMITTEE
    August 24, 1977
    Washington, D.C.



98. **INTERNATIONAL COMMITTEE**
    **August 25, 1977**
    **Washington, D.C.**

99. **FINAL REPORT COMMITTEE**
    **September 1, 1977**
    **Washington, D.C.**

100. **FULL COMMISSION**
     **September 6-9, 1977**
     **Chatham, Mass.**

101. **FINAL REPORT COMMITTEE**
     **September 9, 1977**
     **Chatham, Mass.**

102. **FINAL REPORT COMMITTEE**
     **September 15, 1977**
     **Washington, D.C.**

103. **FINAL REPORT COMMITTEE**
     **September 26, 1977**
     **Washington, D.C.**

104. **FINAL REPORT COMMITTEE**
     **October 13, 1977**
     **Washington, D.C.**

105. **FULL COMMISSION**
     **October 27, 1977**
     **Washington, D.C.**

Digitized by Google

Digitized by Google



Appendix F

# Witnesses at NCEFT Hearings and Participants in NCEFT Workshops and Seminars

**WITNESSES AT NCEFT HEARINGS**

The following are names of witnesses who presented testimony at the five sets of public hearings conducted by the Commission in October, November, and December 1976. The lists are separated by hearing and appear in chronological order, with each witness who presented a separate, formal statement listed alphabetically. Names of individuals who accompanied a witness and contributed information for the record, but who did not submit a prepared statement, are included beneath the name of the witness they accompanied.

**USERS COMMITTEE HEARINGS ON "CONSUMERS' ISSUES IN EFTS," OCTOBER 26 and 27, 1976, WASHINGTON, D.C.**

ANNA ALDAMA, Program Planner, National Consumer Information Center, Washington, D.C.

JOHN BARBER, Director of Planning, Mercantile Bank Shares Corporation, Baltimore, Md.

FRITZ BIERMEIER, Vice President, Supermarkets General Corporation; Woodbridge, N.J.; Chairman, Joint EFT Committee, National Association of Food Chains (NAFC)/Supermarket Institute
    accompanied by:
THOMAS K. ZAUCHA, Director of Public Affairs, NAFC

MARK BUDNITZ, Executive Director, National Consumer Law Center, Boston, Mass.

ROBERT BYROAD, Manager, Tower Credit Union, Fort Meade, Md.

LAWRENCE CONNELL, JR., Banking Commissioner, State of Connecticut, representing National Association of State Savings and Loan Supervisors (NASSLS), Washington, D.C.
    accompanied by:
CHARLES E. ARON, Nebraska Assistant Director of Banking and Finance, and
WILLIAM S. BERGMAN, Executive Vice President, NASSLS

ANTHONY DEREZINSKI, State Senator, State of Michigan; Chairman, Senate Corporate and Economic Development Committee



BARRY DEUTSCH, Director of Marketing and Vice President, Provident National Bank, Pittsburgh, Pa.; Member, Executive Committee, Bank Marketing Association

WILLIAM DUNKELBERG, Associate Professor of Economics; Associate Director, Credit Research Center, Purdue University

CAROL GREENWALD, Commissioner of Banks, State of Massachusetts

MAURICE GREGG, Vice President, Gimbel Brothers, Inc.; Chairman of EFT Committee of National Retail Merchants Association (NRMA), New York, N.Y.
    accompanied by:
SHELDON FELDMAN, Weil, Gotshal & Manges, Attorneys, Washington, D.C., NRMA Counsel

ROBERT HAYDOCK, Bingham, Dana & Gould, Attorneys, Boston, Mass.; Chairman, 3-4-8 Subcommittee of the Permanent Editorial Board of the Uniform Commercial Code; Commissioner on Uniform State Laws, State of Massachusetts

KAREN HAYES, Director, Consumer Affairs, Stop & Shop Companies; Member, Joint EFT Committee National Association of Food Chains/Supermarket Institute, Woodbridge, N.J.; Member, NAFC Consumer Affairs Committee

PAUL HOMRIGHAUSEN, Morrison & Foerster, Attorneys, San Francisco; General Counsel, National Automated Clearing House Association

VIRGINIA KNAUER, Special Assistant to the President for Consumer Affairs, Washington, D.C.

KENNETH LARKIN, Senior Vice President, Bank of America, San Francisco, representing American Bankers Association's Privacy Task Force

JAMES L. MacFARLANE, Vice President, Rocky Mountain Bank Note Company; First Vice President, Bank Stationers Association, New York, N.Y.
    accompanied by:
DAVID RUDNICK, President, Rudco Industries, Inc., Teaneck, N.J.; Second Vice President, Bank Stationers Association

CHARLES MARSON, Legal Director, American Civil Liberties Union of Northern California, San Francisco, Calif.

STEVEN MUELLER, Vice President, System Development Division, Transamerica Financial Corporation; Chairman, National Consumer Finance Association Task Force on EFT, Washington, D.C.

ALLAN NICHOLS, Senior Vice President, First National Bank of Atlanta
    accompanied by:
PAUL HILL, Senior Vice President, First National Bank of Atlanta
ROBERT CREEKMORE, Vice President, First National Bank of Atlanta

FRANCIS B. NIMICK, JR., President, Dollars Savings Bank, Pittsburgh, Pa.



KATHLEEN O'REILLY, Legislative Director, Consumer Federation of America, Washington, D.C.

NORMAN PENNEY, Professor of Law, Cornell University; Member, 3-4-8 Subcommittee of the Permanent Editorial Board of the Uniform Commercial Code

RICHARD PETERSON, Legislative Counsel, Independent Bankers Association of America (IBAA), Washington, D.C.
    accompanied by:
MEYER EISENBERG, Counsel, IBAA, Washington, D.C.

DAVID PHILLIPS, Senior Vice President, Citibank, N.A., New York, N.Y.

EARL WARD, President, AFS Associates, Cincinnati, Ohio, representing Independent Bankers Association of America

WILLIS WARE, Computer Scientist, Rand Corporation, Santa Monica, Calif.; Chairman, Health, Education, and Welfare Secretary's Advisory Committee on Automated Personal Data Systems; Vice Chairman of Privacy Protection Study Commission

ALAN WESTIN, Professor of Public Law and Government, Columbia University

ROBERTA WIELOSZYNSKI, Director, Office of Consumer Affairs, City of Syracuse, N.Y.

REGULATORY ISSUES COMMITTEE HEARINGS ON "THE BRANCH TERMINAL ISSUE," OCTOBER 28 and 29, 1976, WASHINGTON, D.C.

FRANK BARHAM, Assistant Treasurer, Shell Oil Company

PAUL DEATON, President, National Cash Register Employees Credit Union, Dayton, Ohio

E. D. DUNN, Commissioner of Banking and Finance, State of Georgia

GEORGE ELLIS, President, Home Savings Bank of Boston; Chairman, Transfer of Funds Committee, Savings Bank Association of Massachusetts

CHARLES FISCHER, Secretary, Universal Air Travel Plan, Washington, D.C.

MARK FLANNERY, Assistant Professor of Finance, Wharton School of Finance, University of Pennsylvania

LEE GUNDERSON, President, Bank of Osceola, Osceola, Wis., and Member of the Board, American Bankers Association (ABA)
    accompanied by:
CARL GRISWOLD, Chairman, Payment Systems Policy Coordinating Group, ABA; Senior Vice President, Southeast Bank Corporation, Miami, Fla.

JACK GUTTENTAG, Professor of Banking, Wharton School of Finance, University of Pennsylvania

HOMER J. HOLLAND, Vice President, First National Bank of Chicago

361



DONALD ISAACS, Director of EFT Planning, BayBanks, Inc., Boston, Mass.

BRIAN T. KAYE, Deputy Commissioner, Office of the Commissioner of Savings and Loans, State of Wisconsin, representing National Association of State Savings and Loan Supervisors (NASSLS)
   accompanied by:
LYNN FINNEY, Associate Counsel, NASSLS, and
WILLIAM BERGMAN, Executive Vice President, NASSLS

WILLIAM KIRCHNER, Chairman, Richfield Bank & Trust Company, Richfield, Minn. ·

ALFRED LAPAN, President, South Middlesex Cooperative Bank and First Vice President, Massachusetts Cooperative Bank League, Boston, Mass.

PETER MADDEN, Senior Vice President, State Street Bank of Boston; Treasurer, Value Exchange Corporation

CHARLES O. MADDOX, JR., President, Peoples Bank, Winder, Ga.; President, Independent Bankers Association of America (IBAA)
   accompanied by:
MEYER EISENBERG, Lawler, Kent & Eisenberg, Attorneys, Washington, D.C., Counsel to IBAA, and
RICHARD W. PETERSON, Counsel to IBAA

GARTH MARSTON, Acting Chairman, Federal Home Loan Bank Board (FHLBB)
   accompanied by:
ROBERT THOMPSON, EFT Specialist, FHLBB
STEVE EGE, Associate General Counsel, FHLBB

STEPHEN E. MUELLER, Vice President, System Development Division, Transamerica Financial Corporation; Chairman, National Consumer Finance Association Task Force on EFT, Washington, D.C.

ROBERT NEVILLE, Washington Counsel, National Restaurant Association

JOHN B. OLIN, Superintendent of Banking, State of Oregon; President, Conference of State Bank Supervisors (CSBS)
   accompanied by:
WILLIAM H. RILEY, Director, Banking and Finance, State of Nebraska, representing CSBS, and
GLENN L. ALLEN, JR., Director of Supervisory Procedures and Automation, CSBS

DELWYN OLSON, Assistant Controller, Dayton-Hudson Corporation, Minneapolis, Minn., representing American Retail Federation (ARF)
   accompanied by:
MILTON W. SCHOBER, Special Counsel, ARF, and
GERALD MONTGOMERY, Manager of Systems Programming, J. C. Penney Company

JOHN PIGNATARO, Director, Systems and Data Processing and Assistant Comptroller, Sheraton Corporation, Boston, Mass.

DANIEL PRIVES, Law Student, Harvard Program on Information Resources Policy

WILLIAM H. RILEY, Director of Banking and Finance, State of Nebraska

362



P. JAMES RIORDAN, General Counsel, National Association of Mutual Savings Banks, New York, N.Y.

JOHN E. RUPERT, President, Broadview Savings and Loan Company, Cleveland, Ohio

DAVID SMITH, Chief Economist and Senior Vice President, Glendale Savings and Loan Association, Glendale, Calif.

JAMES SMITH, Former Comptroller of the Currency; Executive Vice President, First Chicago Corp., Chicago, Ill.

NORMAN STRUNK, Executive Vice President, U.S. League of Savings Associations, Chicago, Ill.

JOHN SVAGZDYS, President, Massachusetts Credit Union League; President, Brockton Credit Union, Brockton, Mass.

W. JAMES TOZER, JR., Senior Vice President and General Manager, Citibank, N.A., New York, N.Y.

GORDON WARREN, President, Pulaski County Bank, Richland, Mo.

FRANK WIELGA, President, National Association of Federal Credit Unions and Manager, Philadelphia Telco Federal Credit Union, Philadelphia, Pa.

PAUL A. WILLAX, Executive Vice President, Erie County Savings Bank, Buffalo, N.Y.

JAMES WILLIAMS, President, Government Employees Credit Union, San Antonio, Tex.; President, Credit Union National Association, Inc., Madison, Wis.

THOMAS WILLIAMS, President, First National Bank of Atlanta, Ga.


PROVIDERS COMMITTEE HEARINGS ON "ROLE OF GOVERNMENT IN EFTS," NOVEMBER 11 and 12, 1976, WASHINGTON, D.C.

DONALD I. BAKER, Assistant Attorney General, Antitrust Division, U.S. Department of Justice

EUGENE J. BAUR, Vice President and Secretary, Century Federal Savings and Loan Association, Pittsburgh, Pa.

WILLIAM BAXTER, Professor of Law, Stanford University

H. L. BAYNES, President, National Automated Clearing House Association, Washington, D.C.; Senior Vice President, United Virginia Bankshares, Inc.; Payment System Policy Coordinating Group Member, American Bankers Association
    accompanied by:
VIRGIL M. DISSMEYER, Vice President, United Virginia Bankshares, Inc.

ROBERT CAPONE, Vice President, J.C. Penney Company, Inc., New York, N.Y.
    accompanied by:
GEORGE GORDIN, JR., Senior Attorney representing J.C. Penney Company, Inc.

363



J. T. ELLINGTON, JR., Senior Assistant Postmaster
General, U.S. Postal Service, Washington, D.C.

JOHN F. FISHER, Vice President, City National Bank
of Columbus, Ohio

WILLIAM W. FLETCHER, Chairman, EFTS Committee,
Association of Data Processing Service Organizations;
Montvale, N.J.; President, Midwest Advanced Computer
Services, Inc.

FRANK R. GAILOR, Gailor & Elias, Attorneys,
Washington; General Counsel, National Association
of State Savings and Loan Supervisors

STEPHEN S. GARDNER, Vice Chairman, Board of Gover-
nors, Federal Reserve System, Washington, D.C.
    accompanied by:
JAMES KUDLINSKI, Senior Staff Officer, Board of
Governors of the Federal Reserve System

H. R. GILKERSON, Chairman, Funds Transfer Committee,
National Association of Federal Credit Unions;
Treasurer-Manager, Ohio Military Federal Credit
Union, Rickenbacker Air Force Base, Ohio

RONALD W. HASELTON, Chairman, Mutual Institutions
National Transfer System, Inc.; President, Consumer
Savings Bank, Worcester, Mass.; representing
National Association of Mutual Savings Banks (NAMSB)
    accompanied by:
JAMES RIORDAN, General Counsel, NAMSB, and
DONALD E. LAWSON, Assistant to the President, NAMSB

WALTER R. HINCHMAN, Chief, Common Carrier Bureau,
Federal Communications Commission (FCC), Washington,
D.C.
    accompanied by:
JAMES BLASZAK, Common Carrier Bureau, FCC

THOMAS H. HUSTON, Superintendent of Banking, State of
Iowa; Supervisory Procedures Committee, Conference of
State Bank Supervisors (CSBS)
    accompanied by:
GLENN L. ALLEN, JR., Director of Supervisory Proce-
dures, CSBS

WILLIAM E. HUTTON, Division Vice President, Corporate
Bank Services, Automatic Data Processing, Inc.,
Clifton, N.J.
    accompanied by:
ROBERT SINGER, Corporate Legal Staff

FRANK J. KUCERA, President, New York State Credit
Union League; General Manager, IBM-Endicott Employees
Federal Credit Union, Endicott, N.Y., representing
Credit Union National Association

JOHN F. LEE, Executive Vice President and Secretary,
New York Clearing House Association, New York, N.Y.

NEAL J. McDONALD, Senior Vice President and Treasurer,
Twin Cities Federal Savings and Loan Association,
Minneapolis, Minn.

LORENA MATTHEWS, Deputy Administrator, National
Credit Union Administration (NCUA), Washington, D.C.
    accompanied by:
DR. WALTER J. STEWART, Assistant Administrator,
Office of Research and Analysis, NCUA



PHILLIPS M. MONTROSS, Executive Vice President, Midwest Automated Clearing House Association, Chicago, Ill.

DANIEL J. NICHOLAS, President, First Federal Savings and Loan Association, Rockford, Ill.

J. B. PATTON, Director of EFTS Development, Boeing Computer Services, Inc., Seattle, Wash.

LASZLO RAKOCZI, Corporate Vice President and Financial Manager, Tymshare, Inc., Cupertino, Calif.

JOHN J. REYNOLDS, President and Chief Executive Officer, Interbank Card Association, New York, N.Y.

BERNHARD W. ROMBERG, President, Payment and Telecommunication Services Corporation, New York, N.Y.
    accompanied by:
PAUL L. ABRAHAM, Senior Vice President, First National Bank of Kansas City

TOM B. SCOTT, JR., Chairman, Legislative Committee, U.S. League of Savings Associations; President, Unifirst Federal Savings and Loan Association, Jackson, Miss.
    accompanied by:
LAMAR BRANTLEY, Staff, U.S. League of Savings Associations, Chicago, Ill.

GLEN SELF, Vice President, Electronic Data Systems, Dallas, Tex.

LARRY R. SHOTWELL, President of Economic Services, Commercial Credit Corporation, Baltimore, Md.; Member, National Consumer Finance Association Task Force on EFT

WILLIAM P. STRITZLER, Marketing Manager-Finance, American Telephone & Telegraph (AT&T), Morristown, N.J.
    accompanied by:
ROBERT SANDERBORD, Legal Counsel, AT&T
STEVEN GELLER, Staff, AT&T

NORMAN J. TICE, President, City Bank, St. Louis, Mo.

PHILLIP M. WALKER, General Counsel and Vice President, Telenet Communications Corporation, Washington, D.C.

PROVIDERS AND REGULATORS COMMITTEES HEARINGS ON "THE SHARING OF EFT SYSTEMS," DECEMBER 9 and 10, 1976, WASHINGTON, D.C.

HARRY W. ALBRIGHT, JR., President, The Dime Savings Bank of New York; President and Chief Executive Officer, Thrift Transfer Services, Inc.; representing National Association of Mutual Savings Banks (NAMSB)
    accompanied by:
JAMES RIORDAN, General Counsel, NAMSB

WILLIS W. ALEXANDER, Executive Vice President, American Bankers Association (ABA), Washington, D.C.
    accompanied by:
GERALD W. LOWRIE, Executive Director for Government Relations, ABA

EDWARD S. AMAZEEN, Vice President, First National Bank of Boston

THOMAS ANDES, Executive Vice President, The First National Bank of Belleville, Ill.



JAMES BELL, Jones, Day, Reavis & Pogue, Attorneys, Washington, D.C.; General Counsel, Conference of State Bank Supervisors

FRITZ BIERMEIER, Vice President, Supermarkets General Corporation, representing Joint Committee on EFT, National Association of Food Chains/Supermarket Institute, Woodbridge, N.J.

WILLIAM B. BRANDT, Counsel, Nebraska Electronic Transfer System, Inc., Lincoln, Neb.
     accompanied by:
KERMIT HANSEN, President, Nebraska Electronic Transfer System, Inc.,
NORMAN LUND, Electronic Banking Officer, U.S. National Bank of Omaha, and
ROBERT E. HARRIS, Executive Manager, Nebraska Bankers Association

JOHN M. BRASSEY, Deputy Director, Idaho Department of Finance, representing Conference of State Bank Supervisors

JAMES BRINKER, President, NeKan Bell Credit Union, Topeka, Kan.; Treasurer, Credit Union National Association

RUSSELL C. BROWNE, Vice President and Director of Marketing, Commercial Federal Savings and Loan Association, Omaha, Neb.

LESTER CHANDLER, Professor of Economics, Princeton University

JOEL J. CRABTREE, Vice President, Continental Illinois National Bank and Trust Company of Chicago

ANTHONY DEREZINSKI, State Senator, State of Michigan

GERALD T. DUNNE, Professor of Law, St. Louis University; Editor-in-Chief, Banking Law Journal

WILLIAM N. ELLIOTT, Vice President, Product Planning & Control, Northeast DataCom, Inc., Woodbridge, Conn.

LYNNE D. FINNEY, Gailor & Elias, Attorneys, Washington, D.C.; General Counsel, National Association of State Savings and Loan Supervisors

CHARLES GARRISON, President, Florida Savings and Loan Services, Orlando, Fla.

BRUCE GILCHRIST, Director of Computing Activities, Columbia University

TIMOTHY F. GRIFFIN, Commissioner of Savings and Loan Assocations, Illinois Department of Finance, representing National Association of State Savings and Loan Supervisors

CHARLES G. HARDIN, Treasurer and General Manager, State Department Federal Credit Union, Washington, D.C.

BRIAN T. KAYE, Deputy Commissioner, Office of Savings and Loan Commission, State of Wisconsin, representing National Association of Savings and Loan Supervisors

WILLIAM T. LIFLAND, Cahill, Gordon & Reindel, New York, N.Y.



JOHN E. LYDICK, President, TMS Corporation of the Americas; Vice President, First Federal Savings and Loan Association of Lincoln, Neb.

PETER MADDEN, Senior Vice President, State Street Bank of Boston, representing Value Exchange Corporation
    accompanied by:
DEAN W. HARRISON, Senior Vice President and General Counsel, State Street Bank

ROBERT MOLER, Deputy Commissioner of Banking and Finance, State of Georgia, representing Conference of State Bank Supervisors

STEPHEN E. MUELLER, Vice President, System Development Division, Transamerica Financial Corporation; Chairman, National Consumer Finance Association Task Force on EFT, Washington, D.C.
    accompanied by:
T. JOSEPH WAHRER, Vice President, Dial Financial Corporation; Member, NCFA Task Force on EFTS

DELWYN OLSON, Assistant Comptroller, Dayton-Hudson Corporation, representing American Retail Federation (ARF), Washington, D.C.
    accompanied by:
MILTON SCHOBER, Counsel, ARF, Washington, D.C.

JOHN S. REED, Executive Vice President, Citibank, N.A., New York, N.Y.

KENNETH REICH, Director, Funds Transfer Research Department, U.S. League of Savings Associations, Chicago, Ill.

ROBERT P. SHAY, Professor of Banking and Finance, Columbia University

JOHN L. SPAFFORD, President, Associated Credit Bureaus (ACB), Inc., Houston, Tex.
    accompanied by:
WILLIAM B. PRICE, President, Credit Bureau of Columbus, Ohio; Chairman, ACB Task Force on EFT

TED L. SUSS, State Representative, State of Minnesota

ROBERT G. VANDEMARK, Executive Vice President, Operations and Control, Garfinckel, Brooks Brothers, Miller & Rhoads, Inc.; Member, EFT Committee, National Retail Merchants Association (NRMA), New York, N.Y.
    accompanied by:
SHELDON FELDMAN, Counsel, NRMA

ROBERT WILD, Communications and Planning Specialist, Navy Federal Credit Union, Washington, D.C.

LARRY D. WRIGHT, Vice President, First National Bank and Trust Company, Galesburg, Ill.


SUPPLIERS COMMITTEE HEARINGS ON "EFT TECHNOLOGY--PRESENT AND FUTURE," DECEMBER 14, 15, and 16, 1976, SAN FRANCISCO, CALIF.

M. M. ATALLA, President, Atalla Technovations, Sunnyvale, Calif.

A. G. W. BIDDLE, President, Computer & Communications Industry Association, Rosslyn, Va.



LEWIS BROTMAN, Manager, Marketing Identification Systems, Autonetics Group, Rockwell International, Anaheim, Calif.

DR. RUTH DAVIS, Director, Institute for Computer Sciences and Technology, National Bureau of Standards, Washington, D.C.

RICHARD L. DEAL, President, Richard L. Deal & Associates, Inc., Washington, D.C.

WALLACE C. DOUD, Vice President, Commercial and Industry Relations, International Business Machines Corporation, Armonk, N.Y.

LEONARD A. FISH, President, Bank Computer Network Corporation, Schiller Park, Ill.

PAUL F. GLASER, Senior Vice President, Citibank, N.A., and President, Transaction Technology, Inc., Los Angeles, Calif.

DR. LANCE J. HOFFMAN, Assistant Professor, Department of Electrical Engineering and Computer Sciences, The University of California–Berkeley

EDWARD J. HOGAN, Assistant Vice President of Security, Interbank Card Association, New York, N.Y.

SEYMOUR JEFFERY, Chief, Systems and Software Division, National Bureau of Standards, Washington, D.C.

DR. LELAND L. JOHNSON, Director, Communications Policy Program, Rand Corporation, Santa Monica, Calif.

ARTHUR E. LEMAY, President, Savings Management Computer Corporation, Boston, Mass.; Chairman, Operations Committee, Mutual Institutions National Transfer System, Inc. (MINTS)

DR. VICTOR S. LEVADI, Director, Terminal Systems, Addressograph-Multigraph Corporation, Cleveland, Ohio

PETER F. McCLOSKEY, President, Computer and Business Equipment Manufacturers Association, Washington, D.C.

FRED R. MEIER, Vice President, Corporate Product Management, Burroughs Corporation, Detroit, Mich.

RICHARD J. MINDLIN, Assistant Vice President, Industry Standards and Relations, NCR Corporation, Dayton, Ohio

RONALD H. OSTERBERG, Osterberg Associates, Inc., Torrance, Calif.

DONN B. PARKER, Senior Information Processing Analyst, Stanford Research Institute, Menlo Park, Calif.

GERALD J. PITTENGER, President, Great Western Union Federal Savings and Loan Association, representing U.S. League of Savings Associations, Chicago, Ill.
    accompanied by:
TRENTON THOMPSON, Staff, U.S. League of Savings Associations

LASZLO RAKOCZI, General Manager and Corporate Vice President--Technical Research and Development, Tymshare, Inc., Cupertino, Calif.
    accompanied by:
WARREN PRINCE, Staff, Tymshare, Inc.

368



M. J. SARGEANT, Advanced Systems Department Manager,
System Development Corporation, Santa Monica, Calif.

RUSSELL SHIELDS, President, SEI Computer Services,
Chicago, Ill.

WILLIAM P. STRITZLER, Marketing Manager--Finance
Industry, American Telephone & Telegraph (AT&T),
Morristown, N.J.
     accompanied by:
STEVEN L. GELLER, Staff, AT&T
ROBERT M. SANDERFORD, AT&T Legal Counsel

CHARLES Q. SWARTS, Secretary, Aetna Life and
Casualty, Hartford, Conn.

JEAN N. TARIOT, Chairman of the Board, Incoterm
Corporation, Wellesley Hills, Mass.

GEORGE H. WARFEL, Technical Consultant, Menlo Park,
Calif.

CLARK WEISSMAN, Deputy and Chief Technologist,
Research and Development Division, System Develop-
ment Corporation, Santa Monica, Calif.

Digitized by Google

OUTSIDE PARTICIPANTS IN WORKSHOPS, SEMINARS, AND SYMPOSIA

In addition to witnesses who testified at the Commission's public hearings, many individuals contributed their experience and expertise to the work of the Commission by participating in workshops, seminars, and symposia. The names of these outside participants follow.

TECHNOLOGY WORKSHOP, JUNE 15, 1976, WASHINGTON, D.C.

Paul Armer
Chairman, Committee on EFT
American Federation of Information Processing
  Societies
Menlo Park, Calif.

Larry F. Linden
President
Malco Plastic
Garrison, Md.

Donald G. Long
Product Administrator
IBM Corporation
Princeton, N.J.

Daniel D. McCracken
Vice Chairman, Committee on EFT
American Federation of Information Processing
  Societies
Ossining, N.Y.

F. Ken Morioka
Vice President, Communications Systems Division
Control Data Corporation
Santa Ana, Calif.

David L. Pease
Director, EFT Systems and Services
NCR Corporation
Dayton, Ohio



NATIONAL BUREAU OF STANDARDS WORKSHOP, MARCH 7-8,
1977, GAITHERSBURG, MD.

James T. Booth
Standards Director
American Bankers Association
Washington, D.C.

Charles Borson
Consultant
Hinsdale, Ill.

A. C. Brown
Addressograph Multigraph
Warrensville, Ohio

William R. Brown
Burroughs Corporation
Detroit, Mich.

Charles Fischer
Air Transport Association
Washington, D.C.

Darold D. Hoops
Vice President, Master Charge Division
Continental Bank
Chicago, Ill.

Charles Hyatt
Executive Director
CRAFTS, Inc.
Columbus, Ohio

Seymour Jeffery
Chief, Systems & Software Division
National Bureau of Standards
Washington, D.C.

Mark Leymaster
Counsel
Consumer Law Center
Boston, Mass.

Trenton C. Thompson
Research Associate
U.S. League of Savings Associations
Chicago, Ill.

PANEL ON COMPETITION AMONG VENDORS, APRIL 25, 1977,
WASHINGTON, D.C.

Lynn Hopewell
Executive Staff
Computer Sciences Corporation
Falls Church, Va.

Manley R. Irwin
Professor, Whittemore School of Business and
  Economics
University of New Hampshire
Durham, N.H.

Leland L. Johnson
Director, Communications Policy Program
Rand Corporation
Washington, D.C.

Digitized by 

Herbert E. Marks, Esq.
Wilkinson, Cragun & Barker
Washington, D.C.

Victor J. Toth, Esq.
Cohn and Marks
Washington, D.C.


PUBLIC INTERCHANGE MEETING, MAY 12, 1977,
DENVER, COLO.

Retailers Group Chairman:
Lee Bennett
Executive Director
Colorado Retail Council
Denver, Colo.

Financial Institutions Group Chairman:
A. Dale Browning
Senior Vice President
Colorado National Bank
Denver, Colo.

Regulators Group Chairman:
D. J. Fair
Commissioner of Savings & Loans
State of Colorado
Denver, Colo.

Consumer Group Chairwoman:
Mary Ann Peterson
Jefferson County Extension Service
Colorado State University
Golden, Colo.

INTERNATIONAL SYMPOSIA ON PAYMENTS SYSTEMS,
JUNE 15-17 and 20-21, 1977, WASHINGTON, D.C. and
NEW YORK, N.Y.

V. D'Ambrosi
Banca Commerciale Italiana
Milano, Italy

H. L. Baines
United Virginia Bankshares, Inc.
Richmond, Va.

Andre Bousequet
French Postal Giro
Paris, France

John A. Brooks
William & Glyn's Bank
London, England

Richard Butler
International Telecommunications Union
Geneva, Switzerland

L. W. Corp
Bank of England
London, England

Morris D. Crawford, Jr.
The Bowery Savings Bank
New York, N.Y.

W. G. Dalmijn
Bank Giro Centrale
Amsterdam, The Netherlands



W. David
Deutsche Bundesbank
Frankfurt, Germany

Rolf Engler
Leiter de Hauptabtelung
Frankfurt, Germany

Grover W. Ensley
International Savings Bank Institute
Washington, D.C.

John J. Fischer
City National Bank
Columbus, Ohio

Karl-Erik Haeger
Swedish Postal Giro
Stockholm, Sweden

Melec du Halgouet
Societe Generale
Paris, France

Ronald W. Haselton
Consumer Savings Bank
Worcester, Mass.

Yuzo Hirayama
Federation of Bank Associations of Japan
Tokyo, Japan

Dr. Hoftijzer
Netherlands Postal Giro
The Hague, The Netherlands

G. H. J. Hogg
Databank Systems, Ltd.
Wellington, New Zealand

Kevin Kearney
Bank for International Settlements
Basle, Switzerland

Eero Kostamo
Finnish Bankers Association
Helsinki, Finland

Gerald Kramer
Chase Manhattan Bank
New York, N.Y.

Bo Leufstedt
Spadab (Savings Bank Association)
Stockholm, Sweden

E. J. Lindwall
Bank of Montreal
Montreal, Canada

Joseph Madigan
Borden Corporation
New York, N.Y.

J. Marbacker
Swiss National Bank
Zurich, Switzerland

Renato De Mattia
Italian Savings Banks Association
Rome, Italy



Richard Matteis
Citibank
New York, N.Y.

Charles J. McGee
Manufacturers Hanover Trust
New York, N.Y.

I. Monti
Banca Commerciale Italiana
Milano, Italy

Angel Gil Navaz
Consejo Superior Bancario
Madrid, Spain

George Perunic
Bank of America
New York, N.Y.

Kaare Petersen
Norwegian Bankers Association
Oslo, Norway

R. Polo
Banca Commerciale Italiana
Milano, Italy

M. J. Poullet
Banque National de Belgique
Brussels, Belgium

Charles Read
Inter-Bank Research Organization
London, England

Sepp Reidlinger
Creditanstalt Bankverein
Vienna, Austria

J. Ruix Kaiser
Caja de Pensiones
Barcelona, Spain

Rafael Shepard
Banco National de Mexico
Mexico City, Mexico

Charles Slade
Canadian Bankers Association
Toronto, Canada

Wolfgang Starke
Geschaftsfuhrer des Deutschen Sparkassen
und Giroverbandes
Bonn, Germany

Paul C. Todd
P. A. International Management Consultants, Ltd.
London, England

Erik Trolle-Schultz
SRI International
Menlo Park, Calif.

Serge Vachon
Bank of Canada
Ottawa, Canada

Paul Volker
Federal Reserve Bank
New York, N.Y.



Samuel Wainwright
British Postal Giro
London, England

Raymond Wechsler
RCA Corporation
New York, N.Y.

George C. White
Chase Manhattan Bank
New York, N.Y.

Rudolf Wirmer
Deutsche Gnossenschaft Bank
Frankfurt, Germany


CREDIT MARKETS SEMINAR, JULY 6, 1977, CHICAGO, ILL.

S. Lees Booth
Senior Vice President
National Consumer Finance Association
Washington, D.C.

James Brown
Center for Consumer Affairs
University of Wisconsin
Milwaukee, Wis.

William Dunkelberg
Assistant Professor of Economics
Purdue University
West Lafayette, Ind.

Charles F. Haywood
Professor of Economics
University of Kentucky
Lexington, Ky.

Thomas Horan
Manager, Banking Industries Program
SRI International
Menlo Park, Calif.

Frank R. Kennedy
Professor of Law
The University of Michigan
Ann Arbor, Mich.

John Mason
Assistant Professor of Finance
The Wharton School of Finance
The University of Pennsylvania
Philadelphia, Pa.

John Umbeck
Assistant Professor of Economics
Purdue University
West Lafayette, Ind.

Michael Zoroya
Credit Manager
May Department Stores, Inc.
St. Louis, Mo.



PUBLIC INTERCHANGE MEETING, JULY 7, 1977,
CHICAGO, ILL.

Regulators Group Chairman:
Sen. Prescott Bloom
Chairman
Illinois EFT Commission
Springfield, Ill.

Retailers Group Chairman:
Ashley DeShazor
Vice President and Corporate Credit Manager
Montgomery Ward & Co.
Chicago, Ill.

Consumer Group Chairman:
Elliott Hartstein
Chairman, Consumer Protection Committee
Chicago Council of Lawyers
Chicago, Ill.

Financial Institutions Group Chairman:
Thomas Maley
President
Chicago Federal Savings & Loan
Chicago, Ill.

PUBLIC INTERCHANGE MEETING, JULY 15, 1977,
SACRAMENTO, CALIF.

Regulators Group Chairman:
James Campbell
President
Savings Association Central Corporation
San Francisco, Calif.

Retailers Group Chairman:
John J. Hapgood
Executive Vice President
Retailers Credit Association
Sacramento, Calif.

Consumer Group Chairwoman:
Ellen Kastel
Project Director
Center for New Corporate Priorities
Los Angeles, Calif.

Financial Institutions Group Chairman:
L. L. Sidfrid
Manager
Beckman Employees Credit Union
Orange, Calif.





Appendix G

# Other Outside Support for the Commission

In addition to the Commissioners and staff members listed in the front of this report, hundreds of individuals and organizations participated directly in the deliberations and investigations of the Commission.  The number includes the attendees at the public interchange meetings discussed in Appendix D, the hearings witnesses and other experts listed in Appendix F, and the many contributors who responded to requests for information through workshops, questionnaires, and the like.  The Commission has acknowledged their valuable assistance elsewhere in this report.  In this appendix, the Commission wishes to express its thanks to two groups:  those persons who provided staff support to individual Commissioners, and outside consultants who assisted the Commission in documenting and communicating its results.  They are listed below.

STAFF SUPPORT FOR INDIVIDUAL COMMISSIONERS[1]

Kenneth C. Anderson
Steven J. Gordon*
Thomas L. Greaney*
Barbara Richmond*
Constance K. Robinson*

Daniel V. De Simone
Alan Thorndike[2]

Verne S. Atwater
Ronald W. Haselton**
Arthur E. Lemay**
Eugene S. Mann
Robert E. Woodrow
C. Bickford Henchey

James E. Faris
Glenn Allen
William H. Riley**

Lawrence Connell, Jr.
Richard J. Beach*
Daniel Gordon*

Albert A. Foer
Benjamin I. Berman*
Lewis H. Goldfarb*
Barbara Sharpiro

---

[1]*Individuals who were on occasion legally empowered to serve as delegate for a Commissioner from a Federal agency and to cast votes on his behalf are indicated by a single asterisk.  Individuals who were on occasion empowered to represent the interests of one of the 14 Commissioners appointed by name to the Commission are indicated by a double asterisk.*

[2]*Mr. Thorndike served regularly as the representative from the Office of Technology Assessment.*



<u>Roy G. Green</u>
R. Lamar Brantley**
Kenneth E. Reich

<u>Robert E. Lee</u>
Marjorie S. Reed*

<u>George W. Mitchell</u>
James M. Brundy*
Stephen S. Gardner*
Raymond F. Hodgdon
James R. Kudlinski*
Elliott McEntee
Allen L. Raiken
Warren Swaney

<u>John J. Reynolds</u>
Kenneth M. Adams**

<u>Donald L. Scantlebury</u>
Walter L. Anderson*
Raymond M. Chan
James B. Watts*

<u>Thomas W. Taylor</u>
Dennis Gingold*
Robert J. Herrmann*
Louis Mandell*
Richard H. Neiman
Claude A. Raworth*
David Rush*

<u>Gordon R. Worley</u>
Joseph L. Gibson**
George Jones
Raymond G. Young

<u>Richard D. Hill</u>
Frank Curran
Eugene M. Tangney**

<u>William B. Lewis</u>
Richard J. Francis**
William S. Bergman

<u>George Oram</u>
Charles H. Borson
Edward R. Devine, Jr.
William F. Grosser*
Melinda Mount*
Marvin J. Sendrow
Stephen C. Schaffer
Robert O. Thompson*

<u>Robert P. Rogers</u>
Thomas E. Dollar
Gary G. Gilbert
Paul W. Havener
George G. Kershaw
William H. Roelle
David A. Walker

<u>George Waters</u>
James H. Alston
Marjorie Greene**
Dwight A. Miller**

<u>Herb Wegner</u>
Richard A. Collins**
J. Peter Morris

COMMUNICATIONS CONSULTING SUPPORT

Although research consultants are mentioned elsewhere in this report, several persons and organizations, not yet mentioned, provided particularly important contributions to the Commission's work effort. They are listed below.

Thomas R. Ryan
Ruder & Finn, Inc.
Washington, D.C.
(Communications)

Raymond R. Heer
ACE Federal Reporter
Washington, D.C.
(Transcripts)

Karen Burchette
Morgan-Burchette Associates, Inc.
Washington, D.C.
(Graphics and design)

Joseph Foote
Patricia B. Fox
Patricia Helsing
Ruth Macy
Carol Q. O'Neil
Claude E. Owre
Joseph Foote and Associates
Washington, D.C.
(Editorial support)

Barbara Hughes
Editorial Experts
Washington, D.C.
(Report preparation)





Appendix H

# Commission Expenditures by Programs and Functions

The management and expenditure structure of the National Commission on Electronic Fund Transfers was tied directly to the issues that it sought to resolve. Staff and nonpersonnel resources were allocated to support issue examination on the basis of the priorities established by the Commission.

Table H-1 shows the relationships of research programs and support. Research programs and administrative support areas are listed in the left-hand column. The body of this report is organized according to the research areas. The five administrative support areas are shown separately, for the convenience of the reader.

Table H-1 shows that more than 60 percent of the Commission's resources were invested directly in study programs. Of the 40 percent committed to administrative support, more than 60 percent was allocated to general management, i.e., the operations of the Commission Chairman, the Executive Director, and the Director of Research. These management activities were devoted preponderantly to the study programs.

Funds allocated to public affairs, equal to 5 percent of the Commission's resources, helped to develop a dialogue with the American public about EFT. This effort also served the needs of Congressional liaison, the press, and other media. Administrative legal effort required less than 5 percent of the Commission's budget, but provided the Commission with expert assistance in the study programs, as well as in administration. More than 75 percent of the Commission's total expenditures for legal counsel are allocated among the research programs and are not included in the administrative support area in the legal category.

The allocation of resources among the five research programs is an approximate measure of the emphasis the Commission placed on each general area.

Table H-1 also shows Commission resources invested in three other major cost categories—Personnel, Contracts, and Overhead. The Commission allocated 40 percent of its budget to costs of the technical staff. The total cost of full-time personnel amounted to slightly more than 50 percent

Digitized by Google


of the budget.  Commissioner salaries amounted to
about 7 percent.  Commissioners who were employees
of the Federal Government and their Federal agency
staff who assisted them are not included in these
figures.  Nor are the costs of staff of private sec-
tor Commissioners, because these Commissioners did
not seek reimbursement for work performed by their
staff members.

The Commission committed 13 percent of its
budget to costs of outside consultants and con-
tractors.  Approximately 60 organizations and indi-
viduals were retained in these capacities and worked
in many areas, including research on consumer issues,
monetary policy, technology, international develop-
ments in EFT, communications, regulatory policy, and
EFT system costs, as well as EFT case studies.  Also
included are purchased services for editing and
graphics, preparation of transcripts of Commission
meetings and hearings, and typing support.

The Commission spent less than 10 percent of
its budget on travel.  As indicated in Appendix E,
the Commission met as a whole or in committee more
than 100 times in its 21 months of existence.  The
Commission decided to meet not only in Washington,
D.C., But in other cities so that its meetings--all
but two of them public--would be accessible to a wider
audience of citizens.  Meetings were held, among
other places, in Atlanta, Ga., Boston, Mass., Chicago,
Ill., Denver, Colo., Jacksonville, Fla., New York,
N.Y., and Sacramento and San Francisco, Calif.

General Operations accounted for approximately
16 percent of the Commission's budget.  Among the
activities supported were publication of the three
major reports of the Commission and an Internal
Working Document series containing more than 60
research papers.



Table H.1

**NCEFT PROGRAM BUDGET**
**January 1976 – December 1977**

| | PERSONAL SERVICES | | | | NON-PERSONAL SERVICES | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | Commissioners | Technical | Support | Subtotal | Contracts | Travel | General Operations* | Printing | Subtotal | |
| RESEARCH PROGRAMS | $109,227 | $470,302 | $ 72,854 | $652,383 | $228,506 | $147,635 | $174,229 | | $550,370 | $1,202,753 |
| 1.  Consumer Issues | 26,060 | 113,284 | 18,974 | 158,318 | 24,803 | 35,567 | 42,506 | | 285,997 | 261,194 |
| 2.  Developmental Issues | 39,647 | 167,399 | 23,321 | 230,367 | 148,239 | 54,715 | 61,068 | | 642,628 | 494,389 |
| 3.  Technology Issues | 22,176 | 96,223 | 14,737 | 133,136 | 21,627 | 29,333 | 35,552 | | 241,275 | 219,648 |
| 4.  Governmental Issues | 16,692 | 72,436 | 10,127 | 99,255 | 21,569 | 21,255 | 26,507 | | 190,155 | 168,586 |
| 5.  International Issues | 4,652 | 20,960 | 5,695 | 31,307 | 12,268 | 6,765 | 8,596 | | 27,629 | 58,936 |
| ADMINISTRATIVE PROGRAMS | 31,170 | 314,135 | 201,976 | 537,281 | 45,063 | 31,217 | 157,181 | $ 26,505 | 259,966 | 797,247 |
| 1.  General Management | 31,170 | 176,473 | 158,520 | 366,163 | | 25,207 | 104,054 | | 129,261 | 495,424 |
| 2.  Budget & Finance | | 48,593 | 7,059 | 55,652 | | | 17,290 | | 17,290 | 72,942 |
| 3.  Public Affairs | | 40,912 | 18,850 | 59,762 | 17,615 | 6,010 | 18,547 | | 42,172 | 101,934 |
| 4.  Legal | | 48,157 | 7,547 | 55,704 | | | 17,290 | | 17,290 | 72,994 |
| 5.  Reports | | | | | 27,448 | | | 26,505 | 53,953 | 53,953 |
| TOTAL | $140,397 | $784,437 | $264,830 | $1,189,664 | $273,569 | $178,852 | $331,410 | $ 26,505 | $810,336 | $2,000,000 |

Source: NCEFT, Oct. 20, 1977.    *This cost category includes a number of sub-entries, including rent, telephone, office supplies, rented and purchased office equipment, GSA payroll, accounting, and other support services, mail and courier services.

Digitized by Google

Digitized by Google



Appendix I

# NCEFT Publications

The Commission's documentation consists principally of Internal Working Documents (IWDs), the text of major speeches, and Reports (Rs).  It should be emphasized that IWDs do not represent the views or the final position of the Commission, its committees, individual Commissioners, or the NCEFT staff.  They were intended only to provide a framework for discussion of the issues raised.  Reports contain formal conclusions or recommendations of the Commission.

It was the Commission's policy to make its documentation as widely available as possible.  Among the steps it took toward that objective, the Commission placed all IWDs, speeches, and Reports on file at the National Technical Information Service, U.S. Department of Commerce, 5285 Port Royal Road, Springfield, Va.  22161.  Requests for copies of these documents should be addressed to this organization and should include the NTIS accession number (PB number) given in the citations that follow.

IWD-1
A SUMMARY OF THE OPINIONS EXPRESSED AT THE NCEFT WORKSHOPS ON MARCH 2 AND MARCH 5, 1976
March 1976
PB261130

Speech
KEYNOTE ADDRESS, AMERICAN INSTITUTE OF INDUSTRIAL ENGINEERS MEETING BY WILLIAM B. WIDNALL, CHAIRMAN
April 1976
PB261131

IWD-2
EFT ISSUES ANALYSIS OF THE PROVIDERS COMMITTEE
April 1976
Published in IWD-6

IWD-3
EFT ISSUES ANALYSIS OF THE USERS COMMITTEE
May 1976
Published in IWD-6

Digitized by Google


IWD-4
EFT ISSUES ANALYSIS OF THE REGULATORS COMMITTEE
May 1976
Published in IWD-6

IWD-5
EFT ISSUES ANALYSIS OF THE SUPPLIERS COMMITTEE
May 1976
Published in IWD-6

Speech
REMARKS TO FIFTH ANNUAL PAYMENT SYSTEMS SYMPOSIUM
BY JOHN B. BENTON
May 1976
PB261132

Speech
REMARKS TO THE 37TH ANNUAL CONVENTION, NATIONAL
ASSOCIATION OF STATE SAVINGS AND LOAN SUPERVISORS
BY WAYNE I. BOUCHER
May 1976
PB261134

IWD-6
SYNTHESIS OF COMMITTEE VOTES ON THE IMPORTANCE OF
SPECIFIC ISSUES IN EFT
June 1976
PB261135

IWD-7
A DEFINITION OF EFT
June 1976
PB261136

IWD-8
REPORT ON THE NCEFT STAFF'S VISITS TO EFT
INSTALLATIONS
June 1976
Published in IWD-11

IWD-9
A COMPETITIVE MARKET APPROACH TO THE USE, ACCESS,
AND CONTROL OF ELECTRONIC FUNDS TRANSFER SYSTEMS
June 1976
PB261137

IWD-10
THE DEVELOPMENT OF EFT:  A PERSONAL VIEW
June 1976
Published in IWD-11

IWD-11
EFT TODAY:  ORIGINS, STATUS, AND ISSUES
June 1976
Not published; contains proprietary information

IWD-12
EFT:  AN ISSUES OUTLINE
May 1976
PB261133

IWD-13
PRESENTATIONS MADE AT THE TECHNOLOGY WORKSHOP
ON JUNE 15, 1976
July 1976
PB261138



IWD-14
ACHs, POS SWITCHES, AND THE ROLE OF THE GOVERNMENT
IN EFTS
October 1976
PB272558

IWD-15
THE "COMPETITIVE IMPACT" CRITERIA IN THE BRANCH
APPROVAL PROCESS OF FEDERAL REGULATORY AGENCIES
August 1976
PB261139

IWD-16
THE ROLE OF ELECTRONIC TERMINAL SYSTEMS IN THE
DELIVERY OF FINANCIAL SERVICES
August 1976
Published in IWD-18

IWD-17
A PROCEDURAL GUIDE FOR THE CONDUCT OF PUBLIC
HEARINGS
August 1976
PB261140

IWD-18
THE BRANCH/COMPETITIVE IMPACT ISSUE
August 1976
PB261141

IWD-19
CONSUMER ISSUES AND EFT
August 1976
PB272551

IWD-20
SYNTHESIS OF ISSUES AND POSITIONS ON EFT TAKEN IN
THE BOSTON MEETINGS OF THE REGULATORS AND PROVIDERS
COMMITTEES IN JULY
August 1976
PB272552

IWD-21
SYRACUSE EFT CASE STUDY:   SOME CONSUMER ISSUES
August 1976
PB261142

Speech
CHARTING THE EFTS COURSE:   AN UPDATE ON THE NCEFT
BY JOHN B. BENTON
October 1976
PB261143

IWD-22
THE PAYMENTS SYSTEM:   TODAY AND THE FUTURE
December 1976
PB272554

IWD-23
ELECTRONIC FUNDS TRANSFER AND MONETARY POLICY
August 1976
PB272576

IWD-24
ELECTRONIC FUNDS TRANSFER AND MONETARY POLICY:
EXECUTIVE SUMMARY
August 1976
PB272555



IWD-25
THE ECONOMICS OF ELECTRONIC FUNDS TRANSFER SYSTEMS:
A SURVEY OF COST BENEFIT ANALYSIS
October 1976
PB272556

Report R-1
PROGRAMS, PLANS, AND ACCOMPLISHMENTS OF THE NATIONAL
COMMISSION ON ELECTRONIC FUND TRANSFERS:  A PROGRESS
REPORT TO THE PRESIDENT AND TO THE CONGRESS
October 1976
PB258611

IWD-26
REMARKS TO THE BANK MARKETING ASSOCIATION BY
MARK G. BENDER
October 1976

IWD-27
THE ECONOMICS OF ELECTRONIC FUNDS TRANSFER SYSTEMS:
A CONCEPTUAL AND METHODOLOGICAL FRAMEWORK FOR
COST-BENEFIT ANALYSIS
November 1976
PB272557

IWD-28
A PROFILE OF THE CURRENT STATUS OF PRIVATELY
SPONSORED POS SWITCHES
To be published

IWD-29
RETAIL POINT-OF-SALE TERMINALS
October 1977
PB272560

IWD-30
SURVEY OF EFT SHARED PROJECTS AND SHARING
LEGISLATION
January 1977
PB272559

IWD-31
THE LEGAL ENVIRONMENT FOR THE SHARING OF EFT SYSTEMS
October 1977

IWD-32
SHARING ANALYSIS:  POINT-OF-SALE SYSTEMS
To be published

IWD-33
ELECTRONIC FUNDS TRANSFER AND MONETARY POLICY:
COMPENDIUM OF PAPERS PREPARED FOR THE NATIONAL
COMMISSION ON ELECTRONIC FUND TRANSFERS
January 1977
PB272561

IWD-34
ELECTRONIC FUNDS TRANSFER AND MONETARY POLICY:
EVALUATION AND SYNTHESIS OF PAPERS PREPARED
FOR THE NATIONAL COMMISSION ON ELECTRONIC
FUND TRANSFERS
January 1977
PB272562

IWD-35
SUMMARY OF SUPPLIERS QUESTIONNAIRE RESPONSES
October 1976
PB272563



IWD-36
A DESCRIPTION OF ELECTRONIC FUND TRANSFER
ACTIVITIES IN 28 STATES
December 1976
PB272564

IWD-37
SUMMARY OF DATA ON MAJOR TERMINAL-BASED ELECTRONIC
FUNDS TRANSFER PROJECTS IN THE UNITED STATES
December 1976
PB272565

IWD-38
COMPENDIUM OF SUBMITTED PAPERS ON ISSUES IN EFT
PRESENTED FOR THE RECORD OF THE NATIONAL
COMMISSION ON ELECTRONIC FUND TRANSFERS
October 1977

IWD-39
STATE SHARING LEGISLATION ON EFT AND THE FEDERAL
ANTITRUST LAWS
February 1977
PB272567

IWD-40
AN APPRAISAL OF REGULATORY AGENCIES' PAPERS
ON THE COMPETITIVE IMPACT OF EFT
October 1977

IWD-41
ALTERNATIVE APPROACHES TO RESOLVING ACCESS DISPUTES
October 1977

IWD-42
A COLLATION OF POLL RESULTS AND OTHER DATA
ON CONSUMER REACTIONS TO EFT
October 1977

IWD-43
THE ECONOMICS OF ELECTRONIC FUNDS TRANSFER SYSTEMS:
AN ANALYSIS OF DATA DERIVED FROM TWENTY CASE STUDIES
May 1977
PB272568

Report R-2
EFT AND THE PUBLIC INTEREST
February 1977
PB272575

IWD-44
COMPETITION AMONG EFT VENDORS
May 1977
PB272569

IWD-45
EFFECT OF EXISTING LAW AND REGULATION ON OFFERING
OF TELECOMMUNICATION SERVICES
May 1977
PB272570

IWD-46
NBS WORKSHOP SUMMARY
To be published

Digitized by Google

IWD-47
THE ECONOMICS OF ELECTRONIC FUNDS TRANSFER SYSTEMS:
SUMMARY COMMENT AND TWO MODEL CASE STUDIES--PROGRAM
CONTRACTOR'S FINAL REPORT TO THE NATIONAL COMMISSION
ON ELECTRONIC FUND TRANSFERS
June 1977
PB242571

IWD-48
SUMMARY OF QUESTIONNAIRE RESPONSES FROM THE
PUBLIC INTERCHANGE PROGRAM
October 1977

IWD-49
THE RELEVANCE OF EFT IN EUROPE FOR THE UNITED STATES
July 1977
PB272572

IWD-50
SUMMARY TO RESPONSES TO REQUEST FOR COMMENT ENTITLED
"COMPETITION AMONG EFT VENDORS"
July 1977
PB272573

IWD-51
ELECTRONIC FUNDS TRANSFER AND THE AVAILABILITY
OF CREDIT:  COMPENDIUM OF PAPERS PREPARED FOR
THE NATIONAL COMMISSION ON ELECTRONIC FUND
TRANSFERS
October 1977
PB272566

IWD-52
ELECTRONIC FUND TRANSFERS AND THE AVAILABILITY
OF CREDIT:  PROCEEDINGS OF THE JULY 6, 1977
CREDIT MARKETS SEMINAR OF THE NATIONAL
COMMISSION ON ELECTRONIC FUND TRANSFERS
October 1977
PB272553

IWD-53
SUMMARY OF COMPETITIVE IMPACT RESPONSES
October 1977

IWD-54
ELECTRONIC GIRO:  POTENTIAL FOR NEW DIMENSIONS
IN THE UNITED STATES PAYMENT SYSTEM
October 1977
PB272574

IWD-55
JUNE 1977 INTERNATIONAL PAYMENTS SYMPOSIUM
To be published

IWD-56
CONSUMER ISSUES IN EFT, PART I, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON
ELECTRONIC FUND TRANSFERS, OCTOBER 26, 1976
October 1977

IWD-57
CONSUMER ISSUES IN EFT, PART II, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON
ELECTRONIC FUND TRANSFERS, OCTOBER 27, 1976
October 1977



7200-067
5-16
C
B---T

388

Digitized by Google

IWD-58
THE BRANCH/TERMINAL ISSUE, PART I, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON
ELECTRONIC FUND TRANSFERS, OCTOBER 28, 1976
October 1977

IWD-59
THE BRANCH/TERMINAL ISSUE, PART II, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON
ELECTRONIC FUND TRANSFERS, OCTOBER 29, 1976
October 1977

IWD-60
THE ROLE OF GOVERNMENT IN EFT, PART I, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON ELECTRONIC
FUND TRANSFERS, NOVEMBER 11, 1976
October 1977

IWD-61
THE ROLE OF GOVERNMENT IN EFT, PART II, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON ELECTRONIC
FUND TRANSFERS, NOVEMBER 12, 1976
October 1977

IWD-62
THE SHARING OF EFT SYSTEMS, PART I, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON ELECTRONIC
FUND TRANSFERS, DECEMBER 9, 1976
October 1977

IWD-63
THE SHARING OF EFT SYSTEMS, PART II, TESTIMONY
PRESENTED TO THE NATIONAL COMMISSION ON ELECTRONIC
FUND TRANSFERS, DECEMBER 10, 1976
October 1977

IWD-64
EFT TECHNOLOGY--PRESENT AND FUTURE, PART I,
TESTIMONY PRESENTED TO THE NATIONAL COMMISSION
ON ELECTRONIC FUND TRANSFERS, DECEMBER 14, 1976
October 1977

IWD-65
EFT TECHNOLOGY--PRESENT AND FUTURE, PART II,
TESTIMONY PRESENTED TO THE NATIONAL COMMISSION
ON ELECTRONIC FUND TRANSFERS, DECEMBER 15, 1977
October 1977

IWD-66
EFT TECHNOLOGY--PRESENT AND FUTURE, PART III,
TESTIMONY PRESENTED TO THE NATIONAL COMMISSION
ON ELECTRONIC FUND TRANSFERS, DECEMBER 16, 1976
October 1977

Speech
THE WORK OF THE NATIONAL COMMISSION ON
ELECTRONIC FUND TRANSFERS BY JOHN B. BENTON
October 1977





Digitized by Google

UNIVERSITY OF ILLINOIS-URBANA

3 0112 104077299

# National Commission on Electronic Fund Transfers

Digitized by Google