# EXHIBIT B

# CONSUMER PROTECTION ASPECTS OF EFT SYSTEMS

I ASU LAW LISKA

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CONSUMER AFFAIRS

OF THE

## COMMITTEE ON

# BANKING, HOUSING, AND URBAN AFFAIRS

## UNITED STATES SENATE

NINETY-FIFTH CONGRESS

SECOND SESSION

ON

## S. 2546

TO AMEND THE CONSUMER CREDIT PROTECTION ACT TO
PROVIDE CONSUMER RIGHTS AND REMEDIES IN ELECTRONIC
FUND TRANSFER SYSTEMS

## S. 2470

TO PRESCRIBE POLICIES AND PROCEDURES FOR ELECTRONIC
FUND TRANSFER SYSTEMS

FEBRUARY 24, 1978

Printed for the use of the
Committee on Banking, Housing, and Urban Affairs

U.S. GOVERNMENT PRINTING OFFICE
24-968 O                      WASHINGTON : 1978

COMMITTEE ON BANKING, HOUSING, AND URBAN AFFAIRS

WILLIAM PROXMIRE, Wisconsin, *Chairman*

JOHN SPARKMAN, Alabama
HARRISON A. WILLIAMS, Jr., New Jersey
THOMAS J. McINTYRE, New Hampshire
ALAN CRANSTON, California
ADLAI E. STEVENSON, Illinois
ROBERT MORGAN, North Carolina
DONALD W. RIEGLE, Jr., Michigan
PAUL S. SARBANES, Maryland

EDWARD W. BROOKE, Massachusetts
JOHN TOWER, Texas
JAKE GARN, Utah
H. JOHN HEINZ III, Pennsylvania
RICHARD G. LUGAR, Indiana
HARRISON SCHMITT, New Mexico

KENNETH A. McLEAN, *Staff Director*
JEREMIAH S. BUCKLEY, *Minority Staff Director*

SUBCOMMITTEE ON CONSUMER AFFAIRS

DONALD W. RIEGLE, Jr., Michigan, *Chairman*

WILLIAM PROXMIRE, Wisconsin          HARRISON SCHMITT, New Mexico

LEWIS M. TAFFER, *Counsel*
PHILIP A. SAMPSON, *Minority Professional Staff Member*

(II)

# CONTENTS

| | Page |
|---|---|
| S. 2546 | 89 |
| Comments of: | |
| The White House | 116 |
| Department of the Treasury | 121 |
| Federal Trade Commission | 126 |
| National Credit Union Administration | 127 |
| S. 2470 | 128 |
| Comments of: | |
| Federal Deposit Insurance Corporation | 148 |
| Federal Home Loan Bank Board | 151 |
| National Credit Union Administration | 162 |
| Opening statements of: | |
| Senator Riegle | 1 |
| Senator Tower | 4 |
| Senator Schmitt | 1 |

## WITNESSES

| | |
|---|---|
| Herb Wegner, Vice Chairman, National Electronic Funds Transfer Commission | 5 |
| George W. Mitchell, former member, National Electronic Funds Transfer Commission | 18 |
| Roy G. Green, Fidelity Federal Savings and Loan Association, Florida, former member, Electronic Funds Transfer Commission | 36 |
| Albert A. Foer, Federal Trade Commission, former member, Electronic Funds Transfer Commission | 42 |
| Gordon R. Worley, Montgomery Ward & Co., former member, Electronic Funds Transfer Commission | 44 |
| William E. Whitesell, secretary of banking, Commonwealth of Pennsylvania | 65 |
| Hal S. Scott, Harvard Law School, reporter 3–4–8 committee, Permanent Editorial Board of the Uniform Commercial Code | 72 |

## ADDITIONAL DATA

| | |
|---|---|
| Response of Governor Mitchell to subsequent questions received from Senator Schmitt | 32 |
| Letter from Senator Lugar to Senator Schmitt enclosing papers written by EFT experts | 46 |
| Reprints of statements from the Final Report of the National Commission on Electronic Fund Transfers | 47 |
| Response of Roy G. Green to subsequent questioning of Senator Schmitt | 206 |
| Response of Hal S. Scott to eight questions of Senator Schmitt | 216 |
| Response of Gordon R. Worley to subsequent questions of Senator Schmitt | 64 |
| Letter received from Hal S. Scott, professor of law, Harvard University | 82 |
| Reprint of application for Money One Card | 201 |
| Additional statements received for the record: | |
| American Retail Federation | 165 |
| Avco Corp | 173 |
| Iowa Department of Banking | 177 |
| Wisconsin Savings and Loan Commission | 178 |
| TYME Corp | 183 |
| Mutual Institutions National Transfer Systems, Inc | 187 |
| National Consumer Law Center Inc | 193 |
| Kerry Fitzgerald, Stoneham, Mass | 199 |

72

EFFECTIVE DATE

Sec. 13 of S. 2470 and Sec. 924 of the revised Riegle bill deal with the effective date of each bill. The provision of Sec. 924 of the revised Riegle bill calling for an early effective date for sections 910 and 912 is entirely reasonable. It is difficult to see why EFT customers should be required to wait one year for some of the basic protections provided to customers by these bills.

Senator RIEGLE. Thank you very much. Let me compliment you if I may, too, on the job you are doing as Secretary of Banking for the State of Pennsylvania. I think many of the things that have been done in your State under your leadership have really been model examples for the country, and we appreciate your testimony, suggestions, and observations on the two bills.

Mr. WHITESELL. Thank you, Senator.

Senator RIEGLE. Mr. Scott.

## STATEMENT OF HAL S. SCOTT, HARVARD LAW SCHOOL, REPORTER, 3–4–8 COMMITTEE, PERMANENT EDITORIAL BOARD OF THE UNIFORM COMMERCIAL CODE

Mr. SCOTT. Senator Riegle, let me begin by stating the auspices under which I appear here today. I am a professor of law at Harvard University. I'm also currently serving as the reporter to the 3–4–8 Committee of the Permanent Editorial Board of the Uniform Commercial Code, which in turn is composed of members of the American Law Institute and the National Commissioners on Uniform State Law. The Permanent Editorial Board has charged the 3–4–8 Committee with the task of deciding whether articles 3 and 4 of the Uniform Commercial Code, which is the law governing check and note transactions in 49 States, needs to be amended in light of the development, since its enactment in the 1950's and 1960's, of new payment systems such as credit cards and electronic fund transfer systems.

I was retained by the 3–4–8 Committee to look into this matter and submitted a report on this subject to my committee for their consideration. I made copies of this report available to your committee. The 3–4–8 Committee is still in the process of considering my recommendations, and a conference organized by the American Bar Association and the American Law Institute will be held in Williamsburg, Va., on April 8, 9, and 10, to investigate the reaction of relevant groups and individuals to the report, after which the 3–4–8 Committee will make a decision about the future course of its activity in this area. At this time, however, the report and my testimony here have not been endorsed by the committee, and the views expressed here are only my own.

The basic recommendation of the report is that the committee undertake the drafting of what I have termed a Comprehensive Payment Code which deals with the rights and responsibilities of users of all payment systems, including checks and notes now covered by the Uniform Commercial Code as well as new payment systems. By new payment systems, I mean payments by credit card and all types of EFT—no exception.

73

This code is to deal not only with consumer rights in such systems, but will also deal with the relationships of other parties such as those among financial institutions and between financial institutions and merchants. Although each of the payment systems differ significantly in terms of technology, type of transactions, and risks which need to be allocated, all systems have the following common functional problems.

First, the scope, or what we mean to include as being part of a particular transaction; recordkeeping, the types of records which need to be furnished to users or retained, and the privacy of such records; allocation of fraud; allocation of mistake; provision for retention of funds by consumers pending dispute, which is really the right to stop payment and is one meaning of the right of reversal, and the preservation of claims of defenses; provision for the timeliness of items, the time by which credits and debits must be effective; matters of authorization involving the means by which an individual is authorized to engage in a transaction or the terms under which a financial institution authorizes a merchant to accept payment on a guaranteed basis; payment and settlement of items between financial institutions; and miscellaneous matters not covered by the above.

The principal objective of this code would be to try to formulate a consistent set of principles applicable to payment systems which deal with these common functional problems. This comprehensive approach can be commended in light of the following considerations:

First, to the extent that rights and responsibilities of parties in various payment systems differ, the external imposed legal order as contrasted with the basic cost differences in these systems will influence which systems are used, and this is undesirable if we can avoid it.

Second, any segmented approach to such matters would be beset by difficult problems of scope. Thus, a POS transaction with a credit feature—that is, where there's a POS overdraft which triggers a line of credit—might invoke two sets of liability results. Even if one handles the conflict as does your bill, Senator, in the fraud area, by saying debit card rules govern, we're left with the anomaly of two different sets of rules applicable to the same basic transaction. Further, there may be transactions which blur the distinction between different types of systems as does check guarantee. While the ostensible medium of payment is a check, the fact remains that electronic authorization may result in a "hold" being placed on an account until a check is paid, a quasi-debit. If this is treated as a paper transaction under Uniform Commercial Code rules, the check guarantee card user will have unlimited liability for his negligence in fraudulent transactions; but if it is treated like an electronic debit under the proposed legislation, the user may have none.

Third, the existence of different rights and liabilities will undoubtedly provoke some financial institutions to design systems to take advantage of that set of legally imposed rules which they prefer. This is not only wasteful but may circumvent the policy expressed in any particular legislation.

In the report I have drawn an analogy to indicate the difficulties we face. Before article 9 of the Uniform Commercial Code was enacted, each State had different rules regarding various kinds of security

devices, such as chattel mortgages, conditional sales and so on. These kinds of differences produced an extensive body of case law trying to define the essential nature of these security devices and let lawyers argue for the characterization which was in their favor. Only with the enactment of article 9 of the provision for a so-called unitary security interest were these formalistic matters dispensed with. There is much to learn from this prior development in our law if we are to avoid new formalistic pitfalls in the law governing different payment system.

As indicated, my recommendation would not only result in a comprehensive treatment of consumer problems, but also address rights and responsibilities among financial institutions and between financial institutions and merchants. The need for legislation in this area needs some explanation, since one's initial reaction might be that the "big boys" can take care of themselves.

First, the "big boys" may fail to contract on a given risk or will prefer that some standard risk allocation govern their relationship. If they fail to contract some court is going to have to provide the answer. Some standard rules may be necessary.

Second, even where private rules are available, one might hesitate to allow natural monopolies such as arguably is the case with ACH's, or may be the case with bank credit card associations, to formulate their own rules given the price incidence of such risk allocations on consumers.

Finally, internal risk allocations are an integral part of the check law under article 4 of the Uniform Commercial Code and there does not seem to be any less need for it with EFT.

My approach would require replacing articles 3 and 4 with this comprehensive payment code. I have concluded that the existing code is not capable of handling by mere changing of the definition of its scope—that is by expanding the definition of an item—the types of functional problems created by new payment systems. I have not yet decided, nor has my committee, whether this new code should be state law as a replacement to articles 3 and 4 of the Uniform Commercial Code or Federal law or some combination of these two possibilities.

Commercial law is a traditional area of State law and, of course, the Uniform Commercial Code is a State law. My committee is probably leaning in the direction of State law. On the other hand, my report indicates some problems with a continuation of the State law approach will face.

First, it will have to integrate the existing Federal law of credit cards and the anticipated law of the EFT that may be passed by this committee. This may prove easier to do at the Federal level to avoid inconsistency concerns at the State level. Second, there is no guarantee of uniformity at the State level and such uniformity is essential in this area. Third, it is possible that we may want to leave the fleshing out of basic statutory provisions to some regulatory body, as indeed your bill does, Senator, be it the Federal Reserve Board or some other agency. This would have the advantage of avoiding freezing in solutions to problems which would become technologically obsolete and one cannot have uniform state regulation.

This brings me to the direct matter at hand: The desirability of some kind of Federal legislation at this time with respect to consumer rights and some kinds of electronic transfer transactions which is, I take it, what these bills are designed to accomplish.

My report recommends that my committee refrain from taking a direct position either on the general desirability of such legislation or on specific proposals contained in such legislation, and that continues to be my view with respect to the desirability of certain consumer rights. Basically, this raises political and empirical issues which I have no special competence to answer.

This is not, however, to say that I am indifferent with respect to the legislation you may produce. If one accepts the desirabiilty of an eventual comprehensive code, short term actions should attempt to minimize anomalies that may be created among the rules of different payment systems. The reality is that the then existing rules for checks, credit cards and various kinds of EFT will have to be taken into account in drafting such a code and to the extent that this existing body of legislation makes sense as a whole, there will be less need for wholesale change. Wholesale change will be difficult insofar as it will have to contend with interests and ways of doing business that have become entrenched by prior legislation.

Therefore, in formulating my specific comments on this legislation I have focused on those areas which may provide more or less rights for the EFT consumer as compared with credit cards and checks for the purpose of raising the issue as to whether such differences in treatment are justified.

I will not comment in my oral statement here on the particular features of this legislation, except to note that I would appreciate the opportunity to revise my written statement since I did not have a final version of your bill before me when I prepared these remarks, and I would like to have the opportunity to update my remarks to reflect that. that.

Senator RIEGLE. That will be fine, by the way, assuming that it indicates your support for my bill. [Laughter.]

Mr. SCOTT. That leads me to my conclusion. My conclusion on the bills as they are now written is that significant technical difficulties exist in their formulation which would require significant redrafting. My statement has not been able to mention all of the problems. I have, rather, offered some by illustration. Others remain. I reiterate that I take no position on the desirability of the bill as it gives or withholds certain consumer rights.

Let me end by saying that my work in this area has led me to conclude that we are dealing with an excessively complex subject. I think that means that we must take as much time to think these issues through as is consistent with our own estimate of the need for immediate action.

[Complete statement and an additional letter from Professor Scott follow:]

STATEMENT OF HAL S. SCOTT, PROFESSOR OF LAW, HARVARD UNIVERSITY AND REPORTER TO THE 3–4–8 COMMITTEE OF THE PERMANENT EDITORIAL BOARD OF THE UNIFORM COMMERCIAL CODE

Let me begin by stating the auspices under which I appear here today. I am a Professor of Law at Harvard University and am also currently serving as the Reporter to the 3–4–8 Committee of the Permanent Editorial Board of the

76

Uniform Commercial Code, which in turn is composed of members of the American Law Institute and the National Commissioners on Uniform State Law. The Permanent Editorial Board has charged the 3–4–8 Committee with the task of deciding whether Articles 3 and 4 of the Uniform Commercial Code, which is the law governing check and note transactions in 49 states, needs to be amended in light of the development, since its enactment in the 50's and 60's, of new payment systems, such as electronic fund transfers. I was retained by the 3–4–8 Committee to look into this matter and have submitted a report on this subject to my Committee for their consideration. I have made copies of this report available to your Committee. The 3–4–8 Committee is still in the process of considering my recommendations, and a Conference organized by the American Bar Association and the American Law Institute will be held in Williamsburg, Virginia on April 8, 9, and 10 to investigate the reaction of relevant groups and individuals to the report, after which the 3–4–8 Committee will make a decision about the future course of its activity in this area. At this time, however, the Report and my testimony have not been endorsed by the Committee, and the views expressed here are only my own.

The basic recommendation of the Report is that the *Committee undertake the drafting of a Comprehensive Payment Code*, which deals with the rights and responsibilities of users of all payment systems, including checks and notes, now covered by the Uniform Commercial Code, as well as new payment systems. New payment systems are payments by credit card and electronic fund transfers, such as point-of-sale, automated teller machines, check guarantee, wire transfer, telephone transfer, pre-authorized debit and credit transactions through Automated Clearing Houses, GIRO, and check truncation. This Code is to deal not only with consumer rights in such transactions, but will also deal with relationships of other parties, such as those among financial institutions and between financial institutions and merchants. Although each of the payment systems involved differ significantly in terms of technology, types of transactions and risks which need to be allocated, all systems have the following common functional problems : (1) the scope, or what we mean to include as being part of particular transactions; (2) record keeping, the types of records which need to be furnished to users or retained, and the privacy attending such records; (3) allocation of fraud risks; (4) allocation of mistake risks; (5) provision for retention of funds by consumers pending dispute (stop payment or reversal) and the preservation of claims and defenses; (6) provision for the timeliness of items, the time by which credits and debits must be effected; (7) matters of authorization, involving the means by which an individual is authorized to engage in a transaction or the terms under which a financial institution authorizes a merchant to accept payment on a guaranteed basis; (8) payment and settlement of items; and (9) miscellaneous matters, including third party rights of creditors to funds in an account.

The principal objective of the Code would be to try to formulate a *consistent set of principles applicable to payment systems which deal with the common functional problems.* For example, if one decides that all parties should be responsible for their own mistakes, then this principle would be used as a basis for allocating responsibility for mistakes in all payment systems. Or, if one decided that credits should be posted as quickly as is technologically possible, this also would serve to define the time by which credits should be given. This comprehensive approach can be commended in light of the following considerations. First, to the extent that rights and responsibilities of parties in different payment systems differ, the externally imposed legal order, as contrasted with the basic cost differences in the systems, will determine which systems are used, and this is undesirable. For example, if credit card users had a maximum fraud liability, without respect to their own negligence in losing a card, of $50, as is the case under the Fair Credit Billing Act of 1974, while check users were always responsible for negligence, as is the case under the Uniform Commercial Code, and POS card users were responsible for some negligence, as per the recommendation of the National Commission on Electronic Fund Transfers, i.e. writing their PIN number on their card, these rules would influence the comparative use of these three payment systems. While it might appear that credit cards would be most attractive to the consumer because of lower fraud risks, the cost to the financial institutions or merchants of bearing such risks are likely to be passed back to card users by financial institutions or to the general class of buyers by merchants, who will seek to be compensated for bearing such risks. If they are passed back to card users, credit cards might become more costly than checks where the consumer bears this risk.

**77**

This might provide a marginal incentive to use checks, which is unrelated to the basic costs of processing checks or card transactions. Second, any segmented approach to such matters will be beset by difficult problems of scope. Thus, a POS transaction with a credit card feature, i.e. where a POS "overdraft" triggers a line of credit, might invoke two sets of liability rules. Even if one handles the conflict, as does S. 2065, by saying debit card rules govern, one is left with the anomaly of two different sets of rules applicable to the same basic transaction. Further, there may be transactions which blur the distinction between different types of systems, as does check guarantee. While the ostensible medium of payment is a check, the fact remains that electronic authorization may result in a "hold" being placed on the account until the check is paid, a quasi-debt. If this is treated as a paper transation under UCC rules, the check guarantee card user will have unlimited liability for his negligence, but if it is treated like an electronic debit, the user may have none. Third, the existence of different rights and liabilities, will undoubtedly provoke some financial institutions to design systems to take advantage of that set of legally imposed rules which they prefer. If financial institutions want check rules to apply, they might retain the paper component of a transaction, even if it serves no real economic function, or they might artifically separate the credit and debit components of the same transactions. This is not only wasteful but may circumvent the policy expressed in any particular legislation. A better approach to this problem would be to start with a basic question : when should the consumer be responsible for his own negligence, and how is negligence to be defined. Having answered this question, the same negligence rule should apply to all payment transactions, to the extent that this is technologically feasible. If we are going to have different rules, we should at least have in mind some justifications for the differences.

In the report, I have drawn on an analogy to indicate the *difficulties we face.* Before Article 9 of the Uniform Commercial Code was enacted, each state had different rules regarding different kinds of security devices, such as chattel mortgage, conditional sale or factors' liens. Thus, for example, if one had a security device which might properly be described as chattel mortgage one might have to file a financing statement, whereas conditional sellers would not. These kinds of differences produced an extensive body of case law trying to define the essential nature of these two kinds of security devices, and led lawyers to argue for the characterization which was in their favor. Only with the enactment of Article 9, were these formalistic matters dispensed with. All types of security interests were to be filed, and if exceptions were to be made they were based on articulated justifications that went beyond the form of the transaction, i.e. certain consumer goods transactions might not have to be filed because of the high cost involved. There is much to learn from this prior development in our law, if we are to avoid new formalistic pitfalls in the law governing different payment systems !

As indicated, my recommendation would not only result in a comprehensive treatment for financial institution-consumer problems, but also address rights and responsibilities among financial institutions and between financial institutions and merchants. The need for legislation in this area needs some explanation since one's initial reaction might be that the "big boys" can take care of themselves. First, the "big boys" may fail to contract on a given risk or prefer that some standard risk allocation govern their relationship. This is most likely to be the case where no national rule-making organization exists to promulgate rules, as is the case for credit cards, in the Interbank and VISA systems, or for preauthorized debits and credits, under the National Association for Automated Clearinghouses. Shared POS systems and check are notable examples of payment systems which have many different participants who might benefit by a common set of rules. Second, even where private rules are available, one might hesitate to allow natural monopolies to formulate their own rules, given the price incidence of such risk allocations on consumers. It was partially this consideration which explains the entry of the Federal Reserve Board into foreign check collection. If private associations are free to engage in foreign collection of credit or debit payments, one might wish to confine or check their freedom of rule-making. Thus, for example, even if a card issuing institution were forced to assume the risk of credit card fraud, the credit card association by internally allocating this risk to a card issuing bank instead of a merchant, might bring about the situation where the card user might ultimately bear the cost of such risk through card fees paid to the issuing bank.

If it could be shown that the merchant or merchant bank was a more efficient credit card fraud, the credit card association by interally allocating this risk to

78

tion to place the risk with that party, the internal risk allocation of the credit card association might result in an inefficient risk allocation, with the consumer paying the bill. Thus, control of internal risk allocation may be necessary with respect to payment systems which are arguably natural monopolies. Internal risk allocations are an integral part of the check law under Article 4 of the Uniform Commercial Code, and there does not seem to be any less need for such rules in other payment systems.

A final point should be emphasized about the nature of my recommendations. *My approach would require replacing Articles 3 and 4 with this comprehensive payment code.* I have concluded that *the existing code is not capable of handling,* by a mere changing of the definition of its scope, i.e. by expanding the definition of an item under 4–104, *the types of functional problems created by new payment systems.* Articles *3 and 4 deal only with check problems* and not with those presented by the newer credit and debit transactions. It does not perforce deal with matters such as risk of unauthorized transactions with lost or stolen cards, the necessity to issue transaction receipts, the speed of settlement for an electronic debit, or the consequences of electronic check or credit card authorizations, to name a few of the new issues. This is not to belie the necessity of a comprehensive approach; such an approach requires a broader level of generality which is capable of covering new variations; it may even require changes in existing check law which will emerge from a more general treatment. The point is that our existing Code needs to be replaced by an updated version.

*I have not yet decided, nor has my Committee, whether this new Code should be state law, as a replacement to Articles 3 and 4 of the Uniform Commercial Code, or federal law, or some combination of these two possibilities.* Commercial law is a traditional area of state legislation and my Committee is probably leaning in the direction of state law. On the other hand, my report indicates the *problems which a continuation of the state law approach will face.* First, we will have to *integrate* the existing Federal law of credit cards and the anticipated law of EFT. This may prove *easier to do at the federal level* to avoid inconsistency concerns at the state level. Second, *there is no guarantee of uniformity at the state* level and such uniformity is essential in this area. Third, it is possible that we may want to leave the fleshing out of basic statutory provisions to some regulatory body, be it the Federal Reserve Board or some other agency. This would have the advantage of avoiding freezing-in solutions to problems which would become technologically obsolete, and one cannot have uniform state regulation.

This brings me to *the direct matter at hand—*the *desirability of some kind of federal legislation* at this time with respect to consumer rights in electronic fund transfers transactions. *My report recommends that my Committee refrain from taking a direct position either on the general desirability of such legislation or on specific proposals* contained in such legislation, and that continues to be my view. Basically, the question raises political and empirical issues which I have no special competence to answer.

For example, on the issue of reversibility, I cannot say that this is or is not a right consumers should have, nor can I begin to assess whether consumers are already afforded such rights in existing EFT systems. Likewise with respect to other prominent features of the legislation pertaining to transaction receipts or allocation of risk for card fraud. These are matters which must be decided by your Committee and the Congress in response to the asserted need for such rights or the difficulty or cost in providing them, and the interest groups affected are best positioned to furnish you with input on these matters. This is not, however, to say that I am indifferent with respect to the legislation you may produce. If one accepts the desirability of an eventual comprehensive Code, short term action should attempt to minimize anomalies that might be created. The reality is that the then existing rules for checks, credit cards and EFT will have to be taken into account in drafting such a Code, and to the extent that this existing body of legislation makes sense as a whole, there will be less need for wholesale change. Wholesale change will be difficult insofar as it will have to contend with interests and ways of doing business that have become entrenched by prior legislation. Therefore, in formulating my specific comments on this legislation, I would like to focus on those areas which may provide more or less rights for the EFT consumer as compared with credit cards and checks, for the purpose of raising the issue as to whether such differences in treatment are justified. I will direct my comments to the present version of S. 2065, since I have not yet had the time to study thoroughly analogous provisions in S. 2470, introduced by Senator Tower. The issues I will raise in my statement are not

79

exhaustive; my report goes into more detail. I will try here to focus on only some of the major difficulties I foresee.

1. *Scope.*—The newest definition of "electronic fund transfer" excludes "a paper check transaction" and includes certain enumerated transactions, as well as others "performed in whole or substantial part electronically through remote terminals." § 903(5). It also separately applies to ACH type transactions "authorized in advance to recur at substantially regular intervals." This scope section appears to leave check guarantee transactions to state law unless we regard that as something other than "a paper check transaction," which might be the case if we view the electronically produced "hold" as a "debit." It is unclear to me why some or not all of the provisions of this Act should not apply to check guarantee, i.e. responsibility for unauthorized check guarantee card transactions. ACH transactions are only partially covered; some are one-shot and therefore excluded. Moreover, special rules apply to transactions which are covered, as compared with remote terminal transactions. I am not sure why this is the case. Why isn't the consumer granted the right to reverse an ACH debit, under the same conditions as he can reverse a POS debit? See § 908. Further, the bill seems to leave entirely uncovered other forms of electronic fund transfer such as bankwire, which may not involve a "remote terminal," which in my mind may not be justifiable.

In § 910(c), the bill provides that debit card transactions will be governed by debit card rules regarding unauthorized transactions, where a credit feature is involved. This should raise the question of the defensibility of different rules for debit and credit cards, as well as the reason for choosing the debit card model, when both features are involved, i.e. $1 debit and $199 credit.

Some of these problems could be avoided by a comprehensive approach, but some could be avoided now by cross-justifying provisions applicable to credit card and remote terminal transactions, and by refraining from creating a special body of rules applicable to ACH transactions, unless absolutely necessary.

2. *Record keeping.*—Under the newest version of the Riegle bill, certain information will no longer be available to the consumer on transaction receipts, which will be available to credit card users, i.e. description of the transaction. § 906(a). While this is understandable as applied to some transactions where the potential receipt issuer would not possess such information, i.e. telephone and ACH transfers, it is not clear why it should not be provided in a POS transaction, if it is to be supplied for a credit card transaction. Again, there is the question of which rules govern where there is a simultaneous debit and credit transaction. If one of the purposes of a receipt is to notify the consumer that a transaction has taken place according to instructions, then the total absence of any kind of receipt in ACH and telephone transfer is not easily understood. This is even more so where a preplanned ACH debit differs significantly from previous levels. In this instance the absence of a receipt makes it difficult for the consumer to manage the funds in his account, and other subsequent items may be dishonored as a result. § 907(b) eliminates this weakness in the prior bill but does not make clear what kinds of variations will trigger reporting and leaves too much discretion to the Board. Also it is difficult to understand why ATM deposit receipts should contain amounts, since the machine cannot verify the amount of deposit.

Also, it is unclear why notices in ACH transactions for delays or wrong amounts are restricted to credits. Delay in debits, i.e. insurance payments, may be of equal importance to the consumer.

3. *Allocation of risk for fraud.*—S. 2065. § 910, provides a $50 maximum liability for the consumer, with consumer negligence in use of the card, i.e. writing the PIN number on the card or leaving both PIN and card in the hallway of a sleazy hotel, being irrelevant to his liability. Under $50, the consumer may be liable without regard to negligence. Debit card rules are to apply in mixed debit-credit transactions. I am not sure why the $50 debit card liability without negligence is not subject to the same conditions presently applicable to credit cards, i.e. a method exists whereby the user of such card can be identified as the authorized person. *See* Reg. Z, § 226.13(c). Also, it is unclear why the $50 maximum, under both credit and debit card rules, should not be subject to some duty of the consumer to report a loss, either after the loss, or after the receipt of his statement. *See* 4–406. More basically, it is unclear why negligence should be irrelevant, not the case in the check system. 3–404. 3–406. Finally, whatever justification might exist for differences in treatment as a result of the difference between the ease of losing a card or check, is confounded if fraud liability under

80

check guarantee is to be governed by Articles 3 and 4. I am not certain what risk allocation rule applies in a fraudulently authorized ACH debit transfer: the original version of the bill, § 810, would have applied debit card rules.

4. *Allocation of risk for mistake.* The bill now provides, § 911(a)(1), subject to specified exceptions, that a financial institution shall be liable to a consumer for all damages approximately caused by "the financial" institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, in the correct amount or in a timely manner when properly instructed to do so by the consumer . . ." Such damages are not available when "the financial institution failed to credit a deposit of sufficient funds to the consumer's account promptly." Nor are proximate damages available if the failure to act or action was caused by certain technological malfunction. § 911(b)(1). Further, if the technical malfunction, of whatever kind, is made known to the consumer at the time he attempts to initiate the transaction, or for a pre-authorized transfer, at the time the transfer should have occurred, there is no liability. Further § 918 provides than any person who fails to comply with any provisions of the Act is liable for actual damages, in individual actions, § 918(a)(1). Absent proof of actual damages, I take it section (2)(A) allows presumed actual damages no less than $100 nor greater than $1,000, but intent may be taken into account in determining such liability. *See* § 918(b)(1). But it is further provided in § 918(c) that if a party can show that "the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such error," there is no liability at all, actual or presumed. Section 809 deals with error resolution procedures, and inter alia sets up treble damage liability for knowingly and willfully failing to correct certain errors. § 809(e).

There are a number of problems with these provisions. First, the bill does not appear to define mistakes made in ACH transactions, as compared with electronic fund transfers, nor are parties involved in ACH transactions specifically liable for their mistakes. Second, in electronic fund transfers, while proximate damages for mistakes made by financial institutions appear to be available under § 911, without regard to intent, actual damages under § 918(c) may depend on a showing of intent and lack of procedures reasonably designed to avoid the error. This seems a bit inverted—it would be easier to understand the role of intent in allowing proximate rather than actual damages. Third, some of the exceptions for liability for mistakes are questionable. Why should not wrongful dishonor of a debit, following failure to promptly post a credit, result in wrongful dishonor liability? I would think such liability would exist in the check system under 4–402. Fourth, it is not clear to me why *any* kind of down time disclosed in advance of a transaction should be excused. An advance disclosure to a check writer that the bank will not honor a check, absent legitimate excuse, would not, I suppose, avoid wrongful dishonor liability. Further, the consumer may have liability to pay a third party, *see* § 913, when such malfunction occurs, if such party refuses to accept other forms of payment with more risk, i.e., check as opposed to debit card. Fifth, as to error resolution procedures, I am not sure one can justify making such procedures available for debit cards, given they are unavailable for check transactions, where errors also abound. Use of checks as well as debit cards can result in mistakes and impact the consumer's account, but there is no requirement to respond to such claims within 10 days, § 909(a), and/or to recredit an account pending further investigation. § 909(c).

5. *Reversibility.—I have no special objection to the provision of reversibility,* assuming we know what we mean by it. The bill does not define the term, and it can have two distinct meanings. It may refer to the right of a consumer to retain funds pending resolution of a dispute, as is the case with stop payment under 4–403 of the Uniform Commercial Code, while the obligation on the item as well as the underlying obligation survives, *see* 3–802, or it may refer to cancelling the transaction entirely. I take it the former is envisioned, since one presumes return of merchandise would at least be a condition precedent to cancellation. This should be made clear.

Assuming we are talking about retention of funds pending dispute, one must question the 3 day limitation on this right. If it is a good idea to give funds to the consumer pending resolution of the underlying dispute, why not allow a more substantial time. I see no particular magic in the effective time one has to exercise the right to stop payment, since only with the increasing speed of check collection has the time period narrowed down to a 2–3 day period; this was not by design. Further, some difficult scope problems with this section have not been

resolved. The bill speaks of a "transfer initiated by a consumer to the third person," which would apparently exclude an ATM cash withdrawal on a merchant's premises, when the cash was used to make a purchase. Although there are difficult problems in extending reversibility to this situation, I am not sure they cannot be overcome in part, and would wonder why, in principle, the presence of reversibility should depend on the form of the transaction. One can also question why the bill does not make ACH transactions reversible.

Finally, the bill does not take a position on a key aspect of reversibility; its effect on the preservaton of claims and defenses. If the transaction is reversed by the consumer to the financial institution, which then later sues the consumer on the item, can the consumer raise claims and defenses he might have had in litigation with a merchant? Check rules say no, if the financial instituion is a holder-in-due-course, while credit card rules say yes, subject to certain defined conditions. *See* § 170 of the Fair Credit Billing Act.

My conclusion on the bill, as it is now written, is that significant technical difficulties exist in its formulation which would require significant re-drafting. My testimony has not been able to mention all of the problems; I have rather offered the above by way of illustration. Others remain. I reiterate that I take no position on the desirability of the bill as it gives or withholds certain consumer rights. My work in this area has led me to conclude that we are dealing with an exceedingly complex subject which means that we must take as much time to think these issues through as is consistent with our estimate of the need for immediate action.

82

Harvard Law School
Cambridge, Massachusetts 02138
March 7, 1978

Mr. Philip A. Sampson
United States Senate
Committee on Banking, Housing
  and Urban Affairs
Washington, D. C. 20510

Dear Phil:

        This letter will give you my comments on the provisions
of S.2470.   They should be read with my specific comments on
S.2546 to which I sometimes refer, contained in my written
statement to the Committee, a copy of which is enclosed.
You are free to put this letter in the record, if you wish.

1.    Scope.   Your bill specifically excludes, §3(3), "telephone
account transfer or payment, a credit or debit authorization,
or a check authorization or guarantee."  The exclusion for
credit or debit authorization appears to extend to ACH
transactions.   It would also appear to exclude bankwire and
check truncation, so that a significant number of EFT trans-
actions will not be covered.   I am not sure why this is the
case.   For example, why shouldn't the error resolution
provisions of §6 or the unauthorized use provisions of §7
apply to telelphone transfer or ACH transactions, even if
the provisions of §5 on documentaion should not?

        Also, the bill designates credit card rules to govern
for unauthorized mixed debit-credit transactions §7(c),
whereas S.2546, see §910(c), uses the debit card rule.   This
raises a more fundamental question of why these rules should
be different at all.

2.    Record Keeping.   Given the explicit exclusion of telephone
transfer and ACH, why not provide in §5 that receipts or
statements have a description of the transaction, as is done
for credit cards.   There is no provision for notification of
varying amounts in ACH transactions.   Further "negative
notification" of ACH credits is questionable.   §5(c).
Without a descriptive statement of some kind, the consumer
may not be able to uncover a mistake; i.e., an undercredit.
I also have some doubts, as I mention with regard to S.2546,
whether this bill should not require receipts of some kind
in ACH and telephone transfer.

Mr. Philip A. Sampson
March 7, 1978
Page 2

    Finally, why should receipts or statements only be
proof as against a third party?  §5(d).  How about an internal
funds transfer, checking to saving?

3.    Allocation of Risk for Fraud.  The provisions of §7
apply only to unauthorized use of a "debit instrument",
which means no rules for unauthorized use in other EFT
transactions; i.e., telephone transfer or ACH.  Unlike
S.2546, where a customer may be liable for non-negligent
transactions, under $50, absent notice, S.2470 provides that
a customer may only be liable for certain negligence, under
$100.  §7(b).  If negligence is relevant, why shouldn't it
be relevant for losses over $100?  I take it that the
Presidential Commission felt negligence was always relevant.
Further, by restricting negligence liability to under $100,
its actual determination in a dispute, per §7(a), probably
won't be worth it.  On the other hand, the customer's failure
"to promptly report" loss, theft or unauthorized use can
lead to liability over $100.  Why should this kind of
negligence--failure to report--trigger more liability than
other kinds; i.e., writing the PIN number on the card?
Further, with respect to failure to report, you should be
aware that the only failure of the consumer to report a
check fraud which can lead to liability is after receipt of
the statement, not after loss or theft of his check.  See 4-
406 of the UCC.

    Finally, there are difficulties with some of your
negligence definitions.  What is "close proximity" under
§7(a)(2); same bag, same house, et al?  Also under §7(a)(3),
what does "permitting" mean; does it refer to involuntary as
well as voluntary transfers?  If so, it would hardly be
negligent to fail to spend $1,000 to secure a PIN and card,
where the expected discounted loss was $100.

4.    Allocation of Risk for Mistake.  Unlike S.2546, see
§§911, 918, it does not appear that parties are liable in
damages for their mistakes, except where the errors result
from certain malfunctions.  §8(b).  Section 6 only establishes
error resoltuion procedures.  While §6 does require parties
to attempt to resolve errors, as defined in §6(b)(1)-(5), it
does not appear that §10(a) would make parties responsible
for their errors; they are only responsible for the failure
to follow certain procedures with respect to those errors.
Clearly, errors can occur other than by the malfunction of a
terminal; e.g., switch or bank computer.  Further, the check
approach to error would be to allow actual damage for all
mistakes and consequential or what you call "incidental"

84

Mr. Philip A. Sampson
March 7, 1978
Page 3

damages for other proximately caused "dishonor" of items.
4-402.  Further, damages for the failure to exercise ordinary
care in handling an item would be separately defined.  <u>See</u>
4-103(5).  See also 4-108.  Reasonable care would not be a
defense in mistake cases to actual damages; i.e., failure to
get a credit.  Your provisions are quite different, and
should at least be compared and cross-justified with UCC
check rules.

5.  <u>Reversibility</u>.  The major function of stop payment is
to allow a customer to hold funds pending a dispute on the
item, as I elaborate in my comments on 2546.  There would
not appear to be more or less need for this right when
payment is made by electronic means.  The need of the consumer
to control funds pending the dispute does not turn on the
speed of the debit.  Also, failure to provide anything on
reversibility, may lead to a creation of such right as a
matter of state law in courts or state legislatures.

Sincerely,

Senator RIEGLE. Well, just speaking on your conclusion, what we are faced with here in the Congress is the recommendation from the National Commission—and you were here in the audience and you heard them speaking to certain points that were a part of the findings of the Commission—and the Commission has rendered a general judgment that there is need for action, and that the action ought to take place now. So that I think constitutes a very important finding. So that is the estimate of the need for immediate action.

We have had a national commission with a responsibility to examine this, and they have come back and have said there is a need for immediate action. Now that doesn't mean that it needs to be or should be or will be precipitous action.

Mr. SCOTT. I guess that would be the question I would ask, Senator, what we mean by now?"

Senator RIEGLE. Well, I think "now" means within this legislative time period. It means this year.

Now let me ask you the same question in terms of time period. I think it's interesting to think in terms of drafting a comprehensive code which would govern new payment systems. How long will that take?

Mr. SCOTT. Well, I think it's going to take a while. I don't really know how long it will take.

Senator RIEGLE. How long is a while?

Mr. SCOTT. I can't predict.

Senator RIEGLE. Is it 2 weeks or 2 months or 10 years? What's the range?

Mr. SCOTT. It's between 2 weeks, 4 weeks, or 10 years. I mean, I don't really know. I think that the fastest we could anticipate it reasonably, in my own mind, would be 2 years.

Senator RIEGLE. Okay. So at least it's at least 2 years away and that's under your most optimistic assumptions?

Mr. SCOTT. Right.

Senator RIEGLE. And chances are, then, it probably would take longer than that. This is a tough, involved subject.

Mr. SCOTT. That's correct.

Senator RIEGLE. What about 5 years as a more realistic projection? How long did it take to put the Uniform Commercial Code together?

Mr. SCOTT. To put it together or to enact it? To draft it, I guess it really depends on what articles you're talking about. I think that the significant drafting with respect to most articles occurred between 1949 and 1952. So I guess we're talking about maybe 3 years of work. The project started in the early 1940's and it wasn't until the 1960's that we had uniform State law. But in terms of the actual drafting, I think that the most significant drafting occurred over a 3-year period in which I might add the drafts were submitted at length before various bodies of different people to probe them and see whether all the provisions made sense, et cetera.

I guess what I'm saying is that my reaction to this legislation is that as I read it and I go over it, 15 or 20 questions pop out of my head. I say, what happens about this? Why are they doing it this way? And I think, although I recognize the need for or certainly recognize why people may say there's a need to protect consumers

86

now—that seems to be a very real thing to me, we should also be aware that we don't want too produce a bad piece of legislation that won't hold up. It's a balancing. I recognize that and I can't make it—that's why I can't come here and say do it or don't.

Senator RIEGLE. Well, except it goes beyond that. That's a key point, the fact that you're trying to structure a balance; but that connects directly to the next point and that is unless some effort is made to devise whatever that balance is and put it into place, you basically paralyze the development of the whole technology and the whole forward movement of EFT.

The overwhelming weight of testimony we have heard from all the players is that this is one situation where the people who have to make the operational decisions to go forward don't feel that they can do it if they have to fly blind, and I'm very sympathetic to their point. The consumers reinforce that because on their side of it, unless they know what the rules of the game are, they are not anxious to let go of tried and true systems that they presently have.

So you've got the problem not only of striking the balance, but of recognizing that if you don't do that it's like pronouncing a terminal sentence on the system and on the technology.

Mr. SCOTT. Well, I guess as to the economics of the matter of whether front end costs are going to be significantly affected by the particular provisions of these bills, one way or the other, I have heard conflicting statements on that. Mr. Worley seemed to feel, from a retailer's point of view, that they wouldn't have a significant impact, if I understand what he said. I'm not competent to answer that question.

I can say that in terms of legal ordering, as to whether there's great uncertainty about the way these transactions work today, I don't think there is. I think most of the systems—ACH's and credit cards—of course, credit cards aren't covered here—but let's say ACH's, have an elaborate framework under which they operate and the uncertainty is that maybe you will come in and change that framework. But for the moment, they are operating. They have all their hardware up. It's existing and operating. I think it will continue to operate whatever we do here. It may be different in POS which seems to be the prototype we have in mind when we make this statement, but let me say there are other EFT systems such as check guarantee in place and working. There are significant expenditures that have been made in that system without having some definite bill in which institutions know what are ultimately going to be their rights in this matter.

Senator RIEGLE. Also, in terms of your most optimistic estimate of 2 years, I personally don't think you could get it done in 2 years. I think it would take substantially longer than that and I don't think you would pick that as the most likely time period. You put it in terms of saying if it's as fast as it possibly could be done, it would take 2 years. What would be your best estimate as to how long it would likely take?

Mr. SCOTT. I think that I might even say it would be likely that I could draft, or a committee could draft, legislation in 2 years. I think the problem is the enactment stage.

Senator RIEGLE. But you've got to include that.

Mr. SCOTT. But that then depends on whether we are talking about State law or Federal law, which is a decision we haven't yet made.

Senator RIEGLE. So you've got three decisions to make. You've got to decide which fork of the road you want to take in terms of Federal-State; then you've got to do the drafting; and then there's the enactment stage beyond that, assuming you can sell people your point of view. But in the middle stage is a 2-year proposition. What do we add on for the remaining two pieces? What is a likely assumption?

Mr. SCOTT. Well, I don't know how long it will take to get Federal, but to get uniform State legislation is a long period of time.

Senator RIEGLE. I would think so; several years.

Mr. SCOTT. I would say so. Federal legislation would be quicker; that's another advantage which I didn't mention of a Federal law.

Senator RIEGLE. It is speedier but that doesn't mean that you can walk in here one day, drop it on the table and say "Do this," and have it come out in any recognizable form even months later, as you well know. So the problem is we've got significant time delays, I think, with the approach that you are advocating.

Mr. SCOTT. I recognize that, and let me just repeat, I am not coming here saying that I do not think that the need to protect the consumers does not justify this committee going ahead now. All I'm saying is please be aware of the difficulty in coming up with some coherent piece of legislation and also be aware that in the long term that if we start carving up these little systems—these rules for checks, these rules for credit cards, telephone transfer, this for this, that for that—we are going to wind up with an anomalous set of rules.

Now maybe the answer is that we go ahead now and do what we can, but we keep an open mind that in the longer term we try to make sense out of the whole thing, which is really what my committee is trying to do.

Senator RIEGLE. I don't think we are that far apart.

Mr. Whitesell, I think you wanted to comment.

Mr. WHITESELL. I was just going to add a footnote about cost, and that is to say the check guarantee systems and other kinds of systems that are in place implies that there's no cost in having those systems there because they are going forward. There's considerable cost in not having any Federal legislation in this whole area in terms not only of opportunity cost, but in terms of wrong kinds of systems which are already in place which have been developed in a vacuum which would not have been developed had we in fact had some kind of at least minimum guidelines.

Senator RIEGLE. So, positioned as you are at the State level, as you look at the options of the State-by-State approach versus the national approach, which would you tend to favor?

Mr. WHITESELL. I think it's horrendous to contemplate 50 sets of EFT regulations. I really do. I just feel that's horrible, and what we really need to look at is Federal legislation and certainly the bankers in Pennsylvania, I'd say, have absolutely no trouble with saying, "Let us have Federal legislation here." You don't hear any State's rights kinds of arguments at all. You really don't.

Mr. SCOTT. We're talking to different bankers then.

Senator RIEGLE. I'm not surprised to hear that because there's an interesting kind of double jeopardy that works if you start out on one track. If you start out on the State track and then you're overtaken by Federal regulations, that may skew it. You may find yourself

88

having to radically change your practices. So, if we don't have some sort of a Federal response relatively soon, it seems to me every State that takes the initiative runs the risk of being run down at a later stage by Federal law which may or may not be compatible.

Mr. WHITESELL. I think that's absolutely right and I'm not saying States should pass some laws in this area at all. I'm not saying that and I don't want you to get the impression that I'm saying that, but I think it absolutely needs some kind of minimal bill at the Federal level.

Senator RIEGLE. You wanted to respond, Mr. Scott?

Mr. SCOTT. Yes. As I indicated, my report tends to recommend Federal legislation for many of these reasons. For our own project—and I would also say for the consumer end represented by this legislation but I would not underestimate the preference for State legislation. I have had a lot of contact with people in financial institutions over the course of preparing this report and with many people in the bar, especially in the bar, who feel very strongly that this kind of legislation should continue to be at the State level.

As I say, I disagree with that in my report, but I find that a very strong feeling.

Senator RIEGLE. Well, thank you both for coming today, for your patience this morning and for your comments. If we have any other questions that we want to put to you we will send those to you and ask you to respond to those for the record. Thank you again.

The committee hearing is adjourned.

[Whereupon, at 12:40 p.m., the hearing was adjourned.]