# EXHIBIT C

# THE CONSUMER CREDIT PROTECTION ACT AMENDMENTS OF 1977

## HEARINGS

BEFORE THE

## SUBCOMMITTEE ON CONSUMER AFFAIRS

OF THE

## COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS HOUSE OF REPRESENTATIVES

NINETY-FIFTH CONGRESS

FIRST SESSION

ON

## H.R. 8753

A BILL TO AMEND THE CONSUMER CREDIT PROTECTION ACT TO SAFEGUARD CONSUMERS IN THE UTILIZATION OF ELECTRONIC FUNDS TRANSFER SERVICES; AND TO PROTECT CONSUMERS IN THE STABILIZATION OF CREDIT CARDS; AND FOR OTHER PURPOSES

---

### PART 3

DECEMBER 5, 1977
CHICAGO, ILL.

---

Printed for the use of the
Committee on Banking, Finance and Urban Affairs



U.S. GOVERNMENT PRINTING OFFICE

20-691 O          WASHINGTON : 1977

# HOUSE COMMITTEE ON BANKING, FINANCE AND URBAN AFFAIRS

HENRY S. REUSS, Wisconsin, *Chairman*

THOMAS L. ASHLEY, Ohio
WILLIAM S. MOORHEAD, Pennsylvania
FERNAND J. ST GERMAIN, Rhode Island
HENRY B. GONZALEZ, Texas
JOSEPH G. MINISH, New Jersey
FRANK ANNUNZIO, Illinois
JAMES M. HANLEY, New York
PARREN J. MITCHELL, Maryland
WALTER E. FAUNTROY,
    District of Columbia
STEPHEN L. NEAL, North Carolina
JERRY M. PATTERSON, California
JAMES J. BLANCHARD, Michigan
CARROLL HUBBARD, JR., Kentucky
JOHN J. LaFALCE, New York
GLADYS NOON SPELLMAN, Maryland
LES AuCOIN, Oregon
PAUL E. TSONGAS, Massachusetts
BUTLER DERRICK, South Carolina
MARK W. HANNAFORD, California
DAVID W. EVANS, Indiana
CLIFFORD ALLEN, Tennessee
NORMAN E. D'AMOURS, New Hampshire
STANLEY N. LUNDINE, New York
HERMAN BADILLO, New York
EDWARD W. PATTISON, New York
JOHN J. CAVANAUGH, Nebraska
MARY ROSE OAKAR, Ohio
JIM MATTOX, Texas
BRUCE F. VENTO, Minnesota
DOUG BARNARD, Georgia
WES WATKINS, Oklahoma

J. WILLIAM STANTON, Ohio
GARRY BROWN, Michigan
CHALMERS P. WYLIE, Ohio
JOHN H. ROUSSELOT, California
STEWART B. McKINNEY, Connecticut
GEORGE HANSEN, Idaho
HENRY J. HYDE, Illinois
RICHARD KELLY, Florida
CHARLES E. GRASSLEY, Iowa
MILLICENT FENWICK, New Jersey
JIM LEACH, Iowa
NEWTON I. STEERS, JR., Maryland
THOMAS B. EVANS, JR., Delaware
BRUCE F. CAPUTO, New York
HAROLD C. HOLLENBECK, New Jersey

PAUL NELSON, *Clerk and Staff Director*
WILLIAM P. DIXON, *General Counsel*
MICHAEL P. FLAHERTY, *Counsel*
GRASTY CREWS II, *Counsel*
MERCER L. JACKSON, *Minority Staff Director*
GRAHAM T. NORTHUP, *Deputy Minority Staff Director*

---

## SUBCOMMITTEE ON CONSUMER AFFAIRS

FRANK ANNUNZIO, Illinois, *Chairman*

GLADYS NOON SPELLMAN, Maryland
BRUCE F. VENTO, Minnesota
CLIFFORD ALLEN, Tennessee
FERNAND J. ST GERMAIN, Rhode Island
JOSEPH G. MINISH, New Jersey
WALTER E. FAUNTROY,
    District of Columbia

CHALMERS P. WYLIE, Ohio
MILLICENT FENWICK, New Jersey
THOMAS B. EVANS, JR., Delaware

CURTIS A. PRINS, *Staff Director*

# CONTENTS

### STATEMENTS

Page

Baer, David D., executive vice president, First National Bank of Freeport, Freeport, Ill.; chairman, Electronic Funds Transfer Committee, Association for Modern Banking in Illinois (AMBI) ................................................................ 1418

Baker, Richard J., assistant vice president, Commercial National Bank of Peoria, Peoria, Ill.; representing the Illinois Bankers Association .................... 1417

Brown, V. K., consumer, Chicago, Ill .................................................................... 1365

Clark, Ken, staff representative, Wisconsin AFL–CIO, Milwaukee, Wis .............. 1328

Eisendrath, Jack N., attorney-at-law, Milwaukee, Wis.; member, board of directors, Wisconsin Consumer League ................................................................ 1330

Fary, Hon. John G., a Representative in Congress from the State of Illinois ..... 1300

Flodstrom, Karl R., director/counselor, financial division, Family Counseling Service, Aurora, Ill .......................................................................................... 1380

Gall, Ron, director, member of board of directors, Wisconsin Consumer League, Milwaukee, Wis ............................................................................................... 1326

Garber, Alan J., president, Crawford Department Stores, Chicago, Ill ................ 1340

Gitles, Arlene, Consumer Coalition, Skokie, Ill ...................................................... 1318

LaFalce, Hon. John J., a Representative in Congress from the State of New York .......................................................................................................................... 1300

Lamet, Jerome, Assistant Regional Director, Chicago region, Federal Trade Commission, testifying as a consumer .................................................................. 1376

Leveck, Terry, representing the Illinois Department of Aging ............................. 1386

Marquez, Daniel, consumer, Chicago, Ill................................................................. 1372

Partee, Cecil, commissioner, Department of Human Services, Chicago, Ill ......... 1301

Quigley, Daniel, chairman of the board, Electronic Funds Illinois, Inc., Chicago, Ill.......................................................................................................................... 1306

Rank, Prof. Hugh, consumer, Governors State University, Park Forest South, Ill.......................................................................................................................... 1354

Rogers, John L., consumer, Chicago, Ill .................................................................. 1367

Rosenblum, Dan, staff attorney, Legal Assistance Foundation of Chicago, Chicago, Ill ............................................................................................................. 1323

Ruf, J. Frederic, vice president, M. & I. Marshall & Illsley Bank; president, TYME Corp., Milwaukee, Wis ............................................................................ 1399

Ryan, Agnes, attorney-at-law, Chicago, Ill............................................................. 1321

Skopec, Kenneth A., president, Mid-City National Bank of Chicago, Chicago, Ill.; representing the Illinois Bankers Association ............................................. 1421

Vance, Craig R., credit manager, Spurgeon Mercantile Co., Chicago, Ill ............ 1343

Velco, Lori, chairwoman, Skokie Consumer Affairs Commission, Skokie, Ill...... 1373

Vento, Hon. Bruce F., member of the subcommittee............................................. 1299

Wylie, Hon. Chalmers P., ranking minority member of the subcommittee ........ 1295

### ADDITIONAL INFORMATION SUBMITTED FOR THE RECORD

Annunzio, Hon. Frank chairman, Subcommittee on Consumer Affairs, opening statement ............................................................................................................... 1293

Flodstrom, Karl L., prepared statement ................................................................. 1383

McClain, Tom J., vice president and consumer loan administrator of the National Bank of Greenwood, Indianapolis, Ind............................................... 1394

Rank, Prof. Hugh, correspondence submitted re Carte Blanche charge ticket error of Prof. William H. Miller ........................................................................ 1357

Rogers, John L., appendixes attached to statement:
    A. First National Bank of Chicago incorrect debit slip, copy of ................... 1371
    B. Documented verification............................................................................... 1371

Ruf, J. Frederic, prepared statement ...................................................................... 1404

Wylie, Hon., Chalmers P., opening statement ........................................................ 1297

the rich cardholder can pay his account off monthly because he has
the money to do so or his business gives him an expense check, and
we cannot charge him, then someone will pay. Most likely it will be
the cardholder who cannot afford such a luxury as paying an account in
full monthly. This will be the lower income person. This is contrary
to the way people in Washington have been trying to get legislation
to flow. After all, who are you to tell us that we can't charge for
the use of our depositors' money? You're telling us not to recover
our cost or not to make a profit in this one instance. This is con-
trary to freedom. You don't tell the car dealer to let the buyer use
the car for a while before purchasing it or the furniture salesmen to
let the customers use the product and not charge for it. Profit, no
matter how bad it sounds, is still the name of the game (even in bank-
ing.)

We "small town" bankers don't understand you people in Washington. We feel
you are trying to regulate us out of business or out of profit or both. It
would be sad if competition in banking dissappears. Please give a lot of
thought to this bill, H.R. 8753 and to other bills that would only accomplish
further complicating an already over complicated business. Thank you for
being so patient.

Chairman ANNUNZIO. Our first witness is J. Frederic Ruf of the
TYME Corp. of Milwaukee, Wis.

## STATEMENT OF J. FREDERIC RUF, VICE PRESIDENT, M. & I. MARSHALL & ILLSLEY BANK; PRESIDENT, TYME CORP., MILWAUKEE, WIS.

Mr. RUF. Thank you, Chairman Annunzio.

My name is J. Frederic Ruf. I am a vice president of the M. & I.
Marshall & Illsley Bank of Milwaukee and president of the TYME
Corp., one of five competing electronic funds transfer systems oper-
ating within the State of Wisconsin.

I have submitted written testimony. The oral testimony that
follows is supplemental to that testimony and deals exclusively
with our experiences in the State of Wisconsin under title I of your
bill.

Over the past 3 years, we have been in the process of designing
an electronic funds transfer system in Wisconsin. My experience is
limited to the TYME Corp., which is one of five competing systems.
Our system was designed to try to maximize the competitive
nature of our industry. Membership is open to all banks, savings
and loans and credit unions. We only operate as a time system
which I would call a telephone switching network. We do not own

or place electronic terminals; we do not determine which customers of banks, savings and loans, or credit unions will receive these cards. We do not place limitations on the cards by the institution.

We have designed the back office, the method of handling these transactions and limiting our transactions to that segment of the EFT system.

We have tried to parallel the existing check payment systems as far as possible and as such transactions are conducted within our system and not charged instantaneously to either the customer or credited to the merchant. They are charged to the customer on a memo-posting basis with final payment being made the following business day.

This effort was conducted as a joint effort by a number of financial institutions within the State of Wisconsin.

Following the passage of a very general piece of legislation permitting the utilization of offpremises EFT terminals, the regulators began a process of drafting administrative rules under which our systems would operate. As a potential procedure of these services, we joined forces with both the regulators and a number of the consumers who have appeared before your panel already to design a system which we felt would provide adequate safeguards for the utilization of the system through to the ultimate user, meaning the customer.

We are very pleased that much of the substantive matter within our local legislation is reflected in your bill. Obviously the specific wording and phraseology is somewhat different in your bill over Wisconsin, and it is well to point out ours was administratively reached rather than legislatively.

H.R. 8753 deals with a number of these, as I have indicated. I would like to briefly go through the ones that are provided in the Wisconsin legislation so the parallel is apparent to all.

There is a prohibition under mailing of unsolicited debit cards. This is a prohibition which we within the industry support. There is a requirement for descriptive monthly statements, if an account utilizes an EFT card. In the past, the EFT card has accessed with the depository account, but it is not done with a statement that requires a statement. Our descriptive statement is limited to a description of the retailer, his actual physical location within a community. We feel to go beyond that in the form of descriptive statements will create severe hardships for the consumer as well as the financial industry.

The merchants simply do not have the type equipment that will allow them to detail the product or service they are selling at the point of sale without creating tremendous costs in the getting of additional equipment or manning systems which will slow the checkout process.

We believe a description of the store and its actual location is adequate for the consumer to reconstruct the transaction that took place. In our checking system today that is basically what the consumer gets back. If he has paid for his goods, he gets a check. The check indicates the total purchased. To go further would create an undue burden on the industry.

We have limited liability. We support limited liability. We have a limited liability of $50 for any card that is lost or stolen. We don't purport to see any magic in the $50 figure, but support it since it is in line with other similar bills. We do also provide for the right of reversal that in your legislation is referred to as stop payment. We would, as a reversal, since the transaction has taken place before the time span has elapsed in which it can be reversed. The stop payment is only effective as long as the check has not been paid. In this case, the right to reverse extends beyond the actual payment of the item. This, too, is limited in our State, and we think reasonably so, to $50. Anything in excess of $50 can be reversed with a purchase of goods or services. Obviously, the transaction, if it is on a cash basis, there is no reversal. As it is today, we see no reason to have it extended into tomorrow. The $50 limit represents a compromise between our industry, the consumer, and the regulators, and it is our belief that transactions below that dollar amount are generally on a cash basis in today's society and to relieve the industry of the administrative burden of handling small dollar amount reversals we have put on the limitation of $50.

We must disclose to all of our customers very detailed statements of the rules under which the system will operate, and we cannot change those rules without prior notification to consumers provided the change is of an adverse nature. We do not believe there should be a blanket limitation on change without prior notice, since some changes are obviously beneficial to the consumer. I cite the example of some years ago when we raised the interest rate from 4½ percent to 5 percent. I don't think we should penalize the customer who is utilizing an EFT service by not raising his interest rate for 90 days because he utilizes the service when all the other customers could have an increased interest rate.

We require a receipt be given to the customer at point of purchase. We think that is a very key element to the system. That receipt is not required under our present rules for check guarantee because we believe the check to be the receipt, in effect, and there is no need to duplicate that.

I would next like to speak a little bit about fears. We all have fears about anything that is new and unknown. That is quite natural. But I think we have to analyze our fears as to what causes them and why they persist. The consumer has expressed fears about the required usage of these cards, be they credit or debit. I think that is an ungrounded fear. Our industry is a highly competitive industry, and, frankly, if it was required—if I really believed there was going to be some way that everybody was going to use an EFT card, I would open a bank for nothing but checking accounts and would make a lot of money. I don't believe the fear of required usage is a legitimate fear. It is a supplementary service. We in Wisconsin have always so viewed it as a natural extension of the present paying system which is paper based. Just as we extended from cash to checks, this is an extension of checks to the electronic atmosphere which will be supplementary for as long as I think any of us will be around and probably lots longer than that.

A fear of loss of control: There has been a good deal of talk about that. I think control is something that is exercised by the individ-

ual and can only be exercised by the individual, and he or she can control as much as he or she chooses to control. The system in and of itself does not change the control. It may expand the customer's availability of his depository dollars, and in the case of financial institutions expand his availability of interest-earning depository dollars, but it wouldn't in and of itself cause loss of control. It may cause us to try and analyze and reorganize our methods of doing business, but we can live with that.

The financial industry has expressed fears that we aren't unified in our approoach to EFT. Many people within our industry are fearful that major city banks will come in and take over markets of smalltown banks. Our experience in Wisconsin indicates that simply isn't the case. The EFT machine in and of itself is an inanimate object. It can't open an account; it can't close an account; it can't grant a loan; it can't answer a question; it may allow a bank to more effectively penetrate its natural trade area, but certainly our experience would indicate that it has not allowed banks to expand beyond their own recognized market of today.

We are concerned about increased costs. Many of my associates are very concerned about this. We have seen an increase in cost, but a long-term cost displacement and a cost displacement that is reflected in many ways within our industry, and the natural operating costs as our systems grow, there is a need to expand.

Also, some of our associates are concerned about their inability to become a part of the system because of the very technological nature of it. Within the State of Wisconsin, because the systems are available to all, I think we have shown, I think rather conclusively, that no bank, regardless of its size, need be left out of the world of EFT because of its technological nature or the individual financial institution's limited resources.

Regulators have expressed concerns about the potential strain on the capital of the financial industry. These concerns could be construed to be very legitimate, particularly in the last few years, where there have been great strains on the capital position of a number of financial institutions, but, within our State, the way the system is being developed, it has proven to be of very little additional strain to the financial condition of any of the banks that are participating, and we have certainly not disadvantaged the small financial institutions.

Merchants have expressed concern, concern that this will require the acquisition of greater amounts of new equipment to serve their customers. They are concerned that it will disrupt their current methods of operation, and that it might threaten their now-existing revolving credit card business. None of these things have come to pass as yet in the State of Wisconsin and as long as the rules are written reasonably and allow us to have sufficient technical and operating flexibility, we don't believe they will come to pass. It will be an add-on system of benefit to those participating.

Finally, I would like to address myself to several items within the bill in addition to those pointed out in my written testimony.

In your bill, you provide for error resolution in section 808. While we have struggled with error resolution in the last 2½ years, and in the last year the system has operated, we really haven't found any very satisfactory answers. It is a very gray area.

The one thing that has become very apparent to us, and it was really apparent before EFT ever came to pass, is that before we can begin the process of resolving an error, or discrepancy in a customer's bill, we must have adequate information to begin to search. I think it is vital the legislation draft make this proviso so the financial institution can be informed. Without the information, we don't have the ability to search out and solve the problem.

I cite the example of my father who called me several weeks ago and indicated we had inaccurately credited a depositor's account. We acknowledged the occurrence of an inaccuracy and were prepared to correct it, but needed to know where he made the deposit, and so forth. Before we had that information, we had no way of resolving the problem. It was ultimately given to us, and we corrected it very quickly.

We would also like to say, in Wisconsin, with reversibility, it has not created a major problem. In fact, we are looking for our first reversal request. I think you have to look behind that to recognize we are dealing with a relatively limited number of merchants who are very sophisticated and are extremely interested, as are the banks, savings and loans, in properly serving their customers. If the customer has a problem, he appears to have resolved it with the merchant before coming to us.

In your legislation in section 809, you seem to broaden significantly the liability of financial institutions for loss incurred by preauthorized payments. You broaden it beyond what is in the paper-based system today. We think that is an unreasonable broadening of that right. It is no different than the preauthorized payments we have today for insurance companies, primarily for life insurance. The errors are very few and far between, and they have been resolved satisfactorily, for the most part. We believe we should transfer these rights from a paper basis to a cash system, to EFT, but we don't believe they should be expanded significantly and reallocate all the things involved in the financial providers.

We recognize the needs our customers have, just as our predecessors recognized the need to convert from cash to a checking system.

Finally, in 803(e)(4), you talk about separate billing and the detailing of all the products purchased. Again, I refer to my earlier comments and urge the subcommittee that to modify the position on this and provide for other identification without specific identification of the goods or service to be purchased because of the burdensome nature of it.

In closing, I would like to urge the subcommittee to look beyond consumer-oriented EFT transactions into the entire scope of potential electronic funds transfer mechanisms, automated clearinghouses, government payrolls, and other industry or government-oriented aspects of it; encourage you to look at those aspects of it that design a uniform set of regulations so we, as industry providers in the future, will have one set of rules to deal with rather than a multitude of rules.

I commend you for your efforts in drafting this legislation and feel some type of legislation of this nature is of benefit to all service providers as well as service users.

Thank you.

[The prepared statement of Mr. Ruf, on behalf of the TYME Corp., follows:]

PREPARED STATEMENT OF J. FREDERIC RUF, PRESIDENT, TYME CORP.,

MILWAUKEE, WIS.

My name is J. Frederic Ruf. I am a Vice President of the M&I
Marshall & Ilsley Bank of Milwaukee and President of the Tyme
Corporation, one of five competing electronic funds transfer
systems operating within the State of Wisconsin. I am very
pleased to have been invited to appear at these field hearings of
the Sub-Committee on Consumer Affairs of the House Banking,
Housing and Urban Affairs Committee to testify on Title I. of
H.R. 8753, otherwise known as the "Electronic Fund Transfer
Act".

For the past two and one half years, I have been actively involved
in the legal and legislative development of EFT systems within
the State of Wisconsin, as well as the technical design of the
TYME (Take Your Money Everywhere) system. During this
developmental period, members of the financial community,
leaders of consumer groups and the Wisconsin Commissioners of
Banking and Savings and Loans worked together closely to develop
a legal and regulatory framework for the operation of EFT systems
within the state. They were designed to allow for the continued
technical change and development of our EFT systems and to provide
effective recognition of appropriate consumer concerns about these
systems. For example, Wisconsin regulations require: (1) descrip-
tive monthly statements of accounts experiencing EFT activity;
(2) a $50.00 liability limit for unauthorized use; (3) right to charge
back purchases of goods or services over $50.00 for three business
days; (4) prohibition on the issuance of unsolicited debit cards;
(5) system assurance of confidentiality; (6) advance written disclosure
of card usage rules; (7) written receipts for transactions at the point
of purchase; (8) continuing advance notice to regulators of system
expansion; and (9) regular regulator review of system operations.

Since the inauguration of Wisconsin EFT services in December of
1976, providers of these services have been operating under statutory
and administrative authority which includes nearly all of the conceptual
consumer concerns and remedies addressed in your bill, although
the precise requirements may vary from those of the bill. We are
pleased to report that these consumer protections have not significantly
hindered the growth or development of EFT services within our state
and, in fact, we believe have fostered the customer acceptance of our
service offerings. We believe that addressing these issues on a
national level is both appropriate and necessary and commend your
efforts to this end.

In the process of developing our operating system within the State of
Wisconsin, we worked closely with our appropriate State regulators
and leaders of the consumer community in an effort to address and

define the concerns of all affected parties and develop resolutions which would satisfactorily address these concerns. While this type of cooperative effort may seem unusual, for those of us in the financial industry in the State of Wisconsin, it seemed quite natural, since we have done it before with other consumer protection legislation. Individually, we believed that before we could successfully offer a new service, we would have to address and answer the legitimate concerns of our potential customers and design a service which would (1) recognize and preserve their existing legal rights, and (2) provide economic and convenience incentives for the utilization of EFT services.

As providers of this service, we too needed economic incentives and a reasonable opportunity to design a service which would attract a substantial number of depository customers, while potentially reducing our direct and indirect operating costs. We also needed the flexibility to modify our operating procedures as new technology and equipment become available.

In developing the Tyme system, we also recognized that these services would only be supplementary in nature and initially appeal to a rather limited segment of our consuming public. We did not and do not view electronic funds transfer systems as a replacement for the existing paper based payment system, but do believe that they will supplement existing systems. In time, the utilization of EFT services should gain wide acceptance, just as the checking system did develop over the past 30 years, as an alternative to the cash payment system. Acceptance of EFT systems, we believe, will be gradual and only expand if we are able to offer our customers a service which they believe is of real economic and operating convenience to them.

We also believe that the advent of EFT reflects the recognition that our consuming public is becoming far more mobile than it once was, and needs greater and more convenient accessibility to their depository accounts. For those who have expressed fear about the potentially all encompassing nature of EFT, we suggest they review the past. Cash has never totally replaced barter; checks have never totally replaced cash; and EFT will never totally replace any of the above. In each instance, a new service was added to the existing payment system which recognized the expanded needs of the utilizers of the payment system for a better and more convenient method of account access.

We further believe that those people who fear the potential of compulsory EFT fail to recognize the competitive nature of the financial industry, and the continuing desire of that industry to provide services to its customers in a form that meets their needs and insures continued profitable depository growth for the financial institution.

I am very pleased to say that in my opinion, Title I. of H.R. 8753 addresses legitimate consumer concerns about the operation of consumer oriented EFT systems. However, I would urge the drafters to carefully review the bill to see that these protections (1) do not unnecessarily hinder the technological and operating developments of EFT systems, and (2) encompass all facets of the emerging electronic funds transfer systems, such as automated clearing houses, automated bill paying services, wire transfer services, etc. While it is very easy to isolate and examine one facet of these emerging systems, it seems to me that the drafting of legislation to deal only with an isolated facet of EFT could result in confusing and conflicting legislation as the Congress subsequently grapples with other facets of the developing system on a piecemeal basis. My own belief is that the Congress should consider legislation which will equate the rights and liabilities of all parties under all forms of payment mechanisms. In other words, a consumer's rights and obligations should be similar whether he pays cash, check, credit card, preauthorized payment, telephone transfer or by some as yet uninvented means. The type of payment mechanism should not dictate the extent of the rights and obligations of the parties. I urge the Committee to consider this view.

I would further urge that the provision of basic consumer protections not be unnecessarily broad or restrictive simply because we are dealing with an industry in its infancy, or as some have described it, a service in search of a market. I cannot think of any major new technological advance that had a market on its introduction date, for instance, the automobile, the airplane, the power boat, etc. Yet all of these products now have gained wide acceptance and are an integral part of our society. Allow these developing systems the chance to realize the benefits of technological changes so that over a period of time we as providers and you as customers can experience the benefit of the improved product and service.

While we have no specific legislative language to suggest for the creation of this recommended technological flexibility, we urge you to consider giving the appropriate regulatory authorities the ability to review and modify specific provisions of the Act to allow for change.

Having stated my support for the conceptual consumer protections provided within Title I. of H.R. 8753, I now come to the more unpleasant task of articulating our concerns about specific technical provisions of the bill as drafted. In so doing, I fully recognize and appreciate the difficulty of drafting such legislation and the relative ease of criticizing the drafting effort.

What follows is a section by section analysis of our concerns and, in some instances, specific recommendations for modification in the statutory language. Your favorable consideration of these suggestions will minimize some of our concerns without diminishing the quality of the basic consumer protections provided therein.

802.   Definitions and rules of construction

802. (b)

The inclusion of the words on line 12 "clearly and in readily understandable language" appears to raise a number of questions of interpretation without materially enhancing the necessary and appropriate dissemination of information to the potential EFT customer.  We do not believe that any of the service providers could really determine what is clear and understandable language for all of their customers.  What one may understand, the other might not.  But we believe that since the primary modification of all service suppliers is to design an acceptable service for their customers and market, it is unnecessary to add the confusion created by the language suggested.  Therefore, we recommend that this language in Section 802. (b) as well as other sections of the bill be deleted.

802. (c)

Since virtually all transactions, even within the present funds transfer systems, are in part conducted by electronic means, we feel that the definition of "electronic means" in 802. (c) may be unnecessarily broad and inadvertently include virtually all existing funds transfer applications (paper or electronic and even those at the bank counter). At the same time, we recognize the difficulty of narrowing this definition, and therefore, suggest that revision of the definitions of "purchase transaction" and "transfer transaction" might be appropriate and also materially aid in limiting the definition of "electronic means" to those transactions intended to be covered by the bill.  Our suggestions for revisions of Sections 802. (g) and (h) follow.

802. (g)

"The term 'purchase transaction' means a transaction in which a consumer purchases goods, property or services, or repays extensions of credit, primarily for personal, family or household purposes and in which the transfer of funds for payment from an account of the consumer is performed or intended to be performed by the institution holding the account as a result of the transmission to it of electronic impulses rather than the presentation to it an instrument as defined in Section _____. "

802. (h)

"The term 'transfer transaction' means any transfer of funds
between accounts of a consumer at the same institution, any deposit
of funds into an account of a consumer or any cash withdrawal of funds
from an account of a consumer which (1) is initiated or ordered away
from the premises of the institution, and (2) is performed or intended
to be performed by the institution as a result of the transmission to
it of electronic impulses rather than the presentation to it of an
instrument as defined in Section _____."

Note that both definitions are intended to include POS, ATM and
ACH transfers.  The definitions are not intended to include guaranteed
checks which are, in reality, paper transactions.  However, the
definitions will include any on-line charge card transactions.

802. (k)

We suggest that the definition of "unauthorized transfer of funds" be
expanded to include the concept that if a consenting customer gives
another person his electronic funds card and identification number,
that this act be construed as continuing consent for the utilization of
this card by the other party for all transactions which he may conduct
until the card issuer is notified to the contrary.

803.   Electronic funds transfer agreements

803. (b)(1)

As drafted, this section might include service fees related to the
operation of accounts accessible to EFT transactions, regardless
of whether or not these service fees relate to the provision of
electronic funds services.  Since electronic funds services are a
supplementary means of access to existing depository accounts, we
suggest that the language be changed to include only those service fees
which are imposed for the utilization of EFT services.

803. (b)(2)

This appears to require that the terms of an EFT agreement be
disclosed apart from the agreement.  Such a requirement is duplicatory
and its purpose could be accomplished by requiring that the consumer
be given a copy of the agreement.

803.(b)(3)

803.(b)(3) appears to transfer the liability for all losses relating to
banking transactions from the consumer to the bank. We believe that
this is an inadvertent transfer of liability and suggest that it be
redrafted to indicate that the consumer is not liable for unauthorized
transfers, but is liable for all transfers completed at his request.
We have the same comment on Section 811.(a).

803.(b)(6)

This section as well as a number of other sections deals with the
consumer's right to reverse an EFT transaction. As drafted, it
addresses the consumer's right to stop a transfer of funds. But,
since electronic funds transfers are instantaneous, we do not believe
it is possible to stop whatever has already taken place. Therefore,
we suggest that this section, as well as others which deal with this
consumer right, be redrafted to incorporate the concept of consumer
reversibility of electronic funds transactions for the purchase of
goods or services. .

We further suggest that this right to reverse a transaction for the
purchase of goods or services only be available for those transactions
which exceed $50.00. The recommendation that the reversibility apply
to only transactions in excess of $50.00 is based on the belief that
transactions for less than that dollar amount, if completed, will not
render severe economic damage to the individual concerned. However,
it will alleviate the financial institution from significant operating
problems in the handling of small dollar requests for reversibility.
With that limitation, I support the right of reversibility - it has not
impaired the growth of EFT systems in Wisconsin where it is presently
required by administrative rules.

Finally, in this section the concept of business day is introduced,
and we recommend that the term "business day" be clearly defined
since the business day for the bank, the consumer or the merchant
can and does frequently differ. The following is suggested phraseology
for this definition:

> "Business day" means that part of any day on which
> an institution is open to the public for carrying on
> substantially all of its business functions.

803. (b)(11)

While we strongly support the concept that a consumer's financial
dealings with a bank should be maintained on a strictly confidential
basis, we believe that this section as drafted could unduly hinder a
financial institution in its efforts to correct an error or resolve a
dispute. Therefore, we suggest that a specific exception be provided
which will allow the financial institution to provide the consumer, the
merchant or any other parties to the transaction with whatever infor-
mation is necessary to resolve the error or dispute that occurs as a
result of an electronic funds transfer.

803. (d)

This section appears to require that monthly statements be mailed
or delivered on any account which is accessible to EFT activity. We
would suggest that since many of these accounts are not accessed
regularly, that only those accounts which have EFT activity be subject
to the monthly statement requirement.

803. (d)(2)

The inclusion of this provision does not appear to provide the
consumer with any substantive protection, but will certainly create
for the service provider a very major record keeping problem and,
therefore, we recommend that the requirement for EFT agreement
identification numbers be deleted.

803. (d)(4)

This section as drafted requires a brief description of the goods,
property or services purchased through an EFT transaction. The
inclusion of this requirement will, we believe, create major operating
problems for EFT systems without any offsetting consumer benefits.
For example, if a housewife were to pay for the purchase of her
groceries utilizing an EFT card, the merchant would be required
to provide a brief description of the purchased items at the point
of purchase. For most grocers, this would be virtually impossible
since their cash registers are only capable of indicating the dollar
amount of each purchase. Furthermore, no real benefit would
accrue to the consumer who got a receipt with this descriptive
information as well as a monthly statement from his financial
institution duplicating the information. Since the brief description
of the goods would have to be entered individually by the checkout
clerk, it would significantly slow the checkout process within stores
and certainly result in increased cost for the merchant and an

inconvenience for the consumer. This scenario could be applied
to virtually any situation in which the consumer bought multiple
products at a single location such as a hardware store, a liquor
store, or department store. However, I believe that the definition
as stated in 803.(d)(5) should be expanded to include not only the
name, city and state of the place of purchase, but also the location
of the store, since many chain merchants have multiple locations
within a single community. The inclusion of this locational information
should be adequate to allow the consumer to reconstruct the details
of the transaction.

### 803.(d)(6)

The inclusion of a requirement that the affected account number be
reflected in each itemized monthly statement is duplicative (the
monthly statement will contain the account number) without any
substantive benefit for the consumer and, therefore, we recommend
it be deleted.

### 803.(d)(7)

Since multiple accounts can be accessed through an EFT card, the
requirement that the balance on each account be shown on each
statement could, we believe, be extremely confusing to the consumer.
In addition, for any number of reasons, a consumer might not want
the balance information of all accounts to appear on the statement
of one account. For example, while I may be very desirous of having
my father completely apprised of the balances in our joint checking
account accessible by an EFT card, I may not want him to have
equal access to the balance relating to my savings account. There-
fore, I suggest that the section as drafted be modified to require
only the balances of the accounts detailed in the statement.

### 804.   Amendment of electronic funds transfer agreements

### 804.(1)

As presently drafted, this section would require a 90 day advance
notice of any change in an electronic funds transfer agreement. Since
many changes affecting these accounts will be beneficial to the consumer,
such as an increase of interest rates paid on savings deposits, we
suggest that the 90 day advance notice requirement only be applicable
to changes which would have an adverse effect on the consumer.

### 806. Purchase transactions

### 806.(a)(2)

Again, we recommend that the right of reversal be limited to the purchase of goods or services in excess of $50.00 for the reasons outlined earlier.

We also suggest that 806.(a)(2) be expanded to include a requirement that the consumer be notified of the person or department and telephone number which should be notified in the event a reversal is requested. In the interest of adequately and regularly notifying the consumer of this, we suggest that that information be printed on each statement as well as the name, department, address and telephone number of the person who should be notified should the consumer's card be lost or stolen.

### 806.(a)(3)

As indicated earlier, we believe there should be an exemption of this limitation on disclosure for information disseminated to appropriate parties in the process of error or dispute resolution.

### 806.(a)(4)

We do not believe that the inclusion of this provision will enhance the consumer's knowledge regardless of his account activity since, in the case of a transfer between depository accounts, it must be initiated by a specific consumer request and, in the case of automatic or overdraft loan privileges, the consumer already is covered by provisions in other statutes. However, its inclusion could increase the operating cost of EFT systems.

### 806.(a)(5)(C)

Again, we urge that the phraseology requiring a description of goods, property, or services purchased be deleted for the reasons outlined previously.

### 807. Transfer transactions

### 807.(b)

We believe the inclusion in the requirements that the number of the affected account and the name of the financial institution be disclosed are unnecessary for the reasons outlined earlier and because the consumer certainly knows the name of the institution from which he requested and received his card.

## 808.  Correction of errors

For the past year and a half, we have grappled with the problem
of providing the consumer with adequate means for timely error
correction and commend your efforts to include this provision
within the statute.   To date, we have developed no completely
satisfactory solutions to the problem, but continue to try to
balance the need for timely resolution with the time-consuming
task of thoroughly researching the error.   However, we do believe
that the major stumbling block to the timely correction of errors
is the receipt by the financial institution of adequate information
from the affected consumer.   Therefore, we suggest that the
time periods specified within the statute not begin to run until
the financial institution has received sufficient information to allow
it to begin the process of error resolution.

As an example, several months ago a customer called to indicate
that we had incorrectly credited his account $20.00 for a $200.00
deposit.   At the time of our initial conversation, he was unable to
tell me where or when the transaction took place or for that matter,
what account was affected.   While we were cognizant of the fact that
an error had occurred in one of this customer's accounts, we were
unable to proceed with our investigation until several weeks later
when the customer brought his transaction receipt to the bank,
at which point we were able to determine (1) which was the affected
account, (2) when the deposit was made, and (3) within hours the
error was corrected.   However, we were unable to start until we
had adequate information.

In Wisconsin at present reliance is placed on the desire of the
financial institution to satisfy and keep its customers.   This desire
is greater in the case of debit accounts than charge card accounts
since the loss of a customer with an EFT account reduces the
deposits at the institution; loss of a credit card customer simply
eliminates the possibility of additional loans to that customer.
Thus far we have found that the mutual desire for timely error
resolution has been effective and the customers well serviced
without specific statutory assistance.

## 809.  Preauthorized payments, deposits or transfers

While this section deals with the consumer's right to revoke a
preauthorized transaction, we believe that this right of revocation
should be more clearly defined and suggest that the definition include
any timing limitations on the right of revocation and a requirement
that the notice of the right to revoke a preauthorized transfer as
well as the person, department, location and telephone number to

be contacted for the exercise of this right be incorporated in the EFT consumer agreement and included as a portion of the monthly statement rendered on the account affected by an EFT transaction.  We suggest that in establishing the time limit for revocation that a financial institution be given a minimum of three business days, after it has received adequate information, to complete a requested revocation.

### 809. (a)(3)

An exception should be added so that the institution is not liable in the case of the preauthorized deposit of, for example, a dividend check which is dishonored by the drawer.  The institution has no control over that situation.

### 809. (a)(6)(A)

The disclosure of the dates and changes required by this section would be impossible in the case of preauthorized deposits of, for example, dividends which may or may not be declared.  The institution cannot be required to notify the customer of the dates when dividends will be deposited because it does not know.

### 810.  Unsolicited electronic funds transfer capacity or credit capacity

While we concur with the drafters' desire to prohibit the unsolicited dissemination of electronic funds transfer access cards, we feel that the sections as drafted are unnecessarily expansive and burdensome on the issuing financial insitutions.  We do not believe that a requirement that the consumer sign his electronic funds transfer agreement will in any way assure a consumer's complete understanding of that agreement and suggest rather that a financial institution only be required to provide the consumer with a written agreement and possibly further require that financial institution to, on an annual basis, disseminate the agreement to all of its EFT customers in a manner similar to that required by other lending related statutes.

We also feel that the inclusion of the specified language in Section 810. (e) and other following sections that the dissemination of unsolicited cards is prohibited is of no real benefit to the consumer and may, in fact, detract from his ability to understand the essence of the agreement which he will establish with his financial institution. The appropriate regulatory agencies certainly can discover and stop

any unsolicited dissemination of these cards in their regular examinations of the affected institutions.

Finally, we believe that renewal and substitute cards should be excepted from Section 810.(b). There is no reason to require a consumer to apply to obtain a renewal or substitute card.

## 811. Liability of financial institution and consumer for losses

### 811.(b)(3)

While we strongly support the notion that the consumer should be clearly and regularly notified of his limited liability should his EFT card be lost and provided with regular reminders of the persons to be contacted, we do not believe that the inclusion of 811.(b)(3) will materially enhance the consumer's ability to contact his financial institution, and suggest that the cost of providing each consumer with a self-addressed, pre-stamped envelope could be extremely high with little or no offsetting consumer benefit. As we have stated earlier, we believe this end could better be accomplished by requiring the printing of the person or department to be notified on each account statement. If, in the opinion of the Committee, additional incentives are needed, then we would suggest that rather than a pre-stamped notification envelope, the issuing financial institution be required to reimburse the consumer for any postage cost related to notification.

Finally, we believe that since the affected financial institution will have liability for all losses in excess of $50.00, the service providers have ample incentive to equip their customers with a means of timely notification in the hopes that such notification will minimize the financial institution's losses.

### 812. Discriminatory pricing prohibited

As drafted, it appears that this section might prohibit a merchant from offering a cash or cash equivalent discount to the customer who utilizes EFT cards for the purchase of goods or services. We believe that merchants should have that option as they now have.

1416

I sincerely hope that the length and detailed nature of my
commentary on Title I. of H. R. 8753 has not so overshadowed
my testimony that my support of the <u>substantive</u> protections
set forth in this bill is no longer readily apparent to the
Committee.  In the end, if electronic funds transfer systems
are to grow and provide the high quality of customer service
of which they are capable, the <u>substantive</u> protections
suggested in Title I. of H. R. 8753 are essential.   Equally
essential to further EFT development will be the lack of
legislative restraint on the service providers' ability to take
advantage of new technological and operating innovations
during the coming years.

1417

Chairman ANNUNZIO. Thank you very much, Mr. Ruf, for your very enlightening statement.

Our next witness is Richard J. Baker, assistant vice president, Commercial National Bank of Peoria, representing the Illinois Bankers Association of Peoria, Ill.

Mr. Baker?

### STATEMENT OF RICHARD J. BAKER, ASSISTANT VICE PRESIDENT COMMERCIAL NATIONAL BANK OF PEORIA, PEORIA, ILL., REPRESENTING THE ILLINOIS BANKERS ASSOCIATION

Mr. BAKER. Thank you, Mr. Chairman. We will be very brief.

Generally stated, it is our feeling that existing legislation and regulation provide adequate information and protection for the credit-card holder or applicant and that the dynamics of the consumer market will assure fair and equitable service pricing.

Given that position the act at best would be redundant, and its work would represent an intrusion of the Federal Government in the fundamental operation of the business enterprise, to the extent of mandating prices, dictating operational methods and prohibiting marketing techniques acceptable in other industries.

In the interest of brevity, we will forego comments on specific provisions of title II because we would simply be repeating concerns expressed in several previous statements before this subcommittee. We specifically refer to the testimony of Evan Housworth on behalf of the American Banking Association.

It is our hope, through diligent research in hearings such as this one, the subcommittee will realize that further regulatory restrictions of the credit card industry would be redundant, and that consumers, themselves, should determine which service charges, prices, or billing systems will prosper in today's market. I should have prefaced my remarks that I was addressing only title II of the act.

Thank you very much for your time.

Chairman ANNUNZIO. Thank you, Mr. Baker, for your short statement. Your position hasn't changed, and I appreciate that.

Chairman ANNUNZIO. We will now hear from David D. Baer, executive vice president, First National Bank of Freeport.