**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

THE PEOPLE OF THE STATE OF NEW
YORK, by LETITIA JAMES, Attorney
General of the State of New York,

<em>Plaintiff</em>,

v.

CITIBANK, N.A.,

<em>Defendant</em>.

---

Civil Action No. 1:24-cv-00659-JPO

**BRIEF OF *AMICI CURIAE* THE CLEARING HOUSE ASSOCIATION L.L.C., THE
BANK POLICY INSTITUTE, THE NEW YORK BANKERS ASSOCIATION,
AND THE AMERICAN BANKERS ASSOCIATION
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

*Page*

**STATEMENT OF INTEREST** ..................................................................................... 1

**INTRODUCTION** ....................................................................................................... 2

**BACKGROUND** ........................................................................................................ 5

    A.    Wire Transfers .............................................................................................5

    B.    EFTA..........................................................................................................7

    C.    Article 4A...................................................................................................9

    D.    The Dodd-Frank Act .................................................................................10

**ARGUMENT** ........................................................................................................... 12

**I.**    **THE STATUTORY TEXTS OF EFTA AND ARTICLE 4A REFUTE THE NYAG'S THEORY** ................................................................................................12

**II.**    **CONSISTENT JURISPRUDENCE AND REGULATORY GUIDANCE MAKE CLEAR THAT CONSUMER WIRE TRANSFERS ARE GOVERNED BY ARTICLE 4A, NOT EFTA** ..............................................16

    A.    Courts Have Consistently Held That Consumer Wire Transfers Are Governed By Article 4A, Not EFTA .....................................................16

    B.    Regulators Have Confirmed That Consumer Wire Transfers Are Governed By Article 4A, Not EFTA ......................................................19

**III.**    **ADOPTING THE NYAG'S THEORY WOULD UPEND SETTLED EXPECTATIONS AT GREAT COST TO CONSUMERS** .........................................21

**CONCLUSION** ........................................................................................................ 25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Bailey* v. *United States*,
  516 U.S. 137 (1995).............................................................15

*Banco del Austro, S.A.* v. *Wells Fargo Bank, N.A.*,
  215 F. Supp. 3d 302 (S.D.N.Y. 2016)..................................9

*Bodley* v. *Clark*,
  2012 WL 3042175 (S.D.N.Y. July 23, 2012) ..............3, 5, 16

*Braga Filho* v. *Interaudi Bank*,
  2008 WL 1752693 (S.D.N.Y. Apr. 16, 2008) .....................18

*Calderon-Cardona* v. *Bank of New York Mellon*,
  770 F.3d 993 (2d Cir. 2014).................................................7

*Chavez* v. *Mercantil Commercebank, N.A.*,
  701 F.3d 896 (11th Cir. 2012) ............................................17

*Citibank, N.A.* v. *Brigade Cap. Mgmt., LP*,
  49 F.4th 42 (2d Cir. 2022) ..................................................24

*Ctr.-Point Merch. Bank Ltd.* v. *Am. Exp. Bank Ltd.*,
  913 F. Supp. 202 (S.D.N.Y. 1996).................................7, 10

*Delbrueck & Co.* v. *Mfrs. Hanover Tr. Co.*,
  609 F.2d 1047 (2d Cir. 1979)............................................6, 7

*Eisenberg* v. *Wachovia Bank, N.A.*,
  301 F.3d 220 (4th Cir. 2002) ..............................................18

*Export-Import Bank of U.S.* v. *Asia Pulp & Paper Co.*,
  609 F.3d 111 (2d Cir. 2010).................................................3

*Fischer & Mandell LLP* v. *Citibank, N.A.*,
  2009 WL 1767621 (S.D.N.Y. June 22, 2009) .....................16

*Jain* v. *Old Dominion Nat'l Bank*,
  No. 1:20-CV-1161 (E.D. Va. 2021).....................................17

*Jajati* v. *JPMorgan Chase Bank, N.A.*,
  2024 WL 99659 (E.D.N.Y. Jan. 9, 2024) .......................4, 18

*Levin* v. *JPMorgan Chase Bank, N.A.*,
　751 F. App'x 143 (2d Cir. 2018) ..........................................................17

*McLaughlin* v. *Comerica Bank*,
　2023 WL 4139623 (E.D. Mich. June 22, 2023)...............................6, 7

*Nirav Ingredients, Inc.* v. *Wells Fargo Bank, N.A.*,
　2022 WL 3334626 (4th Cir. Aug. 12, 2022)........................................23

*Patco Const. Co.* v. *People's United Bank*,
　684 F.3d 197 (1st Cir. 2012)................................................................23

*Pope* v. *Wells Fargo Bank, N.A.*,
　2023 WL 9604555 (D. Utah Dec. 27, 2023).................................13, 17

*Spain* v. *Union Trust*,
　674 F. Supp. 1496 (D. Conn. 1987) ....................................................14

*Stepakoff* v. *IberiaBank Corp.*,
　637 F. Supp. 3d 1309 (S.D. Fla. 2022) ...............................................16

*U.S. Bank N.A.* v. *Zaccagnino*,
　214 A.D.3d 754 (2d Dept. 2009) ...........................................................6

*Washington Mut. Bank* v. *Superior Ct.*,
　95 Cal. App. 4th 606 (2002) ...............................................................25

*Wright* v. *Citizen's Bank of E. Tennessee*,
　640 F. App'x 401 (6th Cir. 2016)...................................................4, 16

**Statutes and Constitutional Provisions**

15 U.S.C. § 1693.......................................................................... *passim*

N.Y. U.C.C. art. 4-A .................................................................... *passim*

U.C.C. art. 4A .............................................................................. *passim*

N.Y. Const. art. III, § 1 ......................................................................24

**Regulations and Guidance**

12 C.F.R. pt. 205 ..........................................................................................................11

12 C.F.R. pt. 210 .......................................................................................................4, 19

12 C.F.R. § 205.3(b) ...................................................................................................16

12 C.F.R. § 210.25(b) ............................................................................................4, 9, 19

12 C.F.R. § 1005.3(c)(3) ..................................................................................3, 8, 13, 17

12 C.F.R § 1005.6(b) ................................................................................................7, 23

61 Fed. Reg. 19678 (May 2, 1996) ...............................................................................19

76 Fed. Reg. 29902 (May 23, 2011) ................................................................................3

77 Fed. Reg. 6194 (Feb. 7, 2012) .............................................................10, 11, 15, 18

78 Fed. Reg. 72813 (Dec. 4, 2013) ...............................................................................21

85 Fed. Reg. 34870 (June 5, 2020) ...............................................................................15

86 Fed. Reg. 31376 (June 11, 2021) ...............................................................................9

FDIC, *Consumer Compliance Examination Manual* (2022) ........................................20

FDIC, *Electronic Funds Transfer Risk Assessment* (2023) ........................................20

FDIC, *Users' Rights Under the Electronic Funds Transfer Act in the Event of
    Bank Error Regarding an Electronic Wire Transfer* (Apr. 26, 1994) ...................20

FFIEC, *Authentication and Access to Financial Institution Services and Systems*
    (2021) .........................................................................................................................23

Fed. Rsrv. Bd., *Consumer Compliance Handbook* (2016) .........................................19

Fed. Rsrv. Bd., *Fedwire® Funds Service - Annual Statistics* (Jan. 26, 2024)............22

FinCEN, *Feasibility of Cross-Border Electronic Funds Transfer Reporting
    System Under the Bank Secrecy Act* (2006)...........................................................21

OCC, *Comptroller's Handbook on Electronic Fund Transfer Act (Interagency)*
    (2019).........................................................................................................................21

OCC, *Comptroller's Handbook: Payment Systems* (Oct. 2021)..................................21

OCC, *Message from the Director–Wire Transfer Scams and Ways to Protect Yourself* (July 2023) ........................................................................................................20

**Other Authorities**

*"EFT and the Public Interest": Hearings Before the Subcommittee on Financial Institutions*, 95th Cong. 124 (1977) ......................................................................9

BPI, *7 Recommendations to Better Combat Financial Scams and Fraud* (2024) ........................23

E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio L.J. 543 (1979) ......................................................................................8

Howard S. Koh, *Liability for Lost or Stolen Funds in Cases of Name and Number Discrepancies in Wire Transfers*, 22 Cornell Int'l L.J. 91 (1989) .............................................5

LexisNexis, *Discover True Cost of Fraud Study Results* (2024) ....................................................23

N.Y. Assembly, Mem. in Support of 2012 N.Y. Assembly Bill A10591 ....................................11

*Testimony of Carla Sanchez-Adams before the U.S. Senate Committee on Banking, Housing, and Urban Affairs* 22 (Feb. 1, 2024) ........................................................15

The Clearing House, *CHIPS Annual Statistics From 1970 to 2024* (Mar. 2024) ........................22

## STATEMENT OF INTEREST

*The Clearing House Association L.L.C. ("Association")*.  Established in 1853, the Association is a nonpartisan advocacy organization that represents the interests of its member banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers, communities, and economic growth.[1]  Its sister company, The Clearing House Payments Company L.L.C. ("PaymentsCo"), owns and operates U.S. payments networks that provide safe, sound, and efficient payment clearing and settlement services to financial institutions.  PaymentsCo's CHIPS® wire-transfer system and EPN® automated clearing house ("ACH") network clear and settle more than $2 trillion of payments every business day.

*The Bank Policy Institute ("BPI")*.  BPI is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States.  BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial services industry with respect to cybersecurity, fraud, and other information security issues.

*New York Bankers Association ("NYBA")*.  NYBA, founded in 1894, comprises more than 100 community, regional and money center commercial banks and thrift institutions operating across the State of New York.  NYBA's members have over 200,000 employees and aggregate assets in excess of $10 trillion.  NYBA's mission is to be New York State's preeminent provider of legislative and regulatory services to a unified banking industry.

---

[1]     The defendant, Citibank, N.A., is a member of the Association, The Clearing House Payments Company L.L.C., the Bank Policy Institute, the New York Bankers Association, and the American Bankers Association.  Both parties were timely notified of the filing of this brief. Further, no counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person or entity other than *Amici* and their counsel funded its preparation and submission.

*American Bankers Association ("ABA")*.  The ABA is the principal national trade association of the financial services industry in the United States.  Founded in 1875, ABA is the voice for the nation's $23.7 trillion banking industry and its more than two million employees.  ABA members provide banking services in each of the fifty states and the District of Columbia.  Among them are banks, savings associations, and non-depository trust companies of all sizes.

*Amici* have an interest in this case because their members provide payment services that are governed by the Electronic Fund Transfer Act ("EFTA") or Article 4A of the Uniform Commercial Code ("UCC"), depending on the nature of the particular payment transaction.  *Amici* have considerable experience with consumer wire transfers, which are the transactions of focus of the New York Attorney General's Complaint in this case.  Indeed, *Amici*'s members facilitate billions of dollars in wire transfers a day, including consumer wire transfers.  *Amici*'s members are deeply committed to consumer protection, including by meeting their obligations under EFTA, the UCC, and other applicable laws and regulations, as well as to providing consumers with efficient, effective methods for making payments.

## INTRODUCTION

The Complaint by the New York Attorney General ("NYAG") posits an interpretation of the law governing wire-transfer payments that contradicts the text, Congressional intent, regulatory interpretation, and settled understanding of the relevant statutes and that would upend decades of legal precedent and industry practice.  According to the NYAG, Citibank, N.A. ("Citibank") violated EFTA by failing to follow the statute's requirements when customers fell victim to wire fraud schemes.  But the NYAG omits a critical point:  The wire transfers targeted by the Complaint are categorically exempt from EFTA's coverage.  15 U.S.C. § 1693a(7)(B); 12 C.F.R. § 1005.3(c)(3).  Instead, as the Second Circuit has recognized, it is Article 4A of the

UCC that provides the "comprehensive body of law that defines the rights and obligations that arise from wire transfers." *Export-Import Bank of U.S.* v. *Asia Pulp & Paper Co.*, 609 F.3d 111, 118 (2d Cir. 2010); *Bodley* v. *Clark*, 2012 WL 3042175, at *4 (S.D.N.Y. July 23, 2012) (Forrest, J.) (applying Article 4A to unauthorized consumer funds transfer). This Court should reject the NYAG's attempt to deviate from established law and practice and to impose—through litigation—the NYAG's own policy choices as to how the risk of loss surrounding an electronic transfer of funds should be allocated.[2]

*First*, the NYAG badly misreads EFTA. The statute on its face excludes wire transfers from its scope. Congress has repeatedly declined to amend EFTA to bring all wire transfers within its coverage despite numerous suggestions and opportunities to do so. Indeed, when Congress amended EFTA in 2010, it subjected only a *subset* of wire transfers (remittance transfers) to *part* of EFTA's regime—a subset and part not mentioned or relied upon by the NYAG in this case. Congress chose not to apply EFTA to consumer wire transfers in general, as the NYAG would do here. *See* 76 Fed. Reg. 29902, 29908 (May 23, 2011).

Seeking to avoid the clear statutory language and implementing regulations exempting wire transfers from EFTA's coverage, the NYAG attempts to transform the series of integrally connected transactions that constitute a single consumer wire transfer into three supposedly "independent" transfers of funds. But that creative pleading theory cannot survive scrutiny: EFTA and its implementing regulation (Regulation E), along with Article 4A, make clear that the components of a wire transfer are not standalone transactions but rather together

---

[2]    This brief does not take a position as to whether the wire transfers in this case were unauthorized under EFTA. Instead, it argues only that UCC Article 4A is the controlling and exclusive legal framework for wire transfers, including consumer wire transfers (apart from a limited exception for remittance transfers not relevant for the present case but discussed below).

constitute a single funds transfer that is expressly excluded from EFTA's reach.  A single wire transfer is inherently a "*series of transactions*, *beginning with the originator's payment order*, made for the purpose of making payment to the beneficiary of the order.*"  N.Y. U.C.C. § 4-A-104(1) (emphasis added); 15 U.S.C. § 1693a(12) (defining "unauthorized electronic fund transfer" as a transfer "*from a consumer's account initiated by*" someone "without actual authority to initiate such transfer" where the consumer "receives no benefit") (emphasis added); 12 C.F.R. pt. 210, app. A (applying the Article 4A definition of funds transfer to Fedwire® Funds Service transfers by virtue of 12 C.F.R. § 210.25(b)(1)).  The NYAG's contention that the first part of this "series of transactions"—a debit to a consumer's account to pay for a payment order to effect a funds transfer—is an "independent" transfer that falls outside of Article 4A is therefore wrong.  Instead, Article 4A governs a customer's obligation to pay for such a payment order (N.Y. U.C.C. § 4-A-402(3)) and explicitly addresses the debiting of the customer's account to do so (N.Y. U.C.C. § 4-A-403(1)(c)).

*Second*, the NYAG's interpretation conflicts with decades of jurisprudence and regulatory guidance on which *Amici's* members have relied.  Courts, including courts across the Second Circuit, have consistently found that claims brought by consumers seeking recovery for funds wired to a fraudster fall "squarely within the ambit of Article 4A," not EFTA.  *Jajati* v. *JPMorgan Chase Bank, N.A.*, 2024 WL 99659, at *5 (E.D.N.Y. Jan. 9, 2024) (Gonzalez, J.); *see also Wright* v. *Citizen's Bank of E. Tennessee*, 640 F. App'x 401, 404 (6th Cir. 2016) (affirming dismissal of consumer's EFTA claim because Article 4A, not EFTA, applied to claim regarding funds consumer wired "through Fedwire"); *Bodley,* 2012 WL 3042175, at *4 ("[W]ire transfers are explicitly excluded from EFTA's definition of 'electronic fund transfers.'").  The banking regulators agree.  *See infra,* Section II.B.

*Third*, the NYAG's lawsuit seeks to impose via litigation an extraordinary policy change that could upend the current framework governing wires, at great potential cost, including to consumers as a group.  Under Article 4A, if financial institutions accept consumer payment orders in good faith and in compliance with an agreed-upon commercially reasonable security procedure, they do not have an obligation to reimburse customers for unauthorized wire transfers. *See* N.Y. U.C.C. § 4-A-202(2).  In attempting to impose EFTA's more stringent liability regime on all consumer wire transfers—no matter a financial institution's good faith and use of agreed-upon commercially reasonable security procedures—the NYAG would greatly disrupt the current marketplace to the detriment of consumers.  Were financial institutions to become insurers against all unauthorized consumer wire transfers, the availability of convenient, online consumer-initiated wire transfers would decline and the cost for such a service would inevitably increase.  This type of policy decision is for legislators, not the NYAG.

## BACKGROUND

### A.    Wire Transfers

Wire transfers "have existed since the invention of the telegraph," but grew in size and sophistication over the course of the twentieth century.  Howard S. Koh, *Liability for Lost or Stolen Funds in Cases of Name and Number Discrepancies in Wire Transfers*, 22 Cornell Int'l L.J. 91, 94 (1989).  Critically, a wire transfer does not involve a straight-line movement of funds from one party to another.  Instead, a single wire transfer is composed of a "*series of transactions*, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."  U.C.C. § 4A-104 (emphasis added).

By way of example, imagine that a consumer, who banks with Bank A, needs to send $10,000 through the Fedwire Funds Service to an escrow agent with an account at Bank B, in connection with a down payment for a home purchase.  The consumer submits a "payment

order" to Bank A, which is "an instruction from the person making the payment (the originator), to a 'receiving' . . . bank to transfer the funds to the bank account of the beneficiary." *U.S. Bank N.A.* v. *Zaccagnino*, 214 A.D.3d 754, 757 (2d Dept. 2009) (quoting U.C.C. § 4A-103). The payment order initiates, but does not complete, the electronic transfer of funds. Bank A will typically verify the originating customer's payment order using security procedures agreed upon with its customer and will debit the customer's account at Bank A for the amount of the order. To carry out the originating customer's payment order, Bank A will send a message (a payment order) through the Fedwire Funds Service that instructs a bank (the payee's bank) to pay an amount of money to the beneficiary of the funds transfer.[3] *McLaughlin* v. *Comerica Bank*, 2023 WL 4139623, at *3 (E.D. Mich. June 22, 2023).

The message would contain information including "identifying codes for the party originating the transfer [(the consumer)], the remitting bank [(Bank A)], the receiving bank [(Bank B)], the party for whom the receiving bank is receiving the transfer [(the beneficiary)] and the amount of the transfer [($10,000)]." *Delbrueck & Co.* v. *Manufacturers Hanover Tr. Co.*, 609 F.2d 1047, 1049 n.1 (2d Cir. 1979). Assuming the payment order message passes necessary edits and any risk controls the Federal Reserve Banks might have imposed, the Fedwire system will send a message (another payment order) to Bank B and will make the appropriate debits and credits to the Federal Reserve Bank accounts for Banks A and B. Upon receiving the Fedwire message, Bank B will credit the escrow agent's account $10,000. *Id.*; *McLaughlin*, 2023 WL 4139623, at *3 (describing consumer-initiated wire transfer processed through the Fedwire Funds Service, which typically occurs in a matter of minutes).

---

[3]    This description is simplified and ignores, for example, the role of Federal Reserve Banks as receiving banks that are party to the funds transfer. That role is not relevant to the analysis.

Thus, a wire transfer is a "chained series of debits and credits between the originator, the originator's bank, any intermediary banks, the beneficiary's bank, and the beneficiary." *Calderon-Cardona* v. *Bank of New York Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014). All the links in this chain are interconnected and a necessary predicate to achieving the electronic transfer of funds. *Ctr.-Point Merch. Bank Ltd.* v. *Am. Exp. Bank Ltd.*, 913 F. Supp. 202, 206 (S.D.N.Y. 1996) (McKenna, J.) (a wire transfer is "the series of transactions, beginning with a payment order, made for the purpose of making payment to the beneficiary of that order").

**B.    EFTA**

In 1978, as electronic banking became increasingly widespread, Congress enacted EFTA, 15 U.S.C. § 1693 *et seq.*, with a "primary" focus on "consumer rights," 15 U.S.C. § 1693 (declaration of purpose). EFTA defines an "electronic fund transfer" ("EFT") as a transfer of funds "initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). And for those EFTs that fall within its coverage, EFTA requires, among other things, the bank to cover all but $50 to $500 of a consumer's liability for unauthorized transfers, depending on when the consumer alerts the financial institution of the fraud. *See* 15 U.S.C. § 1693g; 12 C.F.R § 1005.6(b).

Since its inception, EFTA has categorically excluded wire transfers from the definition of EFT and therefore from the requirement under EFTA to reimburse consumers if a transfer turns out to be unauthorized. Section 903 of EFTA provides that an "electronic transfer" does *not* include "any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). The wording

"which is not designed *primarily* to transfer funds on behalf of a consumer" refers to services that are principally designed for transfers between financial institutions and/or businesses (*i.e.*, non-consumer payments).  The use of the word "primarily" reflects the understanding at the time EFTA was adopted that consumer payments also flowed and would continue to flow through such systems.  In other words, a transfer of funds "initiated [by a consumer] through an electronic terminal, telephonic instrument, or computer" that "order[s], instruct[s], or authorize[s] a financial institution to debit or credit an account" and is carried out by means of a wire transfer system is excluded from EFTA.  EFTA's implementing rule—Regulation E—removes any doubt about the exclusion of wire transfers from the definition of EFT:  "Exclusions from coverage.  *The term electronic fund transfer does not include*: . . . Wire or other similar transfers.  Any transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses."  12 C.F.R. § 1005.3(c)(3) (emphasis added).

Congress chose to exclude wire transfers from EFTA's requirements because wire-transfer systems did not primarily involve consumers and because Congress recognized that transfers made through those systems were and would be subject to different rules and regulations. For instance, wire transfers conducted through the Fedwire Funds Service were, unlike many new forms of electronic payment, "already governed by rules established by the Federal Reserve Board in Subpart B of Regulation J."  Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio L.J. 543-44 (1979).  And, at that time, Congress was aware that the UCC was being revised to supply a legal framework for "information transmitted by wire." *EFT and the Public Interest: Hearings Before the Subcommittee on Financial Institutions*, 95th Cong. 124 at 519-20 (1977) (statement of Robert Haydock, Chairman of UCC Subcommittee on Article 4).

### C.    Article 4A

In 1989, the American Law Institute and National Conference of Commissioners on Uniform State Laws approved a new Article 4A of the UCC.  Article 4A was crafted to provide a "comprehensive body of law that defines the rights and obligations that arise from wire transfers."  *See* Uniform Laws Annotated, U.C.C. Article 4A, Prefatory Note (1989).  It was adopted by the New York State Legislature in 1990 and has now been adopted by all 50 states and the District of Columbia.  86 Fed. Reg. 31376, 31377 (June 11, 2021); *Banque Worms* v. *BankAmerica Int'l*, 570 N.E.2d 189, 194-95 (1991).  Additionally, the Federal Reserve Board has revised Regulation J to incorporate Article 4A's provisions.  12 C.F.R. § 210.25(b)(1).  In this way, Article 4A achieved national uniformity with respect to the assignment of rights and liabilities for wire transfers.  *Banque Worms*, 570 N.E.2d at 195.

In establishing a comprehensive set of rules governing wire transfers, the drafters of Article 4A faced a policy issue as to how the risk of loss due to fraud or mistake might best be allocated.  *Id.* at 195.  As a default rule, Article 4A "allocates the risk of loss to the bank that received and honored [an] unauthorized order[]."  *Banco del Austro, S.A.* v. *Wells Fargo Bank, N.A.*, 215 F. Supp. 3d 302, 304 (S.D.N.Y. 2016) (Kaplan, J.).  Pursuant to Article 4A, however, a financial institution is not obligated to "refund any payment of the payment order received from the customer" associated with an unauthorized wire transfer if the financial institution and its customer have (i) reached an agreed-upon "commercially reasonable method of providing security against unauthorized payment orders," and (ii) the financial institution "accepted the payment order in good faith and in compliance with the security procedure."  N.Y. U.C.C. § 4-A-202(2).

*Cf.* N.Y. U.C.C. §4-A-204(1).[4]  Article 4A thus represents a "careful and delicate balancing" of both the customer and the financial institutions' interests and provides a "detailed" framework that "allocate[s] risks among the various parties" to wire transfer transactions.  *Ctr.-Point Merch. Bank Ltd.*, 913 F. Supp. at 206.

### D.    The Dodd-Frank Act

For decades, Congress and consumer groups have understood that Article 4A, and not EFTA, governed wire transfers, including wires initiated by consumers.  In 2010, however, Congress determined that consumers ought to have particular rights with respect to remittance transfers.  A remittance transfer is a type of "electronic transfer[] of funds sent by consumers in the United States to recipients in other countries."  77 Fed. Reg. 6194, 6195 (Feb. 7, 2012).  Since many remittance transfers were carried out through wire-transfer systems, remittance transfers "were largely excluded from existing Federal consumer protection regulations in the United States," *id.* at 6278, given EFTA's categorical exemption of wire transfers from the scope of its coverage.

As part of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), however, Congress decided to introduce new protections for consumers transferring money abroad.[5]  Those protections included the right to obtain certain disclosures (such as fees and promised date of delivery to the recipient) and certain error-resolution rights.

---

[4]    N.Y. U.C.C. § 4-A-202(2) also requires a bank to comply with any written agreement or instruction of its customer restricting acceptance of payment orders issued in the customer's name, but, based on the Complaint, no such agreements or instructions appear to be at issue here.

[5]    Remittance transfers are often sent by vulnerable and low-income individuals to family members living abroad and had been subject to numerous complaints of false and deceptive marketing and other issues like excessive or predatory fees prior to the Dodd-Frank Act.  77 Fed. Reg. 6194 at 6199, 6272-73 (discussing importance of rule to low-income immigrants and migrants who support family in countries abroad).

Congress, however, did not otherwise subject remittance transfers sent through wire-transfer systems (*i.e.*, those processed through the Fedwire Funds Service and similar systems, such as the CHIPS network)[6] to the full panoply of EFTA's requirements, including provisions treating unauthorized transfers as a form of error. *See* 15 U.S.C. § 1693o-1.[7]

Although consumer use of wires has increased in the decades since EFTA was enacted (and even in the years since the Dodd-Frank Act was passed), Congress has chosen to leave Article 4A's framework in place rather than expanding EFTA to cover wire transfers beyond the limited remittance-transfer provisions just discussed. Moreover, New York, like other states, has amended its codification of Article 4A to ensure that, apart from the Dodd-Frank Act's remittance-transfer protections, Article 4A will continue to be the exclusive legal framework applying to funds transfers made over wire-transfer systems like the Fedwire Funds Service and the CHIPS network "even if they involve[] consumers." *See* N.Y. Assembly, Mem. in Support of 2012 N.Y. Assembly Bill A10591. Accordingly, financial institutions, including those in New York, have continued to rely on Article 4A as the governing law for wire transfers, including consumer wire transfers.

---

[6]    12 C.F.R. pt. 205, supp. I, cmt. 3 to 3(c)(3) ("Fund transfer systems that are similar to Fedwire include the Clearing House Interbank Payments System (CHIPS), Society for Worldwide Interbank Financial Telecommunication (SWIFT), Telex, and transfers made on the books of correspondent banks.").

[7]    The relatively limited changes to EFTA and Regulation E to cover remittance transfers were nonetheless quite significant to regulators, consumers, and industry participants. The Office of the Comptroller of the Currency ("OCC") commented that displacing Article 4A in this area would generate "legal uncertainty that would disrupt the long-standing legal framework governing the allocations of risk among financial institutions of wire transfers." 77 Fed. Reg. 6194 at 6211. Recognizing that remittance providers "were previously able to rely on UCC Article 4A's rules," the Consumer Financial Protection Bureau ("CFPB") suggested that states amend their codifications of Article 4A to ensure that Article 4A would still apply to remittance transfers that were *not* EFTs as defined in EFTA, *id.* at 6212, and states ultimately did so, including New York, as described *infra*, to ensure the continuing application of Article 4A's framework and protections to such transfers remained clear, *see, e.g.*, N.Y. U.C.C. § 4-A-108(2) (2022).

## ARGUMENT

As the statutory text and decades of consistent jurisprudence and regulatory guidance confirm, EFTA's framework for unauthorized EFTs does not apply to wire transfers, including consumer-originated wires.  That choice was an intentional one made by Congress in enacting EFTA and in the decades since, during which time Congress has several times reconsidered the statute and the transactions it covers but has never chosen to amend EFTA to bring wire transfers within the definition of EFT.  Were this Court to embrace the NYAG's contorted version of consumer wire transfers, it would force tremendous changes for the nation's financial institutions, which would have to amend consumer contracts across the country, modify compliance procedures, and reconsider pricing and even the very availability of affordable, fast consumer wire transfers.  It could also confuse customers, whose wire transfers might be governed by one set of laws if they originate the transfers in a bank branch, but by another set of laws if they do so online.

## I.    THE STATUTORY TEXTS OF EFTA AND ARTICLE 4A REFUTE THE NYAG'S THEORY.

In enacting EFTA, Congress made the deliberate choice to exempt wire transfers, including consumer wire transfers, from its coverage.  EFTA explicitly excludes from the definition of EFT "any transfer of funds, other than those processed by [ACH], made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer."  15 U.S.C. § 1693a(7)(B).  As explained *supra* at 7-8, by using the language "not designed primarily to transfer funds on behalf of a consumer," Congress clearly excluded wires from EFTA's coverage.  Regulation E follows the clear import of the EFTA text: "The term electronic fund transfer does not include: . . . (3) Wire or other similar transfers.  Any

transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses." 12 C.F.R. § 1005.3(c)(3). Indeed, the very existence of this exclusion in EFTA, a consumer-protection statute that applies only to consumer accounts, § 1693(b), §1693a(2), demonstrates that Congress understood that consumer wire transfers were the wire transfers it was excluding from EFTA protections— otherwise, it would not have been necessary to carve such transfers out from the definition of EFT.

The NYAG seeks to circumvent this clear statutory language by arguing that a consumer wire transfer may be broken into three "independent" transfers of funds: (i) a transfer that the payor's bank executes to pay itself for a payment order by debiting the payor's account; (ii) a transfer between the payor's bank and the payee's bank; and (iii) a transfer by the payee's bank into the payee's account. Compl. ¶¶ 6, 58. Under the NYAG's theory, only (ii) above is a "wire transfer" covered by Article 4A, while (i) and, if the payee is a consumer, (iii) are non-wire EFTs covered by EFTA.

The NYAG's trifurcated-transfer theory is contrary to the text of EFTA and broadly accepted understandings of consumer wire transfers. EFTA defines an EFT as "any transfer of funds . . . *which is initiated* through an electronic terminal, telephonic instrument, or computer or magnetic tape *so as to order, instruct, or authorize a financial institution to debit* or credit an account [meaning a consumer account]," 15 U.S.C. § 1693a(7) (emphasis added), while expressly carving out from the definition of EFT a wire transfer, 15 U.S.C. § 1693a(7)(B). Thus, EFTA's basic statutory framework recognizes that the process of effecting a transfer of funds begins with (and includes) an instruction from a payor (which could be a consumer) that entitles a financial institution to be paid for that transfer, including through a debit to the payor's account. *See* 15 U.S.C. § 1693a(7); *see also Pope* v. *Wells Fargo Bank, N.A.*, 2023 WL 9604555, at *3-4 (D. Utah

Dec. 27, 2023) (rejecting plaintiff's argument that fraud-induced in-person wire could be bifurcated into (i) a consumer-initiated transfer and (ii) a transfer involving banks only, as this "two transfers" theory failed under EFTA's wire-transfer exclusion); *Spain* v. *Union Trust*, 674 F. Supp. 1496, 1499-1500 (D. Conn. 1987) (rejecting plaintiff's argument that defendant-bank's debiting of plaintiff's consumer bank account predicated on an exempted fund transfer type (check) was a separate EFT covered by EFTA).

The text of Article 4A further refutes the NYAG's theory.  Article 4A, like EFTA, views and treats a consumer wire transfer as a unified whole, even if it is composed of component parts.  Article 4A defines a "funds transfer" as the "*series of transactions*, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order."  N.Y. U.C.C. § 4-A-104(1) (emphasis added).  Accordingly, a consumer wire transfer *begins* with the consumer's payment order to the consumer's bank.  That payment order is, by definition, a part of the "series of transactions" that is the funds transfer, not a distinct transfer of funds independent or outside of a wire transfer.  For that reason, Article 4A has provisions that expressly deal with both debits to originators' (payors') accounts and credits to beneficiaries' (payees') accounts.  *See* N.Y. U.C.C. §§ 4-A-402, 4-A-403(1)(c) (recognizing that a sender, including consumer originator, must pay the receiving bank for a payment order that the bank has accepted, including by debiting the sender's account); N.Y. U.C.C. § 4-A-405(1) (addressing how the beneficiary's bank may pay the beneficiary).  Article 4A thus provides an end-to-end legal framework for funds transfers, including consumer wire transfers and the components thereof.

Were the plain texts of EFTA's wire transfer exclusion and Article 4A not enough, EFTA's provisions regarding remittance transfers—a subset of wire transfers—also undermine the NYAG's theory.  As the CFPB has explained, "[p]rior to the Dodd-Frank [Act], remittance

transfers fell largely outside of the scope of Federal consumer protection laws."  85 Fed. Reg. 34870, 34871 (June 5, 2020).  To enhance consumer rights with respect to remittance transfers, Congress, through the Dodd-Frank Act, added a new section 919 to EFTA.  That provision required remittance transfer providers to give certain disclosures to senders of remittance transfers and directed the CFPB to promulgate rules regarding those disclosure requirements and appropriate error resolution, cancellation, and refund policies.  15 U.S.C. § 1693o-1(a).  Thus, the Dodd-Frank Act imposed *some* of EFTA's requirements (none of which are relevant in the present case) on a *subset* of wire transfers—which necessarily included the initial payment instruction from the consumer remitter.  It thereby partially displaced Article 4A only with respect to certain qualifying remittance transactions.  § 1693o-1(e); 77 Fed. Reg. 6194, 6198 (Feb. 7, 2012).

The NYAG's theory would render the Dodd-Frank amendments to EFTA meaningless.  If the consumer origination of *all* wire transfers was *already* covered by EFTA, then section 919 of EFTA—and the subsequent remittance-transfer-related rulemaking—would be superfluous.  *See Bailey* v. *United States*, 516 U.S. 137, 146 (1995) ("A legislature is presumed to have used no superfluous words.").

Finally, recent legislative efforts confirm that UCC Article 4A, not EFTA, covers a consumer's initial payment instruction and the associated debit to the consumer's account if the payment is a wire transfer.  Just a few months ago, the Senate held hearings relating to consumer victims of wire fraud.  Participants did not suggest that EFTA already treats such transactions as EFTs.  Instead, consumer advocates urged Congress to close what they have pejoratively labeled the "wire transfer loophole."  *Testimony of Carla Sanchez-Adams before the U.S. Senate Committee on Banking, Housing, and Urban Affairs* 22 (Feb. 1, 2024), https://www.banking.senate.gov/imo/media/doc/sanchez-adams_testimony_2-1-24.pdf; *see also*

*id.* at 20 (observing that "even if a criminal impersonates the consumer and makes a completely unauthorized wire transfer, the consumer may have no protection under Regulation E").  Again, amendments to EFTA for this purpose would make no sense if consumer wire transfers were already covered.

## II. CONSISTENT JURISPRUDENCE AND REGULATORY GUIDANCE MAKE CLEAR THAT CONSUMER WIRE TRANSFERS ARE GOVERNED BY ARTICLE 4A, NOT EFTA.

### A. Courts Have Consistently Held That Consumer Wire Transfers Are Governed By Article 4A, *Not* EFTA.

To *Amici*'s knowledge, every court that has substantively reviewed EFTA's coverage exemptions has held that wire transfers of the sort at issue here, and portions of such transfers, are governed by Article 4A and not EFTA.  This Court should not seek to create new law in holding otherwise.

When confronted with lawsuits brought by consumers and businesses alike against financial institutions seeking reimbursement for wire transfer-related fraud, courts have explained that "Regulation E explicitly excludes from the coverage of the EFTA transfers of funds made through checks and wire transfers," and EFTA therefore provides no relief.  *Fischer & Mandell LLP* v. *Citibank, N.A.*, 2009 WL 1767621, at \*4 (S.D.N.Y. June 22, 2009) (Sullivan, J.).  In other words, EFTA is not a "guarantee provision for [all] account holders" who have been the victim of fraud because wire transfers fall outside its purview.  *Id.*  Thus, courts have dismissed consumer suits brought under EFTA concerning fraudulent or erroneous wire transfers because "EFTA is not intended to apply to wire transfers."  *Wright*, 640 F. App'x at 404; *Stepakoff* v. *IberiaBank Corp.*, 637 F. Supp. 3d 1309, 1313 (S.D. Fla. 2022) (dismissing consumer's EFTA claim premised on a wire transfer because 12 C.F.R. § 205.3(b)(1) "specifically exclude[s]" the "wire transfer at issue from EFTA coverage"); *Bodley,* 2012 WL 3042175, at \*4 (remarking that "wire transfers are

explicitly excluded from EFTA's definition of 'electronic fund transfers'" where consumer alleged transfer by unidentified party of funds from his account violated EFTA).

In fact, courts have held EFTA inapplicable to the types of unauthorized wire transfers resulting from fraudulent conduct that are alleged in the Complaint.  For example, in *McClellon* v. *Bank of America*, a consumer brought a claim against Bank of America ("BofA") premised on BofA's alleged failure to comply with Regulation E and reimburse him for unauthorized wire transfers made by a fraudster who had stolen the plaintiff's identity and wired over $100,000 from his bank account.  2018 WL 4852628, at *1-2 (W.D. Wash. Oct. 5, 2018).  The court dismissed the claim with prejudice, holding "[b]y its very terms, the amended complaint seeks to hold [BofA] liable for allegedly fraudulent wire transfers" but even "accepting [plaintiff's] allegations as true, Regulation E does not apply to the wire transfers at issue."  *Id.* at *6 (citing 12 C.F.R. § 1005.3(c)(3)); *Jain* v. *Old Dominion Nat'l Bank*, No. 1:20-CV-1161, (E.D. Va. 2021), Dkt. Nos. 30, 31 at pp. 4-6 (dismissing claim brought by consumer under EFTA, where "an imposter purporting to be" plaintiff "improperly wired" $638,201 from plaintiff's bank account); *Pope*, 2023 WL 9604555, at *1, 3-4 (dismissing EFTA claim brought by consumer who was the victim of a "classic text phishing scheme" because "EFTA is not applicable to wire transfers").

Instead of turning to EFTA, federal and state courts have repeatedly held that Article 4A governs consumers' rights and liabilities in the event of wire-transfer fraud.  It is blackletter law that "Article 4-A was 'enacted to provide a comprehensive body of law that defines the rights and obligations that arise from wire transfers.'"  *Levin* v. *JPMorgan Chase Bank, N.A.*, 751 F. App'x 143, 147 (2d Cir. 2018).  Courts have accordingly found that Article 4A governs claims concerning the sort of conduct targeted by the NYAG's Complaint.  Such claims include a bank's liability arising from identity theft that led to unauthorized wire transfers.  *See Chavez* v.

*Mercantil Commercebank, N.A.*, 701 F.3d 896, 898-99 (11th Cir. 2012); *Braga Filho* v. *Interaudi Bank*, 2008 WL 1752693, at *3 (S.D.N.Y. Apr. 16, 2008) (Scheindlin, J.), *aff'd sub nom.* 334 F. App'x 381 (2d Cir. 2009) (holding that 17 unauthorized wire transfers from couple's account by imposter were governed by Article 4A). As those courts have made clear, any claim that a financial institution improperly handled a wire transfer request or should reimburse a consumer's wired funds "falls entirely within the coverage of Article 4A." *Jajati*, 2024 WL 99659, at *5; *Eisenberg* v. *Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002) (Article 4A governed consumer's claims against beneficiary's bank with respect to wire transfer sent to perpetrator of a fraudulent investment scheme).

**B.    Regulators Have Confirmed That Consumer Wire Transfers Are Governed By Article 4A, Not EFTA.**

Consistent with the statutory text of both EFTA and Article 4A, regulators have repeatedly made clear that (1) EFTA does not apply to wire transfers other than remittances and (2) a wire transfer is a series of transactions that begins with and *includes* a consumer's originating payment order.

***The CFPB***. The CFPB is the agency charged with implementing EFTA. It stated when implementing the Dodd-Frank Act's provisions concerning remittances that "until the Dodd-Frank Act [remittance] provisions become effective, wire transfers are entirely exempt from the EFTA and Regulation E and instead are governed by State law through State enactment of Article 4A of the U[CC]," which provides "[c]onsumers" with protections "in connection with an unauthorized [wire] transfer," including "improperly executed payment orders." 77 Fed. Reg. 6194, 6211-12 (Feb. 7, 2012). During the rulemaking process, the CFPB expressly observed that by operation of UCC § 4A-108 (which provides that Article 4A does not apply to funds transfers that are governed by EFTA), "the Bureau believes UCC Article 4A *will no longer apply*" to cross-

border consumer remittances and that consumers will instead receive protections set forth in EFTA and Regulation E for this subset of previously exempted funds transfers. *Id.* at 6212 (emphasis added); *see also supra*, at 10-11. The obvious import of these rulemaking pronouncements is that no aspect of a non-remittance wire, including the consumer-initiated payment order, is covered by EFTA.

*The Federal Reserve*. The Federal Reserve Board has stated that "Article 4A provides comprehensive rules governing rights and responsibilities arising from wire transfers . . . . The wire transfer exemption extends to any transfer of funds through Fedwire or through a similar fund transfer system," 61 Fed. Reg. 19678, 19679-80 (May 2, 1996), and "[i]n general, Fedwire funds transfers to or from consumer accounts are exempt from the EFTA and Regulation E," 12 C.F.R. pt. 210, subpt. B, app. A, cmts. 4-5 to § 210.25(b)(1) (describing exceptions to this general rule as the limited remittance-transfer provisions discussed above and transfers carried out partially through the Fedwire Funds Service and partially through the ACH); *see also* Fed. Rsrv. Bd., *Consumer Compliance Handbook*, 85 (2016), https://www.federalreserve.gov/boarddocs/ supmanual/cch/cch.pdf ("any transfer of funds for a consumer within a system that is used primarily to transfer funds between financial institutions or businesses, e.g., Fedwire or other similar network" is not "covered by the EFTA and Regulation E").

Additionally, by operation of 12 C.F.R. § 210.25(b), subpart B of Regulation J incorporates Article 4A of the UCC, which, as noted above, defines "funds transfer" as "the series of transactions, *beginning with the originator's payment order*, made for the purpose of making payment to the beneficiary of the order." U.C.C. §§ 4A-104, 402 (as incorporated in Regulation J) (emphasis added).

19

*The Federal Deposit Insurance Corporation ("FDIC")*.  The FDIC has stated that "[a]ny transfer of funds for a consumer within a system that is used primarily to transfer funds between financial institutions or businesses, e.g., Fedwire or other similar network" is excluded from EFTA.   FDIC, *Consumer Compliance Examination Manual* 809 (2022), https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/compliance-examination-manual.pdf.  And it has explained that EFTA and Regulation E are inapplicable to consumer-initiated wire transfers.  FDIC, *Interpretive Letter:  Users' Rights Under EFTA in the Event of Bank Error Regarding an Electronic Wire Transfer*, 1994 WL 393720, at *1 (Apr. 26, 1994).  In fact, the FDIC's Risk Management Manual of Examination Policies' EFT Risk Assessment Decision Factors worksheet asks examiners to "[r]eview agreements that are in effect concerning funds transfer operations between the bank and its customers" to determine whether "the agreements contain the following information:  . . . Security procedures *as defined by UCC Article 4A.*"  FDIC, *Electronic Funds Transfer Risk Assessment* (Oct. 2020) (emphasis added).

*The OCC*.  Similarly, the OCC has explained that "[w]ire transactions are covered under [Article] 4A of the Uniform Commercial Code."  OCC, *Message from the Director–Wire Transfer Scams and Ways to Protect Yourself* (July 2023), https://www.helpwithmybank.gov/about/message-from-director/index-message-from-director.html    (noting    EFTA    covers    wire transactions only "to some limited extent," meaning remittances).  Like the FDIC and the Federal Reserve Board, the OCC has a consumer compliance handbook that describes the general exclusion of wire transfers from EFTA, though noting the remittance transfer rules may apply to cross-border consumer wires:  "Any transfer of funds for a consumer within a system that is used primarily to transfer funds between financial institutions or businesses, e.g., Fedwire or other

similar network" is not covered by EFTA and Regulation E.  OCC, *Comptroller's Handbook on EFTA (Interagency)* 9 (Mar. 2019), https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/electronic-fund-transfer-act/pub-ch-efta.pdf.

The OCC has also explained that "a wire transfer transaction begins when the originator (bank customer) requests the transfer.  The originating bank verifies the request then initiates the transaction with the operator (e.g., Federal Reserve Bank or TCH) . . . The beneficiary bank then credits the beneficiary account in accordance with the payment instructions."  OCC, *Comptroller's Handbook on Payment Systems*, 10-11 & Fig. 3 (Oct. 2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/payment-sys-funds-transfer-activities/pub-ch-payment-systems.pdf.

***The Financial Crimes Enforcement Network ("FinCEN")***.  FinCEN has confirmed that wire transfers (aside from remittance transfers) are not covered by EFTA.  78 Fed. Reg. 72813, 72814 (Dec. 4, 2013) ("Wire or other similar transfers conducted through Fedwire® or similar wire transfer systems . . . are also specifically excluded from the [EFTA] definition of 'electronic fund transfer.'").  FinCEN has also defined a funds transfer as "a series of payment instruction messages, beginning with the originator's (sending customer's) instructions, and including a series of further instructions between the participating institutions, with the purpose of making payment to the beneficiary (receiving customer)."  FinCEN, *Feasibility of a Cross-Border Electronic Funds Transfer Reporting System Under the Bank Secrecy Act* 55 (Oct. 2006), https://www.fincen.gov/sites/default/files/shared/CBFTFS_Complete.pdf.

## III.    ADOPTING THE NYAG'S THEORY WOULD UPEND SETTLED EXPECTATIONS AT GREAT COST TO CONSUMERS.

Legislators, courts, and regulators have offered a consistent message to financial institutions:  Wire transfers are outside EFTA's purview.  Financial institutions, including *Amici*'s

members, have established their agreements, compliance systems and procedures, and priced their services accordingly, to reflect Article 4A's framework.  In addition, the Association's sister company, PaymentsCo, in operating the CHIPS network, and the Federal Reserve Banks, in operating the Fedwire Funds Service, have relied on Article 4A to supply much of the legal framework that supports those payment services.  In 2023, those systems together processed on average more than $6 trillion of wire transfers every business day.[8]  If this Court were to adopt the NYAG's theory and hold that EFTA applies to consumer wire transfers made over those wire-transfer systems, the rules governing matters addressed by Article 4A would fall away.

As a result of Article 4A's framework and to help ensure ongoing customer trust, financial institutions have invested in, developed, and employed safeguards to protect consumers against fraud.  Financial institutions leverage many types of controls and technologies in designing their security protocols to guard against unauthorized payments and to protect consumer accounts.[9]  In this regard, banks deploy a multilayered approach to customer protection that includes multifactor authentication, behavior and pattern risk analysis tools for transaction analysis, identity risk analysis and verification tools, unusual activity alerts, and customer-set notifications.  BPI, *7*

---

[8]    Fed. Rsrv. Bd., *Fedwire Funds Service—Annual Statistics* (Jan. 26, 2024) https://www.frbservices.org/resources/financial-services/wires/volume-value-stats/annual-stats.h tml; The Clearing House, *CHIPS Annual Statistics From 1970 to 2024* (Mar. 2024), https://media.theclearinghouse.org/-/media/New/TCH/Documents/Payment-Systems/CHIPS_volume_value_YTD_March_2024_v3.pdf?rev=d2dc9ab0676a452cbdc6aa2dd0 27e9f0.

[9]    *Amici* emphasize that the measures described in this paragraph are broader than—and should not be conflated with—the commercially reasonable security procedures Article 4A permits a financial institution to use to verify payment orders.

*Recommendations to Better Combat Financial Scams and Fraud* (2024), http://bpi.com/7-recommendations-to-better-combat-financial-scams-and-fraud/.[10]

Financial institutions have every incentive to develop, maintain, and continue to innovate robust security measures to protect consumers from fraud, including unauthorized wire transfers. They pay the lion's share of the costs associated with the proliferation of fraud and invest heavily in the handling of disputes associated with fraud. A recent survey found, for example, that for every $1 lost to fraud, U.S. financial institutions lose $4.41, due to legal expenses, processing, investigation, and other remediation costs. LexisNexis, *Discover True Cost of Fraud Study Results* (2024), https://risk.lexisnexis.com/insights-resources/research/us-ca-true-cost-of-fraud-study#financialservices. In addition to direct financial impacts, financial institutions face reputational risks if they become associated with fraud that affects their customers, including consumers.

Article 4A—like EFTA—ultimately represents a policy choice as to "how the risk of loss" stemming from a wire transfer "might best be allocated." *Banque Worms*, 570 N.E. 2d at 194; N.Y. U.C.C. § 4-A-203 cmt. 3 (explaining that Article 4A is designed to allocate risk of loss to the party in the best position to avoid losses due to fraudulent payment orders). And Article 4A does not impose EFTA's more stringent liability regime under which a financial institution *must* refund nearly all losses of a consumer victim of a fraudulent transfer. 12 C.F.R. § 1005.6(b); *Nirav Ingredients, Inc.* v. *Wells Fargo Bank, N.A.*, 2022 WL 3334626, at *3 (4th Cir. Aug. 12, 2022)

---

[10] Without taking a position as to whether such guidance is the appropriate standard, *Amici* note that courts have frequently looked to Financial Federal Institutions Examination Council guidance, FFIEC, *Authentication and Access to Financial Institution Services and Systems* (Aug. 11, 2021), https://files.consumerfinance.gov/f/documents/cfpb_authentication-access-financial-institution-services-systems_guidance_2021-08.pdf, to assess the commercial reasonableness of security procedures. *See, e.g.*, *Patco Const. Co.* v. *People's United Bank*, 684 F.3d 197, 201 (1st Cir. 2012). That guidance is updated as technology evolves.

(Article 4A does not make "banks insurers for their account holders' Internet security measures and for peoples' mistakes in falling for phishing scams").

The NYAG's Complaint seeks to enforce its own policy choice as to risk allocation, but it is not the one that Congress adopted in EFTA, nor is it one that New York and the other 49 states have adopted by enacting Article 4A. As the Second Circuit has explained, "by adopting Article 4A, [the New York Legislature] accorded importance to the speed, efficiency, certainty [of wire transfers] (*i.e.* to enable participants in [wire] fund transfers to have better understanding of their rights and liabilities), and finality." *Citibank, N.A.* v. *Brigade Cap. Mgmt.*, 49 F.4th 42, 60 (2d Cir. 2022). In other words, the NYAG would repudiate the Legislature's policy determination as incorporated in legislation. This is a direct violation of the separation of powers in the New York Constitution. N.Y. Const. art. III, § 1.

If the Court were to adopt the NYAG's position that consumer wire transfers are governed as EFTs under EFTA, the very availability of affordable and convenient consumer-initiated wire transfers would be at risk. Financial institutions have designed their consumer wire-transfer offerings based on longstanding precedent that wire transfers originated by those customers are governed by Article 4A, not EFTA. If this precedent were suddenly turned on its head, financial institutions would need to (i) reconsider their customer agreements, (ii) review existing commercially reasonable security procedures, (iii) revisit the fees they charge consumers for wire transfers given increased liability and reputational risks, and (iv) reassess whether to offer online or mobile consumer wire transfers at all.

Indeed, applying Regulation E to online or mobile consumer wires would create a fractured and costly legal framework, confuse consumers, and upend the predictability the marketplace depends for these large payments. Given that EFTA covers only *electronic*

origination of transfers, applying EFTA to some consumer wires might lead to separate contractual terms to govern consumer wire transfers depending on whether they are originated in person at a bank or online or through mobile banking. Furthermore, financial institutions would need to revise their procedures and processes and train their staff (including customer call center staff) to manage the different legal frameworks that would apply to in-person versus electronic transfers. And treating consumer wires differently than commercial wires could require technological changes, since both types of wires travel on the same automated systems and networks.

The above changes would, at a minimum, result in greater delays in making payments through wire transfers as financial institutions would consider the need to add even more friction to consumer wire transfers. A rewriting of existing procedures and practices, moreover, could increase costs and potentially even render unavailable convenient online or mobile consumer wire-transfer services. That would frustrate the objectives of Article 4A, which are to facilitate a low-cost and efficient system for transferring significant value electronically, and could signal the demise of the characteristics of wire transfers that consumers most value—namely, speed and finality of payment. *See Washington Mut. Bank* v. *Superior Ct.*, 95 Cal. App. 4th 606, 624 (2002) ("exempted payment methods" like wire transfers "are popular because of their low cost and ease of transmission"). As a result, consumers may lose the ability to quickly and efficiently make large wire transfers when buying homes, making other large purchases, or switching banks.

Subjecting consumer wire transfers to the EFT provisions of EFTA would effectively render banks insurers for all unauthorized consumer wire transfers. That complex legislative policy choice is not within the remit of the NYAG.

## CONCLUSION

For these reasons, *Amici* urge this Court to grant Citibank's motion to dismiss the NYAG's claims related to consumer wire transfers predicated on violations of EFTA.

Dated:    New York, New York
          May 2, 2024

                                                    Respectfully submitted,

*Of Counsel* for Amicus Curiae *The Clearing*          /s/ *Matthew A. Schwartz*
*House Association L.L.C.*                              H. Rodgin Cohen
                                                       Matthew A. Schwartz
Gregory P. Cavanagh                                    Leslie B. Arffa
Stephanie Heller                                       Miles H. Greene
THE CLEARING HOUSE ASSOCIATION L.L.C.                  SULLIVAN & CROMWELL LLP
1114 Avenue of the Americas, 17th Floor                125 Broad Street
New York, NY 10036                                     New York, NY 10004
(212) 613-0100                                         (212) 558-4000
greg.cavanagh@theclearinghouse.org                     cohenh@sullcrom.com
stephanie.heller@theclearinghouse.org                  schwartza@sullcrom.com
                                                       arffal@sullcrom.com
*Of Counsel* for Amicus Curiae *the Bank*              greenem@sullcrom.com
*Policy Institute*
                                                       *Counsel for* Amici Curiae *The Clearing*
Gregg L. Rozansky                                      *House Association L.L.C., the Bank Policy*
John Court                                             *Institute, New York Bankers Association,*
THE BANK POLICY INSTITUTE                              *and American Bankers Association*
600 13th Street N.W., Suite 400
Washington, D.C. 20005
(202) 289-4322
Gregg.Rozansky@BPI.com
John.Court@BPI.com

*Of Counsel* for Amicus Curiae *the New York*
*Bankers Association*

Niall O'Hegarty
Brent G. Weitzberg
NEW YORK BANKERS ASSOCIATION
99 Park Avenue, 17th Floor
New York, NY 10016
(212) 297-1600
nohegarty@nyba.com
bweitzberg@nyba.com

*Of Counsel* for Amicus Curiae *the American Bankers Association*

Thomas Pinder
Andrew R. Doersam
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, D.C.  20036
(202) 663-5035
adoersam@aba.com
tpinder@aba.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2024, I caused the foregoing to be filed with the Clerk of Court upon all counsel of record via the CM/ECF system.


Date:  May 2, 2024

/s/ *Matthew A. Schwartz*

Matthew A. Schwartz


*Counsel for* Amici Curiae *The Clearing House Association L.L.C., the Bank Policy Institute, New York Bankers Association, and American Bankers Association*