**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE PEOPLE OF THE STATE OF NEW
YORK, by LETITIA JAMES, Attorney
General of the State of New York,

Plaintiff,

*—against—*

CITIBANK, N.A.,

Defendant.

24 Civ. 0659 (JPO)

**CITIBANK, N.A.'S REPLY MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**

STEPTOE LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

2029 Century Park East
Suite 1800
Los Angeles, CA 90067
(213) 439 9400

June 25, 2024

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 4

I.      NYAG and the CFPB Cannot Overcome EFTA's Express Exemption of
Wire Transfers, Defeating the First Cause of Action ............................................... 4

        A.     EFTA's Exemption for Any "Transfer of Funds" by Wire
Encompasses the Entire Transfer From the Sender to the Recipient .......... 5

        B.     NYAG and the CFPB Fail to Meaningfully Address That Their
Outlier Interpretation Conflicts With a Uniform Understanding
Over Decades ............................................................................................... 9

        C.     The CFPB's Dodd-Frank Regulatory Pronouncements Confirm
That Consumer Wires Are Exempt From EFTA ...................................... 10

        D.     NYAG Admits That Its Interpretation Would Render the Wire
Exemption "Redundant" and Not "Necessary" ....................................... 12

        E.     Citibank Is Not Advancing an Interpretation Premised on
Technology Unforeseeable to EFTA's Enacting Congress ..................... 15

        F.     NYAG Grossly Misreads Subpart B of Regulation J .............................. 16

        G.     Alternatively, the "Automatic Transfer" Exemption Defeats
NYAG's Claim ......................................................................................... 18

        H.     The CFPB's Brief Is Not Entitled to Any Deference .............................. 20

II.     The Second Cause of Action Fails Because "Intra-Bank" Transfers Are
Not "Unauthorized" Under EFTA .......................................................................... 21

III.    NYAG Fails to Plead Disclosure Violations or "Illegal Agreements"
Under EFTA, Precluding Its Third Cause of Action ............................................. 23

IV.    NYAG Fails to Plead Facts Showing UCC Violations, Defeating the
Fourth Cause of Action .......................................................................................... 24

        A.     The Burden of Pleading Illegality Falls on NYAG .................................. 25

        B.     The Complaint Does Not Allege Facts Showing a Single Scammer
Succeeded Based on a Single-Factor Security Procedure ........................ 26

        C.     The UCC Does Not Prohibit Consumers From Agreeing to Afford
Banks Flexibility to Select the Particular Security Procedures ............... 27

D.      The Complaint Fails to Allege Facts Showing That Citibank's Procedures Were Commercially Unreasonable ........................................ 28

E.      The Complaint Fails to Allege Facts Showing Bad Faith......................... 29

F.      NYAG's Allegation of Countermanded Consumer Instructions Is Unavailing ................................................................................ 30

V.      NYAG's Claims Under the SHIELD Act and Red Flags Rule Are Entirely Preempted, Defeating the Fifth and Sixth Causes of Action ................................ 31

VI.     NYAG's Fifth Cause of Action Under the SHIELD Act Fails to State a Claim ........................................................................................ 34

VII.    NYAG's Sixth Cause of Action Does Not State a Claim Under the Red Flags Rule ....................................................................................... 36

VIII.   NYAG Fails to Plead Facts Supporting Its Seventh and Eighth Causes of Action for Fraud or Consumer Deception ............................................. 37

CONCLUSION ................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**C**ASES

*Aikens v. Portfolio Recovery Associates, LLC*,
    716 F. App'x 37 (2d Cir. 2017) ................................................................................ 22

*Aubrey v. New School*,
    624 F. Supp. 3d 403 (S.D.N.Y. 2022)........................................................................ 40

*Becker v. Genesis Financial Services*,
    CV-06-5037, 2007 WL 4190473 (E.D. Wash. Nov. 21, 2007) ...................................... 22

*Bhuya v. Citibank, N.A.*,
    CV 22-6006, 2024 U.S. Dist. LEXIS 101179 (E.D.N.Y. June 6, 2024) ......................... 10

*Braga Filho v. Interaudi Bank*,
    No. 03 Civ. 4795, 2008 WL 1752693 (S.D.N.Y. Apr. 16, 2008),
    *aff'd*, 334 F. App'x 381 (2d Cir. 2009)................................................................... 27, 28

*CFPB v. Navient Corp.*,
    17 Civ. 101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)............................................. 38

*Chavez v. Mercantil Commercebank*,
    701 F.3d 896 (11th Cir. 2012) ................................................................................. 28

*Choice Escrow & Land Title, LLC v. BancorpSouth Bank*,
    754 F.3d 611 (8th Cir. 2014) .................................................................................. 29

*Connecticut Office of Protection & Advocacy For Persons*
    *With Disabilities v. Hartford Board of Education*,
    464 F.3d 229 (2d Cir. 2006).................................................................................... 20

*Elkind v. Revlon Consumer Products Corp.*,
    No. 14 Civ. 2484, 2015 WL 2344134 (E.D.N.Y. May 14, 2015)...................................... 40

*Essgeekay Corp. v. TD Bank, N.A.*,
    No. CV183663ESCLW, 2018 WL 6716830 (D.N.J. Dec. 19, 2018)................................. 30

*Essilor International SAS v. J.P. Morgan Chase Bank, N.A.*,
    650 F. Supp. 3d 62 (S.D.N.Y. 2023)......................................................................... 31

*Estate of Pew v. Cardarelli*,
    527 F.3d 25 (2d Cir. 2008)..................................................................................... 13

*Federal Insurance Co. v. Benchmark Bank*,
   No. 2:17-CV-135, 2020 WL 635654 (S.D. Ohio Feb. 11, 2020) ................................... 29

*FTC v. Wyndham Worldwide Corp.*,
   10 F. Supp. 3d 602 (D.N.J. 2014) ............................................................................. 35, 36

*Galper v. JP Morgan Chase Bank, N.A.*,
   802 F.3d 437 (2d Cir. 2015)........................................................................................... 32

*Gutierrez v. Ada*,
   528 U.S. 250 (2000)........................................................................................................ 14

*Houston Contracting Co. v. Chase Manhattan Bank, N.A.*,
   539 F. Supp. 247 (S.D.N.Y. 1982).................................................................................. 16

*James v. Scores*,
   194 N.Y.S.3d 679 (N.Y. Sup. Ct. 2023) ........................................................................ 25

*Johnson v. MFA Petroleum Co.*,
   10 F. Supp. 3d 982 (W.D. Mo. 2014) ............................................................................. 32

*Kacocha v. Nestle Purina Petcare Co.*,
   No. 15 Civ. 5489, 2016 WL 4367991 (S.D.N.Y. Aug. 12, 2016) ................................... 40

*Krause v. Titleserv, Inc.*,
   402 F.3d 119 (2d Cir. 2005)....................................................................................... 13, 14

*Krutchkoff v. Fleet Bank, N.A.*,
   960 F. Supp. 541 (D. Conn. 1996).................................................................................. 18

*Lazaro v. Good Samaritan Hospital*,
   54 F. Supp. 2d 180 (S.D.N.Y. 1999)............................................................................... 39

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001)........................................................................................................ 32

*Mackey v. Lanier Collection Agency & Service, Inc.*,
   486 U.S. 825 (1988)........................................................................................................ 33

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)........................................................................................................ 33

*People ex rel. Spitzer v. Grasso*,
   861 N.Y.S.2d 627 (1st Dep't 2008) ................................................................................ 23

*People v. Northern Leasing Systems, Inc.*,
   94 N.Y.S.3d 259 (1st Dep't 2019) .................................................................................. 39

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016),
    *reinstated on en banc reh'g in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018) ............. 21

*Powerex Corp. v. Reliant Energy Services, Inc.*,
    551 U.S. 224 (2007) ................................................................................................ 7

*Rodriguez v. Branch Banking & Trust Co.*,
    46 F.4th 1247 (11th Cir. 2022) ............................................................................. 28

*Silvas v. E\*Trade Mortgage Corp.*,
    421 F. Supp. 2d 1315 (S.D. Cal. 2006), *aff'd*, 514 F.3d 1001 (9th Cir. 2008) ................ 34

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ................................................................................. 40

*Toretto v. Donnelley Financial Solutions, Inc.*,
    583 F. Supp. 3d 570 (S.D.N.Y. 2022) .................................................................... 36

*United States v. Atl. Research Corp.*,
    551 U.S. 128, 137 (2007) ..................................................................................... 13

*United States v. Laraneta*,
    700 F.3d 983 (7th Cir. 2012) ............................................................................... 31

*United States v. Philip Morris Inc.*,
    263 F. Supp. 2d 72 (D.D.C. 2003) ........................................................................ 33

*Virginia is for Movers, LLC v. Apple Federal Credit Union*,
    No. 1:23cv576, 2024 WL 1091786 (E.D. Va. Mar. 13, 2024) ..................................... 19

*Walker v. Schult*,
    45 F.4th 598 (2d Cir. 2022) ................................................................................. 25

*Wellton International Express v. Bank of China (Hong Kong)*,
    612 F. Supp. 3d 358 (S.D.N.Y. 2020) .................................................................... 26

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................................................ 13

## STATUTES

15 U.S.C. § 1681m ......................................................................................................... 34

15 U.S.C. § 1681t ........................................................................................................... 32

15 U.S.C. § 1693a ................................................................................................... passim

15 U.S.C. § 1693c ..................................................................................... 23

15 U.S.C. § 1693*l*....................................................................................... 24

5 U.S.C. § 553 ............................................................................................ 21

N.Y. Exec. L. § 63(12)..................................................................... 3, 31, 39

N.Y. Gen. Bus. L. § 899-bb ....................................................................... 35

N.Y. UCC § 4-A-102 .............................................................................. 5, 6

N.Y. UCC § 4A-104 ...................................................................................... 6

N.Y. UCC § 4-A-108 ............................................................................. 5, 16

N.Y. UCC § 4-A-202 ..................................................................... 24, 25, 31

N.Y. UCC § 4-A-203 .................................................................................. 31

Pub. L. 104-208 (1996).............................................................................. 32

Pub. L. 108-159 (2003).............................................................................. 32

## REGULATIONS

12 C.F.R. § 1005.10 ................................................................................... 19

12 C.F.R. § 1005.3 ............................................................................. 5, 6, 18

12 C.F.R. § 1005.4 ..................................................................................... 23

12 C.F.R. § 1005.7 ..................................................................................... 23

12 C.F.R. § 205.9 ......................................................................................... 8

12 C.F.R. § 41.90 ....................................................................................... 36

31 C.F.R. § 1010.100 ............................................................................ 11, 12

## ADMINISTRATIVE MATERIALS

Amendment to the Bank Secrecy Act Regulations Relating to Recordkeeping
    for Funds Transfers and Transmittals of Funds by Financial Institutions,
    60 Fed. Reg. 220 (Jan. 3, 1995) ....................................................... 11

Definitions of Transmittal of Funds and Funds Transfer, 78 Fed. Reg. 72,813 (Dec. 4, 2014) ... 12

Electronic Fund Transfers, 44 Fed. Reg. 18,468 (Mar. 28, 1979) ................. 6

Electronic Fund Transfers, 46 Fed. Reg. 46,876 (Sept. 23, 1981) ............................................. 8, 16

Electronic Fund Transfers, 61 Fed. Reg. 19,678 (May 2, 1996) .................................................. 17

Electronic Fund Transfers, 76 Fed. Reg. 29,902 (May 23, 2011) ................................................. 7

Electronic Fund Transfers, 76 Fed. Reg. 81,020 (Dec. 27, 2011) ................................................ 20

Electronic Fund Transfers, 77 Fed. Reg. 6,194 (Feb. 7, 2012) ............................................... 11, 12

Funds Transfers Through Fedwire, 55 Fed. Reg. 40,791 (Oct. 5, 1990) ........................... 7, 17, 18

The Fair Credit Reporting Act's Limited Preemption of State Laws,
   87 Fed. Reg. 41,042 (July 11, 2022) ................................................................................ 33

**LEGISLATIVE HISTORY MATERIALS**

S. Rep. No. 95-915 (1978) ......................................................................................................... 8, 15

**TREATISES**

1 Benjamin Geva, The Law of Electronic Funds Transfers (2024) .............................................. 14

**OTHER AUTHORITIES**

Patrikis, Baxter, and Bhala, *Wire Transfers* (1993) ..................................................................... 6

Roland E. Brandel & Eustace A. Olliff III,
   *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531 (1979) .............. 14, 15

UCC § 4A-108 ............................................................................................................................... 17

Uniform Laws Annotated, U.C.C. Article 4A, Prefatory Note (1989) .......................................... 5

## INTRODUCTION

Wire transfers are expressly exempt from EFTA's coverage. The primary issue before this Court is whether EFTA's wire exemption should be read in the novel manner that NYAG proposes, rendering the exemption meaningless (or "technically redundant," as NYAG concedes). The answer to that question is emphatically "no." The text, structure, and history of the wire exemption—to say nothing of decades of uniform guidance and commentary from regulators and other stakeholders—support reading the wire exemption to mean what it says and to actually exempt wire transfers. This lawsuit is a transparent effort by NYAG to use litigation rather than legislation by Congress to overturn decades of shared understandings as to the exemption's meaning and to effectively amend EFTA to delete the wire exemption entirely.

The CFPB has now joined NYAG's effort to rewrite EFTA through litigation, but in doing so, disregards its own prior pronouncements, which make clear that the wire exemption has substantive meaning. Chalking up those previous statements to "imprecision," the CFPB tries to gloss over its clear reversal of positions. Making matters worse, the CFPB posted its new position—which under settled law is entitled to no deference—on its blog with a message about ensuring that banks "meet their legal obligations." This regulation-by-blog-post approach is wholly improper. Neither the CFPB nor NYAG can rewrite EFTA or any other statute.

NYAG and the CFPB cannot overcome the clear and long-recognized division of coverage between EFTA and UCC Article 4A. EFTA exempts any "transfer of funds . . . by means of [wire] service," and so when a consumer is the sender or recipient of a wire, the transfer is exempt from EFTA. Such a transaction instead is governed by UCC Article 4A, which was designed specifically to provide uniform legal treatment for wire transfers. The arguments otherwise from NYAG and the CFPB—which are at times misaligned or even contradictory— are meritless.

NYAG and the CFPB argue that the portion of a wire transfer in which the sending bank debits its own customer's account for the wire amount is not itself a "transfer of funds" sent over a wire network and hence not exempt from EFTA. Only the "bank-to-bank" portion, they argue, is exempt. But the flaw in that argument is that the phrase "transfer of funds" encompasses the full wire transfer, including its interdependent components (or segments). This reading is confirmed by decades of regulatory pronouncements, and further validated by the structure of EFTA, which refers to payments by other multi-segment payment methods (*e.g.*, automated clearinghouse ("ACH") or point-of-sale transactions) in each case as a single "transfer of funds."

The newly-formulated theory of NYAG and the CFPB is all the more problematic because it renders the wire exemption meaningless. EFTA reaches only payments to or from consumers, and so an exemption that carves out only the "bank-to-bank" segment—what NYAG and the CFPB assert is the "wire transfer"—would serve no purpose. Tellingly, NYAG admits that its theory renders the exemption "redundant," but then argues unpersuasively that surplus statutory language is sometimes to be expected. But it is far from expected to read a statute to render an entire subsection meaningless. No one has previously considered the wire exemption to be the dead letter that NYAG now claims it always has been.

Notably, neither NYAG nor the CFPB meaningfully addresses the massive record of regulators, experts, courts, and others having understood the wire exemption to do what it was plainly intended to do. NYAG highlights that no one has specifically rejected its novel "bank-to-bank" theory. But no one has addressed the theory ***at all***, which just underscores how far NYAG has gone awry: it has devised a novel conception of a wire transfer that does not fit how wire transfers or EFTA have been understood, over decades. The CFPB quite brazenly tries to distance itself from its own prior writings on the issue by euphemistically claiming to have been

"imprecise" in the past. In fact, the CFPB's prior writings were both precise and consistent with what all stakeholders—until this lawsuit—well understood the wire exemption to mean.

As amply demonstrated in Citibank's Motion and herein, the attempt by NYAG and the CFPB to eliminate the wire exemption should be rejected. Additionally, NYAG's Complaint suffers significant further pleading deficiencies that NYAG's Opposition fails to overcome.

**UCC Claims.** NYAG's UCC-based claims fail because NYAG has failed to meet its burden to plead facts that give rise to a plausible inference that Citibank engaged in repeated "illegal acts." N.Y. Exec. L. § 63(12). These claims are premised on accusing Citibank of deploying "unreasonable" security procedures. Yet, NYAG fails to plead what those procedures were. NYAG argues that it need not plead anything about what Citibank did because it is Citibank's burden to prove the reasonableness of its procedures. But the UCC's burden-shifting rule governs only in a direct UCC action by a consumer. Here, NYAG is proceeding indirectly on the theory that Citibank engaged in illegality. NYAG thus bears the burden to plead facts showing Citibank broke the law, which it cannot do without setting forth facts about the security procedures that were deployed in specific instances and why they are allegedly lacking.

**SHIELD Act and Red Flags Rule.** NYAG's effort to enforce the SHIELD Act and Red Flags Rule via the New York State Executive Law is preempted by the Fair Credit Reporting Act ("FCRA"). NYAG contends in its Opposition that the FCRA preempts only "state laws imposing requirements that ***differ*** from federal ones." However, the relevant preemptive language plainly does not require any federal-state conflict; it covers any state law that imposes requirements or prohibitions "***with respect to*** the conduct required" by federal law. NYAG here invokes the state Executive Law to require Citibank to take actions "with respect to" alleged red flags that supposedly should trigger more scrutiny for certain wires—a subject covered by the federal Red

Flags Rule. New York's SHIELD Act claim is likewise preempted but, regardless, does not apply to the circumstances here. It is a data-breach statute, but NYAG does not claim Citibank's systems were hacked. Moreover, as with the Red Flags Rule, the underlying obligation is merely to adopt appropriate policies, not to be strictly liable for every successful scam.

**Consumer Fraud and Deception.** NYAG's claims for fraud under Executive Law § 63(12) and deceptive practices under General Business Law § 349 also should be dismissed. In its Complaint and Opposition, NYAG identifies only nonactionable puffery and practices that it dislikes, such as Citibank requiring customers to explain in affidavit form the factual circumstances related to a refund request. This practice is supposedly deceptive, NYAG argues, because customers would refuse to swear to affidavits if they knew their statements might be used against them. NYAG's nonsensical theory rests on the notion—found nowhere in EFTA or the UCC—that Citibank need not bother to investigate fraud but should instead reimburse allegedly unauthorized wires on a no-questions-asked basis. That argument defies reality, and, more fundamentally, has nothing to do with fraud or deception.

The Complaint should be dismissed in its entirety.

## ARGUMENT

I.  **NYAG and the CFPB Cannot Overcome EFTA's Express Exemption of Wire Transfers, Defeating the First Cause of Action**

For nearly 50 years, there has been a straightforward and well-understood division of coverage between EFTA and UCC Article 4A, with wires falling squarely within Article 4A.

EFTA covers any "electronic fund transfer," which is defined as "any transfer of funds" that is initiated through various electronic means to "debit or credit an account" that is "established primarily for personal, family, or household purposes." 15 U.S.C. § 1693a(2), (7). Among the exemptions is one for "any transfer of funds" made "by means of a service that

transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." *Id*. § 1693a(7)(B). The "service[s]" that are not "designed primarily" for consumers are the wire services, such as Fedwire, CHIPS and SWIFT, because those are "used primarily for transfers between financial institutions or between businesses." 12 C.F.R. § 1005.3(c)(3). Hence, when a consumer sends or receives, for example, a wire through CHIPS, the transfer of funds is exempt from EFTA. Such a transaction is governed instead by UCC Article 4A, which was designed to provide a "comprehensive body of law that defines the rights and obligations that arise from wire transfers," *see* Uniform Laws Annotated, U.C.C. Article 4A, Prefatory Note (1989), and which exempts transactions covered by EFTA. N.Y. UCC § 4-A-102; *id*. §4-A-108.

NYAG's Complaint is an effort to upend this clear and settled division of coverage. None of the arguments set forth in its Opposition has merit.

### A.    EFTA's Exemption for Any "Transfer of Funds" by Wire Encompasses the Entire Transfer From the Sender to the Recipient

NYAG and the CFPB advance a novel theory for why wire transfers are covered by EFTA without any explanation for why so many got it so wrong for so long. Their argument hinges on artificially separating (1) the so-called "bank-to-bank" transmission (which is allegedly exempt) from (2) the segment where the sending bank debits its own customer's account (which is allegedly not). Specifically, NYAG and the CFPB argue that the latter segment is not part of the wire transfer at all but is a "payment for wire services." (ECF 25 ("Opp.") 23.) This segment allegedly falls outside the wire exemption because it is not a "transfer of funds" that is done "by means of a [wire] service," 15 U.S.C. § 1693a(7)(B), but is instead an internal transfer within the bank itself. (Opp. 18; ECF 28-1 ("CFPB Br.") 2, 7.) The immediate problem with this analysis is that it assumes that the "transfer of funds" can be subdivided in this way.

That is incorrect. The phrase "transfer of funds" encompasses the full "transfer" of the funds from the sender to the recipient of the wire, notwithstanding that the transfer will necessarily have multiple steps or segments along the way. This holistic view of wire transfers runs throughout the relevant statutory and regulatory history.

As an initial matter, the statute governing wire transfers, UCC Article 4A, treats wire transfers holistically. The Official Comments to UCC Article 4A explain that the transactions "commonly referred to in the commercial community" as "wire transfer[s]" are those that UCC Article 4A covers and defines as "funds transfer[s]." N.Y. UCC § 4-A-102, Official Comment. A "funds transfer" is defined, in turn, as a "*series of transactions*" to pay a beneficiary. *Id*. § 4A-104(1) (emphasis added). (*See also* ECF 21-1, at 13-16 (amicus from banking industry groups).)

Regulation E is consistent with the view that a wire transfer includes all parts of the transaction. Since the Federal Reserve first adopted Regulation E in 1979, the wire exemption has applied to transfers via a "network that is used primarily for transfers between financial institutions or *between businesses*." Electronic Fund Transfers, 44 Fed. Reg. 18,468, at 18,481 (Mar. 28, 1979) (emphasis added); 12 C.F.R. § 1005.3(c)(3). The reference to transfers "between businesses" defeats any suggestion that the exemption reaches only transfers between banks.

The Federal Reserve has since repeatedly described wire transfers in this commonsense way. Federal Reserve officials published a book in 1993 on the law of wire transfers, explaining that a single wire transfer consists of separate "segments" that are the "ingredients" of a *single* transfer. *See* Patrikis, Baxter, and Bhala, *Wire Transfers* 15, 17-18 (1993) (*see* Michael Reply Decl. Ex. A). Federal Reserve guidance over the years adheres to this view. When adopting Subpart B of Regulation J in 1990, the Federal Reserve wrote: "Fedwire funds transfers *to or from consumer accounts* are exempt from the Electronic Fund Transfer Act and Regulation E."

Funds Transfers Through Fedwire, 55 Fed. Reg. 40,791, at 40,804 (Oct. 5, 1990) (emphasis added). The funds transfer goes "to" or "from" a consumer account because there is a single transfer. Similarly, when the Federal Reserve released updated, official commentary for Regulation E in 2011, it wrote: "A wire transfer is generally an **account-to-account** transaction. Funds are transferred **from the consumer's account** into a recipient's account . . . ." *See* Electronic Fund Transfers, 76 Fed. Reg. 29,902, at 29,903 (May 23, 2011) (emphasis added).

The CFPB has described wire transfers in the same way. The CFPB's website describes a wire transfer as a singular movement of funds to the ultimate recipient: "A wire transfer is a common way to electronically move money from one person to another." (Michael Reply Decl. Ex. B.) Even in its Statement of Interest in this case, the CFPB has made clear that "under EFTA and Regulation E, an electronic **fund transfer** generally encompasses **the entire movement of funds from a sender to its ultimate recipient**." (CFPB Br. 15 (emphasis added).) Yet, in the same Statement, the CFPB fails to explain how a "transfer of funds" under the definition of an "electronic fund transfer" (15 U.S.C. § 1693a(7)) encompasses the "entire movement of funds," but a "transfer of funds" under the wire exemption (*id.* § 1693a(7)(B)) somehow refers only to the "bank-to-bank" segment. Because the key phrase "transfer of funds" is used in both places, the CFPB's argument runs headlong into the "[s]tandard principle of statutory construction . . . that identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc*., 551 U.S. 224, 232 (2007).

The fact that EFTA itself treats other multi-segment fund transfer mechanisms holistically, including two that are expressly referenced as covered by the statute—(1) ACH transfers, *see* 15 U.S.C. § 1693a(7)(B) and (2) "point-of-sale transfers," *id*. § 1693a(7)—further reinforces this point. In an ACH transfer, the sending and receiving banks issue "debits and

credits to [their] reserve balances" at the Federal Reserve for the payment amount, and each bank "in turn credits and debits the accounts of the appropriate customers." (Michael Reply Decl. Ex. C, at 66; *see also* ECF 13-3, at 339.) In point of sale transfers, where a consumer uses a "computer terminal at a retail establishment" to pay for goods, S. Rep. No. 95-915, at 2 (1978), there is similarly both a "settlement" between the customer's bank and the merchant's bank and a corresponding "debiting of the consumer's account" by the consumer's bank. (ECF 13-3 at 341; *see also* Michael Reply Decl. Ex. C, at 71.) There is no suggestion in EFTA that a single ACH or point-of-sale transfer is, in reality, three or more separate fund transfers. To the contrary, for purposes of the required disclosure of the "party to or from whom funds were transferred" in each "electronic fund transfer," 12 C.F.R. § 205.9(a)(6), (b)(1)(v), a point-of-sale record should identify the merchant's name, such as "XYZ Store, Anytown, Ohio," and a record of a Social Security payment via ACH should disclose "that the payor is the United States government." Electronic Fund Transfers, 46 Fed. Reg. 46,876, at 46,887-88 (Sept. 23, 1981) (Questions 9-28 and 9-41). In short, payments with multiple intermediate segments constitute a single "transfer of funds" and are treated as such under EFTA's disclosure requirements.

Along the same lines, EFTA requires Citibank to disclose the ultimate recipient of outbound wires on monthly customer statements, not, as NYAG's theory would imply, to disclose "Citibank" as the recipient of the EFTA-covered internal "transfer." (ECF 12 ("Citibank Br.") 18-19.) The CFPB and NYAG respond to this issue in conflicting ways, neither of which helps their case. The CFPB concedes that the "ultimate recipient" of a wire transfer should be disclosed, but does not explain how that position can be squared with its view that only the sending bank's debit of its own customer is the relevant EFTA "transfer." (CFPB Br. 16.) For its part, NYAG asserts that Congress actually "intended" for banks to disclose themselves as the

recipient of every wire—obscuring the ultimate recipient—and that doing so would somehow suffice to serve the statutory purpose of assisting consumers to flag errors. (Opp. 20.) This reading makes no practical sense, and only underscores that NYAG has badly misread EFTA.

In sum, the central argument advanced by NYAG and the CFPB—which attempts to rewrite EFTA—fails because it has no answer for the long-settled understanding that a "transfer of funds" refers to an integrated transaction moving from payor to payee.

### B.    NYAG and the CFPB Fail to Meaningfully Address That Their Outlier Interpretation Conflicts With a Uniform Understanding Over Decades

NYAG casually waves away mountains of authority showing that regulators, industry experts, courts, and all other stakeholders have uniformly read the wire exemption as Citibank does. According to NYAG, all these sources are "silent on the treatment" of the bank debit by which consumers "pay for" wires. (Opp. 24 (emphasis removed).) But that is precisely the point. No one has ever considered the segment of a wire transfer where the sender's account is debited to be a "payment for wire services" or a separate "fund transfer." NYAG fails to show that its position here—that such a transfer is governed by EFTA—was shared by *anyone* prior to this lawsuit, when such a position surely would have been noted somewhere in the countless authorities explaining that EFTA categorically exempts consumer wires. The limited attempts by NYAG and the CFPB to dispute the weight of the authorities Citibank cited are unpersuasive.

First, the FDIC was clear in an interpretive letter that a consumer wire was governed by the UCC because of the wire exemption. (Citibank Br. 16.) That there may have been an independent ground for the same conclusion—that the wire at issue was initiated in person (Opp. 25; CFPB Br. 15)—does not change that the FDIC grounded its reasoning in the wire exemption.

Second, NYAG cannot explain why the Federal Reserve's first Official Guidance stated that an electronically-initiated wire with "instructions for crediting individual consumers'

accounts" was exempt, if, as NYAG argues, the crediting of consumers' accounts has nothing to do with the wire exemption. (Citibank Br. 15.) NYAG persists in claiming that this Guidance simply relates to the "bank-to-bank" segment (Opp. 24), but cannot identify any language suggesting as much or explain why the Federal Reserve even mentioned the consumer credit segment. Nor can NYAG explain why the Federal Reserve would fail to mention what NYAG contends is the "correct" reading: that, ultimately, EFTA governs wire transfers because an integrated component (the consumer debit) is not exempt. This point appears nowhere in the regulatory record dating back to EFTA's passage in 1978.

Third, NYAG cannot explain the abundance of cases declaring wires exempt from EFTA. NYAG states that some "involved pro se plaintiffs" and that in others there may have been independent grounds to not apply EFTA (*e.g.*, consumers authorizing the wires in person). (Opp. 25-26 & n.1.) But those observations do not change the reality that court after court has read the wire exemption to exempt wires, with none holding otherwise or adopting NYAG's theories. (Citibank Br. 20 & n.8 (collecting cases).) *See also Bhuya v. Citibank, N.A*., CV 22-6006, 2024 U.S. Dist. LEXIS 101179, at *7-8 (E.D.N.Y. June 6, 2024) (applying wire exemption).

### C.    The CFPB's Dodd-Frank Regulatory Pronouncements Confirm That Consumer Wires Are Exempt From EFTA

The CFPB similarly cannot explain away that its predecessors at the Federal Reserve have always understood the wire exemption to exempt wires or that the CFPB itself has taken the same view since its inception in 2011. The CFPB claims its prior writings were the product of "imprecise" drafting (CFPB Br. 14), but that euphemistic characterization cannot obscure that the CFPB is opportunistically changing positions to engineer a legislative change via litigation.

Most notably, the CFPB's regulatory release in connection with Dodd-Frank in 2012 repeatedly refers to the proper operation of the wire exemption. Dodd-Frank provided a ***subset*** of

EFTA protections to "remittance transfers" to individuals abroad, and would make little sense if the *entirety* of EFTA's protections already covered remittances by wire. (Citibank Br. 17-18.) In adopting the implementing regulations, the CFPB was clear that a significant portion of remittances were historically sent by wire transfers that, prior to Dodd-Frank fell "largely outside the scope of existing Federal consumer protections" because "*wire transfers are entirely exempt from EFTA* and Regulation E and instead are governed by . . . Article 4A of the Uniform Commercial Code." Electronic Fund Transfers, 77 Fed. Reg. 6,194, at 6,195, 6,211-12 (Feb. 7, 2012) (emphasis added). The CFPB noted that, under the new law, a "transaction that will not otherwise be an electronic fund transfer under the EFTA, *such as a wire transfer*, does not become an electronic fund transfer because it is a remittance transfer." *Id*. at 6,211 (emphasis added). As recently as 2019, the CFPB issued a similar description of the interplay between Dodd-Frank and the wire exemption, when it issued a report on the remittance rules. (Michael Reply Decl. Ex. D, at 11, 34-35 (stating that remittances were often by wire but, prior to Dodd-Frank, "Congress had specifically structured EFTA to exclude wire transfers").)

In a separate portion of its detailed 2012 release, the CFPB acknowledged the import of the wire exemption when discussing the implications of Dodd-Frank for FinCEN's "Travel Rule." Since 1995, the Travel Rule has required banks "involved in a wire transfer to collect and retain certain information for five years" so that the records are available to law enforcement. 60 Fed. Reg. 220, at 220 (Jan. 3, 1995). At the time of Dodd-Frank, the Travel Rule excluded transactions governed by EFTA. 31 C.F.R. § 1010.100(ddd) (2012). Because of EFTA's wire exemption, consumer wires have always been subject to the Travel Rule. Given that Dodd-Frank was bringing international wire remittances within EFTA for certain limited purposes (*e.g.*, disclosure obligations not at issue here), however, the CFPB and FinCEN recognized that the

- 11 -

Travel Rule would need updating. The CFPB's discussion of the point reiterated the CFPB's

clear understanding that the wire exemption applies to "consumer initiated wire transfers":

> When EFTA section 919, as implemented by this rule, becomes effective, certain
> transactions that have ***traditionally been outside the scope of the EFTA will be
> governed by the EFTA, such as consumer-initiated wire transfers***. The Bureau has
> had discussions with FinCEN about the importance of FinCEN amending its rules so
> that they continue to apply to remittance transfers after the effective date of this rule.

77 Fed. Reg. 6,194, at 6,213 (emphasis added). FinCEN thereafter amended the Travel Rule so

that remittance wires remained covered, while transactions meeting EFTA's definition of an

"electronic fund transfer" were exempt. 31 C.F.R. § 1010.100(ddd). In doing so, FinCEN was

clear that "[w]ire or other similar transfers conducted through Fedwire" are "specifically

excluded from the definition of 'electronic fund transfer'"—meaning they remain subject to the

Travel Rule. 78 Fed. Reg. 72,813, at 72,814 (Dec. 4, 2014). If the CFPB's position today is to be

believed, this fix to the Travel Rule, which the CFPB flagged as important in 2012, was pointless

because consumer wires have been subject to EFTA all along and hence have ***always*** been

exempt from the Travel Rule—a claim that might surprise FinCEN.

Simply put, the CFPB's claim to having been merely "imprecise" in the past is not

credible. The CFPB has improperly reversed itself through its Statement of Interest in this case.[1]

### D. NYAG Admits That Its Interpretation Would Render the Wire Exemption "Redundant" and Not "Necessary"

The correct meaning of the wire exemption is even more evident given NYAG's

admission that its reading renders the exemption "technically redundant" and not "technically

necessary." (Opp. 21.) The modifier "technically" does not change the fact that NYAG asks the

---

[1] The CFPB's statements in 2012 are separately instructive because they repeatedly refer to remittances services available online, 77 Fed. Reg. 6,194, at 6,196, 6,240—confirming that electronically-initiated consumer wires are not new and contradicting NYAG's argument that Citibank's cited authorities are all from a "bygone era when it was impossible" to initiate wires electronically. (Opp. 25.)

Court to conclude that Congress drafted an ***entire subsection of EFTA to be meaningless***. Although it may be "appropriate to tolerate a degree of surplusage" to ***avoid*** "a textually dubious construction that threatens to render the entire provision a nullity," it is hardly appropriate to ***adopt*** a dubious construction that renders an entire provision meaningless. *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

In *Yates v. United States*, 574 U.S. 528, 543 (2015), the Supreme Court held that courts should not interpret a statute in an manner that would "render superfluous an entire provision." At issue were two criminal provisions that Congress passed together and that both criminalized the altering of "objects" to impede federal investigations. One criminalized falsifying, altering or destroying "any record, document, or tangible object," and the other criminalized altering or destroying an "object" with "the intent to impair the object's integrity or availability for use in an official proceeding." *Id*. at 541-42 (citations omitted). The Supreme Court held that "tangible object[s]" in the first provision applied only to those tangible objects similar to the other items listed, *i.e.*, those "used to record or preserve information," because reading the phrase literally to include "all physical objects" would "render superfluous" the entire provision addressing "objects" more specifically. *Id*. at 543; *see also Estate of Pew v. Cardarelli*, 527 F.3d 25, 32 (2d Cir. 2008) (adopting "interpretation that preserves the meaning of an entire subsection"). Consistent with *Yates*, the Court should not render superfluous the entire EFTA wire exemption.

The cases cited by NYAG are inapposite. In *Krause v. Titleserv, Inc*., 402 F.3d 119 (2d Cir. 2005) (cited Opp. 21), the Second Circuit examined a copyright law that authorized software purchasers to make copies if doing so was "an essential step in the utilization of the computer program in conjunction with a machine." *Id*. at 122. The issue was whether this provision allowed for (1) copying essential to the purchaser's "utilization" of the software (*e.g*., fixing

bugs) or only (2) copying essential to making a program usable "in conjunction with a machine" (*i.e.*, changes that would allow the program to work at all). *Id*. at 127. The latter interpretation arguably gave meaning to the final few words ("in conjunction with a machine") but would do so at the expense of an "awkward reading of its words," and, worse, would undermine the clear legislative purpose of giving software purchasers flexibility to improve software they bought. *Id*. at 127-29. Thus, the Second Circuit found that an arguable "slight repetition in the statutory text" was tolerable. *Id.* at 127. Here, the statutory language is unambiguous. And, NYAG is not vindicating a statutory purpose at the expense of "slight repetition," but proposing to entirely delete the wire exemption, with no evidence it was intended to be a nullity. *See also Gutierrez v. Ada*, 528 U.S. 250, 256-58 (2000) (holding that the two words "any election" in a Guam election statute were not redundant but had "some clarifying value" and that, alternatively, the "rule against redundancy" would not justify a "strange," alternate construction) (cited Opp. 21).[2]

Notably, this is another area in which the CFPB and NYAG part ways. Unlike NYAG, the CFPB argues that the wire exemption was **not** surplusage because it resolved "reasonable uncertainty as to whether the new EFTA" would otherwise cover the bank-to-bank segment. (CFPB Br. at 12.) But EFTA reaches only transfers involving a debit or credit to a **consumer** account—and hence there could be no "uncertainty" about the fact that EFTA does not apply to a bank-to-bank transaction. 1 Benjamin Geva, The Law of Electronic Funds Transfers § 6.04 (2024) ("To be an 'electronic fund transfer,' the transfer of funds must be made either into or out of a 'consumer asset account.'"). Moreover, the substantive provisions of EFTA exclusively

---

[2] NYAG also wrongly argues that EFTA's check guarantee exemption is another example of Congress drafting meaningless exemptions. (Opp. 21-22.) In a check guarantee system, a customer uses a bank card at a retail store as a backup payment mechanism. If a paper "check is dishonored for almost any reason, the card-issuing bank will nonetheless stand behind it." Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531, 534 (1979). Use of these systems *could* result in a the debit of a consumer account (if the paper check failed) and hence, absent the exemption, could trigger EFTA coverage.

govern the relationship between banks and their "consumer" customers and so it would have been wholly nonsensical for EFTA's substantive provisions to somehow govern inter-bank dealings. The CFPB tellingly points to no evidence that anyone in the drafting process expressed the concern it theorizes or that the wire exemption was a response to any such concern.

Finally, contrary to NYAG's arguments, EFTA's legislative history amply demonstrates that the wire exemption has meaning. As discussed in Citibank's Motion, Congress was urged at least three times to include wires in EFTA's coverage, but chose not to do so—a critical point about which neither NYAG's Opposition nor the CFPB's Statement has anything to say. (Citibank Br. 7-8.) Congress chose to exclude wires because, unlike the then-new technologies that were subject to great legal uncertainty, wires had existed for decades and were "already governed by rules established by the Federal Reserve." Brandel & Olliff, *supra*, at 543-44.[3]

### E.    Citibank Is Not Advancing an Interpretation Premised on Technology Unforeseeable to EFTA's Enacting Congress

NYAG incorrectly argues that Citibank's interpretation of the wire exemption "would have made no sense in 1978" when EFTA passed because consumers could not initiate wires electronically, in the same manner as today. (Opp. 23.) Although technology has advanced, it is not true that Congress in 1978 was unaware that consumer wire transfers could be initiated electronically and hence could (absent an exemption) fall within EFTA's coverage. Indeed, the very existence of the wire exemption is proof that Congress considered that a consumer wire

---

[3] In a misguided attempt to support its position, NYAG seizes upon a quote from the Senate report stating that "[t]here are several banking services which the bill does not cover" including "traditional 'wire' transfers between banks." S. Rep. No. 95-915, at 4 (1978). But, as discussed, the "service" referenced here is a wire "transfer," meaning one from payor to payee. The phrase "between banks" refers, in this context, to the fact that the funds are going to and from accounts at the banks that participate in the wire services. There is zero indication that the wire exemption was focused on the bank-to-bank segment alone—a segment that would not fall within EFTA anyway, given the absence of a consumer in the transmission. Nor is there any suggestion in the legislative history—or any suggestion anywhere in the decades since—that consumer-initiated wires are within EFTA's coverage.

might otherwise fall within EFTA's scope. Further proof is that Congress was repeatedly urged to include wires in EFTA's coverage, but chose not to do so. (*See* Citibank Br. 7-8.)

Moreover, the congressionally-commissioned report that led to EFTA specifically noted that "consumers may send funds on the Federal Reserve wire network by using the facilities of a member bank" (ECF 13-3, at 338), and that wire services "could be offered to consumers for payment of merchant bills" (ECF 13-2, at 231-32). Even in 1978, there were ample ways for consumers to initiate a wire by electronic means. Telephones existed in 1978, and it was understood that if a consumer initiated the wire via telephone, under a written plan with the consumer's bank, that transaction—but for the wire exemption—would have been within EFTA's coverage. 15 U.S.C. § 1693a(7)(E); *see also* Electronic Fund Transfers, 46 Fed. Reg. 46,876, at 46,880 (Sept. 23, 1981) (question 3.14 discussing transfers initiated by phone). So, too, could a bank customer request a wire transaction via telex (similar to a fax). *Houston Contracting Co. v. Chase Manhattan Bank, N.A.*, 539 F. Supp. 247, 248 (S.D.N.Y. 1982) (discussing wire request via telex sent in 1979). Further, the Federal Reserve's original Regulation E guidance from 1981 noted that a "number of financial institutions" allowed home computers to be "linked to the institution's own computer system," and transactions via those systems would be covered too. 46 Fed. Reg. 46,876, at 46,877. Thus, the possibility of electronically-initiated wires was well understood when Congress exempted wires from EFTA.

## F.    NYAG Grossly Misreads Subpart B of Regulation J

NYAG misreads Subpart B of Regulation J (the regulation governing Fedwire) to support its position, but Subpart B in fact undermines NYAG's arguments. As discussed in Citibank's Motion, Subpart B filled a legal gap created by the then-new Article 4A, arising from the fact that Article 4A by its terms does not apply to a funds transfer if "any part" is governed by EFTA. N.Y. UCC § 4-A-108. (Citibank Br. 10-11.) This structure would leave no governing law for a

"hybrid" consumer transfer in which a Fedwire or other wire is followed by an ACH transfer (a payment method expressly carved out of the wire exemption and hence covered by EFTA, 15 U.S.C. § 1693a(7)(B)). *See* Funds Transfers Through Fedwire, 55 Fed. Reg. 40,791, at 40,792, 40,804 (Oct. 5, 1990). To fix the problem, Subpart B provided that in this scenario EFTA would govern the ACH transfer and the UCC would govern the Fedwire transfer. *Id*. at 40,798-99.[4]

According to NYAG, the Federal Reserve's adoption of this Subpart B fix would have been "superfluous" if the wire exemption "exclude[d] the entire life of a 'consumer wire.'" (Opp. 23.) But this argument addresses a strawman. Citibank has never claimed that the wire exemption reaches every ***subsequent*** transfer after a wire is completed; its Motion explicitly discussed the wire-then-ACH example. (Citibank Br. 15-16.) And contrary to the arguments from NYAG and echoed by the CFPB (Opp. 10, 23, 27; CFPB Br. 4, 9 & n.4), the wire-then-ACH example is further proof that the internal segments of one payment system are ***not*** divisible as independent fund transfers. If the wire transfer ***alone*** triggered coverage under EFTA, the Federal Reserve would have simply said so, rather than noting that EFTA is triggered only in the hybrid scenario when ACH payments occur after a wire transfer is complete.[5]

The adopting release for Subpart B eliminates any possible doubt about whether the internal segments of a wire transfer are independent fund transfers under EFTA because it states

---

[4] NYAG's position implies that a similar gap exists with respect to ***all*** consumer wires through CHIPS and SWIFT, since EFTA would cover the consumer debit segment and render Article 4A inapplicable to the rest. Yet there is no evidence of anyone noticing what would be a major legal gap in coverage—further undermining NYAG's theory.

[5] Relatedly, the CFPB highlights language from a later Federal Reserve release about how a wire initiated by phone could potentially "be covered by both Regulation E and Article 4A." Electronic Fund Transfers, 61 Fed. Reg. 19,678, at 19,680 (May 2, 1996) (cited CFPB Br. 4). But that discussion is premised on the same example of a fund transfer that "is made in part by Fedwire and in part via an automated clearinghouse." *Id*. at 19,679. If initiated by telephone, this dual-track payment would trigger the same coverage gap discussed above and fixed by Subpart B. The Federal Reserve release acknowledges that the UCC's authors foresaw this problem, by reference to a UCC Official Comment that, in turn, discusses a hypothetical case whereby a payment order to a consumer is carried out first via a wire to an intermediary bank, and then via ACH to a third bank. *See* UCC § 4A-108, Comment 2 (Case #1). This example again confirms that the dual-regulation scenario occurs ***only*** when there are two independent payment mechanisms, such as a wire followed by an ACH payment.

that "Fedwire funds transfers **to or from consumer accounts** are exempt from the Electronic

Fund Transfer Act and Regulation E." 55 Fed. Reg. at 40,804 (emphasis added). This phrasing

makes plain that transfers via Fedwire or other wire services are understood as going "to or from

consumer accounts"—not merely from bank to bank—and that the transfers are fully exempt.

### G.    Alternatively, the "Automatic Transfer" Exemption Defeats NYAG's Claim

Citibank's Motion explained that **if** the Court were to artificially subdivide wire transfers

as NYAG proposes, then dismissal would still be warranted because Citibank's internal debit to

its customer occurs automatically upon a wire request and thus falls outside EFTA under the

exemption for automatic transfers between a bank and its customer. (Citibank Br. 22-23.)

NYAG's contrary arguments are meritless.

First, NYAG refers to the CFPB's Official Interpretation that this exemption applies to

"overdraft charges, provisional credits, error adjustments, and **similar items** that are initiated

automatically on the occurrence of certain events," 12 C.F.R. § 1005.3, Supp. I, Comment

3(c)(5) (emphasis added), and argues that the wire debit is not "similar" to these examples. But

the exemption's plain language goes beyond these examples and covers **any** automatic

deduction, which means one that occurs "without a specific request from the consumer," 12

C.F.R. § 1005.3(c)(5), and which would include all manner of automatic debits, such as

minimum credit card payments. *Krutchkoff v. Fleet Bank, N.A.*, 960 F. Supp. 541, 543-45 (D.

Conn. 1996). The Official Interpretation NYAG cites does not narrow the scope of the

regulation, or say that the exemption applies **only** to items similar to its examples. The examples

are just that—examples. Regardless, the deductions here are "similar" in the relevant respect:

they are "initiated automatically on the occurrence of certain events," namely, upon outbound

wires. 12 C.F.R. § 1005.3, Supp. I, Comment 3(c)(5).

Second, NYAG argues—citing **no authority**—that the exemption "still requires the act that triggers the automatic transfer to be an authorized act." (Opp. 27.) But nothing in the regulation, or even the CFPB's Official Interpretation, states as much. Consider the "overdraft charges" example from the CFPB's guidance. If an unauthorized person writes a check that triggers an overdraft and an associated charge, the charge would be automatically deducted and fall outside Regulation E, even if the customer had rights to recover outside Regulation E. *See, e.g., Virginia is for Movers, LLC v. Apple Federal Credit Union*, No. 1:23cv576, 2024 WL 1091786, at *8 (E.D. Va. Mar. 13, 2024) (overdraft fees are fully exempt from EFTA).[6]

For its part, the CFPB argues that the automatic transfer exemption is inapplicable because each wire is not automatic but issues via a "specific request that the transfer occur." (CFPB Br. 16.) But here the CFPB is treating a wire as a **single** transfer ("the" transfer)—which is precisely what Citibank contends—rather than a "bank-to-bank" transfer accompanied by a separate transfer in the form of a debit from the sender's account. Thus, the CFPB's argument contradicts its overarching theory that the account debit is not part of the wire transfer.

Importantly, there is no allegation or evidence that the customer issues **multiple** authorizations, one for each of these "transfers." Rather, the Complaint alleges that pre-existing customer agreements "act as electronic authorizations for Citi to debit consumers' bank accounts"—meaning the authorization for the customer debit **automatically** follows from the wire request. (Compl. ¶ 56.) The CFPB cannot have it both ways. If there is a single transfer (which there is), then it is exempt in full. If there are multiple transfers, then the allegedly

---

[6] NYAG also is simply wrong that Citibank's interpretation would violate the rule against conditioning an "extension of credit" on the "consumer's repayment by preauthorized electronic fund transfers." 12 C.F.R. § 1005.10(e) (cited Opp. 28). "Credit" is defined as the bank allowing a customer "to defer payment of debt" *id.* § 1005.2(f), and the transactions at issue here occur in a "near instantaneous" manner, and at "lightning-fast speed." (Compl. ¶¶ 52, 58.) The customer is thus not "deferring" anything or receiving any "credit."

separate debit from the customer's account does not arise from a "specific request," but is an "automatic" consequence of the "bank-to-bank" transfer—and hence exempt.

### H.    The CFPB's Brief Is Not Entitled to Any Deference

The Court should afford the CFPB's newfound views no weight. It is settled that when "an agency advances a statutory interpretation in an amicus brief that has not been articulated before in a rule or regulation," its views are not entitled to deference. *Conn. Office of Protection & Advocacy For Persons With Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 239-40 (2d Cir. 2006). The CFPB seemingly recognizes this point because it does not even argue that the Court should defer to its views. Instead, the CFPB is entitled to nothing more than whatever "power to persuade" results from the "thoroughness" and "validity of its reasoning," accounting for its "consistency with earlier" positions. *Id.* (citation omitted). Here, as detailed above, the CFPB has brazenly contradicted its own prior published position, and now advances arguments that mangle the language and structure of EFTA. (*See supra* § I.C; Citibank Br. 17-18.)

The change in position is unmistakable. The CFPB took over rulemaking authority for EFTA from the Federal Reserve in July 2011. *See* Electronic Fund Transfers, 76 Fed. Reg. 81,020, at 81,020 (Dec. 27, 2011). In the intervening thirteen years, the CFPB has never given the slightest indication of the position it now takes. Its brief points to zero enforcement actions or a single writing before its Statement of Interest adopting its new position here. In fact, the CFPB's current Supervision and Examination Manual refers to wires being exempt from EFTA, without any suggestion that every consumer wire also includes an EFTA-covered component. (Michael Reply Decl. Ex. E, at 9.) The resounding silence for these many years is all the more notable given the significance of its claim—that the wire exemption relied on for decades by the banking industry is, effectively, a dead letter. It should be quite clear that the CFPB is not bringing to bear its expertise to interpret a statute it administers, but, instead, is seeking to

accomplish a major legislative change via litigation, without bothering to consult with Congress, or even following the normal notice-and-comment procedures that would govern if it were changing a regulation. 5 U.S.C. § 553.

This abrupt change of position would be bad enough, but the CFPB has gone further in flouting proper administrative processes. Immediately following the CFPB's filing, its general counsel published a blog post touting the filing, and stating that the Bureau "will keep working to ensure that banks and other financial institutions meet their legal obligations." (Michael Reply Decl. Ex. F.) The CFPB's brief and its blog post reflect a calculated effort to send a warning shot towards the banking industry that the CFPB may start enforcing its new and novel reading of the wire exemption without the benefit of legislation. Importantly, industry trade groups have demanded that the CFPB withdraw the blog post, because it forces banks to contend with a legal interpretation that is gravely wrong as a matter of both law and process, but which is asserted by an agency with enforcement and supervisory powers over those banks. (*Id*. Ex. G.)

The trade groups' complaint is well-founded. It is wholly improper for the CFPB to try to effectuate regulatory change—or to amend a statute—via a litigation brief and blog post. *See PHH Corp. v. CFPB*, 839 F.3d 1, 42 (D.C. Cir. 2016) (admonishing CFPB for an "about-face" that "flout[ed] . . . decades of carefully and repeatedly considered official government interpretations"), *reinstated on en banc reh'g in relevant part*, 881 F.3d 75, 83 (D.C. Cir. 2018). The Court need not indulge the CFPB's gambit. Far from deferring to the CFPB, the Court should reject its improper attempt to legislate by amicus and blog post, and dismiss the case.

## II.     The Second Cause of Action Fails Because "Intra-Bank" Transfers Are Not "Unauthorized" Under EFTA

Where scammers move funds between a customer's accounts (*e.g*., from savings to checking) before a fraudulent outbound wire, the initial transfer does not qualify as

"unauthorized" under EFTA because it is not a transfer for which the "consumer receives no benefit." (Citibank Br. 23-24.) NYAG argues that these transfers "enabled larger fraudulent transactions" that depleted consumers' accounts. (Opp. 29.) The obvious flaw with NYAG's argument, however, is that it examines **subsequent** transfers, when the statutory definition turns on whether the consumer receives the benefit of the **particular transfer** at issue. 15 U.S.C. § 1693a(12) (defining an "unauthorized" transfer as one where there the consumer receives "no benefit" from "such transfer"). The CFPB notably did not join this misguided argument.

Courts have correctly understood that the proper focus of the "benefit" of the transaction is the transaction itself, not later, downstream effects. That is why credit card balance transfers across a single consumer's cards, or withdrawals to pay a consumer's own debts, are not considered "unauthorized" under EFTA. *Aikens v. Portfolio Recovery Assocs., LLC*, 716 F. App'x 37, 40 (2d Cir. 2017); *Becker v. Genesis Fin. Servs*., CV-06-5037, 2007 WL 4190473, at *12 (E.D. Wash. Nov. 21, 2007). In these examples, the beneficiary of the transfer is the consumer herself, even if the consumer did not give permission for the transactions and would have preferred that they never happened. In other words, a transfer to and from the same consumer cannot meet the definition of "unauthorized" because the full benefit goes to the consumer. Hence, the savings-to-checking transfers at issue here are not "unauthorized."

NYAG's fallback is to argue that moving funds from savings to checking "deprived consumers of the benefit of their interest-bearing accounts" (Opp. 30), but the Complaint alleges nothing along those lines. Moreover, again, whether a transaction is "unauthorized" turns on whether the consumer receives "no benefit" from the transfer itself, not whether the consumer suffers some related, downstream loss.

Finally, NYAG pleads no facts showing that its claimed relief of restitution and damages could be appropriate when the same customer is on both ends of the transaction (Citibank Br. 23-24), and NYAG's only response is to argue, in a conclusory fashion, that these remedies are not "element[s]" of the claim. (Opp. 30.) But NYAG is not exempt from the fundamental requirement to show cognizable injury and standing, which are lacking with respect to transfers across a consumer's own accounts. *People ex rel. Spitzer v. Grasso*, 861 N.Y.S.2d 627, 642 (1st Dep't 2008) (standing requirements apply to the "Attorney General, like all other parties").

## III.  NYAG Fails to Plead Disclosure Violations or "Illegal Agreements" Under EFTA, Precluding Its Third Cause of Action

NYAG persists in incorrectly arguing that EFTA requires Citibank to specify "what efforts Citi might undertake to verify" wires. (Opp. 31 (emphasis removed).) EFTA, however, says ***nothing*** on the subject. *See* 15 U.S.C. § 1693c; 12 C.F.R. §§ 1005.4, 1005.7. Regardless, Citibank makes clear that it might require a "telephone call or other required contact with or from you prior to" authorizing a wire or "other controls to verify your identity." (ECF 13-15 § 6.) Further detail would only aid scammers in evading the procedures.

EFTA likewise has nothing to say about the unremarkable evidentiary presumption set forth in Citibank's agreements—that Citibank's business records are treated as showing what they show, absent substantial evidence otherwise. (Citibank Br. 26.) Yet, NYAG leaps to the conclusion that this practice somehow "relieves Citi of its obligation to undertake a reasonable investigation." (Opp. 31.) NYAG pleads no facts as to how that could be so, and, more fundamentally, cites nothing in EFTA or otherwise that dictates exactly how banks must evaluate the evidence. The presumption is simply a procedural rule that does not inherently bias decisions towards one side or the other; if Citibank's records show that a reimbursement should be paid, the consumer will be reimbursed.

Finally, NYAG wrongly claims that Citibank's online agreements operate as a "waiver of any right" under EFTA, 15 U.S.C. § 1693*l*, simply because the agreements generally "authorize Citibank to treat any instruction" made with a valid username and password combination "as if the instructions had been made in writing and signed by" the customer. (ECF 13-15 at 3 (§ G).) However, EFTA does not purport to regulate the requirements banks impose before approving a payment. Rather, EFTA provides only that if a transfer is in fact unauthorized, the consumer may have certain remedies. Nothing in the cited agreement states or implies that a transaction by username and password is deemed an authorized transfer under EFTA or that the customer waives any reimbursement right just because a transaction was validated that way. Further, the Complaint does not allege ***any*** instances of Citibank denying a reimbursement because the scammer obtained only the username and password of a customer. NYAG argues one can "infer" such an occurrence from its Complaint (Opp. 30), but that is demonstrably false. The Complaint's examples of highly sophisticated wire scams contradict any suggestion that any scammer was able to send a wire based solely on having a consumer's username and password. (*See* § IV.B, *infra* (discussing this point in the UCC context).)

## IV.    NYAG Fails to Plead Facts Showing UCC Violations, Defeating the Fourth Cause of Action

To show "repeated illegality" under Executive Law § 63(12) based on UCC violations, NYAG must plead facts showing multiple, particular UCC violations. (Citibank Br. 27-28.) The allegations must show that (1) Citibank approved a wire in a manner that was (a) not in "good faith" compliance with a "commercially reasonable" security procedure, or (b) conflicted with a "written agreement or instruction of the customer," and (2) Citibank refused to issue a refund. (*Id*. (quoting N.Y. UCC § 4-A-202).)

The overarching flaw in NYAG's UCC-based claims is that NYAG repeatedly asks the Court to infer that it was not commercially reasonable, or was not in good faith, for Citibank to have approved certain wires, while failing to allege what steps Citibank actually took that led to the approvals. That NYAG was able to find scams that succeeded does not mean that Citibank acted unreasonably or in bad faith. Citibank is keenly aware of the problem of online wire fraud and works diligently to combat it. But it is not reasonable to expect, and the law does not demand, perfection. It demands good faith and commercial reasonableness (at the risk of bearing the loss). NYAG's pleading cannot plausibly state a violation of that standard without alleging the facts as to what Citibank actually did in each instance.

A.    **The Burden of Pleading Illegality Falls on NYAG**

NYAG tries to sidestep its inadequate pleading by arguing that it is Citibank's burden to plead and prove that in each instance it deployed security procedures that were commercially reasonable (Opp. 32), presumably meaning that NYAG could state a claim with ***no facts*** on the issue. Not so. Consistent with the general rule that "plaintiffs bear the burdens on the elements in their claims," *Walker v. Schult*, 45 F.4th 598, 616 (2d Cir. 2022) (citation omitted), NYAG bears the burden of proof under Executive Law § 62(12), *James v. Scores*, 194 N.Y.S.3d 679, 692 (N.Y. Sup. Ct. 2023) (referring to NYAG having met its "prima facie burden" for a Section 63(12) claim), and so must at least plead sufficient facts at this stage. True, in a claim brought ***by*** a consumer, Citibank would bear the burden of proof ***at trial*** on certain issues, N.Y. UCC § 4-A-202(2)(b), but NYAG is not a consumer bringing a direct UCC claim.

Moreover, even in a direct claim, the consumer cannot use the UCC's burden-shifting rule to proceed with a complaint bereft of facts plausibly showing a violation. Indeed, recognizing this burden, this Court dismissed an Article 4A complaint that failed to allege "(1) the existence of any security procedure, (2) whether that security procedure is commercially

reasonable, or (3) whether the bank accepted the payment order in good faith and in compliance with the security procedure." *Wellton Int'l Express v. Bank of China (Hong Kong)*, 612 F. Supp. 3d 358, 364 (S.D.N.Y. 2020) (Oetken, J.). As in *Wellton*, the UCC's burden-shifting for trial does not undo NYAG's obligation here to plead facts plausibly showing a claim.

### B.    The Complaint Does Not Allege Facts Showing a Single Scammer Succeeded Based on a Single-Factor Security Procedure

NYAG's argument that Citibank employs the unreasonable procedure of "single-factor verification" (username and password) (Opp. 32-33) misreads Citibank's Online Agreement. The Agreement nowhere states that a username and password combination alone will be used to approve a wire transfer, but, rather, states that for wires "Citibank may follow a security procedure established for your protection," which may involve being "contacted, either by telephone or electronically" or "other controls." (Compl. ¶ 84.) Citibank—like all of its major competitors (*see* Citibank Br. 30 n.11)—has adopted a multifaceted security procedure that may employ numerous possible tools to do its best to stay ahead of scammers.

Moreover, the Complaint lacks any allegation that Citibank approved a wire by a scammer based ***solely*** on the scammer having the username and password of a consumer. NYAG argues that the Court can "infer reliance on single-factor protocols" based on the alleged experiences of certain consumers. (Opp. 33.) But the cited examples do not plausibly suggest any such inference, and, to the contrary, reveal more sophisticated scams. Consumer A and E clicked on "phishing" texts (Compl. ¶¶ 124, 169), and Consumer E's phone was apparently taken over entirely by scammers. (*Id.* ¶ 170.) Consumer C's data was stolen in a hack of a mortgage firm. (*Id.* ¶ 154.) Consumer I not only clicked a "phishing" link, but read a scammer his or her debit card number and one-time passcode from Citibank. (*Id.* ¶¶ 234, 237.) It would have been easy enough for NYAG to plead an example of a scammer that succeeded based solely on having a

consumer's username and password, if there were such an example. NYAG does not do so with respect to any particular consumer presumably because it cannot.

C.    **The UCC Does Not Prohibit Consumers From Agreeing to Afford Banks Flexibility to Select the Particular Security Procedures**

NYAG's argument that Citibank's discretion to choose the security procedures somehow vitiates the consumer's agreement to those procedures (Opp. 32-33) is baseless. The customer's acknowledgment that Citibank "may" employ certain identified (or even unidentified) procedures reflects express agreement for Citibank to exercise its discretion. Immediately following the language about Citibank choosing among security "controls," the Online Agreement is clear: "You agree to these security procedures . . . ." (Compl. ¶ 84.) This is plainly an agreement, no less so because it lacks the type of detailed description that would provide a roadmap for scammers. NYAG's argument on this point echoes one that the court squarely rejected in *Braga Filho v. Interaudi Bank*, No. 03 Civ. 4795, 2008 WL 1752693 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 334 F. App'x 381 (2d Cir. 2009), namely, that a "provision allowing the Bank to choose security procedures means plaintiffs did not agree to those procedures." *Id*. at *4. An agreement to allow a bank discretion to choose is still an agreement, and nothing in the UCC indicates otherwise. Further, as the *Filhio* court noted, "a bank that chooses unreasonable procedures does so at its own peril." *Id*.

NYAG's attempt to distinguish *Filho* by asserting "in that case the security procedure provided that the bank '***would*** select security procedures'—not that it ***may***" (Opp. 33 (emphasis added)) is unavailing. There is no substantive difference between a bank stating that it "will" select the security procedure and stating that it "may." In both cases, the consumer agrees to afford the bank discretion. To the extent there is a difference, NYAG's argument falls apart upon the slightest scrutiny because the word "would" in *Filho* was the court's paraphrase of an

agreement that actually states the bank is "authorized"—*i.e.*, that it **may**—select an appropriate security procedure. *Id*. at *4. (*See* Michael Reply Decl. Ex. H (copy of agreement at issue in *Filho* stating: "You [the bank] are hereby authorized to select security procedures for accepting instructions that are commercially reasonable for you . . . .").) In fact, the approved agreement in *Filho* did not provide a single example of what procedures may be employed, and so the Citibank agreement goes even beyond the *Filho* standard. NYAG notes that the bank in *Filho* later adopted a procedure for the customer that it required itself to follow thereafter (Opp. 33), but that is beside the point because the customer "did not know what the Bank's security procedures were," and—as here—relied on the bank to choose. 2008 WL 1752693, at *8.

NYAG next cites *Chavez v. Mercantil Commercebank*, 701 F.3d 896, 901 (11th Cir. 2012), to support its theory that discretionary procedures do not count as agreed security procedures. (Opp. 32.) But *Chavez* turned on the fact that the agreement at issue unambiguously stated that a specific procedure listed in an annex to the contract "shall be the sole security procedure" used. *Id.* at 897-98, 901-03. There is no such limiting language here. (Compl. ¶ 84.)

### D.    The Complaint Fails to Allege Facts Showing That Citibank's Procedures Were Commercially Unreasonable

NYAG argues that its "Complaint alleges facts from which to infer unreasonableness" (Opp. 34), but that is simply not so. It is not possible to conclude the verification procedures were unreasonable without knowing what they were. For example, in *Rodriguez v. Branch Banking & Trust Co.*, the court declined to rule on the reasonableness of a bank's security procedure—even though it was a question of law—because it did not know what the procedure entailed. 46 F.4th 1247, 1258 (11th Cir. 2022). To know what the security procedure was, the court needed to know whether the procedures included things like, "required password changes . . . security questions, [and] signature authentication . . . ." *Id*.  Here, NYAG does not allege

anything close to the full range of procedures used, instead asking the Court to speculate that the procedures must have been unreasonable because the scammers succeeded. That simply does not follow. It is not too much to ask NYAG to set forth in its Complaint what verification tools Citibank employed, and why it believes they were lacking.

Suggesting that its pleadings are nonetheless sufficient, NYAG quotes its Complaint's allegation that, in the face of anomalous activity, Citibank failed to "employ its ***most robust*** verification procedures." (Opp. 35 (emphasis added).) However, the "standard is not whether the security procedure is the best available but whether it is reasonable for the particular parties involved." *Fed. Ins. Co. v. Benchmark Bank*, No. 2:17-CV-135, 2020 WL 635654, at *9 (S.D. Ohio Feb. 11, 2020). Notably, the Complaint does not allege what procedures short of the "most robust" were actually employed, nor what would be appropriately "robust."

Next, NYAG complains that Citibank's Online Agreement is a standard "non-negotiable" form for typical consumers (Opp. 34), but fails to allege facts suggesting why that is unreasonable or whether non-commercial consumers commonly negotiate bespoke security agreements with their banks. NYAG also overlooks that, although the agreement itself is standard, the particular security procedure deployed in each instance is not. Flexibility is a feature of the system. As courts have recognized, "[i]f a bank develops a single effective and versatile security procedure, it is not commercially unreasonable for the bank to use that security procedure for the majority of its customers and depart from the procedure only when necessary." *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 621 (8th Cir. 2014).

### E.    The Complaint Fails to Allege Facts Showing Bad Faith

The Complaint lacks sufficient factual allegations showing Citibank acted in bad faith in connection with its security procedures, as required to plead UCC-based illegal conduct under Executive Law § 63(12). For these purposes, the question is whether "the bank complied or acted

in accordance with the implemented security procedure." *Essgeekay Corp. v. TD Bank, N.A.*, No. CV183663ESCLW, 2018 WL 6716830, at *4 n.5 (D.N.J. Dec. 19, 2018). Without allegations about the security procedures actually employed, NYAG cannot meet its pleading burden on this issue either. Nor can it credibly allege that Citibank acted other than in good faith on any other basis; there can be no dispute that Citibank proactively acts to avoid frauds and scams.

NYAG's Opposition argues that because "multiple consumers did not share account or security information and Citi did not make contact with the consumers," it is " reasonable to infer that Citi did not adhere to its security procedures at all." (Opp. at 36.) Yet again, NYAG asks the Court to speculate about facts that NYAG chose not to plead. The Complaint gives every indication that Citibank in fact deployed its procedures, but that scammers in certain instances used sophisticated techniques to overcome them. NYAG's cited examples on this point involve "phishing" and "SIM-swap" scams (Compl. ¶¶ 124, 169-70), and, in one case, a consumer reading codes over the phone to a scammer. (*Id*. ¶ 219.) If NYAG actually believed that Citibank approved these wires without following any security procedures "at all"—in other words, that Citibank allowed one-click, no-questions-asked wires in the tens of thousands of dollars to go out to new recipients—then NYAG should have pleaded those facts. The failure to do so is fatal to NYAG's UCC claim.

### F.    NYAG's Allegation of Countermanded Consumer Instructions Is Unavailing

NYAG cites two instances (Consumers D and I) in which Citibank allegedly "accepted . . . Payment Orders in contravention of . . . clear instructions" from consumers. (Opp. 37.) Neither supports NYAG's claim for multiple reasons.

First, the obligation on Citibank is to comply with "any ***written*** agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer."

N.Y. UCC § 4-A-202(2). No consumer is alleged to have issued a written instruction, nor agreed to anything in writing, that Citibank countermanded.[7]

Second, this provision refers to agreements or instructions that, for example, "prohibit the bank from accepting a payment order that is not payable from an authorized account, that exceeds the credit balance in specified accounts of the customer, or that exceeds some other amount." N.Y. UCC § 4-A-203, Official Comment 3. Consumer D did not issue anything along those lines, but merely denied the legitimacy of a particular transaction. (Compl. ¶ 161.)

Third, although Consumer I is alleged to have given an oral instruction to "block" the account, the instruction was not given "at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted." N.Y. UCC § 4-A-202(2). The Complaint alleges that the wire had already gone out. (Compl. ¶ 241.)

Finally, in the two cited examples, Citibank **reimbursed** the consumers (*id.* ¶¶ 167, 247), which defeats any suggestion of "persistent . . . illegality." N.Y. Exec. L. § 63(12). To the extent the UCC required Citibank to bear the loss, it did so.

## V.    NYAG's Claims Under the SHIELD Act and Red Flags Rule Are Entirely Preempted, Defeating the Fifth and Sixth Causes of Action

Citibank's Motion explained that the federal Red Flags Rule is enforced exclusively via certain **federal** agencies and officials, and that NYAG's effort to enforce the Red Flags Rule indirectly via the Executive Law § 63(12) is preempted. (Citibank Br. 34-36.) Specifically, the

---

[7] For these purposes, the term "written" applies to both an "agreement" with, or "instruction" from, the consumer, under the basic statutory construction canon that "a modifier at the beginning or end of a series of terms modifies all the terms." *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012). The alternative construction—whereby an oral "instruction" suffices but not an oral "agreement"—makes no sense. *Accord Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62, 79 (S.D.N.Y. 2023) (referring to bank's obligation "to comply with its customers' other **written instructions**") (emphasis added).

Fair Credit Reporting Act preempts any state law "requirement or prohibition. . . with respect to the conduct required by" the Red Flags Rule. (*Id*. at 41 (quoting 15 U.S.C. § 1681t(b)(5)(F)).)

NYAG's Opposition does not dispute that it is statutorily precluded from directly enforcing the Red Flags Rule. NYAG instead contends that it may do so indirectly under state law, arguing that the FCRA only preempts "state laws imposing requirements that ***differ*** from federal ones." (Opp. 40 (emphasis in original).) Here again NYAG ignores the plain statutory language, which in this instance preempts state laws "***with respect to*** the conduct required by" the Red Flags Rule, 15 U.S.C. § 1681t(b)(5)(F) (emphasis added). In the context of preemption, the phrase "with respect to" is "sweeping." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 542 (2001). A "claim is 'with respect to' a preempted subject matter" so long as the claim "***concerns*** that subject matter." *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 446 (2d Cir. 2015) (emphasis added); *see also*, *e.g.*, *Johnson v. MFA Petroleum Co.*, 10 F. Supp. 3d 982, 990 (W.D. Mo. 2014) (preemption of state laws "with respect to" octane disclosures reaches those with "a connection" or "reference to" octane disclosures).

There is no requirement, as NYAG suggests, for a conflict before preemption is triggered. In fact, the history of that preemption provision contradicts NYAG's position. Prior to a 1996 amendment, the FCRA preempted state law obligations to the extent they were "inconsistent" with the Act. 15 U.S.C. § 1681t (1994 Supp. I) (now codified at 15 U.S.C. § 1681t(a)). In 1996, Congress added § 1681t(b) to achieve even broader preemption for the subject matters referred to in that section, *see* Pub. L. 104-208 § 2419 (1996), and, in 2003, included the new Red Flags Rule within that broader preemptive scope. Pub. L. 108-159 § 711 (2003). The Congresses that drafted and amended the FCRA thus clearly knew how to set forth language limiting the preemptive scope to conflicts between federal and state law, but chose to use broader language.

The CFPB's interpretive guidance cited by NYAG (Opp. 40) only undercuts NYAG's position. The guidance provides an example of a subsection with the same syntax at issue but pertaining to a federal requirement to "provide free annual credit reports to consumers." 87 Fed. Reg. 41,042, at 41,046 (July 11, 2022). The CFPB explains that a "State law *on this topic*—for example, a State law requiring consumer reporting agencies to provide semi-annual credit reports to consumers—would likely be 'with respect to the conduct required' by this provision" and hence would be preempted. *Id*. (emphasis added). In short, no conflict is necessary. As with the CFPB's example, NYAG is using state law to pursue a "topic" covered by federal law—and hence is preempted.

NYAG next argues that the FCRA cannot preempt the Executive Law insofar as the Executive Law is merely a mechanism for "enforcing the Red Flag Rule." (Opp. 41.) But it tellingly cites no authority for the notion that preemption statutes have an implied exception for state laws in service of federal standards. To the contrary, "[l]egislative 'good intentions' do not save a state law within" the "pre-emptive scope" of a federal law. *Mackey v. Lanier Collection Agency & Serv., Inc*., 486 U.S. 825, 830 (1988). Thus, when there is "[n]othing in the language" of a federal preemption statute stating that it is "limited to inconsistent state regulation," then preemption is triggered even "when state and federal law are consistent." *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 386-87 (1992). NYAG's argument about having "enforced violations of the FTC Act" via the Executive Law (Opp. 42) is beside the point because the FTC Act contains no preemption provision. In fact, the FTC "has long *encouraged* use of overlapping state deceptive practices statutes because problems in the marketplace exceed the Agency's enforcement capabilities." *United States v. Philip Morris Inc*., 263 F. Supp. 2d 72, 78 (D.D.C. 2003) (emphasis in original).

- 33 -

NYAG is simply wrong to argue that it furthers "Congress's stated goal of uniformity" in the FCRA to allow its claim to proceed. (Opp. 42.) To the contrary, NYAG asks the Court to add a new state remedy for the Red Flags Rule when Congress already limited direct enforcement to certain *federal* officials and agencies. 15 U.S.C. § 1681m(h)(8)(B); *id*. § 1681s(c)(2). Preemption is appropriate in these circumstances because "a state's provision of remedies for a violation of federal law amounts to a form of state regulation of the affected area, even if the state does not impose any requirements beyond those provided by the federal law." *Silvas v. E\*Trade Mortg. Corp*., 421 F. Supp. 2d 1315, 1320 (S.D. Cal. 2006), *aff'd*, 514 F.3d 1001 (9th Cir. 2008) (concluding that Home Owners' Loan Act preempted state common law claims, even if premised on federal law standards). (Citibank Br. 36 n.13 (collecting cases).)

Finally, although NYAG greatly misreads the scope of the SHIELD Act (*see* § VI, *infra*), applying the SHIELD Act as NYAG proposes would be preempted, as well. That is because NYAG alleges that Citibank's violations of the SHIELD Act arise from the *same* alleged failures to act upon the *same* alleged anomalous activity as does the Red Flags Rule. (*Compare* Compl. ¶ 305 *with id*. ¶ 315.) Based on NYAG's own allegations, both claims are preempted.

## VI.    NYAG's Fifth Cause of Action Under the SHIELD Act Fails to State a Claim

In addition to being preempted, as addressed above, NYAG fails to state a claim under the SHIELD Act. As Citibank has explained, the SHIELD Act is an anti-hacking law, not directed to whether or how banks should apply extra scrutiny to wire requests. (Citibank Br. 39-40.) For instance, NYAG contends that it is a SHIELD Act violation for Citibank to accept wires after "changes to consumers' usernames or passwords" (Compl. ¶ 305), but wholly fails to explain how the SHIELD Act dictates the standards for verifying wires. Citibank cited examples of the law being applied in the ways one would expect—to businesses that allowed hackers to break into their systems to steal troves of customers' data. NYAG, in response, fails to identify a

single example of it being applied on facts remotely resembling those here, *i.e.*, where phishing or similar scams are aimed at individual customers. (*Compare* Citibank Br. 39 *with* Opp. 37-38.)

Further, the SHIELD Act does not create liability for every successful scam; it requires only that covered businesses "implement[] a data security program that includes" certain "reasonable . . . safeguards." N.Y. Gen. Bus. L. § 899-bb(2). NYAG does not allege ***anything*** about Citibank's program. (Citibank Br. 38 (collecting cases dismissing claims with similar shortcomings).) NYAG attempts to obscure this important point by arguing that the SHIELD Act required Citibank "to address 'external' threats to its systems"—as if any successful external threat is a violation. (Opp. 37-38.) Not so. Again, the law requires ***only*** the implementation of a data security "program." The language NYAG selectively quotes comes from a provision stating that a business "shall be deemed in compliance" if it "implements a ***data security program***" that "***identifies*** reasonably foreseeable internal and ***external risks***." N.Y. Gen. Bus. L. § 899-bb(2)(b)(A)(2) (emphasis added). Whether Citibank has a program for identifying external risks is a topic about which the Complaint has nothing to say. NYAG cannot state a claim regarding program deficiencies without facts pertaining to the program or its terms.

NYAG's reliance on *FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602 (D.N.J. 2014), serves only to illustrate what is lacking here. In *Wyndham*, a hotel chain failed to prevent three separate data breaches, giving hackers access to "more than 619,000 consumer payment card account numbers" that were then exported to Russia and used to make millions in fraudulent card charges. *Id*. at 609. The FTC's claim, under regulatory standards somewhat similar to the SHIELD Act, detailed exactly what was lacking with the hotel's policies, including, for example, that it failed "to employ firewalls," and held data on servers "with commonly-known default user

IDs and passwords." *Id*. at 626.[8] By contrast, NYAG's allegations that Citibank failed to catch every sophisticated scammer targeting customers on a one-by-one basis falls far short of adequately alleging deficient data protection policies, especially absent the type of data breach into Citibank's systems the SHIELD Act was designed to address.

## VII.    NYAG's Sixth Cause of Action Does Not State a Claim Under the Red Flags Rule

NYAG fails to state a claim under the Red Flags Rule for reasons similar to those requiring dismissal of the SHIELD Act claim, again in addition to preemption. The Red Flags Rule does not impose liability for missing a "red flag," but instead requires covered businesses to "***develop and implement*** a written Identity Theft Prevention Program (Program) that is ***designed to*** detect, prevent, and mitigate identity theft . . . ." 12 C.F.R. § 41.90(d) (emphasis added). (*See also* Citibank Br. 36-39.) NYAG's argument that "[o]bvious red flags," such as first-time wires, "were not treated as such" (Opp. 39), both misrepresents the Complaint and misunderstands the Rule. Assuming that a first-time wire is considered a "red flag," nothing in the Rule requires Citibank to block the user from all wires. Rather, the obligation is merely to implement a policy "designed" to "[r]espond appropriately" to a red flag. 12 C.F.R. § 41.90(d)(2)(iii).

The Complaint does not allege—nor could it—that Citibank's policy is to completely ignore the surrounding circumstances of a wire when deciding what level of security procedure to employ to verify the request. If anything, the Complaint suggests that the wires at issue ***did*** receive heightened scrutiny because the scammers were only able to succeed by obtaining, for

---

[8] Even further afield is *Toretto v. Donnelley Financial Solutions, Inc*., 583 F. Supp. 3d 570 (S.D.N.Y. 2022) (cited Opp. 38), a class action brought by victims of a data breach whereby "hackers stole the personal information of over 200,000 individuals." *Id*. at 571. The case did not involve the SHIELD Act or similar law requiring a business to implement data security policies, but, instead, addressed the duties flowing from the company to its affected customers under common law. Nothing like that is at issue in this case.

example, answers to multiple "challenge" questions, one-time codes sent to the consumer, or full debit card numbers. (Compl. ¶¶ 184, 234.)

Beyond these scattered clues from which one can infer (in part) how Citibank responded to scams, the Complaint does not disclose to the Court the security procedures employed in the example cases of Consumers A through J. (*See* § IV, *supra.*) NYAG vaguely alleges that certain anomalous activity "does not ***automatically*** trigger the ***most robust*** verification procedures." (Compl. ¶ 102 (emphasis added); *id.* ¶¶ 106, 293(b) (similar).) But there are no facts alleged about what procedures short of the "most robust" are called for by Citibank's policies, or why any particular policy in that regard is lacking. These fundamental pleading shortcomings supply an independent ground to dismiss.

## VIII.   NYAG Fails to Plead Facts Supporting Its Seventh and Eighth Causes of Action for Fraud or Consumer Deception

NYAG's Opposition focuses on three categories of conduct that supposedly are fraudulent under N.Y. Executive Law § 63(12) and deceptive under General Business Law § 349: (1) Citibank requiring affidavits from alleged fraud victims; (2) isolated statements of misplaced assurance from customer service representatives; and (3) generic claims about account security—but none rescues NYAG's failure to state a claim.

**Affidavits.** NYAG does not point to anything in EFTA or the UCC providing that banks must honor without investigation reimbursement claims from customers alleging they were victimized by fraud. Instead, NYAG complains about the ***form*** of the investigation, with NYAG evidently preferring an approach that does not utilize a method—sworn affidavits—designed to encourage customers to tell the truth. But a preference for one investigative technique or another does not amount to fraud or deception. Nor is it fraudulent or deceptive to "condition" a claim on an affidavit. (Opp. 43.) NYAG argues that doing so is inconsistent with EFTA's requirement to

provisionally credit accounts in certain circumstances. (*Id*.) But even assuming EFTA applied (it does not), there is no allegation of a single customer who refused to fill out an affidavit or whose claim was denied for that reason. Even if NYAG could show that a customer was due a provisional credit under EFTA but did not receive it, that would, at most, suggest the customer may have a claim under EFTA—but, again, that is not the same as fraud or deception.

NYAG's related argument, that Citibank deceptively uses sworn affidavits to satisfy its burden under the UCC, is equally meritless. According to NYAG, a "fair inference" from Citibank using information in the affidavits to deny claims is that customers would not have provided sworn evidence had they known Citibank would use it against them. (Opp. 44.) The argument that asking consumers to verify what happened is somehow deceptive is, frankly, absurd. Nor does the case NYAG cites to support its argument, *CFPB v. Navient Corp.*, 17 Civ. 101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017), help. In that case, a loan servicing company provided borrowers with a form to fill out to switch to a potentially cheaper "income driven" repayment plan. The form misleadingly implied that "the only consequence of submitting incorrect or incomplete information" was a delay in processing when, in reality, the stakes were much higher: borrowers could face severe, irreversible consequences, such as having their interest capitalized or being kicked off the plan. *Id*. at *3, *23. Here, Citibank's practice goes in the opposite direction. Far from lulling customers into thinking the paperwork is unimportant, Citibank reinforces the importance of accuracy by requesting information in affidavit form.

**Isolated Customer Representative Statements.** Three one-off statements allegedly made by individual Citibank representatives to alleged victims (Opp. 44) also do not amount to fraud or deception. To begin, NYAG never pleaded this conduct as part of its claims (*see* Compl. ¶¶ 319, 324 (identifying challenged conduct)), and complaints "cannot be amended by the briefs

in opposition to a motion to dismiss." *Lazaro v. Good Samaritan Hosp*., 54 F. Supp. 2d 180, 184 (S.D.N.Y. 1999) (citation omitted). Moreover, none of the identified statements is deceptive. One representative told a customer fearing fraud not to "worry" because the "the funds were still in his account," and to visit a local branch. (Compl ¶ 161.) Nowhere does NYAG allege these statements to be false. Another involved a customer who was told not to "worry," and to fill out the affidavit to make a claim (*id*. ¶ 210), which can hardly be understood as a promise or guarantee that the claim would be honored. (*See id.* ¶ 125 (another customer told not to worry).) Even if these representatives made isolated mistakes, it cannot be that a handful of comments by employees which turn out to be incorrect—even if believed by the employees to be true at the time made—violate Executive Law § 63(12) and General Business Law § 349. To apply the law as NYAG suggests would expose practically every employer in New York to liability.[9]

Equally important, NYAG's theory here is once again inconsistent with the statute itself. Section 63(12) applies to "repeated fraudulent or illegal acts" or when a person engages in "persistent fraud or illegality." N.Y. Exec. L. § 63(12). The statute defines "repeated" as "any separate and distinct fraudulent or illegal act, or conduct which affects more than one person." *Id.* The statements at issue were all made to a specific customer and could not "affect[ ] more than one person." *Id*. Accordingly, NYAG cannot state a claim on this additional basis.

**Advertising.** Lastly, NYAG argues that Citibank's advertising statements about the security of online banking are somehow fraudulent. They are not. Indeed, the statements about which NYAG complains—statements like "As always at Citi, your security is important to us"— are classic examples of non-actionable puffery. (Compl. ¶ 83.) Puffery is an "exaggeration or

---

[9] *People v. N. Leasing Sys., Inc*., 94 N.Y.S.3d 259 (1st Dep't 2019), relied on by NYAG, only shows why the facts here do not state a claim. There, a leasing company trained its representatives on how to deceptively induce merchants into "predatory leasing agreements" for credit card equipment. *Id*. at 261-62. Those facts bear no resemblance to isolated Citibank employees attempting to assist customers by telling them not to "worry."

overstatement expressed in broad, vague, and commendatory language." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007) (citation omitted). The hallmark of puffery is that it lacks "objective measurements or definitive language by which to objectively analyze" its truth or falsity. *Aubrey v. New School*, 624 F. Supp. 3d 403, 414 (S.D.N.Y. 2022). Whether Citibank takes security "seriously," for example, cannot be measured objectively.

The cases cited by NYAG are easily distinguished. Unlike here, the challenged statements were objectively determinable, such as whether a dog food aggressively marketed as a bacon product actually was made with any meaningful amount of bacon, *see Kacocha v. Nestle Purina Petcare Co.*, No. 15 Civ. 5489, 2016 WL 4367991, at *14-16 (S.D.N.Y. Aug. 12, 2016), or whether a cream promoted as having an "Age Defying with DNA Advantage" would in fact "retard aging by manipulating the DNA in skin cells," *see Elkind v. Revlon Consumer Prods. Corp.*, No. 14 Civ. 2484, 2015 WL 2344134, at *1, *13 (E.D.N.Y. May 14, 2015).

NYAG also argues that the question of whether a statement is capable of deceiving a reasonable consumer is inappropriate for resolution on a motion to dismiss (Opp. 45), but the case it cites acknowledges that there were "ample" examples in the caselaw of courts dismissing these types of consumer fraud claims on the pleadings—with the outcome dependent on the specific allegations at hand. *Kacocha*, 2016 WL 4367991, at *14. The generic, subjective statements at issue here—lacking any objective measure of truth or falsity—fall easily into the category of non-actionable puffery. (*See* Citibank Br. 42-43 (collecting cases).)

## CONCLUSION

For the reasons stated, and those in Citibank's Motion, the Complaint should be dismissed in its entirety.

Dated: June 25, 2024

Respectfully submitted,

STEPTOE LLP

By: */s/ Charles Michael*
    James L. Brochin
    Charles Michael
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    jbrochin@steptoe.com
    cmichael@steptoe.com

    Julia B. Strickland (*pro hac vice*)
    David W. Moon (*pro hac vice*)
    2029 Century Park East
    Suite 1800
    Los Angeles, CA 90067
    (213) 439 9400
    jstrickland@steptoe.com
    dmoon@steptoe.com

    Austin Kreitz (*pro hac vice*)
    717 Texas Avenue
    Suite 2800
    Houston, TX 77002
    (713) 221-2300
    akreitz@steptoe.com

    *Counsel for Citibank N.A.*