# EXHIBIT D

**BUREAU OF CONSUMER FINANCIAL PROTECTION | OCTOBER 2018**

# Remittance Rule Assessment Report



Revised April 2019

transferring money to his or her child studying abroad is sending a remittance transfer, as is a consumer who sends money from the United States to a friend on vacation in a foreign country who has lost his or her wallet. A consumer may send himself or herself a remittance transfer; these so-called self-to-self remittance transfers might occur if an individual maintains bank accounts in multiple countries and wants to transfer funds between them. As noted above, consumer-to-business payments can also be considered remittance transfers.

These examples highlight the varied nature of consumer uses of remittances. As demographics, economies, and lifestyle preferences evolve, it is likely that the remittances market will shift and new consumer uses will emerge, reflecting changes in how consumers live, move, and handle their finances.

### 1.3.4  Background to the Remittance Rule

Measures of the market for remittances show that it grew significantly in the decades prior to the passage of the Dodd-Frank Act. From 1990 to 2008, the volume of certain outbound remittances from the United States increased nearly fivefold.[76] This growth in the market saw an attendant increase in regulation.[77]

In the United States, remittance transfers sent by MSBs, banks, and credit unions have generally been subject to federal anti-money laundering laws and restrictions on transfers to or from certain persons for a number of years. As noted in this report, MSBs are also subject to state licensing and (in some cases) state regulatory regimes, which vary widely. Notably, before the enactment of section 1073 of the Dodd-Frank Act, remittance transfers fell largely outside the scope of existing federal consumer protections. For instance, EFTA was enacted in 1978 to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer (EFT) systems. As implemented by Regulation E (12 C.F.R. part 1005), EFTA governed transactions such as transfers initiated through automated teller machines, point-of-sale terminals, Automated Clearing House (ACH) systems, telephone bill payment plans, or remote banking services. However, prior to the enactment of

---

[76] *See* The World Bank, *Migration and Remittances Data*, http://www.worldbank.org/en/topic/migrationremittancesdiasporaissues/brief/migration-remittances-data (last updated Apr. 2018).

[77] The broader growth in both remittances and cross-border transactions more generally also saw a parallel increase in interest in building a regulatory framework to prevent bad actors from utilizing the financial system to effect cross-border transactions. Other regulations relating to cross-border transactions are discussed further in Section 3.2.8.

section 1073 of the Dodd-Frank Act, Congress had specifically structured EFTA to exclude wire transfers, and transfers sent by MSBs also generally fell outside the scope of the original Regulation E.[78]

Following the financial crisis and "Great Recession" of the late 2000s, Congress passed the Dodd-Frank Act in 2010 with the stated intent of "improving accountability and transparency in the financial system."[79] The Dodd-Frank Act established the Bureau, and transferred responsibility for implementing several preexisting statutes to the Bureau, including EFTA. As discussed in greater detail in Section 2 of this report, section 1073 of the Dodd-Frank Act amended EFTA by adding a new section 919 addressing remittance transfers.[80] It specifically charged the Bureau with implementing regulations for section 1073 within 18 months of the passage of the Dodd-Frank Act.

Section 2 lays out the history of the Bureau's remittance transfer rulemakings and the content of the Remittance Rule. As noted above, the Remittance Rule is only one part of the broader regulatory framework that applies to remittance transfers. This larger regulatory environment is discussed in Section 3.2.8.

---

[78] The original Regulation E became Subpart A when the new remittance transfer rules were added to what became Subpart B.

[79] Pub. L. No. 111–203, 124 Stat. 1376 (2010).

[80] 15 U.S.C. 1693o–1.

variations on such products, to the Bureau's knowledge, no single such product has garnered significant market share in cross-border payments.

The second form is offering a service or product that supports the provision of cross-border payments, potentially including remittance transfer service providers. One such example of this model is Ripple, which offers both a messaging service similar to others, such as SWIFT, discussed above, but also offers the use of a proprietary virtual currency to facilitate the settlement of cross-border transactions between participating entities. While Ripple has not yet achieved the scale or impact of other messaging services, it has formed a number of notable partnerships in recent years, both with banks and MSBs. [237, 238]

It appears likely that companies and services that leverage virtual currencies will continue to attract attention and investment from market participants for the foreseeable future. [239] The Bureau will continue to monitor the impact of virtual currencies on the remittance transfer market.

## 3.2.8   Legal and regulatory developments

As noted above in Sections 1.1.1 and 2.1, EFTA section 919 created the first comprehensive U.S. federal consumer protections for remittance transfers. However, entities that provide remittance transfers have long been subject to other federal requirements as well as to the laws and regulations of the states and foreign jurisdictions in which they operate. These legal and regulatory requirements may inform provider and consumer decisions and, thus, are also helpful in understanding the effect of the Rule.

---

[237] Martin Arnold, *Ripple and Swift Slug it Out Over Cross-border Payments*, Financial Times (June 5, 2018), *available at* https://www.ft.com/content/631af8cc-47cc-11e8-8c77-ff51caedcde6; Felice Maranz, *Western Union Says It's Testing Transactions With Ripple*, Bloomberg (Feb. 14, 2018), *available at* https://www.bloomberg.com/news/articles/2018-02-13/western-union-says-it-s-testing-transactions-with-ripple; Press Release, MoneyGram, *Ripple and MoneyGram Partner to Modernize Payments* (Jan. 11, 2018), *available at* http://ir.moneygram.com/news-releases/news-release-details/ripple-and-moneygram-partner-modernize-payments.

[238] Ripple is not the only entity offering a product which leverages the blockchain as a solution to cross-border payments. For example, IBM has introduced a product called "IBM Blockchain World Wire," which offers the ability to "simultaneously **clear and settle** cross-border payment in near real-time…[u]sing blockchain technology" [bold original]. *See* Press Release, IBM, *Redefining Access to Money for People Businesses Everywhere* IBM Block Chain Wire, *available at* https://www.ibm.com/blockchain/solutions/world-wire (last visited Oct. 9, 2018).

[239] For example, in June 2018, "[l]eading venture capital firm" Andreessen Horowitz announced it had raised $300 million for a "fund dedicated to crypto companies." *See* Kate Rooney, *Leading Venture Capital Firm Andreessen Horowitz Raises its First Dedicated Cryto Fund CNBC-Tech* (June 25, 2018), *available at* https://www.cnbc.com/2018/06/25/leading-venture-capital-firm-andreessen-horowitz-raises-its-first-dedi.html.

This section touches briefly upon these different aspects of the legal and regulatory landscape governing remittances. The laws and regulations discussed below are not necessarily consistent in their application across entity-type. For instance, laws that may apply to MSBs may not apply to all financial institutions.

## Federal laws and regulations

Apart from the Remittance Rule, entities that provide remittance transfers must comply with several other federal laws. These laws include those that deal with anti-money laundering (AML) and combating the financing of terrorism. Other federal laws prohibit unfair or deceptive acts or practices, provide consumer protections for certain electronic fund transfer (EFT) services, and protect consumers' privacy in particular circumstances.

### THE BANK SECRECY ACT AND AML REQUIREMENTS

The Bank Secrecy Act (BSA) requires U.S. financial institutions, which under the BSA includes MSBs,[240] to assist U.S. government agencies in detecting and preventing money laundering.[241] Financial institutions must comply with BSA reporting and record-keeping requirements, as well as establishing and maintaining an effective AML compliance program.[242] The BSA also requires certain MSBs to

---

[240] For BSA purposes, a "financial institution" includes, but is not limited to, "an insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. § 1813(h))," "any credit union," and "a licensed sender of money or any other person who engages as a business in the transmission of funds." 31 U.S.C. § 5312(a)(2).

[241] The Currency and Foreign Transactions Reporting Act, its amendments, and the other statutes relating to the subject matter of that act, have come to be referred to as the Bank Secrecy Act. These statutes are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1959, 18 U.S.C. § 1956, 18 U.S.C. § 1957, 18 U.S.C. § 1960, and 31 U.S.C. §§ 5311-5314 and 5316-5332 and notes thereto. *See also* 31 C.F.R. § 1010.100(e).

[242] For example, among other requirements, the BSA requires financial institutions to keep records of cash purchases of negotiable instruments, file reports of cash transactions exceeding $10,000 (daily aggregate amount), and to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities. See 31 C.F.R. part 1010 for general provisions and 31 C.F.R. § 1010.210 specifically for rules on AML programs. MSBs have similar requirements. *See* 31 C.F.R. part 1022 (Rules for Money Services Businesses); *see also* Fin. Crimes Enf't Network, *Money Laundering Prevention: A Money Services Business Guide*, U.S. Dep't of the Treasury, *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/money-laundering-prevention-msb-guide (last visited Oct. 11, 2018). The BSA regulations contain other requirements not listed here.

register with the Financial Crimes Enforcement Network (FinCEN) and prepare and maintain a list of agents, if any.[243]

In addition, all U.S. persons, which includes consumers who send remittance transfers and entities that provide them, must comply with the U.S. Treasury Department's Office of Foreign Assets Control's (OFAC's) regulations.[244] OFAC administers and enforces economic sanctions programs primarily against countries and groups of individuals, such as terrorists and narcotics traffickers. The sanctions can be either comprehensive or selective, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals.[245] While OFAC regulations are not part of the BSA, evaluation of OFAC compliance is frequently included in BSA/AML examinations.[246]

These laws may also indirectly affect the remittance market. Like many other types of businesses, MSBs hold accounts with financial institutions to facilitate their business operations. Financial institutions in turn are expected to assess the risks related to each of their customers on a case-by-case basis including risk assessment for BSA/AML.[247] The accounts held by MSBs for their business operations are an example of accounts considered to be high risk for purposes of BSA/AML compliance in part because MSBs are associated with a high frequency of cash transactions and the risk of money laundering. For financial institutions, accounts that are considered high risk for purposes of BSA/AML compliance

---

[243] 31 U.S.C. § 5330; 31 CFR § 1022.380. FinCEN is a bureau of the U.S. Treasury Department that implements, administers, and enforces regulations pursuant to the BSA. *See* U.S. Dep't of the Treasury, Treasury Order 180-01, Financial Crimes Enforcement Network (July 1, 2014), *available at* https://www.treasury.gov/about/role-of-treasury/orders-directives/Pages/to180-01.aspx.

[244] 31 C.F.R. part 501. Per OFAC, U.S. persons includes all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the United States, and all U.S. incorporated entities and their foreign branches. *See* U.S. Dep't of the Treasury, *Resource Center – OFAC FAQs: General Questions,* Basic Information on OFAC and Sanctions, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx (last visited Oct. 11, 2018).

[245] *See* U.S. Dep't of the Treasury, *Resource Center – OFAC FAQs: General Questions,* Basic Information on OFAC and Sanctions, https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx (last visited Oct. 11, 2018).

[246] *See* Fed. Fin. Insts. Examination Council (FFIEC), Bank Secrecy Act/Anti-Money Laundering Examination Manual, at 16 (2014), *available at* http://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/ffiec-bsa-aml-examination-manual.pdf. The FFIEC manual provides guidance to examiners for carrying out BSA/AML and OFAC examinations. The development of this manual was a collaborative effort of the federal and state banking agencies and FinCEN to ensure consistency in the application of the BSA/AML requirements. In addition, OFAC assisted in the development of the sections of the manual that relate to OFAC reviews. *Id.* at 1.

[247] *See* Fed. Fin. Insts. Examination Council (FFIEC), Bank Secrecy Act/Anti-Money Laundering Examination Manual, at 16 (2014), *available at* http://www.occ.treas.gov/publications/publications-by-type/other-publications-reports/ffiec-bsa-aml-examination-manual.pdf; *see also* Press Release, FinCEN, *Fincen Statement on Providing Banking Services to Money Services Businesses* (Nov. 10, 2014), *available at* https://www.fincen.gov/news/news-releases/statement.

require heightened oversight, such as more intensive account monitoring and investigation of suspicious transactions, which often leads to higher compliance costs and liabilities for both MSBs and financial institutions. There is some evidence that the costs to comply with BSA/AML laws and potential penalties for non-compliance can be substantial.[248]

The cost of maintaining accounts that are considered high risk for purposes of BSA/AML has been reported to be part of the reason why financial institutions have engaged in a practice known as "de-risking" with respect to these accounts.[249] De-risking is commonly understood to occur when financial institutions (typically large banks) restrict or terminate the accounts of corporate clients (such as MSBs) in response to risks perceived in maintaining those clients' business. Specifically, it has been reported that financial institutions have been terminating the accounts of MSBs because of these perceived risks, or refusing to open accounts for MSBs, effectively eliminating them as a category of customers.[250] As a result, some MSBs may find it difficult to obtain the bank accounts they need to provide remittance services. De-risking has also negatively affected correspondent banking, such that financial institutions are terminating correspondent banking relationships with other financial institutions, thereby cutting off access to foreign countries' payment clearing systems.[251]

---

[248] The U.S. Government Accountability Office (GAO) noted in a 2018 report that most of the banks it interviewed that offer money transmitter services stated that BSA/AML compliance costs significantly increased in the last 10 years due to the need to hire additional staff and upgrade information systems. *See* U.S. Gov't Accountability Off., *Remittances to Fragile Countries: Treasury Should Assess Risks from Shifts to Non-Banking Channels*, at 19 (GAO-18-313, Mar. 2018), *available at* https://www.gao.gov/assets/700/690546.pdf. The GAO also found in 2016 that from January 2009 to December 2015 the U.S. government collected over $5 billion in penalties, fines, and forfeitures for various BSA violations. *See* U.S. Gov't Accountability Off., *Financial Institutions: Fines, Penalties, and Forfeitures for Violations of Financial Crimes and Sanctions Requirements*, at 28 (GAO-16-297, Mar. 22, 2016), *available at* https://www.gao.gov/assets/680/675987.pdf.

[249] *See* U.S. Gov't Accountability Off., *Bank Secrecy Act: Further Actions Needed to Address Domestic and International Derisking Concerns,* at 7-11 (GAO-18-642T, June 2018), *available at* https://www.gao.gov/assets/700/692812.pdf; *see also* U.S. Gov't Accountability Off., *Remittances to Fragile Countries: Treasury Should Assess Risks from Shifts to Non-Banking Channels*, at 1-4 (GAO–18–313, Mar. 2018), *available at* https://www.gao.gov/assets/700/690546.pdf.

[250] *See* Press Release, FinCEN, *Fincen Statement on Providing Banking Services to Money Services Businesses* (Nov. 10, 2014), *available at* https://www.fincen.gov/news/news-releases/statement.

[251] *See* Fin. Action Task Force, *FATF Guidance: Correspondent Banking Services*, at 4 (Oct. 2016), *available at* http://www.fatf-gafi.org/media/fatf/documents/reports/Guidance-Correspondent-Banking-Services.pdf.

De-risking is not unique to U.S. financial institutions; it is reported to be a global phenomenon that may be becoming more pervasive. The extent to which it is happening and the associated market effects, however, have not yet been quantified.[252]

**OTHER FEDERAL REQUIREMENTS**

Remittance transfer providers are generally subject to prohibitions on unfair, deceptive, or abusive acts or practices. Specifically, section 5(a) of the Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce."[253] The Dodd-Frank Act prohibits covered persons and service providers from engaging in unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.[254] The FTC, the Bureau, and prudential banking and credit union regulators may enforce these prohibitions exclusively or jointly depending on the type of entity.[255]

---

[252] *See* U.S. Gov't Accountability Off., *Remittances to Fragile Countries: Treasury Should Assess Risks from Shifts to Non-Banking Channels*, at 4 (GAO–18–313, Mar. 2018), *available at* https://www.gao.gov/assets/700/690546.pdf. In its report, the GAO stated that several of the money transmitters they interviewed had reported that they were using nonbanking channels to transfer funds as a result of losing access to bank accounts. *Id.* at 17. The GAO also stated that money transmitters they interviewed reported increased costs associated with moving cash and bank fees. *Id.* at 18.

[253] 15 U.S.C. § 45. FTC cases involving MSBs include a 2009 settlement between the Federal Trade Commission (FTC) and MoneyGram International, Inc., the second-largest money transfer service in the United States, relating to charges that the company allowed its money transfer system to be used for fraud. MoneyGram was required to pay $18 million in consumer redress and implement a comprehensive anti-fraud and agent-monitoring program. https://www.ftc.gov/news-events/press-releases/2009/10/moneygram-pay-18-million-settle-ftc-charges-it-allowed-its-money. More recently, in 2017, the Western Union Company, a global MSB, agreed to forfeit $586 million and enter into agreements with the FTC, the U.S. Justice Department, and the U.S. Attorneys' Offices of the Middle District of Pennsylvania, the Central District of California, the Eastern District of Pennsylvania, and the Southern District of Florida.

[254] 12 U.S.C. §§ 5536, 5531(a); *see also* 12 U.S.C. § 5481(6) (defining covered person), § 5481(15)(A)(iv) (defining financial product or service to include transmitting or exchanging funds).

[255] Section 5(a) of the FTC Act applies to all persons engaged in commerce, however, the FTC cannot enforce the prohibition against banks and credit unions. 15 U.S.C. §§ 45(a)(2), 57a(f). The Bureau enforces the Dodd-Frank prohibition against unfair, deceptive and abusive acts and practices with respect to MSBs and certain banks and credit unions. 12 U.S.C. §§ 5531, 5536, 5515, and 5561-66. Prudential banking and credit union regulators have supervisory and enforcement authority regarding unfair or deceptive acts or practices for the banks, savings associations, and federal credit unions that they oversee. *See* 12 U.S.C. §§ 1786(e), 1786(k)(2), 1818(b), 1818(i)(2), 5516; *see also*, Bd. of Governors of the Fed. Reserve Sys., Consumer Fin. Prot. Bureau, Fed. Deposit Ins. Corp., Nat'l Credit Union Admin. & Office of the Comptroller of the Currency, Interagency Guidance Regarding Unfair or Deceptive Credit Practices, 1 & n.1 (Aug. 22, 2014) (citing relevant statutory authority).

Additionally, financial institutions[256] that hold consumer accounts (including checking, demand deposit, and payroll card accounts) generally are subject to subpart A of Regulation E, which includes provisions intended to provide consumer protections to consumers who use EFT services.[257] Subpart A applies to "electronic fund transfers" (as defined by Regulation E), which excludes wire transfers, but may include certain other types of remittance transfer services provided by covered institutions.[258]

Furthermore, financial institutions that offer remittance services are required to comply with privacy provisions enacted as part of the Gramm-Leach-Bliley Act (GLBA) and implemented through the Bureau's Regulation P.[259] These provisions impose limitations on when financial institutions can share nonpublic personal information with third parties. They also require, under certain circumstances, that financial institutions disclose their privacy policies and permit opting out of certain sharing practices with unaffiliated entities.

## State laws and regulations

Entities that provide remittance transfers might also need to comply with some or all of the laws and regulations of the states (and territories) in which they operate. Each of these states has its own individual laws and regulations that apply to remittances and some have additional specific licensing requirements for MSBs that transfer money to foreign countries. Like other entities that do business in multiple states, MSBs that operate in more than one state may be required to comply with each state's

---

[256] Under Regulation E, a "financial institution" is "a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services, other than a person excluded from coverage of this part by section 1029 of the Consumer Financial Protection Act of 2010, title X of the [Dodd-Frank Act]." 12 C.F.R. § 1005.2(i).

[257] Regulation E implements EFTA and contains two parts: subpart A and subpart B. Subpart A includes, for example, provisions regarding disclosures related to use of EFT services (including accounts that provide EFT services), issuance of access devices (*e.g.*, debit cards) that access such accounts, limits on consumer liability for unauthorized EFTs, error resolution procedures for financial institutions that hold consumer accounts, and provisions governing preauthorized electronic fund transfers. 12 C.F.R. §§ 1005.1-1005.20. Subpart B provides the rules for remittance transfers that are the subject of this report. 12 C.F.R. §§ 1005.30-1005.36.

[258] Regulation E defines "electronic fund transfer" as any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 C.F.R. § 1005.3(b)(1).

[259] 15 U.S.C. §§ 6801-6809; 12 C.F.R. part 1016. For GLBA purposes, a "financial institution" means "any institution the business of which is engaging in financial activities as described in [12 U.S.C. § 1843(k)]." 15 U.S.C. § 6809(3)(A).