**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE PEOPLE OF THE STATE OF
NEW YORK, by LETITIA JAMES,
Attorney General of the State of New York,

*Plaintiff*,

v.

CITIBANK, N.A.,

*Defendant*.

Civil Action No. 1:24-cv-00659-JPO

**CITIBANK, N.A.'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION TO CERTIFY THE COURT'S JANUARY 21, 2025 ORDER**
**FOR INTERLOCUTORY APPEAL AND FOR A STAY**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................... 2

    A. EFTA And Its Wire Exemption ............................................................ 2

    B. The NYAG's Novel Interpretation Of EFTA............................................ 4

ARGUMENT ....................................................................................................... 5

I.    THE COURT SHOULD CERTIFY ITS JANUARY 21, 2025 ORDER FOR INTERLOCUTORY APPEAL ............................................................................6

    A. The Order Presents A Pure, Controlling Question Of Law................................. 7

        1. The question presented is purely legal ..................................... 7

        2. The question presented is controlling ..................................... 8

    B. There Is Substantial Ground For Difference Of Opinion ................................... 11

        1. The question is difficult and of first impression ............................... 12

        2. There is conflicting authority on this question ................................... 19

    C. An Immediate Appeal Would Materially Advance The Ultimate Termination Of The Litigation ................................................................. 21

    D. Exceptional Circumstances Are Present .............................................. 22

II.   THE COURT SHOULD ISSUE A STAY PENDING APPEAL ...........................23

CONCLUSION ................................................................................................. 25

**Page(s)**

**Cases**

*Aikens* v. *Portfolio Recovery Assocs., LLC,*
   716 Fed. Appx. 37 (2d Cir. 2017) ................................................................23

*Andrew* v. *White,*
   145 S. Ct. 75 (2025)......................................................................................20

*Balintulo* v. *Daimler AG,*
   727 F.3d 174 (2d Cir. 2013) .........................................................................6

*Capitol Records, LLC* v. *Vimeo,*
   972 F. Supp. 2d 537 (S.D.N.Y. 2013)...................................................*passim*

*Christopher* v. *SmithKline Beecham Corp.,*
   567 U.S. 142 (2012).....................................................................................16

*Dupree* v. *Younger,*
   598 U.S. 729 (2023)......................................................................................7

*FCC* v. *AT&T Inc.,*
   562 U.S. 397 (2011).................................................................................13, 14

*Ferring B.V.* v. *Allergan, Inc.,*
   343 F. Supp. 3d 284 (S.D.N.Y. 2018)..........................................................24

*FHFA* v. *UBS Ams., Inc.,*
   858 F. Supp. 2d 306 (S.D.N.Y. 2012)................................................ 9-10, 19, 22

*Flo & Eddie, Inc.* v. *Sirius XM Radio, Inc.,*
   2015 WL 585641 (S.D.N.Y. Feb. 10, 2015) .............................................11, 24

*FTC* v. *Bunte Bros., Inc.,*
   312 U.S. 349 (1941)......................................................................................16

*In re Flor,*
   79 F.3d 281 (2d Cir. 1996) ...........................................................................6

*In re Scotts EZ Seed Litig.,*
   2017 WL 6398627 (S.D.N.Y. Aug. 31, 2017) ..............................................22

*Kashanchi* v. *Tex. Com. Med. Bank, N.A.,*
   703 F.2d 936 (5th Cir. 1983)........................................................................13

*Kasiotis* v. *N.Y. Black Car Operators' Inj. Comp. Fund, Inc.*,
    90 F.4th 95 (2d Cir. 2024) ........................................................................................7

*Koehler* v. *Bank of Berm. Ltd.*,
    101 F.3d 863 (2d Cir. 1996) .................................................................................23

*Laurent* v. *PricewaterhouseCoopers LLP*,
    2014 WL 251986 (S.D.N.Y. Jan. 22, 2014) ........................................ 8, 19, 22-23

*Loper Bright Enters.* v. *Raimondo*,
    603 U.S. 369 (2024) ...........................................................................................7, 17

*McTigue* v. *Regal Cruises*,
    1998 WL 289153 (S.D.N.Y. June 3, 1998) .........................................................22

*Merck Eprova AG* v. *Brookstone Pharm., LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013) .................................................................25

*Nam* v. *Permanent Mission of the Republic of Korea to the United Nations*,
    2023 WL 2456646 (S.D.N.Y. Mar. 10, 2023) ............................................... 24-25

*Nat'l Fed. of Indep. Bus.* v. *Dep't of Labor, Occupational Safety & Health Admin.*,
    595 U.S. 109 (2022) .......................................................................................... 16-17

*Nazimuddin* v. *Wells Fargo Bank, N.A.*,
    2025 WL 33471 (5th Cir. Jan. 6, 2025) .............................................................19

*Pope* v. *Wells Fargo Bank, N.A*,
    2023 WL 9604555 (D. Utah Dec. 27, 2023) .................................................17, 20

*Pope* v. *Wells Fargo Bank, N.A*,
    2025 WL 459676 (D. Utah Jan. 8, 2025).............................................................17

*Pulsifer* v. *United States*,
    601 U.S. 124 (2024)..............................................................................................18

*Rahimian* v. *Wells Fargo Bank N.A.*,
    2024 WL 4818797 (C.D. Cal. Sept. 20, 2024) ............................................... 19-20

*SEC* v. *Coinbase, Inc.*,
    2025 WL 40782 (S.D.N.Y. Jan. 7, 2025) ....................................................*passim*

*Tex. Dep't of Housing and Cmty. Affairs* v. *Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015).............................................................................................16

*Textron Lycoming Reciprocating Engine Div.* v. *United Auto. Workers of Am.*,
    523 U.S. 653 (1998).............................................................................................14

*United States ex rel. Quartararo* v. *Cath. Health Sys. of Long Island Inc.*,
  84 F.4th 126 (2d Cir. 2023) ..................................................................7

*United States* v. *Bronstein*,
  849 F.3d 1101 (D.C. Cir. 2017) ............................................................18

*United States* v. *Scott*,
  990 F.3d 94 (2d Cir. 2021) .............................................................. 13-14

*Weber* v. *United States*,
  484 F.3d 154 (2d Cir. 2007) ................................................................12

*Wike* v. *Vertrue, Inc.*,
  566 F.3d 590 (6th Cir. 2009) .................................................................3

*Wright* v. *Citizens Bank of E. Tenn.*,
  640 Fed. Appx. 401 (6th Cir. 2016)......................................................19

**Statutes**

15 U.S.C. § 1693(b) ..............................................................................19

15 U.S.C. § 1693a(2)..........................................................................3, 18

15 U.S.C. § 1693a(6)..............................................................................19

15 U.S.C. § 1693a(7)........................................................................*passim*

15 U.S.C. § 1693a(12)............................................................................10

15 U.S.C. § 1693c..................................................................................3

15 U.S.C. § 1693d ..................................................................................3

15 U.S.C. § 1693f ..................................................................................10

15 U.S.C. § 1693g(a)....................................................................3, 10, 23

15 U.S.C. § 1693m(a) .............................................................................11

15 U.S.C. § 1693o(a)..............................................................................11

15 U.S.C. § 1693o-1 ................................................................................1

28 U.S.C. § 1292(b) ............................................................................5, 21

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. 111-203, § 1073, 124 Stat. 1376..............................................16

N.Y. U.C.C. § 4-A-108, Official Comment .................................................4

N.Y U.C.C. § 4-A-202(2).................................................................10

U.C.C. § 4-A, Prefatory Note ...........................................................4

U.C.C. § 4-A-108, cmt. 2 ...............................................................21

U.C.C. § 4-A-202(2)....................................................................4

U.C.C. § 4-A-204(1)....................................................................4

**Regulations**

42 Fed. Reg. 31,763 (June 23, 1977) ..................................................13

46 Fed. Reg. 46,876 (Sept. 23, 1981) .................................................17

**Other Authorities**

Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531 (1979) ................................................ 12-13

Henry Meier, *If NY's AG Is Right, Then We Are All Doing Something Seriously Wrong*, Credit Union Times (April 8, 2024)..................................................22

Antonin Scalia & Bryan Garner, *Reading Law* (2012)...................................14

S. Rep. No. 95-915 (1978) ........................................................2, 12, 15

## INTRODUCTION

This case presents a critical question for both the banking industry and consumers: whether the Electronic Fund Transfer Act encompasses electronically initiated consumer wire transfers. Every year, consumers use wire transfers offered by Citibank and its peer institutions to send hundreds of billions of dollars. Those wire transfers are conducted over systems built and maintained on the universally shared premise that the Uniform Commercial Code, rather than EFTA, governs. This Court's first-of-its-kind conclusion that those transfers are in fact covered by EFTA would "force tremendous changes for the nation's financial institutions," who will have to re-examine how to conduct, how much to charge for, and even whether to offer consumer wire-transfer services going forward. BPI Amicus Br., ECF No. 20-1, at 12.

The NYAG's theory that a wire transfer can be dissected into its component parts, and that some of those parts can then subjected to EFTA, represents a sharp departure from nearly five decades of judicial decisions, congressional understanding, and regulatory guidance. Multiple courts have held that wire transfers fall outside EFTA's ambit. Congress likewise made its view of the statute clear in 2010 when it chose to extend some of EFTA's protections to only a subset of wire transfers. *See* 15 U.S.C. § 1693o-1. And federal regulators—until the CFPB's about-face in this litigation—have long treated wire transfers' exemption from EFTA as settled. Even this Court recognized that "those who adopted the EFTA might not have anticipated" the statutory construction it endorsed here. Order, ECF No. 49, at 34 (citation and alteration omitted).

The Court's order represents an ideal candidate for certification for immediate interlocutory appeal. All three criteria under 28 U.S.C. § 1292(b) are met. The central

question—whether consumer-to-consumer electronic wire transfers are subject to EFTA—is a pure, controlling question of law that can be answered without resort to the record or disputed facts. There is substantial ground for difference of opinion over the meaning of EFTA's exemption, as the Court's own analysis of competing interpretive canons, the contrary authorities, and longstanding practice all demonstrate. And the immediate appeal of this question would materially advance the termination of this litigation by resolving many (and the most important) of the NYAG's claims, thus substantially narrowing the scope of any subsequent proceedings and eliminating the need for extensive transaction-specific discovery.

If this Court certifies the question for immediate appeal, it should stay additional proceedings pending resolution of that appeal. Considerations of judicial economy and the public interest merit waiting until the critical, threshold EFTA issue is resolved. Wire transfers have been treated as exempt from EFTA since its enactment, so there is no harm in maintaining that status quo until the Second Circuit resolves this question. Conversely, the public would be harmed by requiring financial institutions to reconsider the pricing and availability of a popular consumer product, before the Second Circuit can weigh in.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     EFTA And Its Wire Exemption

Congress enacted EFTA in 1978 with the aim of addressing certain "relatively new banking and payment services" that used "computer and electronic technology" rather than paper. S. Rep. No. 95-915, at 2 (1978). Broadly speaking, EFTA addresses two subjects: (1) disclosure and (2) the allocation of liability. Banks that offer "electronic fund transfer" services must disclose the governing terms for these services and, under certain

2

circumstances, issue receipts and monthly statements. 15 U.S.C. §§ 1693c, 1693d. They also must reimburse consumers who promptly give notice of an unauthorized transfer, up to the Act's liability cap. *Id.* § 1693g(a).

EFTA applies to any "electronic fund transfer," which it defines as "any transfer of funds . . . initiated through an electronic terminal, telephone instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). The term "account" is defined, in turn, as one "established primarily for personal, family, or household purposes." *Id.* § 1693a(2). EFTA thus "covers a wide range of electronic money transfers—from ATM withdrawals and debit-card payments to banking by phone—and subjects them to a litany of procedural requirements." *Wike* v. *Vertrue, Inc.*, 566 F.3d 590, 592 (6th Cir. 2009).

Congress created an exemption, however, for "any transfer of funds . . . made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). Put differently, that exemption covers all transfers made using "service[s]" for transferring funds held at "Federal Reserve Banks or other depository institutions," so long as those services are "designed primarily" for transactions between financial institutions rather than between consumers. As a textual matter, the exemption applies to transfers that are "initiated through an electronic terminal" and ultimately result in the "debit or credit" of an "account" "established primarily for personal, family, or household purposes." *Id.* § 1693a(2), (7).

3

Since EFTA's enactment, courts, regulators, banks, and scholars have consistently understood Section 1693a(7)(B) to exclude consumer wire transfers. Citibank MTD Br., ECF No. 12, at 8-9, 15-22. Consumers have not gone unprotected, however, because consumer wire transfers have commonly been understood to fall within the ambit of Article 4A of the Uniform Commercial Code, which was intended to provide a "comprehensive body of law that defines the rights and obligations that arise from wire transfers." U.C.C. § 4-A, Prefatory Note (1989). Unlike EFTA, Article 4A allocates responsibility for fraud losses based on whether a bank followed commercially reasonable security procedures in determining whether a wire was authorized by the consumer. *Id*. §§ 4-A-202(2)(b), 4-A-204(1)(a). The two statutory schemes are considered to be "mutually exclusive." N.Y. U.C.C. § 4-A-108, Official Comment.

## B. The NYAG's Novel Interpretation Of EFTA

In January 2024, the NYAG filed this lawsuit under New York Executive Law 63(12), which imposes liability on parties that "engage in repeated fraudulent or illegal acts." The NYAG's lawsuit is premised on a novel theory that a wire transfer is actually at least three separate transfers (consumer payor to its bank, the payor's bank to the payee's bank, and the payee's bank to the payee), and that only one of those transfers—the transmission of funds between banks—is exempt from EFTA's requirements. Complaint, ECF No. 1, ¶¶ 46-58. Accordingly, the NYAG asserts that Citibank should have been addressing consumer losses from fraudulent wire transfers under EFTA, not U.C.C. Article 4A. *Id.* ¶ 58. In addition to that claim, the NYAG alleged other violations of EFTA and asserted that Citibank had violated the U.C.C., New York's Shield Act, the Federal

4

Red Flag Rule, and New York's prohibition on deceptive acts and practices. *Id.* ¶ 263-325. Citibank moved to dismiss the complaint in its entirety. ECF No. 11.

On January 21, 2025, this Court issued an order dismissing the U.C.C., Shield Act, and Red Flag Rule claims, while allowing the other claims, including the wire-transfer EFTA claim, to proceed. Order 62. In declining to dismiss the wire-transfer EFTA claim—which it described as raising a "question of first impression"—the Court held that EFTA's wire-transfer exemption applies only to the bank-to-bank transmission portion of a wire transfer. *Id.* at 10, 34. In reaching that conclusion, the Court primarily focused on Section 1693a(7)(B)'s use of the word "transfer." *Id.* at 11-18. It discounted the industry and regulatory understanding of the scope of the exemption as "extrinsic evidence" that did not "demonstrate[] a contemporaneous understanding of subsection (7)(B) as precluding EFTA coverage for electronic Payment Orders." *Id.* at 25. And it found contrary judicial decisions unpersuasive because "none considered the precise statutory interpretation question at issue." *Id.* at 29.

The case is now set to proceed to discovery. The Court has scheduled a Rule 16 Conference for March 13, 2025. Initial Conference Order, ECF No. 50.

## ARGUMENT

This Court should certify its order because the order satisfies all three Section 1292(b) criteria: it "involves a controlling question of law," there is "substantial ground for a difference of opinion" on the answer to that question, and an immediate appeal would "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Indeed, this is a paradigmatic candidate for certification. For decades, Citibank and its peers have provided wire-transfer services while complying with a regulatory framework that virtually

everyone understood does not include EFTA.  The Court's order, however, would require banks to upend their wire-transfer programs or risk additional legal liability for the thousands of consumer wire transfers that they execute every day.  At a minimum, appellate guidance is warranted before Citibank and the entire financial-services industry are forced to make such a drastic change based on the NYAG's novel reading of the statute.  And if this Court certifies its order for an interlocutory appeal, then each of the stay factors supports staying this case during the pendency of the appeal to avoid reams of discovery inapplicable to an Article 4A regime.

## I.  THE COURT SHOULD CERTIFY ITS JANUARY 21, 2025 ORDER FOR INTERLOCUTORY APPEAL

Certification is warranted here.  Although certification for interlocutory review is warranted in "only exceptional circumstances," *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (citation omitted), it should be granted where, as here, those exceptional circumstances are present.  Indeed, where all the Section 1292 factors are met and the case "involves a new legal question or is of special consequence," the Second Circuit has instructed that "the district court should not hesitate to certify an interlocutory appeal." *Balintulo* v. *Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (citation omitted).

This Court's order satisfies all the criteria for certification.  First, whether 16 U.S.C. § 1693a(7)(B) exempts an entire consumer-to-consumer wire transfer is a pure, controlling question of law.  Resolving this question in Citibank's favor would result in dismissal of Counts I and III, and would provide important guidance for future cases.  Second, there is substantial ground for a difference of opinion on the answer to that question.  The weight of authority cuts against this Court's conclusion on what is at least a difficult question of

6

first impression in this Circuit. Third, resolving the applicability of EFTA would materially advance the ultimate termination of this litigation by drastically narrowing the issues for discovery and trial. Moreover, given the importance of this issue to the financial-services industry and consumers, along with the sweeping relief the NYAG seeks, this case presents exceptional circumstances justifying immediate interlocutory appeal.

### A. The Order Presents A Pure, Controlling Question Of Law

The scope of Section 1693a(7)(B) is precisely the type of "pure question of law" that a reviewing court can decide "without having to study the record." *Capitol Records, LLC* v. *Vimeo*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (citation omitted). And it is controlling because a resolution in Citi's favor would "significantly affect the conduct of the action" and promises to hold "precedential value for a large number of cases." *SEC* v. *Coinbase, Inc.*, 2025 WL 40782, at *6 (S.D.N.Y. Jan. 7, 2025) (citation omitted).

#### 1. The question presented is purely legal

A pure question of law is one that this Court can answer by consulting only legal authorities and the pleadings. *See Dupree* v. *Younger*, 598 U.S. 729, 735 (2023) ("[P]ure[] legal issues" are those "that can be resolved without reference to any disputed facts."). The quintessential example of a pure question of law is a question of statutory interpretation. *See Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 387 (2024) ("[T]he interpretation of the meaning of statutes" is a "question[] of law."). For that reason, the Second Circuit often accepts certification under Section 1292(b) for questions of statutory interpretation. *See, e.g.*, *Kasiotis* v. *N.Y. Black Car Operators' Inj. Comp. Fund, Inc.*, 90 F.4th 95 (2d Cir. 2024); *United States ex rel. Quartararo* v. *Cath. Health Sys. of Long Island Inc.*, 84 F.4th 126 (2d Cir. 2023).

The Court's order "hinged on statutory interpretation—a quintessentially legal determination." *Laurent* v. *PricewaterhouseCoopers LLP*, 2014 WL 251986, at *1 (S.D.N.Y. Jan. 22, 2014) (Oetken, J.). The dispute turns on the scope of 15 U.S.C. § 1693a(7)(B), and the parties' disagreement rests entirely on competing views of the statutory text, rather than any factual disagreements. *See* Order 9 ("Citibank's argument turns on the meaning of [Section 1693a(7)(B).]"). For that reason, the Court resolved this question on a motion to dismiss, "without having to study the record." *Capitol Records, LLC*, 972 F. Supp. 2d at 551 (citation omitted). In determining whether consumer wire transfers fall within EFTA's statutory exception, it considered typical indicia of statutory meaning, including dictionary definitions, legislative history, linguistic canons, and statutory structure and context. *See* Order 8-36. Accordingly, the Second Circuit, like this Court, would need to consult only "a limited universe of familiar texts" to resolve this question. *Coinbase, Inc.*, 2025 WL 40782, at *7.

### 2.     The question presented is controlling

A question is "controlling" if the Second Circuit's guidance "could significantly affect the conduct of the action." *Coinbase, Inc.*, 2025 WL 40782, at *6 (citation omitted). A question can also be "controlling" in a broader sense if its resolution would generate "precedential value for a large number of cases." *Id*. The question here is controlling in both senses.

At the outset, the Second Circuit's resolution of this question in Citibank's favor would "significantly affect the conduct of the action." It would dispatch the NYAG's principal claim that, even if Citibank is following commercially reasonable security procedures, Citibank is violating EFTA by failing to investigate claims of unauthorized wire

8

transfers or credit the accounts of affected consumers. *See FHFA* v. *UBS Ams., Inc.*, 858 F. Supp. 2d 306, 337 (S.D.N.Y. 2012) ("[Questions] which go directly to the plaintiff's ability to maintain some or all of its claims[] are precisely the type of legal issue that Congress intended to be addressed through the Section 1292(b) procedure."). The NYAG's EFTA claim (Count I of the complaint) is the core of this case: it seeks to hold Citibank liable for every fraudulently induced consumer wire transfer "in the last six years." Complaint, Demand for Relief ¶ b. This Court's order accordingly dedicated nearly half its analysis to that claim. *See* Order 8-36.

Beyond that, several other claims would also disappear or narrow in scope. The NYAG's terms-and-conditions claim (Count III) would drop out. The Court allowed this claim to proceed because the NYAG "has alleged that at least one portion of the User Agreement violates the EFTA's anti-waiver provision." *Id.* at 48. But if EFTA does not apply to wire transfers, then Citibank cannot be held liable for violating its anti-waiver provision. Along the same lines, the NYAG's claims for engaging in fraudulent and deceptive practices (Counts VII and VIII) would narrow in scope. The Court allowed those claims to proceed to the extent that Citibank made "(1) incorrect statements . . . to particular customers about the security of their accounts[] and (2) incorrect statements . . . to any customer about their rights under the EFTA or their need to complete affidavits prior to Citibank conducting an investigation or issuing a provisional credit or reimbursement." *Id.* at 61. But Citibank cannot be held liable for making "incorrect statements" to customers "about their rights under the EFTA" if EFTA does not apply to these transfers in the first place.

Discovery and trial on the EFTA-related claims will be particularly burdensome. The NYAG seeks to hold Citibank liable for six years of alleged fraud perpetrated by third parties relating to consumer wire transfers. The NYAG seeks, among other relief, "an accounting of all consumers whose claims for monetary losses in connection with unauthorized [wire transfers] were denied by [Citibank] in the last six years." Complaint, Demand for Relief ¶ b. Given the transaction-specific nature of the relief, enormous resources will need to be dedicated during discovery and at trial to addressing any supposedly wrongful denials among the tens of thousands of consumer wire transfers that occurred over a six-year period. For each wire transfer, discovery will be needed concerning whether the wire transfer qualifies as an "unauthorized electronic fund transfer" that triggers reimbursement and the extent of Citibank's investigation into the transfer. *See id.* ¶ 271; 15 U.S.C. §§ 1693a(12), 1693f, 1693g(a).

This discovery would all be unnecessary if the Second Circuit determines on appeal that Citibank's reading of the statute is correct and Article 4A controls. Under Article 4A, discovery would instead focus on whether Citibank employed "commercially reasonable" antifraud procedures. N.Y U.C.C. § 4-A-202(2). Interlocutory appeal under Section 1292(b) is designed precisely for this circumstance—where it would "significantly narrow the scope of discovery in this case and the proof that the parties would be able to present at trial, saving the parties and the public time and money." *UBS Ams., Inc.*, 858 F. Supp. 2d at 338.

The EFTA question is "controlling in the broader sense," too. *Coinbase, Inc.*, 2025 WL 40782, at *8. In analyzing this factor, "courts look to the potential impact of an appeal on other pending and future cases." *Id.* (citation omitted). Here, authoritative guidance by

the Second Circuit would produce significant "precedential value" for the many other cases that will surely arrive in the wake of this Court's order. *Id.*

There should be little doubt that those cases are coming. The NYAG's construction of the statute will open the floodgates for future litigation by it, other state attorneys general, and private parties. By its terms, the NYAG's position exposes every major financial institution to liability for years of potential EFTA violations, because all these institutions "have established their agreements, compliance systems, and procedures, and priced their services" on the understanding that EFTA does not apply to wire transfers. BPI Amicus Br. 22. In addition to actions brought by the NYAG and any other States, other lawsuits will surely arise because EFTA contains a private cause of action, 15 U.S.C. § 1693m(a), and is also enforceable by the Consumer Financial Protection Bureau, 15 U.S.C. § 1693o(a)(5).

One way or another, the Second Circuit will need to weigh in on this question, and its answer will determine the fate of "many other" lawsuits. *Coinbase, Inc.*, 2025 WL 40782, at *8. That weighs in favor of a prompt, definitive resolution through certification, which would avoid the need for costly, duplicative litigation. *See Flo & Eddie, Inc.* v. *Sirius XM Radio, Inc.*, 2015 WL 585641, at *2 (S.D.N.Y. Feb. 10, 2015) (case has precedential value for purposes of Section 1292(b) certification where "[o]thers . . . will undoubtedly be sued in follow-on actions").

**B.    There Is Substantial Ground For Difference Of Opinion**

Substantial ground for difference of opinion exists when either the question is "particularly difficult and of first impression for the Second Circuit," or there is "conflicting

authority on the issue." *Capitol Records*, 972 F. Supp. 2d at 551 (citation omitted). Both are true here.

### 1. The question is difficult and of first impression

Most obviously, there is substantial ground for difference of opinion because the meaning of Section 1693a(7)(B) poses a "particularly difficult" question that the Second Circuit has not yet answered. *Id.*; *see Weber* v. *United States*, 484 F.3d 154, 159 (2d Cir. 2007) (Congress passed Section 1292(b) "to assure the prompt resolution of knotty legal problems."). The primary consideration is "the strength of the arguments in opposition to the challenged ruling." *Capitol Records*, 972 F. Supp. 2d at 551 (citation omitted).

There are strong arguments that the plain meaning of Section 1693a(7)(B) entirely exempts consumer wires, and leaves consumer protection to the U.C.C. A consumer wire is a type of "electronic fund transfer" (or a "transfer of funds") whose distinctive feature is that it involves—*i.e.*, that it is accomplished "by means of"—a bank's transmitting funds using a wire service "on behalf of a consumer." 15 U.S.C. § 1693a(7)(B). Those wire services are "not designed primarily" for individual consumers because they are used "primarily [by] financial institutions and large corporate customers" for high-dollar-value transactions between sophisticated entities. *See* Roland E. Brandel & Eustace A. Olliff III, *The Electronic Fund Transfer Act: A Primer*, 40 Ohio St. L. J. 531, 543 (1979). Looking only at the text of Section 1693a(7)(B), consumer wires are exempt.

Congress's decision to exempt wire transfers makes good sense given the statutory context. EFTA was enacted to address "a variety of relatively new banking and payment services." S. Rep. No. 95-915, at 2. The Federal Reserve's wire service, however, dates back to 1918, NCEFT Report Part 3, ECF No. 13-3, at 338, and was "already governed by

rules established by the Federal Reserve Board in Subpart B of Regulation J," Brandel & Olliff, *supra*, at 543-44.[1] For that reason, Congress had no need to subject wire transfers to EFTA's requirements. And in recognition of its "inability to forecast future technological and banking developments," Brandel & Olliff, *supra,* at 535, Congress erred on the side of caution by enacting Section 1693a(7)(B) to ensure that the entire customer-to-customer wire transfer was exempt from EFTA. *See Kashanchi* v. *Tex. Com. Med. Bank, N.A.*, 703 F.2d 936, 940 (5th Cir. 1983) ("Congressional concern about electronic systems not specifically mentioned in the Act was focused, however, on future and as yet undeveloped systems, not on systems that Congress had simply failed to discuss."); NCEFT Report 338 ("consumers may send funds on the Federal Reserve wire network by using the facilities of a member bank").

In holding otherwise, this Court focused on the statute's use of the word "transfer." *See* Order 11-18. But the key statutory phrases here are "electronic fund transfer" and "transfer of funds"—not "transfer" alone—and those specific phrases do not encompass the smallest possible increment in which money moves. It is a commonplace principle of statutory interpretation that "[t]wo words together may assume a more particular meaning than those words in isolation." *FCC* v. *AT&T Inc.*, 562 U.S. 397, 406 (2011). That is why, for example, "[a] golden boy" means "one who is charming, lucky, and talented," not a boy "made of or resembling gold." *Id.* So too an "'American flag' could literally encompass a flag made in America, but that is not the ordinary meaning of the phrase." *United States*

---

[1] Although the Court stated that Regulation J was promulgated in 1980, *see* Order 26, it was adopted in 1977, before EFTA was enacted. *See* 42 Fed. Reg. 31,763, 31,763 (June 23, 1977).

v. *Scott*, 990 F.3d 94, 129 (2d Cir. 2021) (Menashi, J., concurring) (citation omitted).  Here, the phrases "electronic fund transfer" and "transfer of funds" connote a complete transaction from one customer to another—not merely a subsidiary portion of that transaction.  Ordinary speakers would say, for example, that "Jim transferred $100 to Mary," even if the funds pass from one intermediary bank account to another intermediary bank account and never directly from Jim to Mary.

This reading of the phrase "transfer of funds" obviates the Court's concern that Citibank's interpretation would give the word "transfer" separate meanings within the same statutory provision.  *See* Order 12-13.  The wire exemption carves out any "transfer of funds" by means of a service that "transfers" funds across wire networks. 15 U.S.C. § 1693a(7)(B).  But the latter reference is to the verb "transfer" in isolation, not the full noun phrase "transfer of funds."  The presumption of consistent usage already carries little force across different parts of speech.  *See FCC*, 562 U.S. at 403 ("a noun and its adjective form may have meanings as disparate as any two unrelated words"); *see also, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law* 171 (2012) (a law prohibiting anyone "married" from "marrying" another person refers to a valid marriage in the first usage and an invalid ceremony purporting to create a marriage in the second).  That is doubly true where the noun form appears within a more specific phrase—like the phrase "transfer of funds" used here.  *See Textron Lycoming Reciprocating Engine Div.* v. *United Auto Workers of Am.*, 523 U.S. 653, 657 (1998) ("It is not the meaning of 'for' we are seeking here, but the meaning of '[s]uits for violation of contracts.'") (citation omitted).

This is not merely how ordinary speakers understand the "transfer of funds"; it is how Congress understood such transfers in EFTA. The Act refers to various services that, as with wires, have multiple segments but are considered undivided "electronic fund transfers." The statute provides, for example, that the term "electronic fund transfer . . . includes . . . point-of-sale transfers," 15 U.S.C. § 1693a(7), which may include using a "computer terminal at a retail establishment" to pay for goods, S. Rep. No. 95-915, at 2. Each point-of-sale transfer involves the transmission of funds in multiple segments, including a debit of the consumer's account by his or her bank and a bank-to-bank transmission. *See* NCEFT Report 341-344; NCEFT Interim Report, ECF No. 34-3, at 70-71. But EFTA considers the single, indivisible point-of-sale transfer to be a paradigmatic "electronic fund transfer." 15 U.S.C. § 1693a(7). So, too, with ACH payments, which were well understood at the time of EFTA's enactment to constitute "electronic fund transfers" under EFTA but which nonetheless contain subcomponents where money is transmitted through various junctures along the way from sender to recipient. *See* NCEFT Report 339-340; 15 U.S.C. § 1693a(7). The subcomponents of those transactions are never mentioned as separate fund transfers (or even mentioned at all) in EFTA, and nowhere are any of these fund-transfer services described as comprising multiple "fund transfers."

Regulators and legislators have long shared the same understanding. Since EFTA's enactment and before this lawsuit, every agency to opine on this question had endorsed Citibank's construction of the statute. *See* BPI Amicus Br. 18-21 (collecting regulatory guidance from the CFPB, the Federal Reserve, the FDIC, the OCC, and FinCEN). Congress has been aware of that understanding, has declined to disturb it, and indeed has

15

relied on it. Congress has repeatedly considered and declined proposals to amend EFTA to include consumer wire transfers. *See* Citibank MTD Br. 11-12. Perhaps most notably, when Congress chose to expand EFTA's protections in 2010, it extended the statute to reach only remittance wire transfers. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1073, 124 Stat. 1376, 2060-2067. This decision to single out a discrete subset of consumer wire transfers would not make any sense if EFTA encompassed the entire category of transactions all along. *See Tex. Dep't of Housing and Cmty. Affairs* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 537 (2015) (finding later statutory amendments to be "convincing confirmation of Congress' understanding" because they "presupposed" that the statute had a certain scope).

This Court accorded little significance to this context on the basis that it was "extrinsic evidence." Order 21-29. But the Supreme Court has endorsed the longstanding principle that "established practice may shed light on the extent of power conveyed by general statutory language," and "the want of assertion of power by those who presumably would be alert to exercise it[] is equally significant in determining whether such power was actually conferred." *FTC* v. *Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941). Indeed, the Supreme Court often looks to agencies' failure to exercise power as a relevant indicator of what a statute means, not as irrelevant extrinsic evidence. *See, e.g.*, *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (emphasizing that, "despite the industry's decades-long practice," the agency failed to take any enforcement action or "otherwise suggest[] that it thought the industry was acting unlawfully"); *Nat'l Fed. of Indep. Bus.* v. *Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 119

(2022) (per curiam) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind[.]").

Here, moreover, it is not just that regulators have never sought to regulate wire transfers under EFTA—they have affirmatively *disclaimed* that authority from the outset. *See* 46 Fed. Reg. 46,876, 46,879 (Sept. 23, 1981) ("If a transfer of funds to a financial institution is sent by Fedwire or a similar network, and the instructions for crediting individual consumers' accounts are transmitted on magnetic tape," the transfer "is exempt" from EFTA.); *see also Loper Bright Enters.*, 603 U.S. at 386 (respect for agency views "especially warranted" when the "interpretation was issued roughly contemporaneously with enactment of the statute"). With perhaps one exception, *see Pope* v. *Wells Fargo Bank, N.A.*, 2023 WL 9604555, at *3-4 (D. Utah Dec. 27, 2023), *vacated on procedural grounds*, 2025 WL 459676 (D. Utah Jan. 8, 2025), private litigants, too, have never thought to argue that wire transfers can be dissected and their consumer-to-bank portions subjected to EFTA, even though the statute recognizes a private cause of action that has authorized millions of consumers over the years to serve as private attorneys general. The fact that regulators and consumers read EFTA for decades not to cover consumer wire transfers indicates at least that there is substantial room for disagreement over the statute's meaning.

In addition, Citibank's interpretation of Section 1693a(7)(B) avoids rendering the provision meaningless. Citibank MTD Br. 14-15. Under Citibank's reading, Section 1693a(7)(B) does important work by exempting the entire consumer-to-consumer wire transfer. On the NYAG's reading, by contrast, the provision is superfluous because it

exempts only the bank-to-bank transmission of funds. But that transmission *is not covered by EFTA in the first place*. The Act applies to transfers that "debit or credit an account," 15 U.S.C. § 1693a(7), and the account must be one "established primarily for personal, family, or household purposes," *id.* § 1693a(2). There was no reason at all for Congress to exempt the bank-to-bank leg of a transfer, when that portion of the transfer has never fallen within EFTA. That is why the NYAG concedes that its reading renders Section 1693a(7)(B) "technically redundant." NYAG MTD Br., ECF No. 25, at 21.

The Court acknowledged this superfluity but agreed with the NYAG that Section 1693a(7)(B) amounts to "clarifying language." Order 19. The Court reasoned that the canon against surplusage is not an ironclad rule and that lawmakers sometimes "include words that add nothing of substance." *Id.* at 20 (quoting *United States* v. *Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017)). But *Bronstein* involved a far more benign type of redundancy—namely, the common practice of deploying "synonyms and near-synonyms" in sequence. 849 F.3d at 1110 (citation omitted). Here, concluding that an entire 53-word subsection of EFTA has never had any independent meaning goes well beyond the level of surplusage that courts typically tolerate. "When a statutory construction . . . renders an entire subparagraph meaningless, . . . the canon against surplusage applies with special force," and "still more when the subparagraph is so evidently designed to serve a concrete function." *Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) (citation and alteration omitted). That is particularly true here because there is no reason why Congress would have believed it necessary to "clarify[]" that "purely interbank wires were beyond the reach of EFTA," Order 19, when by its terms EFTA focuses exclusively on the rights of

18

"consumers"—defined as "natural persons." 15 U.S.C. § 1693a(6); *see id.* § 1693(b) ("The primary objective of this subchapter . . . is the provision of individual consumer rights.").[2]

At a minimum, "the strength of the[se] arguments" demonstrates that there is "substantial ground for difference of opinion" as to whether electronically initiated consumer wires are subject to EFTA. *Capitol Records*, 972 F. Supp. 2d at 551 (emphasis omitted).

### 2. There is conflicting authority on this question

There is also substantial ground for a difference of opinion because out-of-district case law—including decisions of multiple courts of appeals—and long-held industry and regulatory views all conflict with this Court's order. *See, e.g.*, *Laurent*, 2014 WL 251986, at *2 (certifying in light of conflicting authority based on Fourth and Seventh Circuits); *UBS Ams., Inc.*, 858 F. Supp. 2d at 340 (certifying in light of conflicting authority based on district-court opinions from California and Arizona).

Other courts have expressly held that wire transfers are not subject to EFTA. The Sixth Circuit, for example, held in *Wright* v. *Citizen's Bank of East Tennessee* that "EFTA does not apply" to wire transfers. 640 Fed. Appx. 401, 404 (6th Cir. 2016). Similarly, the Fifth Circuit held in *Nazimuddin* v. *Wells Fargo Bank, N.A.*, that wire transfers "are outside the scope of the EFTA and its protections do not apply." 2025 WL 33471, at *2 (5th Cir. Jan 6, 2025). Another district court has held the same. *See Rahimian* v. *Wells Fargo*

---

[2]    The Court also noted that Congress included seemingly superfluous language in Section 1693a(12), and so "the Court need not select less textually plausible interpretations just to avoid surplusage." Order 20-21. But there is no canon under which superfluity in one provision excuses it in another provision. And, for all the reasons discussed, the interpretation advanced by Citibank is not "less textually plausible."

*Bank N.A.*, 2024 WL 4818797, at *7 (C.D. Cal. Sept. 20, 2024) ("EFTA does not apply to wire transfers.") (quotation marks omitted); *see also Pope*, 2023 WL 9604555, at *4 (rejecting argument that wire transfer "fall[s] with[in] EFTA" because it is comprised of "two transfers").

The Court discounted these cases because, in its view, "none considered the precise statutory interpretation question at issue." Order 29. Even so, the *holding* of this Court's order conflicts with the *holdings* of those other cases. In *Wright, Nazimuddin*, and *Rahimian*, the courts relied on the legal rule or principle that wire transfers are not subject to EFTA to reject the plaintiffs' claims. *See Andrew* v. *White*, 145 S. Ct. 75, 81 (2025) ("When this Court relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court[.]"). The NYAG may have come up with a novel *argument* supporting its statutory construction, but those prior holdings still conflict with this Court's holding that EFTA exempts only bank-to-bank transfers through a wire network.

Beyond the case law, the Court's order is also inconsistent with the views of:

- the Federal Reserve, which was in charge of implementing EFTA until the CFPB assumed responsibility in 2011, *see* Citibank MTD Br. 10-11; Citibank MTD Reply Br., ECF No. 33, at 6-7;

- the CFPB, from 2011 until its flip-flop for this case, *see* Citibank MTD Br. 17-18; Citibank MTD Reply Br. 7, 10-12;

- the FDIC, *see* Citibank MTD Br. 16; Citibank MTD Reply Br. 9;

- FinCEN, *see* Citibank MTD Reply Br. 12;

- payment-law experts, as shown in legal treatises and similar publications, *see* Citibank MTD Br. 10 n.4, 21;

- the banking industry, *see* BPI Amicus Br.; and

- the drafters and adopters of the U.C.C., *see* U.C.C. § 4-A-108, cmt. 2, example 3 ("A consumer originates a payment order from the consumer's account at Bank A to the designated recipient's account at Bank B. . . . Bank A uses the CHIPS system to execute that payment order. . . . This transfer is not an 'electronic fund transfer' as defined in 15 U.S.C. § 1693a(7) because of the exclusion for such types of transfers in 15 U.S.C. § 1693a(7)(B)[.]").

Citibank respectfully submits that there is substantial reason to doubt whether all these authorities have been so wrong, for so long. The Court should therefore hold that its order meets not one but both independently sufficient tests under the second prong of Section 1292(b).

## C. An Immediate Appeal Would Materially Advance The Ultimate Termination Of The Litigation

Finally, certification would "materially advance the ultimate termination of the litigation," 28 U.S.C. 1292(b), by significantly narrowing the scope of discovery and trial and increasing the likelihood of settlement. "[I]n practice" this factor is "closely connected" to the first factor, whether there is "a controlling question of law." *Capitol Records,* 972 F. Supp. 2d at 551 (citation omitted). This factor is likewise met if an immediate appeal would "advance the time for trial or to shorten the time required for trial." *Id.*

Reversal would narrow the scope of discovery and "substantially reduce the issues to be tried." *Coinbase, Inc.*, 2025 WL 40782, at *12. As it currently stands, the NYAG alleges that Citi has violated EFTA by "requir[ing] submissions of . . . affidavits before investigating . . . unauthorized payment activity" and "failing to provisionally credit" and "reimburse" consumers accounts. Complaint ¶ 271. And it seeks to hold Citi liable for every fraudulently induced wire transfer in the past six years. *Id.* at Demand for Relief ¶ b. The NYAG's primary claim will thus require a massive amount of discovery regarding whether, for each wire transfer, Citi required a notarized affidavit and credited, provisionally and

permanently, the customer's account.  That discovery will be an immensely burdensome waste of time for the parties and this Court if the Second Circuit holds that wire transfers are not subject to EFTA.  Meanwhile, reversal would also eliminate the need for discovery over any "incorrect statements made to any customer about their rights under the EFTA" or whether Citi required customers to waive their rights under EFTA.  Order 48, 61.  Trial, too, would be correspondingly narrowed.  Immediate appeal is thus appropriate because "a definitive answer" on the certified question "may save the Court and parties vast amounts of expense and time." *Capitol Records*, 972 F. Supp. 2d at 554 (citation omitted).

Immediate appeal would also increase the likelihood of settlement by "remov[ing] a cloud of legal uncertainty." *UBS Ams., Inc.*, 858 F. Supp. 2d at 338.  That alone satisfies the third factor, as courts in this district have repeatedly recognized. *See, e.g.*, *McTigue* v. *Regal Cruises*, 1998 WL 289153, at *1 (S.D.N.Y. June 3, 1998); *In re Scotts EZ Seed Litig.*, 2017 WL 6398627, at *2 (S.D.N.Y. Aug. 31, 2017).

### D.	Exceptional Circumstances Are Present

For the foregoing reasons, this case satisfies all three requirements for certification under Section 1292(b).  This case also "presents exceptional circumstances warranting interlocutory review." *Laurent*, 2014 WL 251986, at *2.  As amici have laid out in more detail, if this Court's order stands, financial institutions will need to transform current wire-transfer systems or build out new ones at considerable cost to consumers and companies alike. *See* BPI Amicus Br. 21-22, 24; *see also* Henry Meier, *If NY's AG Is Right, Then We Are All Doing Something Seriously Wrong*, Credit Union Times (April 8, 2024).  The likely result will be more expensive consumer wire transfers, if financial institutions continue to

offer the service at all.  *See* BPI Amicus Br. 12 (financial institutions will "reconsider pricing and even the very availability of affordable, fast consumer wire transfers").

In addition, this Court has explained that exceptional circumstances are present "where a lengthy accounting [of damages] is required upon finding liability." *Laurent*, 2014 WL 251986, at *2.  The Second Circuit has also identified as an exceptional circumstance situations "where a long trial is envisioned to determine liability over a defense disputing the right to maintain the action." *Koehler* v. *Bank of Berm. Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996).  This case trips every one of these additional sensors, confirming that it is the type of exceptional case where interlocutory review is appropriate.[3]

*    *    *

Because this case "squarely presents circumstances that the Second Circuit . . . ha[s] determined warrant interlocutory review," the Court should grant Citibank's motion for interlocutory appeal.  *Laurent*, 2014 WL 251986, at *2.

## II.    THE COURT SHOULD ISSUE A STAY PENDING APPEAL

If the Court certifies its order for an interlocutory appeal, the Court also should stay this case during the pendency of that appeal.  Whether to "enter a stay pending an

---

[3]    The Court also adopted other legal positions that, although perhaps less disruptive to the banking industry, are nonetheless important issues that may be resolved on an immediate appeal. In particular, this Court's conclusion that intra-bank transfers are covered under EFTA, Order 39-40, cannot be squared with the statute's requirement that banks must "reimburse[] . . . the consumer for losses" arising from unauthorized transfers.  15 U.S.C. § 1693g(a).  That language presupposes that the consumer has lost money in the transaction.  But there is no loss when money simply moves between accounts controlled by the consumer; any loss occurs only once an outbound wire transfer takes place, as the Second Circuit has suggested.  *See Aikens* v. *Portfolio Recovery Assocs., LLC*, 716 Fed. Appx. 37, 40 (2d Cir. 2017) (considering benefit of outbound transfer). Because this Court certifies orders rather than issues, *Coinbase, Inc.*, 2025 WL 40782, at *7, the Second Circuit may have available this claim on appeal too.

23

interlocutory appeal is within the discretion of the district court." *Nam* v. *Permanent Mission of the Republic of Korea to the United Nations*, 2023 WL 2456646, at \*1 (S.D.N.Y. Mar. 10, 2023) (citation omitted). "[J]udicial economy strongly favors" a stay pending appeal of a "legal question at the core of" the case, which is exactly the circumstance here. *Flo & Eddie*, 2015 WL 585641, at \*4; *see Coinbase*, 2025 WL 40782, at \*13 (issuing a stay for "largely the same reasons" as the finding that "interlocutory appeal will materially advance the termination of the action") (citation omitted).

The other factors besides judicial economy that courts consider in this context are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nam*, 2023 WL 2456646, at \*1. Those factors likewise support a stay.

First, for the reasons discussed, Citibank has made a strong showing of its position on the merits. Second, absent a stay, the parties face the irreparable harm of burdensome further proceedings (including a trial) and the associated risk that the Second Circuit will eventually reverse on the EFTA issue and render pointless months of intrusive and complex discovery that will have taken place. *Ferring B.V.* v. *Allergan, Inc.*, 343 F. Supp. 3d 284, 291 (S.D.N.Y. 2018). Third, issuance of a stay will not harm the NYAG, which has "tolerated" Citibank's treatment of consumer wire transfers "for decades," and "loses not a dime's worth of" monetary relief "by holding up until the legal issue is resolved." *Flo & Eddie*, 2015 WL 585641, at \*4. Nor will a stay harm consumers, given the novelty of the

24

NYAG's theory and the longtime operation of the status quo. Consumers have a private right of action under EFTA, yet have for decades declined to sue under the NYAG's novel theory—as Citibank and the rest of the financial-services industry have treated consumer wire transfers as subject to the framework established by U.C.C. Article 4A. Fourth, the public interest favors a stay because "proceeding with trial risks wasting the resources of the parties, the Court, and the public." *Nam*, 2023 WL 2456646, at *3. The public does not benefit from requiring the entire financial-services industry to make a costly paradigm shift—and reprice or potentially even pull back the offering of a common, useful service to consumers—before the Second Circuit has had an opportunity to weigh in. *See Merck Eprova AG* v. *Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (removing "products from the market would likely disserve the public interest by artificially inflating prices and decreasing consumer choice") (quotation marks and brackets omitted).

**CONCLUSION**

For the foregoing reasons, Citibank respectfully requests that the Court certify its order for interlocutory appeal and stay this proceeding pending completion of that appeal.

Dated: February 18, 2025

Respectfully submitted,

STEPTOE LLP

SULLIVAN & CROMWELL LLP

/s/ Jeffrey B. Wall

Charles Michael
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
cmichael@steptoe.com

Jeffrey B. Wall (*pro hac vice* pending)
Morgan L. Ratner (*pro hac vice* forthcoming)
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
(202) 956-7500
jwall@sullcrom.com
mratner@sullcrom.com

Julia B. Strickland (*pro hac vice*)
2029 Century Park East
Suite 980
Los Angeles, CA 90067
(213) 439 9400
jstrickland@steptoe.com

*Counsel for Citibank N.A.*